08 CV 01713

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLOBAL GOLD MINING, LLC,<br><br>         Petitioner,<br><br>  -against-<br><br>VARDAN AYVAZIAN,<br><br>         Respondent. | PETITION TO COMPEL<br>ARBITRATION<br>(9 U.S.C. § 206)<br><br>Case No.:08-___<br><br>ECF CASE |

Petitioner Global Gold Mining, LLC, ("Global Gold"), by and through its attorneys, King & Spalding LLP, for its Petition to Compel Arbitration against Respondent Vardan Ayvazian pursuant to 9 U.S.C. § 206, states as follows:

### NATURE OF THE PROCEEDING

1. This motion is related to a decision by this Court in <u>Global Gold Mining, LLC, v. Peter M. Robinson, et al.</u>, Index No. 07 Civ. 10492 (GEL), denying Global Gold's petition seeking to compel the International Chamber of Commerce ("ICC") to submit the issue of arbitrability between Petitioner and Respondent to the convened arbitration tribunal. The Court held that a motion to compel arbitration is the more appropriate mechanism, and this motion follows.

2. In December 2003, Petitioner Global Gold Mining, LLC, executed a Share Purchase Agreement (the "SPA") to purchase all of the shares of an Armenian company, SHA, LLC (the "Company"). At the time of the sale, Global Gold believed that Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan, the three individuals who signed the agreement (either in person or by power of attorney), were the Company's sole shareholders. Unbeknownst

to Global Gold, a fourth shareholder who did not sign the SPA, Vardan Ayvazian, was a secret participant and beneficial owner in the Company, and actually controlled the entire transaction behind the scenes. As one of the three signatories to the SPA has confirmed, Ayvazian was an "undisclosed to Global Gold shareholder."

3.   The provisions of the final SPA agreement, including a clause requiring arbitration of disputes arising from the agreement, were communicated to and approved by Ayvazian, as were the preliminary agreements between the nominal shareholders and Global Gold. In short, Batoyan, Janibekian, and Lalazaryan negotiated and contracted with Global Gold through detailed instructions from Ayvazian. Moreover, Ayvazian benefited financially from the execution of the SPA, just as if he had been a disclosed principal like the other shareholders. Ayvazian actually received the purchase price after the SPA was executed, and distributed the proceeds to himself and his fellow shareholders.

4.   Global Gold discovered after the closing that the SPA contained numerous misrepresentations and omissions about the status of the Company's assets, governmental authorizations, and compliance with various legal requirements. In short, all four shareholders had lied to Global Gold in making various seller representations and warranties, and they stood in breach of the agreement, causing substantial losses to Global Gold.

5.   The SPA contains an arbitration clause (the "Arbitration Clause"), providing that all disputes under the agreement will be referred for final settlement to a panel of three arbitrators under the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC"), in New York City, under New York law. The Arbitration Clause provides:

> **11.5   Arbitration; Jurisdiction; Service of Process**
> The parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this

> Agreement as the standard. The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days. During this thirty (30) day period, any party within ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute. After thirty day's [sic] effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators.
>
> In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrators; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose. On a case-by-case basis, the parties may also agree to alternative dispute resolution methods. Such an Agreement must be in writing and signed by both parties.

(See Kehoe Decl., Ex. A, at § 11.5.).

  6. The SPA also contains a clause selecting New York law as the governing law. (See id. at § 11.6.).

  7. Pursuant to the Arbitration Clause, on November 2, 2006, Global Gold sent a "Notice of Dispute" to Respondents Ayvazian, Batoyan, Janibekian, and Lalazaryan advising them of a dispute under the SPA (the "Dispute") (See Kehoe Decl., Ex. B). The Respondents did not attempt to resolve the Dispute in good faith within the thirty-day period provided by the Arbitration Clause.

  8. On December 28, 2006, Global Gold exercised its right under the SPA to arbitrate the Dispute. In accordance with the ICC Rules, Global Gold submitted a "Request for Arbitration" (the "Request") to the ICC Court of Arbitration ("ICA"), which is the organ of the

ICC that administers ICC arbitrations. Global Gold named Ayvazian, Batoyan, Janibekian, and Lalazaryan as respondents. In a response to the Request, Respondent Lalazaryan acknowledged and confirmed that Ayvazian was an "undisclosed to Global Gold shareholder." See Kehoe Decl., Ex. E, at 1). Ayvazian did not respond to Global Gold's Request for Arbitration.

9. Under Article 6(2) of the ICC Rules, when a respondent objects to arbitrability, or fails to respond to an arbitration demand, the ICA makes an initial, administrative determination as to the *prima facie* existence of an arbitration agreement governing the dispute. If the ICA finds that there is no *prima facie* agreement to arbitrate, the disappointed party may "ask any court having jurisdiction whether or not there is a binding arbitration agreement." (See Kehoe Decl., Ex. C, Article 6(2); Ex. D, Order).

10. Global Gold petitioned the Supreme Court of the State of New York for New York County and sought an order directing the ICC/ICA to refer the dispute with Ayvazian, including the question of its arbitrability, to the arbitration tribunal convened to arbitrate the dispute involving the other shareholders. Respondents ICC removed the matter to the United States District Court for the Southern District of New York. The District Court (Lynch, J.) dismissed Global Gold's petition, holding that "any action to ask this or another court 'whether or not there is a binding arbitration agreement' must be brought as a motion to compel arbitration against the party resisting arbitration." (See Kehoe Ex. D, Order, at 11).

11. Mindful of the Court's ruling and instruction, Global Gold brings before this Court a motion to compel arbitration against Ayvazian. Ayvazian is bound by the SPA's arbitration clause as a principal who instructed his agents who were signatories. He personally approved and agreed to the SPA's arbitration clause, controlled the actions of the other shareholders throughout negotiations and closing of the agreement, and directly benefited from

the sale. Thus, even though Respondent Ayvazian is not a signatory to the sale agreement, he is bound by its arbitration clause under the laws of agency and estoppel, none of which the ICC disputed in the related proceeding. Following this Court's decision, therefore, Global Gold asks this Court to compel Ayvazian to arbitrate Global Gold's claims against him in the pending arbitration. (ICC Case No. 14 770/EBS).

## THE PARTIES

12. Petitioner Global Gold is a limited liability corporation organized under the laws of Delaware with its principal place of business in Greenwich, Connecticut.

13. Vardan Ayvazian is a resident and citizen of Armenia. As an undisclosed shareholder in the Armenian company purchased by Global Gold in December 2003, he is bound by the sale agreement and the arbitration clause that Global Gold seeks to enforce.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction because this is a proceeding to enforce an arbitration agreement falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("New York Convention") pursuant to Section 203 of the Federal Arbitration Act, 9 U.S.C. § 203.

15. This Court has personal jurisdiction over Ayvazian because Ayvazian agreed to arbitrate in New York. Although Ayvazian is a non-signatory, he is bound to the arbitration agreement with Global Gold through principles of agency and/or estoppel. See Am. Bureau of Shipping v. Tencara Shipyard, S.P.A., 170 F.3d 349, 352 (2d Cir. 1999) (exercising personal jurisdiction to consider petitioners' claim that respondents, who were non-signatories, were bound to the arbitration agreement by estoppel).

16.  Venue is proper pursuant to 9 U.S.C. 204 because the agreement at issue specifically designates New York City as the place of arbitration.

17.  Jurisdiction and venue are also proper under Article 6(2) of the ICC Rules of Arbitration, which states that where the ICA makes a *prima facie* determination that an arbitration may not proceed, "any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement." (See Kehoe Decl., Ex. A, at § 11.5).

## GROUNDS FOR ARBITRATION

### A.  The Share Purchase Agreement and Ayvazian's Involvement

18.  Global Gold is an American company that invests in Armenia's gold-mining industry. In the spring of 2003, Global Gold entered into negotiations with the Company for the purpose of acquiring its Armenian mining properties. On December 21, 2003, Global Gold concluded and executed a Share Purchase Agreement ("SPA") with Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan, all citizens and residents of Armenia, pursuant to which Global Gold purchased all of the issued and outstanding shares of the Company. (See Kehoe Decl., Ex. B). At that time, Global Gold believed that Lalazaryan, Janibekian, and Batoyan were the sole owners of the Company. The SPA was signed by Lalazaryan on behalf of himself, and, by power of attorney, his two fellow shareholders. (See Kehoe Decl., Ex. A, at 103-04).

### B.  Ayvazian, the Undisclosed Principle, Negotiates, Approves, And Profits From The SPA

19.  After the SPA was fully executed and Global Gold had made its payment, Global Gold learned from law enforcement personnel that Respondent Ayvazian, who at the time was Armenia's Minister of the Environment,[1] was a secret participant and beneficial owner in the Company when the SPA was signed. In a March 19, 2007 response to Global Gold's Request

---

[1] Ayvazian has since resigned from his government post.

6

for Arbitration, Respondent Lalazaryan confirms this fact by stating, ". . . I am not responsible for such violations made by *other shareholders, including the undisclosed to Global Gold shareholder Vardan Ayvazian*." (See Kehoe Decl., Ex. E, at 1 (Yurik Lalazaryan's Submission to the ICA) (emphasis added)).

20. Further research by Global Gold has revealed that Ayvazian completely controlled the transaction on the seller's side. This is confirmed in an existing sworn affidavit from a person with direct knowledge (the "Affidavit"). For personal safety and security reasons of the affiant, Petitioner does not submit the affidavit with this publicly filed Petition. If the Court requires the Affidavit to decide this motion in favor of Petitioner, Petitioner respectfully requests the opportunity to submit the Affidavit either under seal or for an *in camera* review.

21. The Affidavit explains that Ayvazian "was a secret participant/shareholder of [the Company] at the time of entering the Share Purchase Agreement with Global Gold, and . . . *he actually controlled the transaction.*" (Affidavit ¶ 1) (emphasis added). Batoyan, Janibekian, and Lalazaryan negotiated the terms of the SPA on the basis of explicit "instructions" from Ayvazian, and "[e]very point of the Share Purchase Agreement was communicated with and approved by Vardan Ayvazian." (Affidavit ¶ 2). Moreover, after Global Gold paid Batoyan, Janibekian, and Lalazaryan for their shares, Ayvazian collected the entire purchase price and distributed the funds to the other sellers while keeping a share for himself. (Affidavit ¶ 2). Notably for purposes of this motion to compel arbitration, "the Share Purchase Agreement and disclosure letter provisions regarding . . . arbitration, and choosing New York law were approved personally by Vardan Ayvazian." (Affidavit ¶ 2).

22. Armenia's preeminent association of investigative journalists, called hetq, has noted in an article entitled "Vardan Ayvazian has a Special Fondness for Goldmines," that

7

Ayvazian "has registered the majority of his mines in the names of his relatives, friends and employees." (See Kehoe Decl., Ex. F, at 1). Respondent Batoyan has acted as a "representative" for Ayvazian in other gold mine matters. The article describes Batoyan as a "friend and fellow villager of Vardan Ayvazian's wife" who has "also acted as Ayvazian's representative in other organizations . . . [although] Mayren Batoyan has no relation to mining and works at a Yerevan hospital." (See id.). hetq's descriptions of Batoyan, her relationship with the Ayvazians, and her role as Ayvazian's agent in establishing another mining company for Ayvazian adds further confirmation to the principal-agent relationship between Ayvazian and his fellow shareholders Batoyan, Janibekian, and Lalazaryan.

C.   **Sellers Breached the Representations and Warranties in the SPA**

23.   When Global Gold purchased all shares in the Company, it negotiated certain contractual promises from the former shareholders that would serve to protect the Company's assets and value as an ongoing business. The Company's mining activities depended significantly on the cooperation of Armenian government officials in issuing and respecting licenses, providing certain authorizations for work to be performed, handling official paperwork in a timely fashion, and generally cooperating with the Company in its exploration and mining activities. As a foreign investor, Global Gold sought to protect itself in the event that the Company's Armenian shareholders misrepresented the true value of the Company as an ongoing business, or cooperated illicitly with government officials like Ayvazian to ensure that the Company's shares, once owned by Global Gold, would have little or no real value. While Global Gold was entirely unaware of Ayvazian's status as an undisclosed shareholder when the SPA was signed, it was careful to secure commitments from the selling shareholders that, to the

best of their knowledge, the Company's licenses were valid through 2017 and governmental authorizations and other approvals were in order and as represented.

24. Specifically, the former shareholders were responsible for full disclosure about the value of the Company's assets and business, the status of any Governmental Authorizations and Legal Requirements applicable at the time of the SPA or potentially applicable in the future, and any actual and potential limitations or restrictions on the Company's assets or business. (See Kehoe Decl., Ex. A, at §§ 3, 10). Moreover, the former shareholders promised that the Company was in full compliance with all laws and regulations and that no family members or any other individuals indirectly controlled by the former shareholders were involved in the negotiation of the SPA or in any businesses that competed or might ultimately compete with the Company. (See Kehoe Decl., Ex. A, at §§ 3.17, 3.19, 3.25). In sum, the former shareholders made multiple warranties as to the status and ownership of the Company as well as the legal and business environment into which Global Gold was entering by purchasing shares in the Company.

25. After the SPA was executed, and after Global Gold began investing and working at the SHA properties, those properties because to gain notice by other mining companies and increase in value. Ayvazian, directly and indirectly, began to put pressure on Global Gold to extract payments that were illegal and more than the SPA required. Virtually every representation in the SPA was false, and almost every warranty was breached. For example, although the Sellers had represented and warranted that the Company's exploration licenses extended through 2017, Ayvazian, acting in his capacity as Minister of the Environment, illegally and arbitrarily reduced the terms of those licenses. (See Kehoe Decl., Ex. G, at 14; Ex. E, at 1). Although the Sellers had represented and warranted that the Company was in compliance with all Legal Requirements, and that its Governmental Authorizations were valid

and in order, Ayvazian decided otherwise in his capacity as Minister of the Environment. (See id.). In sum, having made a series of representations to Global Gold about the Company, its licenses, and its legal status, Ayvazian contradicted and reneged on those representations and warranties shortly after the execution of the SPA.

26.    Accordingly, Global Gold now seeks to compel Ayvazian to arbitrate pursuant to the terms of the SPA.

## RELIEF REQUESTED

WHEREFORE, Petitioner Global Gold respectfully requests this Court to enter an order:

A.    Compelling Ayvazian to submit to the tribunal or arbitrators convened in ICC Case No. 14 770/EBS the question of the arbitrability of Global Gold's claims against him; or

B.    In the alternative, deciding that Global Gold's claims against Ayvazian are arbitrable and compelling Ayvazian to submit those claims to the tribunal of arbitrators convened in ICC Case No. 14 770/EBS for final resolution pursuant to the terms of the SPA;

C.    Requiring Ayvazing to pay attorneys' fees, costs and other expenses associated with bringing this Petition; and

D.    Awarding such other and further relief as this Court deems just and proper.

Dated: New York, New York
     February 21, 2008

                        KING & SPALDING LLP

                        Edward G. Kehoe
                        Louisa B. Childs
                        1185 Avenue of the Americas
                        New York, New York 10036
                        Telephone: (212) 556-2100
                        Facsimile: (212) 556-2246

                        R. Doak Bishop
                        Wade M. Coriell
                        1100 Louisiana, Suite 4000
                        Houston, TX 77002-5213
                        Phone: (713) 751-3200
                        Fax: (713) 751-3290

                        Kenneth R. Fleuriet
                        25 Cannon Street
                        London EC4M 5SE
                        United Kingdom
                        Phone: +44 (0)20-7551-7500
                        Fax: +44 (0)20-7551-7575

                        *Attorneys for Petitioner Global Gold Mining, LLC*