UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GLOBAL GOLD MINING LLC,

                Petitioner,

    -against-

VARDAN AYVAZIAN,

                Respondent.

Case No.:08-__CV-01713__

**ECF Case**

**ELECTRONICALLY FILED**

---

**PETITIONER GLOBAL GOLD LLC'S MEMORANDUM OF LAW
IN SUPPORT OF ITS PETITION TO COMPEL ARBITRATION**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2246

*Attorneys for Petitioner
Global Gold Mining, LLC*

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT AND PROCEDURAL HISTORY ................................. 1

II. STATEMENT OF FACTS ................................................................................................ 6

    A. The Share Purchase Agreement and Ayvazian's Involvement ............................... 6

    B. Ayvazian, the Undisclosed Principal, Negotiates, Approves, and Profits From the SPA ........................................................................................................ 6

    C. Sellers Breached the Representations and Warranties in the SPA ........................ 8

III. ARGUMENT ................................................................................................................... 10

    A. The Court Has Jurisdiction to Compel Arbitration ............................................... 10

    B. The Court Should Compel Ayvazian to Arbitate Global Gold's Claims Against Him ........................................................................................................... 11

        1. Ayvazian is Bound by the Arbitration Agreement Under the Laws of Agency ................................................................................................. 11

        2. Ayvazian is Bound by the Arbitration Agreement Under the Doctrine of Estoppel ............................................................................... 13

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

## FEDERAL CASES

Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,
  170 F.3d 349 (2d Cir. 1999) .................................................................... 10, 11, 13-14

Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.,
  347 F.3d 448 (2d Cir. 2003) .................................................................................. 12

David L. Threlkeld & Co. v. Metallgesellschaft Ltd.,
  923 F.2d 245 (2d Cir. 1991) .................................................................................... 4

Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,
  9 F.3d 1060 (2d Cir. 1993) ................................................................................. 4, 11

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,
  473 U.S. 614 (1985) ................................................................................................ 4

Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,
  51 F. Supp. 2d 457 (S.D.N.Y. 1999) ..................................................................... 12

## STATE CASES

Burbank Broad. Co. v. Roslin Radio Sales, Inc.,
  99 A.D.2d 976 (1st Dep't 1984) ....................................................................... 12-13

HRH Constr. LLC v. Metro. Transp. Auth.,
  33 A.D.3d 568, 569 (1st Dep't 2006) .................................................................... 13

In re Chas. A. Stevens Co.,
  79 A.D.2d 545 (1st Dep't 1980) ............................................................................ 12

J.P. Endeavors v. Dushaj,
  8 A.D.3d 440, 442 (2d Dep't 2004) ....................................................................... 13

NetTech Solutions, L.L.C. v. Zippark.com, Fed. APD, Inc.,
  No. 01 Civ. 2683, 2001 WL 1111966 ................................................................... 12

## ICC CASES

Bridas S.A.I.P.I.C., Bridas Energy International, Ltd., Intercontinental Oil & Gas
 Ventures, Ltd. and Bridas Corporation v. Government of Turkmenistan,
 Concern Balkannebitgazsenagat and State Concern Turkmenneft,
 ICC Arbitration Case No. 9058/FMS/FGA ...............................................................12

Capital India Power Mauritius I and Energy Enterprises (Mauritius) Company v.
 Maharashtra Power Development Corp. Ltd., Maharashtra State Electricity
 Board and the State of Maharashtra,
 ICC Case No. 12913/MS ............................................................................................12

## ICC RULES OF ARBITRATION

Article 6(2) .................................................................................................................. 3-4

## MISCELLANEOUS

Restatement (Second) of Agency §186 ............................................................................13

Petitioner Global Gold Mining, LLC ("Global Gold"), respectfully submits this memorandum of law in support of its Petition to Compel Arbitration against Respondent Ayvazian, pursuant to Section 206 of the Federal Arbitration Act (the "FAA").

### I. PRELIMINARY STATEMENT AND PROCEDURAL HISTORY

This motion is related to a decision by this Court in <u>Global Gold Mining, LLC, v. Peter M. Robinson, et al.</u>, Index No. 07 Civ. 10492 (GEL), denying Global Gold's petition seeking to compel the International Chamber of Commerce ("ICC") to submit the issue of arbitrability between Petitioner and Respondent to the convened arbitration tribunal. The Court held that a motion to compel arbitration is the more appropriate mechanism, and this motion follows.

In December 2003, Petitioner Global Gold Mining, LLC, executed a Share Purchase Agreement (the "SPA") to purchase all of the shares of an Armenian company, SHA, LLC (the "Company"). At the time of the sale, Global Gold believed that Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan, the three individuals who signed the agreement (either in person or by power of attorney), were the Company's sole shareholders. Unbeknownst to Global Gold, a fourth shareholder who did not sign the SPA, Vardan Ayvazian, was a secret participant and beneficial owner in the Company, and actually controlled the entire transaction behind the scenes. As one of the three signatories to the SPA has confirmed, Ayvazian was an "undisclosed to Global Gold shareholder."

The provisions of the final SPA agreement, including a clause requiring arbitration of disputes arising from the agreement, were communicated to and approved by Ayvazian, as were the preliminary agreements between the nominal shareholders and Global Gold. In short, Batoyan, Janibekian, and Lalazaryan negotiated and contracted with Global Gold through detailed instructions from Ayvazian. Moreover, Ayvazian benefited financially from the

execution of the SPA, just as if he had been a disclosed principal like the other shareholders. Ayvazian actually received the purchase price after the SPA was executed, and distributed the proceeds to himself and his fellow shareholders.

Global Gold discovered after the closing that the SPA contained numerous misrepresentations and omissions about the status of the Company's assets, governmental authorizations, and compliance with various legal requirements. In short, all four shareholders had lied to Global Gold in making various seller representations and warranties, and they stood in breach of the agreement, causing substantial losses to Global Gold.

The SPA contains an arbitration clause (the "Arbitration Clause"), providing that all disputes under the agreement will be referred for final settlement to a panel of three arbitrators under the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC"), in New York City, under New York law. The Arbitration Clause provides:

> 11.5  **Arbitration; Jurisdiction; Service of Process**
> The parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this Agreement as the standard. The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days. During this thirty (30) day period, any party within ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute. After thirty day's [sic] effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators.
>
> In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrators; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place

2

>as the parties shall unanimously choose. On a case-by-case basis, the parties may also agree to alternative dispute resolution methods. Such an Agreement must be in writing and signed by both parties.

(See Kehoe Decl., Ex. A, at § 11.5.).

The SPA also contains a clause selecting New York law as the governing law. (See id. § 11.6.)

Pursuant to the Arbitration Clause, on November 2, 2006, Global Gold sent a "Notice of Dispute" to Respondents Ayvazian, Batoyan, Janibekian, and Lalazaryan advising them of a dispute under the SPA (the "Dispute") (See Kehoe Decl., Ex. B). The Respondents did not attempt to resolve the Dispute in good faith within the thirty-day period provided by the Arbitration Clause.

On December 28, 2006, Global Gold exercised its right under the SPA to arbitrate the Dispute. In accordance with the ICC Rules, Global Gold submitted a "Request for Arbitration" (the "Request") to the ICC Court of Arbitration ("ICA"), which is the organ of the ICC that administers ICC arbitrations. Global Gold named Ayvazian, Batoyan, Janibekian, and Lalazaryan as respondents. In a response to the Request, Respondent Lalazaryan acknowledged and confirmed that Ayvazian was an "undisclosed to Global Gold shareholder." See Kehoe Decl., Ex. E, at 1). Ayvazian did not respond to Global Gold's Request for Arbitration.[1]

Under Article 6(2) of the ICC Rules, when a respondent objects to arbitrability, or fails to respond to an arbitration demand, the ICA makes an initial, administrative determination as to the *prima facie* existence of an arbitration agreement governing the dispute. If the ICA finds that

---

[1] Although he did not respond, Ayvazian has discussed the dispute repeatedly in Armenian press interviews. In his various interviews, Ayvazian has never objected to being a party to the arbitration and has consistently stated that his dispute with Global Gold will be resolved through international arbitration.

3

there is no *prima facie* agreement to arbitrate, the disappointed party may "ask any court having jurisdiction whether or not there is a binding arbitration agreement." (See Kehoe Decl., Ex. C, Article 6(2); Ex. D, Order).

In this case, the ICA ruled that it was *prima facie* satisfied that an arbitration agreement existed between Global Gold and the three signatory shareholders based on the clear language of the SPA.[2] An Arbitration Tribunal was thereafter convened, and Jonathan D. Schiller, Dr. Ivan Zykin, and Professor Hans Smit were selected as the tribunal members.[3] However, the ICC/ICA

---

[2] "The Federal Arbitration Act requires the federal courts to enforce arbitration agreements, reflecting Congress recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1063 (2d Cir. 1993). The federal policy favoring arbitration "applies with special force" in the context of international transactions, like Global Gold's. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985) (compelling arbitration of international antitrust claims); see also David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 248 (2d Cir. 1991) (noting that the "federal policy [that] strongly favors arbitration ... is even stronger in the context of international business transactions" and granting motion to compel arbitration).

[3] Jonathan D. Schiller is a co-founder and the Managing Partner of Boies, Schiller, and Flexner LLP. He concentrates on complex litigation and international arbitration, including ICC arbitrations. Mr. Schiller also serves as an arbitrator in ICC and other arbitrations. See Boies, Schiller, and Flexner LLP's website entitled, "Jonathan D. Schiller," http://www.bsfllp.com/lawyers/data/0002. Dr. Zykin is a partner of Andrey Gorodissky & Partners, one of Russia's preeminent law firms, where he chairs the international arbitration practice group. He also serves as the Vice President of the International Commercial Arbitration Court at the RF Chamber of Commerce and Industry (ICAC). Dr. Zykin has served as an arbitrator in more than one hundred and fifty cases, including arbitrations under the ICC Rules. See Andrew Gorodissky & Partners' website entitled, "Ivan S. Zykin," http://www.agp.org.ru/english/lawyers/ zykin.html. Hans Smit is the Stanley H. Fuld Professor of Law at Columbia Law School, where he teaches civil procedure, international arbitration, international law and transactions, and conflict of laws. Mr. Smit writes extensively in the area of international arbitration, and he has been knighted by the Queen of the Netherlands (Order of Netherlands Lion). See Columbia Law School's website entitled, "Hans Smit," http://www.law.columbia.edu/fac/Hans_Smit.

refused to submit the dispute between Global Gold and Ayvazian to the convened Arbitration Tribunal, without providing a reason or rationale in its decision.

Global Gold petitioned the Supreme Court of the State of New York for New York County and sought an order directing the ICC/ICA to refer the dispute with Ayvazian, including the question of its arbitrability, to the arbitration tribunal convened to arbitrate the dispute involving the other shareholders. Respondents ICC removed the matter to the United States District Court for the Southern District of New York. The District Court (Lynch, J.) dismissed Global Gold's petition, holding that "any action to ask this or another court 'whether or not there is a binding arbitration agreement' must be brought as a motion to compel arbitration against the party resisting arbitration." (See Kehoe Ex. D, Order, at 11). The court also stated:

> [B]y arguing to this Court than an action against Ayvazian is the proper method for seeking judicial intervention, the ICC respondents have implicitly represented to the Court that they would abide by the result of such an action and would honor an order compelling arbitration. Whether the ICC respondents could be sued in the event of such an unlikely decision to flout their own rules and a judicial decision they had invited would present a very different question from the issue now before this Court.

(See id. at 8 n.5.)

Mindful of the Court's ruling and instruction, Global Gold brings before this Court a motion to compel arbitration against Ayvazian. Ayvazian is bound by the SPA's arbitration clause as a principal who instructed his agents who were signatories. He personally approved and agreed to the SPA's arbitration clause, controlled the actions of the other shareholders throughout negotiations and closing of the agreement, and directly benefited from the sale.

Thus, even though Respondent Ayvazian is not a signatory to the sale agreement, he is bound by its arbitration clause under the laws of agency and estoppel, none of which the ICC disputed in the related proceeding. Following this Court's decision, therefore, Global Gold asks

5

this Court to compel Ayvazian to arbitrate Global Gold's claims against him in the pending arbitration. (ICC Case No. 14 770/EBS).

## II. STATEMENT OF FACTS

### A. The Share Purchase Agreement and Ayvazian's Involvement

Global Gold is an American company that invests in Armenia's gold-mining industry, as well as in Chilean and Canadian mining and exploration. In the spring of 2003, Global Gold entered into negotiations with the Company for the purpose of acquiring its Armenian mining properties. On December 21, 2003, Global Gold concluded and executed a Share Purchase Agreement ("SPA") with Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan, all citizens and residents of Armenia, pursuant to which Global Gold purchased all of the issued and outstanding shares of the Company. (See Kehoe Decl., Ex. A). At that time, Global Gold believed that Lalazaryan, Janibekian, and Batoyan were the sole owners of the Company. The SPA was signed by Lalazaryan on behalf of himself, and, by power of attorney, his two fellow shareholders. (See Kehoe Decl., Ex. A, at 103-04).

### B. Ayvazian, the Undisclosed Principal, Negotiates, Approves, and Profits From the SPA

After the SPA was fully executed and Global Gold had made its payment, Global Gold learned from law enforcement personnel that Respondent Ayvazian, who at the time was Armenia's Minister of the Environment,[4] was a secret participant and beneficial owner in the Company when the SPA was signed. In a March 19, 2007 response to Global Gold's Request for Arbitration, Respondent Lalazaryan confirms this fact by stating, ". . . I am not responsible for such violations made by *other shareholders, including the undisclosed to Global Gold*

---

[4] Ayvazian has since resigned from his government post.

6

*shareholder Vardan Ayvazian.*" (See Kehoe Decl., Ex. E, at 1 (Yurik Lalazaryan's Submission to the ICA) (emphasis added)).

Further research by Global Gold has revealed that Ayvazian completely controlled the transaction on the seller's side. This is confirmed in an existing sworn affidavit from a person with direct knowledge (the "Affidavit"). For personal safety and security reasons of the affiant, Petitioner does not submit the affidavit with this publicly filed Petition. If the Court requires the Affidavit to decide this motion in favor of Petitioner, Petitioner respectfully requests the opportunity to submit the Affidavit either under seal or for an *in camera* review.

The Affidavit explains that Ayvazian "was a secret participant/shareholder of [the Company] at the time of entering the Share Purchase Agreement with Global Gold, and . . . *he actually controlled the transaction.*" (Affidavit ¶ 1) (emphasis added). Batoyan, Janibekian, and Lalazaryan negotiated the terms of the SPA on the basis of explicit "instructions" from Ayvazian, and "[e]very point of the Share Purchase Agreement was communicated with and approved by Vardan Ayvazian." (Affidavit ¶ 2). Moreover, after Global Gold paid Batoyan, Janibekian, and Lalazaryan for their shares, Ayvazian collected the entire purchase price and distributed the funds to the other sellers while keeping a share for himself. (Affidavit ¶ 2). Notably for purposes of this motion to compel arbitration, "the Share Purchase Agreement and disclosure letter provisions regarding . . . arbitration, and choosing New York law were approved personally by Vardan Ayvazian." (Affidavit ¶ 2)

Armenia's preeminent association of investigative journalists, called hetq, has noted in an article entitled "Vardan Ayvazian has a Special Fondness for Goldmines," that Ayvazian "has registered the majority of his mines in the names of his relatives, friends and employees." (See Kehoe Decl., Ex. F, at 1). Respondent Batoyan has acted as a "representative" for Ayvazian in

7

other gold mine matters. The article describes Batoyan as a "friend and fellow villager of Vardan Ayvazian's wife" who has "also acted as Ayvazian's representative in other organizations . . . [although] Mayren Batoyan has no relation to mining and works at a Yerevan hospital." (See id.). hetq's descriptions of Batoyan, her relationship with the Ayvazians, and her role as Ayvazian's agent in establishing another mining company for Ayvazian adds further confirmation to the principal-agent relationship between Ayvazian and his fellow shareholders Batoyan, Janibekian, and Lalazaryan.

C.   **Sellers Breached the Representations and Warranties in the SPA**

When Global Gold purchased all shares in the Company, it negotiated certain contractual promises from the former shareholders that would serve to protect the Company's assets and value as an ongoing business. The Company's mining activities depended significantly on the cooperation of Armenian government officials in issuing and respecting licenses, providing certain authorizations for work to be performed, handling official paperwork in a timely fashion, and generally cooperating with the Company in its exploration and mining activities. As a foreign investor, Global Gold sought to protect itself in the event that the Company's Armenian shareholders misrepresented the true value of the Company as an ongoing business, or cooperated illicitly with government officials like Ayvazian to ensure that the Company's shares, once owned by Global Gold, would have little or no real value. While Global Gold was entirely unaware of Ayvazian's status as an undisclosed shareholder when the SPA was signed, it was careful to secure commitments from the selling shareholders that, to the best of their knowledge, the Company's licenses were valid through 2017 and governmental authorizations and other approvals were in order and as represented.

Specifically, the former shareholders were responsible for full disclosure about the value of the Company's assets and business, the status of any Governmental Authorizations and Legal

Requirements applicable at the time of the SPA or potentially applicable in the future, and any actual and potential limitations or restrictions on the Company's assets or business. (See Kehoe Decl., Ex. A, at §§ 3, 10). Moreover, the former shareholders promised that the Company was in full compliance with all laws and regulations and that no family members or any other individuals indirectly controlled by the former shareholders were involved in the negotiation of the SPA or in any businesses that competed or might ultimately compete with the Company. (See Kehoe Decl., Ex. A, at §§ 3.17, 3.19, 3.25). In sum, the former shareholders made multiple warranties as to the status and ownership of the Company as well as the legal and business environment into which Global Gold was entering by purchasing shares in the Company.

After the SPA was executed, and after Global Gold began investing and working at the SHA properties, those properties because to gain notice by other mining companies and increase in value. Ayvazian, directly and indirectly, began to put pressure on Global Gold to extract payments that were illegal and more than the SPA required. Virtually every representation in the SPA was false, and almost every warranty was breached. For example, although the Sellers had represented and warranted that the Company's exploration licenses extended through 2017, Ayvazian, acting in his capacity as Minister of the Environment, illegally and arbitrarily reduced the terms of those licenses. (See Kehoe Decl., Ex. G, at 14; Ex. E, at 1). Although the Sellers had represented and warranted that the Company was in compliance with all Legal Requirements, and that its Governmental Authorizations were valid and in order, Ayvazian decided otherwise in his capacity as Minister of the Environment. (See id.). In sum, having made a series of representations to Global Gold about the Company, its licenses, and its legal status, Ayvazian contradicted and reneged on those representations and warranties shortly after the execution of the SPA.

9

### III. ARGUMENT

#### A. The Court Has Jurisdiction to Compel Arbitration

This Court has jurisdiction over this dispute. See Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349 (2d Cir. 1999); see also Kehoe Decl. Ex. D (this Court's Order at 11) ("Any action to ask *this* or another court 'whether or not there is a binding arbitration agreement' must be brought as a motion to compel arbitration . . .") (emphasis added); (Order at 8 n.5) (Court explains that ICC respondents represented to the Court that they would abide by an Order by *this Court* ordering arbitration).

In American Bureau of Shipping, Tencara, a yacht builder, entered into a contract with American Bureau of Shipping ("ABS"), for ABS to inspect and certify that a particular yacht was seaworthy. When the yacht subsequently suffered damages allegedly due to defective design, Tencara and the yacht's owners (the "Owners") sued ABS. ABS moved to compel Tencara and the Owners to arbitrate pursuant to an arbitration clause in the underlying contract. Although only ABS and Tencara signed the contract, ABS argued that the Owners were bound by the contract under the theories of agency and estoppel. The district court (Baer, J.) held that only Tencara could be compelled to arbitrate. On appeal, the Second Circuit noted that its "first task is to determine whether the Owners of the [yacht] can be bound to arbitrate with ABS even though they never signed the arbitration agreement." Am. Bureau of Shipping at 352. With regard to that analysis, the Court noted "[b]ecause it proves to be sufficient, we focus exclusively on the estoppel theory." Id. In opposing the motion to compel arbitration, the Owners first asserted that the Court did not have personal jurisdiction over them and could not consider ABS's estoppel argument, because the Owners were not in privity of contract with ABS. The Court determined "[t]his contention is without merit" and held that:

> It is well-settled that federal courts applying New York law have personal jurisdiction over parties that agree to arbitrate their disputes in New York. The Owners construe this to mean that personal jurisdiction exists only when there is an express arbitration agreement between the parties. But if the Owners are estopped from denying their obligations under the arbitration agreement between Tencara and ABS, it follows that they are also estopped from asserting a lack of personal jurisdiction based on that agreement. There is no reason to read the equitable theory of estoppel to allow the defense of "no personal jurisdiction" while barring the defense of "no duty to arbitrate." With the owners estopped from denying personal jurisdiction, the law regards such jurisdiction as established in litigation between these parties. We therefore turn to the merits of ABS's estoppel argument.

Id. (internal citation omitted). New York was chosen as the applicable law and forum, and New York is where jurisdiction lies.

### B.   The Court Should Compel Ayvazian to Arbitate Global Gold's Claims Against Him

Although a person generally is not bound by the terms of a contract that he/she did not sign, there are a number of exceptions to this general rule. The two most widely-recognized exceptions involve agency and estoppel theories. See Am. Bureau of Shipping, 170 F.3d at 352 (listing theories).

#### 1.   Ayvazian is Bound by the Arbitration Agreement Under the Laws of Agency

Applying the FAA, the Second Circuit has held:

> While it is true that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"…"a party may be bound by an agreement to arbitrate *even in the absence of a signature. Ordinary principles of contract and agency determine which parties are bound by an agreement to arbitrate.*"

Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1063-64 (2d Cir. 1993) (internal citations omitted and emphasis added).

Under New York law, a non-signatory to an arbitration agreement is bound to the agreement if a signatory to the agreement entered into it as the non-signatory's agent. See In re Chas. A. Stevens Co., 79 A.D.2d 545, 545 (1st Dep't 1980) (requiring party to arbitrate a dispute pursuant to an arbitration agreement that was signed by the party's agent); see also NetTech Solutions, L.L.C. v. Zippark.com, Fed. APD, Inc., No. 01 Civ. 2683, 2001 WL 1111966, *11 n9 (Sept. 20, 2001) ("While it is well-settled that generally a contract cannot bind a non-signatory, a contract can bind a non-signatory where it was signed by the non-signatory's agent....") (internal citation omitted); Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 51 F. Supp. 2d 457, 475 (S.D.N.Y. 1999) (binding non-signatory to a contract's terms under agency theory). This basic principle is recognized in international arbitration decisions as well. See, e.g., Capital India Power Mauritius I and Energy Enterprises (Mauritius) Company v. Maharashtra Power Development Corp. Ltd., Maharashtra State Electricity Board and the State of Maharashtra, ICC Case No. 12913/MS, Final Award of 27 April 2005 (applying New York law); Bridas S.A.I.P.I.C., Bridas Energy International, Ltd., Intercontinental Oil & Gas Ventures, Ltd. and Bridas Corporation v. Government of Turkmenistan, Concern Balkannebitgazsenagat and State Concern Turkmenneft, ICC Arbitration Case No. 9058/FMS/FGA, Partial Award of 25 June 1995.

In this context, a sufficient agency relationship exists where when (i) the principal and agent agree that the agent will act for the principal; (ii) the principal retains a degree of control over the agent; and (iii) the principal specifically authorizes the agent to bind him to submitting a claim to arbitration. Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 462 (2d Cir. 2003) (applying New York law and listing elements of principal / agency relationship); Burbank Broad. Co. v. Roslin Radio Sales, Inc., 99 A.D.2d 976, 977 (1st Dep't 1984) (ordering

hearing to determine whether agent had authority to bind the principal to arbitration agreement). The fact that the principle is undisclosed does not change this analysis. An undisclosed principal is "'bound by contracts . . . on his [or her] account by an agent acting within his [or her] authority.'" J.P. Endeavors v. Dushaj, 8 A.D.3d 440, 442 (2d Dep't 2004) (quoting Restatement (Second) of Agency §186).

Here, Ayvazian is subject to the SPA's arbitration clause because Ayvazian was an undisclosed shareholder of the Company that was sold pursuant to the SPA, and Batoyan, Janibekian, and Lalazaryan negotiated and executed the SPA as Ayvazian's agents. Ayvazian was the beneficial owner of the Company at the time the SPA was signed, and he agreed with Batoyan, Janibekian, and Lalazaryan that they would negotiate the SPA at his behest. Ayvazian directed and controlled their actions through detailed instructions, and specifically approved the arbitration clause, thereby authorizing them to enter into the clause. (See Kehoe Decl., Ex. G, at 7-8). Under New York law and the FAA, these facts are sufficient to bind Ayvazian to the Arbitration Clause under a principal / agency theory.

### 2. Ayvazian is Bound by the Arbitration Agreement Under the Doctrine of Estoppel

There is an equally compelling case that Ayvazian is bound to the Arbitration Clause through equitable estoppel. This doctrine provides that a non-signatory is equitably estopped from denying its obligation to arbitrate when it knowingly receives a "direct benefit" from a contract containing an arbitration clause. See HRH Constr. LLC v. Metro. Transp. Auth., 33 A.D.3d 568, 569 (1st Dep't 2006) (binding non-signatory to arbitration agreement under estoppel theory because it "knowingly assumed performance of the [agreement] and derived a direct benefit therefrom"); Am. Bureau of Shipping, 170 F.3d at 353 (estopping non-signatories to arbitration agreement governed by the FAA and New York law from disavowing obligations to

arbitrate because they "received direct benefits" from the agreement). In this case, Ayvazian was the beneficial owner of the Company at the time the SPA was executed, and he received the purchase price (the primary benefit of the bargain due the sellers under the SPA), after the SPA was executed. (See Kehoe Decl., Ex. G, at 7). Indeed, one of the signatories in his response to the ICC acknowledged Ayvazian as a secret shareholder. (See Kehoe Decl., Ex. E, at 1 (Yurik Lalazaryan's Submission to the ICA)). Under these facts, he should be equitably estopped from disavowing his obligation to arbitrate.

## CONCLUSION

For the foregoing reasons, the Court should grant Global Gold's petition to compel Ayvazian to arbitrate, and should enter an order directing the parties to submit their dispute to binding arbitration in New York City pursuant to the terms of the SPA, before the existing Arbitration Tribunal that will decide the case between Petitioner and Respondents Mayren Batoyen, Edward Janibekian, and Yurik Lalazaryan, ICC Case No. 14 770 (EBS).

Dated: New York, New York
       February 21, 2008

KING & SPALDING LLP

_____
Edward G. Kehoe
Louisa B. Childs
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

R. Doak Bishop
Wade M. Coriell
1100 Louisiana, Suite 4000
Houston, TX 77002-5213
Phone: (713) 751-3200
Fax: (713) 751-3290

Kenneth R. Fleuriet
25 Cannon Street
London EC4M 5SE
United Kingdom
Phone: +44 (0)20-7551-7500
Fax: +44 (0)20-7551-7575

*Attorneys for Petitioner Global Gold Mining, LLC*