UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLOBAL GOLD MINING LLC,

Petitioner,

-against-

VARDAN AYVAZIAN,

Respondent.

08 CV 01713

Case No.: 08

ECF Case

**ELECTRONICALLY FILED**

## DECLARATION OF EDWARD G. KEHOE
## IN SUPPORT OF PETITIONER'S MEMORANDUM OF LAW
## IN SUPPORT OF PETITION TO COMPEL ARBITRATION

EDWARD G. KEHOE declares under penalty of perjury as follows:

1.      I am an attorney and counselor at law, duly licensed to practice in the U.S. District Court for the Southern District of New York. I am a partner at the law firm of King & Spalding LLP ("King & Spalding"), attorneys for Global Gold Mining, LLC ("Global Gold"), the Petitioner in the above-captioned matter. I submit this declaration in support of Petitioner's Memorandum of Law in Opposition to Respondents' Motion to Dismiss.

2.      Attached as <u>Exhibit A</u> is a true and correct copy of the SHA, LLC, Share Purchase Agreement, by and between Global Gold Mining, LLC and The Participants of SHA, LLC, made as of December 21, 2003.

3.      Attached as <u>Exhibit B</u> is a true and correct copy of Global Gold's Notice of Dispute, sent by R. Doak Bishop, on behalf of Global Gold, to Yurik Lalazaryan, Mayren Batoyan, Edward Janibekian, and Vardan Ayvazian.

4.      Attached as <u>Exhibit C</u> are a true and correct copy of the ICC Rules of Arbitration.

5.      Attached as <u>Exhibit D</u> is a true and correct copy of the Opinion and Order in <u>Global Gold Mining, LLC, v. Peter M. Robinson</u>, *et al.*, No. 07 Civ. 10492 (GEL) (S.D.N.Y. Feb. 5, 2008).

6.      Attached as <u>Exhibit E</u> is a true and correct copy of a letter from Yurik Lalazaryan to the International Chamber of Commerce International Court of Arbitration (the "ICA"), dated March 19, 2007.

7.      Attached as <u>Exhibit F</u> is a true and correct copy of the article by Edik Baghdasaryan entitled "Vardan Ayvasian Has a Special Fondness for Goldmines," published by hetq online on April 16, 2007.

8.      Attached as <u>Exhibit G</u> is a true and correct copy of a letter from R. Doak Bishop, Partner of King & Spalding, to the Secretariat of the ICA, dated December 28, 2006, attaching Global Gold's Request for Arbitration.

Dated:  New York, New York
        February 21, 2008


EDWARD G. KEHOE (EK2615)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2246

# EXHIBIT A

<u>SHA, LLC</u>

## SHARE PURCHASE AGREEMENT

by and between

### Global Gold Mining, LLC

and

### The Participants of SHA, LLC

### (for registration purposes)

<u>ՍՀԱ ՍՊԸ</u>

<u>ԲԱԺՆԵՄԱՍԻ ԳՆՄԱՆ ՊԱՅՄԱՆԱԳԻՐ</u>

### Global Gold Mining, LLC

եւ

### ՍՀԱ ՍՊԸ ՄԱՍՆԱԿԻՑՆԵՐԻ

կողմից եւ միջեւ

(գրանցման նպատակներով)

# SHARE PURCHASE AGREEMENT

This Share Purchase Agreement ("Agreement") is made as of December 21, 2003, by Global Gold Mining, LLC, a Delaware, United States limited liability company ("Buyer"), SHA, LLC an Armenian limited liability company participants Yurik Lalazaryan, an individual resident in Armenia, ("A"), Mayren Batoyan, an individual resident in Armenia ("B"), and Edward Janibekian, an individual resident in Armenia ("C") (collectively "Sellers").

## RECITALS

Sellers desire to sell, and Buyer desires to purchase, all of the issued and outstanding shares (the "Shares") of participation in SHA, LLC, an Armenian limited liability company (the "Company"), for the consideration and on the terms set forth in this Agreement.

## AGREEMENT

The parties, intending to be legally bound, agree as follows:

1.    **DEFINITIONS**.  For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1:

"Acquired Company"--the Company and its Subsidiaries if any, collectively.

"Adjustment Amount"--as defined in Section 2.5.

---

# ԲԱԺՆԵՄԱՍԻ ԳՆՄԱՆ ՊԱՅՄԱՆԱԳԻՐ

Սույն Բաժնեմասի Գնման Պայմանագիրը («Պայմանագիր») կնքվել է 2003թ-ի դեկտեմբերի 21-ին, Global Gold Mining, LLC, ԱՄՆ Դելավեր Նահանգի սահմանափակ պատասխանատվության ընկերության («Գնորդ»), եւ ՍԽԱ, ՍՊԸ, Հայաստանի Հանրապետության սահմանափակ պատասխանատվության ընկերության մասնակիցներ Հայաստանի բնակիչ եւ ֆիզիկական անձ Յուրիկ Լալազարյանի («Ա»), Հայաստանի բնակիչ եւ ֆիզիկական անձ Մայրեն Բատոյանի («Բ»), Հայաստանի բնակիչ եւ ֆիզիկական անձ Էդվարդ Ջանիբեկյանի («Գ») (միասնաբար «Վաճառողներ») միջեւ:

## ԱՌԱՔԵԼԱՆ

Վաճառողները ցանկանում են վաճառել, իսկ Գնորդը ցանկանում է գնել ՍԽԱ, ՍՊԸ-ի Հայաստանի սահմանափակ պատասխանատվության ընկերության («Ընկերություն») թողարկված եւ սովորական բոլոր բաժնեմասերը («Բաժնեմաս»)՝ սույն Պայմանագրի պայմանների եւ դրույթների համաձայն:

## ՊԱՅՄԱՆԱԳԻՐ

Կողմերը՝ իրավականորեն պարտավորված լինելու մտումով, համաձայնում են հետեւյալի մասին:

1.    ՍԱՀՄԱՆՈՒՄՆԵՐ: Սույն Պայմանագրի իմաստով, հետեւյալ սահմանումներն ունեն սույն Բաժնի 1-ում մասնավորված կամ ներկայացված իմաստները:

«Ձեռքբերված Ընկերություն» -- Ընկերությունը եւ դրա Դուստր Ընկերությունները եթե կան, միասնաբար:

«Սահմանված Գումար» -- ինչպես սահմանված է Բաժնի 2.5-ում:

1

in Section 2.5.

"Applicable Contract"--any Contract (a) under which the Acquired Company has or may acquire any rights, (b) under which the Acquired Company has or may become subject to any obligation or liability, or (c) by which the Acquired Company or any of the assets owned or used by it is or may become bound.

"Balance Sheet"--as defined in Section 3.4.

"Best Efforts"--the efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible.

"Breach"--a "Breach" of a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement will be deemed to have occurred if there is or has been (a) any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision, or (b) any claim (by any Person) or other occurrence or circumstance that is or was inconsistent with such representation, warranty, covenant, obligation, or other provision, and the term "Breach" means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

"Buyer"--as defined in the first paragraph of this Agreement.

«Կիրառելի Պայմանագիր» -- ցանկացած Պայմանագիր (ա) որի համաձայն Ձեռքբերված Ընկերությունը ունի կամ կարող է ձեռք բերել իրավունքներ, (բ) համաձայն որի Ձեռքբերված Ընկերությունը դարձել է կամ կարող է դառնալ որևէ պարտավորության կամ պարտականատիրության սուբյեկտս, կամ (գ) համաձայն որի Ձեռքբերված Ընկերությունը կամ դրա սեփականությունը հանդիսացող կամ դրա կողմից օգտագործվող որևէ գույքի նկատմամբ կարող է կիրառվել արգելանք։

«Հաշվեկշիռ» -- ինչպես սահմանված է Բաժին 3.4-ում։

«Լավագույն Ջանքեր» -- ջանքեր որոնք արդյունքի ձգտող որևէ ողջամիտ Անձ կգործադրեր միևնման հանգամանքներում` ապահովելու համար որպեսզի այդ արդյունքը ձեռք բերվի ինչպան հնարավոր է կարճ ժամանակահատվածում։

«Խախտում» -- սույն Պայմանագրի որևէ հայտարարության, երաշխիքի, խոստման, պարտավորության կամ սույն Պայմանագրի որևէ դրույթի կամ սույն Պայմանագրով սահմանված ցանկացած պայմանավորվածության «Խախտումը» կհամարվի տեղի ունեցած եթե առկա է կամ առկա է եղել (ա) այդ հայտարարության, երաշխիքի, խոստման, պարտավորության կամ որևէ դրույթի իրականացման կամ կատարման որևէ անճշտություն կամ խախտում, կամ (բ) որևէ պնդում (որևէ Անձի կողմից) կամ այլ միջադեպ կամ հանգամանք որը հակասում է այդ հայտարարությանը, երաշխիքին, խոստմանը, պարտավորությանը կամ որևէ դրույթին, և «Խախտում» սահմանումը նշանակում է ցանկացած նման անճշտություն, խախտում, չիրականացում, պնդում, հանգամանք կամ միջադեպ։

«Գնորդ» -- ինչպես սահմանված է սույն Պայմանագրի առաջին պարագրաֆում։

2

"Closing"--as defined in Section 2.3.

"Closing Date"--the date and time as of which the Closing actually takes place.

"Company"--as defined in the Recitals of this Agreement.

"Consent"--any approval, consent, ratification, waiver, or other authorization (including any Governmental Authorization).

"Contemplated Transactions"--all of the transactions contemplated by this Agreement, including:

(a)     the sale of the Shares by Sellers to Buyer;

(b)     the execution, delivery, and performance of the Promissory Note, the Sellers' Releases, and the Escrow Agreement;

(c)     the performance by Buyer and Sellers of their respective covenants and obligations under this Agreement; and

(d)     Buyer's acquisition and ownership of the Shares and exercise of control over the Acquired Company.

"Contract"--any agreement, contract, obligation, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding.

«Կատարում» -- ինչպես սահմանված է Բաժին 2.3-ում:

«Կատարման Ամսաթիվ» -- փաստացի Կատարման ամսաթիվն եւ ժամանակը:

«Ընկերություն» -- սույն Պայմանագրի Առակյայում սահմանվածի համաձայն:

«Համաձայնություն» -- ցանկացած հաստատում, համաձայնություն, վավերացում, հրաժարում, կամ այլ լիազորություն (ներառյալ ցանկացած Կառավարական Լիազորությունները):

«Նախատեսված Գործարքներ» -- սույն Պայմանագրով նախատեսված բոլոր գործարքները, ներառյալ.

(ա)     Վաճառողների կողմից Բաժնետոմսերի վաճառքը Գնորդին,

(բ)     Մուրհակի ստորագրումը, իրականացումը եւ կատարումը, Վաճառողների Իրավունքի Փոխանցման Հայտարարությունները, եւ Էսքրոու Պայմանագիրը:

(գ)     Գնորդների եւ Վաճառողի կողմից իրենց համապատասխան խոստումների եւ պարտավորությունների կատարումը սույն Պայմանագրի համաձայն, եւ

(դ)     Գնորդի կողմից Բաժնետոմսերի ձեռքը եւ տնօրինումը, եւ Ձեռքբերված Ընկերության կառավարման իրականացումը:

«Պայմանագիր» -- ցանկացած համաձայնագիր, պայմանագիր, պարտավորություն, խոստում, կամ ստանձնում (լինի գրավոր կամ բանավոր եւ ուղղակի կամ անուղղակի) որն իրավականորեն պարտավորեցնող է:

3

"Damages"--as defined in Section 10.2.

"Disclosure Letter"--the disclosure letter delivered by Sellers to Buyer concurrently with the execution and delivery of this Agreement.

"Employment Agreements"--as defined in Section 2.4(a)(iii).

"Encumbrance"--any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environment"--soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"Environmental, Health, and Safety Liabilities"--any cost, damages, expense, liability, obligation, or other responsibility arising from or under Environmental Law or Occupational Safety and Health Law and consisting of or relating to:

(a)     any environmental, health, or safety matters or conditions (including

«Վնասներ» -- Բաժին 10.2-ում սահմանվածի համաձայն:

«Բացահայտման Նամակ» -- Վաճառողների կողմից Գնորդին տրված բացահայտման նամակը՝ տրված սույն Պայմանագրի ստորագրման եւ կնքման հետ միաժամանակ:

«Աշխատանքային Պայմանագիր» -- Բաժին 2.4(ա)(iii)-ում սահմանվածի համաձայն:

«Ծանրաբեռնում» -- ցանկացած մեղադրանք, հայց, համայնքի գույքային շահ, պայման, փոխադարձ բաժնեմաս, արդելյանք, այլընտրանք, գրավ, ապահովված գրավ, առաջնային իրավունք, կամ ցանկացած տեսակի սահմանափակում, ներառյալ օգտագործման, քվեարկության, եկամուտի ստացման, կամ սեփականության ցանկացած այլ գործոնի կիրառման ընտառանքը սահմանափատում:

«Միջավայր» -- հող, հողի մակերես կամ հողածածկույթից ցածր մակերեսույթ, մակերեսային ջրեր (ներառյալ նավարկվող ջրեր, օվկիանոսային ջրեր, հոսանքներ, ջրավազաններ, դրենաժային ավազաններ, խմբեր ջրի աղբյուրներ, հոսանքների մնագործքներ, շրջապատի օդ (ներառյալ ներսի օդը), բուսական ու կենդանական աշխարհ, եւ ցանկացած այլ միջավայր կամ բնական ռեսուրս:

«Միջավայրային, Առողջապահական, եւ Անվտանգության Պարտավորություն» -- Միջավայրային Օրենքից, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքից ծագող կամ դրանից համաձայն ցանկացած արժեք, վնաս, ծախս, պարտավորություն, պարտավորվածություն, կամ այլ պատասխանատվություն, եւ որը բաղկացած է հետեւյալից կամ կապված է հետեւյալի հետ.

(ա)     ցանկացած միջավայրային, առողջապահական կամ անվտանգության

4

or safety matters or conditions (including on-site or off-site contamination, occupational safety and health, and regulation of chemical substances or products);

(b)    fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and response, investigative, remedial, or inspection costs and expenses arising under Environmental Law or Occupational Safety and Health Law;

(c)    financial responsibility under Environmental Law or Occupational Safety and Health Law for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions ("Cleanup") required by applicable Environmental Law or Occupational Safety and Health Law (whether or not such Cleanup has been required or requested by any Governmental Body or any other Person) and for any natural resource damages; or

(d)    any other compliance, corrective, investigative, or remedial measures required under Environmental Law or Occupational Safety and Health Law.

The terms "removal," "remedial," and "response action," include the types of activities covered by Armenian law.

խնդիրներ կամ պայմաններ (ներառյալ տարածքի ներսում կամ դրանից դուրս աղտոտումից, աշխատանքային անվտանգության եւ առողջապահության, քիմիական նյութերի եւ մարմինների կարգավորում),

(բ)    Միջավայրային Օրենքից, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքից ծագող կամ դրանց համաձայն տույժեր, տուգանքներ, դատական որոշումներ, վճիռներ, համաձայնություններ, իրավական եւ վարչական վարույթներ, վնասներ, կորուստներ, հայցեր, պահանջներ եւ պատասխանող, հետաքննական, վերականգնողական, կամ ստուգման ծախսեր եւ արժեքներ,

(գ)    ֆինանսական պատասխանատվություն` համաձայն Միջավայրային Օրենքի, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքի, մաքրման ծախսերի եւ ուղղիչ գործողությունների, ներառյալ ցանկացած հետաքննական, մաքրման, տեղափոխման, տեղայնացման կամ այլ վերականգնողական կամ պատասխան գործողությունների համար («Մաքրում»), որոնք պահանջվում են Միջավայրային Օրենքի, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքի համաձայն (անկախ այն հանգամանքից թե արդյոք այդ Մաքրումը պահանջվել է որեւէ Կառավարական Մարմնի կամ այլ Անձի կողմից) եւ ցանկացած այլ բնական ռեսուրսի վնասների համար, կամ

(դ)    ցանկացած այլ կատարում, ուղղիչ, հետաքննչական կամ վերականգնողական միջոցներ որոնք պահանջվում են Միջավայրային Օրենքի, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքի համաձայն:

«Տեղափոխում», «վերականգնում» կամ «պատասխանան միջոցներ» սահմանումները ներառում են Հայաստանի օրենսդրությամբ պահանջվող գործողությունների տեսակները:

"Environmental Law"--any Legal Requirement that requires or relates to:

(a) advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or other prohibitions and of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(b) preventing or reducing to acceptable levels the release of pollutants or hazardous substances or materials into the Environment;

(c) reducing the quantities, preventing the release, or minimizing the hazardous characteristics of wastes that are generated;

(d) assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e) protecting resources, species, or ecological amenities;

(f) reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances;

(g) cleaning up pollutants that have been released, preventing the threat of

«Միջավայրային Օրենք» -- նշանակում է ցանկացած Օրենքի Պահանջ, որը պահանջում է հետեւյալը կամ կապված է հետեւյալի հետ.

(ա) համապատասխան իշխանությունններին, աշխատողներին եւ հանրույթանց բաժիններին կամ վտանգավոր նյութերի վտանցսա-ի կամ նախատեսվող արտանետումների, արտանետումների սահմանափակումների խախտումների, կամ այլ արգելքների եւ գործողություններ սկսելու վերաբերյալ տեղեկացնելը, ինչպիսիք են համածծերի արդյունահանումը կամ շինարարությունը, որոնք կարող են զգալի ազդեցություն ունենալ Միջավայրի վրա,

(բ) բաժիններիի կամ վտանգավոր նյութերի Միջավայր արտանետումը կանխելը կամ մինչեւ թույլատրելի մակարդակ նվազեցնումը,

(գ) կուտակված բաժիններիի քանակների, վտանգազատության աստիճանի նվազեցնումը կամ դրանց արտանետման կանխումը,

(դ) ապրանքների մշակման, կազմման, փաթեթավորման, եւ օգտագործման ապահովումը ձեւով որը բացառում է ապրանքների օգտագործման կամ տիրապետումման ընթացքում մարդու առողջության կամ Միջավայրին անցանկալի վտանգը:

(ե) ռեսուրսների, կենդանական եւ բուսական աշխարհի, կամ բնական հուշարձանների պաշտպանությունը,

(զ) վտանգավոր նյութերի, բաժիններիի, յուղերի կամ պոտենցիալ վտանգավոր այլ նյութերի տեղափոխմման հետ կապված վտանգները մինչեւ ընդունելի մակարդակներ նվազեցնելը,

(է) արտանետվածած բաժիններիի մաքրումը, արտանետումների վտանգի

6

have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or

(h)    making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets.

"Escrow Agreement"--as defined in Section 2.4.

"Facilities"--any real property, leaseholds, or other interests currently or formerly owned or operated by the Acquired Company and any buildings, plants,
structures, or equipment (including motor vehicles, tank cars, and rolling stock) currently or formerly owned or operated by the Acquired Company.

"GAAP"--generally accepted United States accounting principles, applied on a basis consistent with the basis on which the Balance Sheet and the other financial statements referred to in Section 3.4(b) were prepared.

"Governmental Authorization"--any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

"Governmental Body"--any:

(a)    nation, state, county, city, town, village, district, or other jurisdiction

կանխատումը, կամ նման մաքրման կամ կանխման համար վճարելը, կամ

(ը)    պատասխանատուներին պարտադրելը վճարել մասնավոր կողմերին առողջությանը կամ Միջավայրին վնաս հասցնելու համար, կամ հանրային շահը ներկայացնողներին թույլ տալը փոխխատուցում ստանալ հանրային գույքին հասցված վնասի համար:

«Էսքրո Պայմանագիր» -- Բաժին 2.4-ում սահմանվածի համաձայն:

«Միջոցներ» -- ծառկացած անշարժ գույք, վարձակալված գույք, կամ այլ շահ Ձեռքբերված Ընկերության կողմից տնօրինվող կամ օգտագործվող ներկայումս կամ նախկինում եւ Ձեռքբերված Ընկերության կողմից ներկայումս կամ նախկինում տնօրինվող կամ օգտագործվող ցանկացած շենքեր, գործարաններ, կառուցվածքներ, կամ սարքավորումներ (ներառյալ ավտոմեքենաներ, հեղուկատարներ, եւ փոխադրիչներ) :

«GAAP» -- համընդհանուր ընդունվող Միացյալ Նահանգների հաշվապահական նորմեր, որոնք կիրառվում են Բաժին 3.4(բ)-ում սահմանված Հաշվեկշռի եւ այլ ֆինանսական հաշվետվությունների հիմնավորումներին համապատասխան:

«Կառավարական Լիազորություն» -- ցանկացած հաստատում, համաձայնություն, լիցենզիա, թույլտվություն, հրաժարում, կամ այլ տրված, շնորհված, ապահովված կամ ցանկացած Կառավարական Մարմնի իշխանության կամ որեւէ Օրենքի Պահանջի համաձայն այլ ձեւով տրամադրված ցանկացած լիազորություն:

«Կառավարական Մարմին» -- ցանկացած

(ա)    երկիր, պետություն, շրջան,

town, village, district, or other jurisdiction of any nature;

(b)    federal, state, local, municipal, foreign, or other government;

(c)    governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal);

(d)    multi-national organization or body; or

(e)    body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"Hazardous Activity"--the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, under, about, or from the Facilities or any part thereof into the Environment, and any other act, business, operation, or thing that increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on or off the Facilities, or that may affect the value of the Facilities or the Acquired Company.

"Hazardous Materials"--any waste or other substance that is listed, defined, designated, or classified as, or otherwise

քաղաք, ավան, գյուղ, տարածք կամ այլ ցանկացած տեսակի այլ իրընգիշխանություն,

(բ)    համերկրային, պետական, տեղական, քաղաքային, օտարերկրյա կամ այլ կառավարություն,

(գ)    ցանկացած տեսակի կառավարական կամ կիսակառավարական մարմին (ներառյալ ցանկացած կառավարական գործակալություն, մասնաճյուղ, վարչություն, պաշտոնյա, կամ մարմին եւ ցանկացած դատարան կամ դատական այլ մարմին),

(դ)    բազմազգային կազմակերպություն կամ մարմին, կամ

(ե)    ցանկացած վարչական, գործադիր, դատական, օրենսդրական, ոստիկանական, կանոնակարգային, կամ հարկային իշխանություն ցանկացած բնույթի իշխանություն իրականացնող կամ իրականացնելու իրավական մարմին,

«Վնասակար Գործողություն» -- Վնասակար Նյութերը Միջոցների որեւէ մասից դեպի Միջավայր կամ Միջավայրյում տարածումը, կուտակումը, կիրառումը, ներկրումը, կիրառումը, արտադրումը, գտումը, վերարտադրումը, վերամշակումը, Արտանետումը, պահումը, փոխադրումը, տեղափոխումը, մշակումը կամ օգտագործումը (ներառյալ ընդերքի ջրերի որեւէ ձեւով դուրսբերումն կամ այլ օգտագործումն), եւ վտանգը կամ վտանգի հնարավորությունն ավելացնող, կամ Միջոցների տարածքում կամ դրանից դուրս անձանց կամ գույքին վնասելու վտանգ հարուցող, կամ Միջոցների կամ Ձեռքբերված Ընկերության արժեքի վրա ազդող ցանկացած այլ բայլ, գործունեություն, գործողություն կամ երեւույթ:

«Վնասակար Նյութեր» -- ցանկացած թափոն կամ նյութ` ներառյալ դրա ցանկացած խառնուրդ կամ լուծույթ, որը նշված է, սահմանվված է, նշանակված է,

8

designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefore and asbestos or asbestos-containing materials.

"Intellectual Property Assets"--as defined in Section 3.22.

"Interim Balance Sheet"--as defined in Section 3.4.

"Knowledge"--an individual will be deemed to have "Knowledge" of a particular fact or other matter if:

(a)    such individual is actually aware of such fact or other matter; or

(b)    a prudent individual could be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter.

A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, or who has at any time served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter.

"Legal Requirement"--any national, regional, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

կամ որակված է որպես, կամ այլ կերպ համարվում է վնասակար, ռադիոակտիվ, կամ թունավոր կամ բացիոն կամ աղտոտող Միջավայրային Օրենքի համաձայն կամ համապատասխան, մասնավորապես ներառյալ նավթը եւ դրա բոլոր փոխակերպումները կամ արհեստական փոխարինիչները, ինչպես նաեւ ասբեստա եւ ասբեստ պարունակող նյութերը:

«Մտավոր Սեփականություն» -- Բաժին 3.22-ում սահմանվածի համաձայն:

«Միջանկյալ Հաշվեկշիռ» -- Բաժին 3.4-ում սահմանվածի համաձայն:

«Իմացություն» -- անձնավորությունը կիմանա-րվի որոշակի փաստի կամ այլ խնդրի վերաբերյալ «Իմացություն» ունեցող, եթե.

(ա)    անձնավորությունն իրականում տեղյակ է այդ փաստի կամ այլ խնդրի մասին, կամ

(բ)    ողջամիտ անձնավորությունը պետք է որ հայտնաբերեր կամ այլ կերպ տեղեկանար ճնան փաստի կամ այլ խնդրի մասին փաստի կամ այլ խնդրի գոյության վերաբերյալ ողջամտորեն մանրակրկիտ ուսումնասիրություն կատարելու ընթացքում:

Որեւէ Անձ (անձնավորությունից բացի) կիմանարվի որոշակի փաստի կամ այլ խնդրի վերաբերյալ «Իմացություն» ունեցող, եթե որեւէ անձնավորություն որն Անձի մոտ ծառայում է, կամ որեւէ ժամանակ ծառայել է որպես տնօրեն, պաշտոնյա, գործընկեր, գործածություն, կամ հոգաբարձու (կամ ցանկացած ճնան որակով) ունի, կամ որեւէ ժամանակ ունեցել է Իմացություն ճնան փաստի կամ այլ խնդրի մասին:

«Օրենքի Պահանջ» -- ցանկացած ազգային, շրջանային, տեղական, քաղաքային, օտարերկրյա, միջազգային, բազմազգային, կամ այլ վարչական հրաման, սահմանադրություն, օրենք, կանոնակարգ, ընդհանուր օրենքի սկզբունք,

9

regulation, statute, or treaty.

"Occupational Safety and Health Law"--any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private (including those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"Order"--any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"Ordinary Course of Business"--an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if:

(a)    such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person;

(b)    such action is not required to be authorized by the board of such Person (or by any Person or group of Persons exercising similar authority) ; and

(c)    such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the

կարգ, օրենսդրություն կամ միջազգային պայմանագիր:

«Աշխատանքային Անվտանգության եւ Առողջապահական Օրենք» -- ցանկացած Օրենքի պահանջ որը կոչված է ապահովելու անվտանգ եւ առողջ աշխատանքային պայմաններ եւ մեղմելու աշխատանքային անվտանգության եւ առողջապահական ռիսկերը, եւ ցանկացած կառավարական կամ մասնավոր ծրագիր (ներառյալ արդյունաբերողների միությունների եւ ապահովագրական ընկերությունների կողմից հայտարարված կամ ֆինանսավորվածները) որը կոչված է ապահովելու աշխատանքային անվտանգ եւ առողջ պայմաններ:

«Հրաման» -- ցանկացած դատարանի, վարչական մարմնի, կամ այլ Կառավարական Մարմնի կամ դատավորի կողմից ընդունված, տրված, արված կամ տրամադրած ցանկացած դատավճիռ, որոշում, հրահանգ, վճիռ, հրաման, ցուցում, ծանուցագիր, կամ եզրակացություն:

«Գործունեության Բնականոն Ընթացք» -- որեւէ Անձի կողմից ձեռնարկած միջոցը կհամարվի ձեռնարկված «Գործունեության Բնականոն Ընթացում» միայն այն դեպքում, եթե.

(ա)    նման ձեռնարկումը համապատասխանում է այդ Անձի անցած փորձին եւ ձեռնարկվել է տվյալ Անձի առօրյա բնականոն գործունեության ընթացքում,

(բ)    այդ ձեռնարկումը պարտադիր չէ որպեսզի լիազորվի տվյալ Անձի (կամ համանման իրավասության որեւէ այլ Անձի կամ Անձանց խմբի) խորհրդի կողմից, եւ

(գ)    այդ ձեռնարկումն իր բնույթով եւ կարեւորությամբ համանման է սովորաբար իրականացվող ձեռնարկումներին, առանց տնօրենների (կամ համանման իրավասության որեւէ այլ Անձի կամ Անձանց խմբի) խորհրդի

10

exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Person.

"Organizational Documents"--(a) the articles or certificate of formation a company ; (b) any charter or similar constituent document adopted or filed in connection with the creation, formation, or organization of a Person; and (c) any amendment to any of the foregoing.

"Person"--any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

"Plan"--as defined in Section 3.13.

"Proceeding"--any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"Promissory Notes"--as defined in Section 2.4(b)(ii).

"Related Person"--with respect to a particular individual:

լիազորության, տվյալ Անձի գործունեություննր համանման այլ Անձանց գործունեություն առօրյա բնականոն ընթացքում կատարված ձեռնարկումներին։

«Կազմակերպչական Փաստաթղթեր» -- (ա) ընկերության կազմավորման հաստատումը կամ վկայականը, (բ) որևէ կանոնադրություն կամ համանման իրավական փաստաթուղթ որն ընդունվել կամ տրամադրվել է Անձի ստեղծման, կազմավորման եւ կազմակերպման կապակցությամբ, եւ (գ) վերոհիշյալի որեւէ փոփոխություն։

«Անձ» -- որեւէ անձնավորություն, կորպորացիա (ներառյալ շահույթ չհետապնդող ցանկացած կորպորացիա), սահմանափակ կամ սահմանափակ պատասխանատվությամբ ընկերակցություն, սահմանական պատասխանատվությամբ ընկերություն, համատեղ ձեռնարկություն, գույք, տրաստ, ընկերակցություն, կազմակերպություն, արհեստակցական միություն, կամ այլ կազմավորում կամ Կառավարական Մարմին։

«Ծրագիր» -- Բաժին 3.13-ում սահմանվածի համաձայն։

«Վարույթ» -- ցանկացած ձեռնարկում, արբիտրաժ, աուդիտ, լսում, քննություն, վեճի քննարկում, կամ դատական գործ (քաղաքացիական, քրեական, վարչական, վերաքննչական, կամ ոչ պաշտոնական) որը սկսվել, հարուցվել, անցկացվել, կամ լսվել է որեւէ Կառավարական Մարմնի կամ դատավորի կողմից, միջոցով կամ այլ կերպ ընդգրկված։

«Մուրհակներ» -- Բաժին 2.4(բ)(ii)-ում սահմանվածի համաձայն։

«Փոխկապակցված Անձ» -- կոնկրետ անձնավորության առումով.

(ա)   այդ անձնավորության Ընտանիքի յուրաքանչյուր անդամ,

(a)   each other member of such individual's Family;

(բ)   ցանկացած Անձ որն ուղղակիորեն կամ անուղղակիորեն վերահսկվում է այդ անձնավորության կամ նրա Ընտանիքի մեկ կամ ավելի անդամների կողմից,

(b)   any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family;

(գ)   ցանկացած Անձ որում տվյալ անձը կամ նրա Ընտանիքի անդամները ունեն (առանձնին կամ ընդհանուր) Նյութական Շահ, կամ

(c)   any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

(դ)   ցանկացած Անձ որի նկատմամբ տվյալ անձնավորություն կամ նրա Ընտանիքի մեկ կամ ավելի անդամները ծառայում են որպես տնօրեն, պաշտոնյա, գործընկեր, գործադիր, կամ հոգաբարձու (կամ համանման պաշտոնում):

(d)   any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee (or in a similar capacity).

Որոշակի Անձի առումով` անձնավորությունից բացի.

With respect to a specified Person other than an individual:

(ա)   որևէ Անձ որն ուղղակիորեն կամ անուղղակիորեն վերահսկում է տվյալ Անձին, ուղղակիորեն կամ անուղղակիորեն վերահսկվում է տվյալ Անձի կողմից, կամ ուղղակիորեն կամ անուղղակիորեն ընդհանուր վերահսկման տակ է գտնվում տվյալ Անձի հետ միասին,

(a)   any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with such specified Person;

(բ)   որևէ Անձ որն ունի Նյութական Շահ տվյալ Անձի մոտ,

(b)   any Person that holds a Material Interest in such specified Person;

(գ)   յուրաքանչյուր Անձ որը տվյալ Անձի մոտ ծառայում է որպես տնօրեն, պաշտոնյա, գործընկեր, գործադիր, կամ հոգաբարձու (կամ համանման պաշտոնում),

(c)   each Person that serves as a director, officer, partner, executor, or trustee of such specified Person (or in a similar capacity);

(դ)   որևէ Անձ որի մոտ տվյալ Անձն ունի Նյութական Շահ,

(d)   any Person in which such specified Person holds a Material Interest;

12

(c)    any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity); and

(f)    any Related Person of any individual described in clause (b) or (c).

For purposes of this definition, (a) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual, and (b) "Material Interest" means direct or indirect beneficial ownership of voting securities or other voting interests representing at least 25% of the outstanding voting power of a Person or equity securities or other equity interests representing at least 25% of the outstanding equity securities or equity interests in a Person.

"Release"--any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing into the Environment, whether intentional or unintentional.

"Representative"--with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Securities Act"--the United States Securities Act of 1933 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

(ե)    որեւէ Անձ որի նկատմամբ տվյալ Անձը ծառայում է որպես գլխավոր գործընկեր կամ հոգաբարձու (կամ համանման պաշտոնում), եւ

(ը)    կետ (բ)-ում եւ (գ)-ում նկարագրված անձնավորության ցանկացած Փոխկապակցված Անձ:

Սույն սահմանման իմաստով, (ա) անձնավորության «Ընտանիքը» ներառում է (i) անձնավորությունը, (ii) անձնավորության ամուսինն/կնոջը, (iii) ցանկացած ֆիզիկական անձ որը կապված է անձնավորության կամ նրա ամուսնու/կնոջ երկրորդ աստիճանի ազգակցական կապով, եւ (iv) ցանկացած այլ ֆիզիկական անձ որը բնակվում է այդ անձնավորության հետ, եւ (բ) «Նյութական Շահ» նշանակում է Անձի մոտ ուղղակի կամ անուղղակի շահավետ սեփականություն առնվազն 25% ձայնի իրավունքը տվող կանոնադրական արժեթղթերի կամ նման ձայնի իրավունք տվող կանոնադրական այլ շահերի նկատմամբ, կամ հասարակ կանոնադրական արժեթղթերի առնվազն 25% նկատմամբ սեփականությունն կամ գույքային շահը Անձի նկատմամբ:

«Արտանետում» -- ցանկացած տարածում, արտահոսք, ճառագայթում, արտանետում, կուտակում, գրում, հիմնային ացում, նետում, կամ Միջավայր այլ ձեւով արտանետում՝ լինի դա կանխամտածված կամ ոչ:

«Ներկայացուցիչ» -- կոնկրետ Անձի իմաստով, ցանկացած տնօրեն, պաշտոնյա, աշխատող, գործակալ, խորհրդատու, խորհրդական, կամ այդ Անձի այլ ներկայացուցիչ, ներառյալ իրավախորհրդատուն, հաշվապահները եւ այլ ֆինանսական խորհրդատուները:

«Արժեթղթերի Ակտ» -- Միացյալ Նահանգների 1933թ-ի Արժեթղթերի Ակտը կամ որեւէ իրավահաջորդ օրենք, եւ կանոնակարգեր եւ կանոններ ընդունված այդ Ակտի կամ որեւէ իրավահաջորդ օրենքի

13

համաձայն։

"Sellers"--as defined in the first paragraph of this Agreement.

«Վաճառողներ» -- սույն Պայմանագրի առաջին պարբերությունում սահմանվածի համաձայն։

"Sellers' Releases"--as defined in Section 2.4.

«Վաճառողների Իրավունքների Փոխանցման Հայտարարություններ» -- Բաժին 2.4-ում սահմանվածի համաձայն։

"Shares"--as defined in the Recitals of this Agreement.

«Բաժնեմաս» -- Սույն Պայմանագրի Առարկայում սահմանվածի համաձայն։

"Subsidiary"--with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the Owner or one or more of its Subsidiaries; when used without reference to a particular Person, "Subsidiary" means a Subsidiary of the Company.

«Դուստր Ընկերություն» -- որևէ Անձի («Սեփականատեր») իմաստով, ցանկացած կորպորացիա կամ այլ Անձ որի ինօորենները խորհրդի կամ այլ գործադիր մարմնի մեծամասնությունը ընտրելու իրավունը տվող արժեթղթերը կամ այլ շահերը, կամ այլ կերպ այդ կորպորացիայի կամ այլ Անձի գործունեության ուղղությունները կամ քաղաքականությունը որոշելու իշխանությունը (բացի արժեթղթերից կամ այլ շահերից որոնց իշխանական բնույթը կախված է տեղի չունեցած հանգամանքից) պատկանում է Սեփականատիրոջը կամ դրա մեկ կամ մի քանի Դուստր Ընկերություններին. եթե օգտագործվում է առանց որևէ կոնկրետ Անձի առումով «Դուստր Ընկերություն» նշանակում է Ընկերության Դուստր Ընկերությունը։

"Tax Return"--any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

«Հարկային Հայտարարագիր» -- ցանկացած հայտարարագիր (ներառյալ որևէ տեղեկատվական հայտարարագիր), հաշվետվություն, հայտարարություն, ժամանակացույց, ծանուցում, ձև, կամ այլ փաստաթուղթ կամ տեղեկություն որը ներկայացվել կամ համձձվել է որևէ Կառավարական Մարմնին որևէ Հարկի սահմանման, ստուգման, գանձման, կամ վճարման, կամ որևէ Հարկի՝ ի կատարումն որևէ Օրենքի Պահանջի վարչարարման, կիրառման, կամ պարտադիր կատարման առնչությամբ։

"Threat of Release"--a substantial likelihood of a Release that may require

«Արտանետման Վտանգ» -- Միջգավղթին Արտանետման արդյունքում

14

likelihood of a Release that may require action in order to prevent or mitigate damage to the Environment that may result from such Release.

"Threatened"--a claim, Proceeding, dispute, action, or other matter will be deemed to have been "Threatened" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a claim, Proceeding, dispute, action, or other matter is likely to be asserted, commenced, taken, or otherwise pursued in the future.

## 2. SALE AND TRANSFER OF SHARES; CLOSING.

**2.1 Shares.** Subject to the terms and conditions of this Agreement, at the Closing, Sellers will sell and transfer the Shares to Buyer, and Buyer will purchase the Shares from Sellers.

**2.2 Purchase Price.** The purchase price (the "Purchase Price") for the Shares will be Fifteen Thousand US Dollars ($15,000). Purchase Price is inclusive of and the Sellers are solely and separately responsible for all taxes, fees and levies, duties and other charges applicable now or those which may become applicable in the future, including such taxes, duties or other charges acknowledged retroactive, which may be imposed on any of the Purchase Price (including, but not limited to, the property tax, profit or income tax, VAT) (all taxes, duties or other charges hereinafter collectively referred to as the "Taxes"), associated with, or payment of, such Purchase Price. Buyer may calculate

վնասի պատճառումից պաշտպանվելու կամ մեղմելու միջոցառումների կիրառումն պահանջող Արտանետումած զգալի հավանականություն:

«Սպառնում» -- հայցը, Վարույթը, վեճը, միջոցը, կամ այլ խնդիրը կհամարվի «Սպառնացած» եթե արվել է որևէ պահանձ կամ հայտարարություն (բանավոր կամ գրավոր) կամ ներկայացվել է որևէ ծանուցում (բանավոր կամ գրավոր), կամ որևէ այլ դեպք տեղի է ունեցել կամ այլ հանգամանքներ առկա են, որոնք ողջամիտ Անձին բոլոր կտրամին եզրակացնել որ նման հայցը, Վարույթը, վեճը, միջոցը, կամ այլ խնդիրը հնարավոր է որպեսզի հետագայում ներկայացվի, սկսվի, կիրառվի, կամ այլ կերպ իրականացվի:

## 2. ԲԱԺՆԵՏՈՄՍԻ ՎԱՃԱՌՔԸ ԵՒ ՓՈԽԱՆՑՈՒՄԸ. ԿԱՏԱՐՈՒՄ

**2.1 Բաժնետոմս:** Սույն Պայմանագրի պայմաններին եւ դրույթների համաձայն, Կատարման դրությամբ, Վաճառողները վաճառում եւ փոխանցում են Բաժնետոմսը Գնորդին, իսկ Գնորդը գնում է Բաժնետոմսը Վաճառողներից:

**2.2 Գնման Գինը:** Բաժնետոմսի գնման գինը («Գնման Գին») կազմում է Տասնհինգ Հազար ԱՄՆ Դոլար ($15,000): Գնման Գինը ներառում է եւ Վաճառողները միանձնյա եւ առանձին-առանձին պատասխանատու են սույն Գնման Գնի կամ դրա վճարման հետ կապված' ներկայումս կամ ապագայում ցանձման ենթակա բոլոր եւ ցանկացած հարկերի, տուրքերի եւ այլ վճարների, ներառյալ այն հարկերը, տուրքերը կամ վճարները որոնք կհամարվեն վճարման ենթակա ապագայում, որոնք կարող են կիրառվել Գնման Գնի կամ դրա որևէ մասի նկատմամբ (ներառյալ, սակայն չսահմանափակված, գույքահարկը, շահույթահարկը, եկամտահարկը, ԱԱՀ-ն) (բոլոր հարկերը, տուրքերը կամ այլ վճարները հետսությու միասնաբար

15

such Purchase Price. Buyer may calculate, and withhold from the Purchase Price and pay any Tax on behalf of the Sellers.

կանխավճարվեն «Հարկեր»)՝ կապակցված Գնման Գնի կամ դրա վճարման հետ։ Գնորդը կարող է հաշվարկել, Գնման Գնից պահել, եւ Վաճառողների փոխարեն վճարել ցանկացած Հարկ:

2.3   **Closing**.  The purchase and sale (the "Closing") provided for in this Agreement will take place at the offices of Buyer's counsel at 2a Tamanyan Street, Suite #2 Yerevan , Armenia, at 10:00 a.m. (local time) on December 21,  2003 Subject to the provisions of Section 9, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.3 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.

2.3   **Կատարում**: Սույն Պայմանագրով սահմանված առք եւ վաճառքը («Կատարում») տեղի կունենա Հայաստանի Հանրապետության Երեւան քաղաքի Թամանյան 2ա բնակարան 2 հասցեում գտնվող Գնորդի իրավախորհրդատուի գրասենյակում, տեղական ժամանակով 10:00-ին, 2003թ-ի դեկտեմբերի 21-ին: Բաժնի 9-ի դրույթների պայմանով, սույն Բաժնի 2.3-ում սահմանված ամսաթվին, ժամին եւ նշված տեղում սույն Պայմանագրով սահմանված առք ու վաճառքի գործարքը չավարտելը չի լուծում սույն Պայմանագիրը եւ չի ազատում որեւէ կողմին սույն Պայմանագրով սահմանված իր պարտավորությունների կատարումից:

2.4   **Closing Obligations**.  At the Closing:

2.4   **Կատարման Պարտավորություններ**: Կատարման ժամանակ.

(a)      Sellers will deliver to Buyer:

(ա)      Վաճառողները Գնորդին տրամադրում է.

(i)      certificates representing the Shares, duly endorsed (or accompanied by duly executed stock powers or equivalent documents), with signatures for transfer to Buyer;

(i)      Բաժնեմասը ներկայացնող վկայագրերը, պատշաճ ձեւով հաստատված (կամ պատշաճ ձեւով բաժնեմասային իրավունքի հաստատումով ուղեկցված կամ համապատասխան փաստաթղթեր), Գնորդին փոխանցումը հաստատող ստորագրություններով;

(ii)      releases in the form of Exhibit 2.4(a)(ii) executed by Sellers (collectively, "Sellers' Releases");

(ii)      Վաճառողների կողմից հաստատված իրավունքներից փոխանցման հայտարարությունները Հավելված 2.4(ա)(ii)-ում նշված ձեւով (միասնաբար՝ «Վաճառողների

16

(iii)    an acknowledgment that Buyer is credited with paying Fifteen Thousand US Dollars ($15,000) towards the purchase price paid as of December 21, 2003;

(iv)    a certificate executed by Sellers representing and warranting to Buyer that each of Sellers' representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and is accurate in all respects as of the Closing Date as if made on the Closing Date (giving full effect to any supplements to the Disclosure Letter that were delivered by Sellers to Buyer prior to the Closing Date in accordance with Section 5.5. and

(v) a resolution of SHA, LLC general meeting of participants authorizing transfer of Shares to Buyer.

(b)    Buyer will deliver to Sellers:

(i)    an acknowledgement canceling Sellers' obligations to repay the Fifteen Thousand US Dollars ($15,000) previously advanced in connection with this transaction:

Իրավունքների Փոխանցման Հայտարարությունններ»);

(iii)    հաստատում առ այն, որ Գնորդը վճարել է Տասնհինգ Հազար ($15 000) ԱՄՆ Դոլար գնման գինը 2003թ-ի դեկտեմբերի 21-ին,

(iv)    Վաճառողների կողմից ստորագրված՝ Գնորդին հավաստող եւ երաշխավորող վկայագիր առ այն, որ Վաճառողների կողմից սույն Պայմանագրում արված յուրաքանչյուր հավաստումները եւ երաշխիքները ճիշտս են եղել բոլոր առումներով սույն Պայմանագրի ամսաթվի դրությամբ եւ ճիշտ են Կատարման Ամսաթվի դրությամբ համարելով որ արվել են Կատարման Ամսաթվի դրությամբ (իրավական ամբողջական ուժ հաղորդելով Բաժնի 5.5-ի համաձայն Գնորդին Վաճառողների կողմից ներկայացված Բացահայտումման Նամակի յուրաքանչյուր հավելմաննը), եւ

(v)    Բաժնեմասը Գնորդին փոխանցելը լիազորող՝ ՍՀԱ, ՍՊԸ մասնակիցների ընդհանուր ժողովի որոշումն:

(բ)    Գնորդը Վաճառողներին տրամադրում է.

(i)    սույն գործարքի հետ կապված եւ նախկինում կանխավճարված Տասնհինգ Հազար ԱՄՆ Դոլարը ($15,000) Վաճառողների կողմից վերադարձնելու պարտավորությունը չեղյալ համարելու վերաբերյալ հաստատում;

17

transaction;

(ii) the draft of a mutually agreeable royalty agreement payable to A, B, and C jointly to pay a royalty of One US Dollar ($1.00) per Ounce of Gold produced at the Hankavan Mine for the first One Hundred Sixty Thousand Ounces of gold produced, which shall be entered between the parties only if and when Buyer determines that the Hankavan Mine can be economically developed and commercial operations commence and all · Governmental Authorizations for the proceeding of such mining operations has been obtained, not to exceed in the total amount of One Hundred Sixty Thousand US Dollars ($160,000) in the form of Exhibit 2.4(b) (the "Royalty Agreement"); and

(iii) a certificate executed by Buyer to the effect that, except as otherwise stated in such certificate, each of Buyer's representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and is accurate in all respects as of the Closing Date as if made on the Closing Date;

(ii) Ա-ին, Բ-ին եւ Գ-ին միասնաբար վճարվող եւ երկուսուտեր համաձայնությա առաmyկա հանդիսացող ռոյալթիների պայմանագրի նախագիծը Հանքավանի Հանքում արտասյալիված ոսկու առաջին Հարյուր Վաթսուն Հազար Ունցիայի համար յուրաքանչյուր Ունցիա հաշվարկով Մեկ ԱՄՆ Դոլար ($1,00) վճարման վերաբերյալ, որը պետք է կողմերի միջեւ ստորագրվի միայն այն դեպքում եւ երբ որ Գնորդը որոշի որ Հանքավանի Հանքը կարող է տնտեսապես շահավետորեն զարգացնվել եւ ծեռնարկատիրական աշխատանքները սկսվեն եւ ստացված լինեն բոլոր Կառավարական Լիազորությունները հանքարդյունաhանման աշխատանքների hարմար, վճարվելիք գումարը չգերազանցելով Հարյուր Վաթսուն Հազար ԱՄՆ Դոլարը ($160,000) ինչպես ներկայացված է Հավելվածում 2.4(բ)-ում («Ռոյալթիի Պայմանագիր»), եւ

(iii) Գնորդի կողմից հաստատված վկայագիր առ այն, բացի այդ վկայագրում այլ կերպ սահմանված դեպքերի, սույն Պայմանագրով ներկայացված Գնորդի յուրաքանչյուր հավաստումները եւ երաշխիքները ճիշտ են եղել բոլոր առումներով սույն Պայմանագրի ամսաթվի դրությամբ եւ ճիշտ են ճիշտ են բոլոր առումներով Կատարման Ամսաթվի դրությամբ հանմարելով որ արվել են Կատարման Ամսաթվի դրությամբ, եւ

18

3.    REPRESENTATIONS AND WARRANTIES OF SELLERS. Sellers represent and warrant to Buyer as follows:

3.    ՎԱՃԱՌՈՂՆԵՐԻ ՀԱՎԱՍՏՈՒՄՆԵՐԸ ԵՒ ԵՐԱՇԽԻՔՆԵՐԸ: Վաճառողները Գ-Նորդին հավաստոււմ եւ երաշխավորում են հետեյալը.

3.1    Organization and Good Standing.

3.1    Կազմավորում եւ Պատշաճ Վիճակ:

(a)    Part 3.1 of the Disclosure Letter contains a complete and accurate list for the Acquired Company of its name, its jurisdiction of incorporation, other jurisdictions in which it is authorized to do business, and its capitalization (including the identity of each participant and the number of shares held by each). The Acquired Company is a company duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, with full company power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under Applicable Contracts. The Acquired Company is duly qualified to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

(ա)    Բացահայտման Նամակի Բաժին 3.1-ը պարունակում է լրիվ եւ ճիշտ ցուցակ ներառելով Ձեռքբերված Ընկերության անունը, նրա կազմավորման օրենսդրությունը, այլ երկրների օրենսդրությունների համաձայն գործունեություն ծավալելու իրավունքը, եւ նրա կապիտալիզացիան (ներառյալ յուրաքանչյուր մասնակցի ինքնությունը եւ յուրաքանչյուր մասնակցի բաժնեմասերի չափը): Ձեռքբերված Ընկերությունը պատշաճ կերպով կազմավորված եւ գրանցված է, իրավականորեն գոյություն ունի, եւ գտնվում է պատշաճ վիճակում իր կազմավորման օրենսդրության համաձայն, ունի իր գործունեությունն ամբողջությամբ վարելու` ինչպես որ այն վարվում է ներկայումս, ցանկացած գույքեր եւ միջոցներ տնօրինելու եւ օգտագործելու, եւ Կիրառելի Պայմանագրերի համաձայն իր բոլոր պարտավորությունները կատարելու իշխանություն եւ իրավասություն: Ձեռքբերված Ընկերությունը պատշաճ կերպով իրավասու է գործելու որպես օտարերկրյա կորպորացիա եւ պատշաճ վիճակում է յուրաքանչյուր օրենսդրության համաձայն` դրանց համաձայն նրա կողմից տնօրինված կամ օգտագործվող գույքի կամ տնօրինումը կամ օգտագործումը, կամ նրա կողմից իրականացվող գործունեության տեսակները կպահանջեն նման

19

իրավունակություն:

(բ)    Վաճառողներն
Գնորդին տրամադրել են
Ձեռքբերված Ընկերության
Կազմավորման Փաստաթղթերի
պատճեները՝ ներկայումս
իրավական ուժ ունեցող տեսքով:

(b)    Sellers have delivered to Buyer copies of the Organizational Documents of the Acquired Company, as currently in effect.

**3.2**    **Authority; No Conflict.**

**3.2**    <u>Լիազորություն; Շահերի Բախման Բացակայություն:</u>

(ա)    Սույն Պայմանագիրը սահմանում է Վաճառողների իրավական, պատշաճ և Վաճառողներին պարտավորեցնող պարտավորություն՝ Վաճառողների ենթակամ կիրառելի իր դրույթների համաձայն: Վաճառողների կողմից վերը նշված Հոդված 2.4(ա)-ում սահմանված փաստաթղթերի ստորագրումից և տրամադրումից հետո (միասնաբար՝ «Վաճառողների Կատարման Փաստաթղթեր»), Վաճառողների Կատարման Փաստաթղթերը կսահմանեն Վաճառողների իրավական, պատշաճ և պարտավորեցնող պարտավորությունները՝ Վաճառողների հանդեպ կիրառելի իրենց համապատասխան դրույթների համաձայն: Վաճառողներն ունեն բացարձակ և անսահմանափակ իրավունք, իշխանություն, իրավասություն, և ունակություն ստորագրելու և կատարելու սույն Պայմանագիր և Վաճառողների Կատարման Փաստաթղթերը և կատարելու սույն Պայմանագրով և Վաճառողների Կատարման Փաստաթղթերով սահմանված իրենց պարտավորությունները:

(a)    This Agreement constitutes the legal, valid, and binding obligation of Sellers, enforceable against Sellers in accordance with its terms. Upon the execution and delivery by Sellers of the documents identified in Article 2.4(a) above, (collectively, the "Sellers' Closing Documents"), the Sellers' Closing Documents will constitute the legal, valid, and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms. Sellers have the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and the Sellers' Closing Documents and to perform their obligations under this Agreement and the Sellers' Closing Documents.

(բ)    Բացի Բացահայտման Նամակի Բաժին 3.1-ում նշված, սույն Պայմանագրի ստորագրումը և կատարումը, կամ

(b)    Except as set forth in Part 3.2 of the Disclosure Letter, neither the execution and delivery of this Agreement nor the

20

of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time):

    (i)    contravene, conflict with, or result in a violation of any provision of the Organizational Documents of the Acquired Company, or (B) any resolution adopted by the board of directors or the stockholders of the Acquired Company;

    (ii)    contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under, any Legal Requirement or any Order to which the Acquired Company or a Seller, or any of the assets owned or used by the Acquired Company, may be subject;

    (iii)    contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate,

որեւէ Նախատեսված Գործարքների իրականացումը կամ կատարումը՝ ուղղակիորեն կամ անուղղակիորեն (ծանուցմամբ կամ առանց դրա, կամ ժամանակի ընթացքում).

    (i)    չի հակասի, բախման մեջ չի գտնվի, կամ խախտման արդյունք հանդիսանա Ձեռքբերված Ընկերության Կազմակերպչական Փաստաթղթերի որեւէ դրույթի, կամ (Բ) Ձեռքբերված Ընկերության տնօրենների խորհրդի կամ բաժնետերերի ժողովի կողմից կայացված որեւէ որոշմանը.

    (ii)    չի հակասի, բախման մեջ չի գտնվի, կամ խախտման արդյունք հանդիսանա, կամ որեւէ Կառավարական Մարմնին կամ այլ Անձին իրավունք վերապահի կասկածի տակ դնել որեւէ Նախատեսված Գործարք կամ Ձեռքբերված Ընկերության կամ որեւէ Վաճառողի, Ձեռքբերված Ընկերության տնօրինման կամ օգտագործման տակ գտնվող որեւէ գույքի հանդեպ կիրառելի որեւէ Օրենքի Պահանջի կամ Հրամանի հիման վրա ձեռք բերի իրավունքի պաշտպանության կամ պարտավորությունների կատարումից ազատման միջոց:

    (iii)    չի հակասի, բախման մեջ չի գտնվի, կամ խախտման արդյունք հանդիսանա, կամ որեւէ Կառավարական Մարմնին իրավունք ընձեռի հետ վերցնել, չեղյալ համարել,

21

suspend, cancel, terminate, or modify, any Governmental Authorization that is held by the Acquired Company or that otherwise relates to the business of, or any of the assets owned or used by, the Acquired Company;

կասեցնել, կանգնեցնել, վերացնել, կամ փոփոխել Ձեռքբերված Ընկերության կամ դրա գործունեության, տնօրինվող կամ օգտագործվող գույքի հետ որևէ կերպ առնչվող որևէ Կառավարական Լիազորության կամ դրա որևէ դրույթ կամ պահանձ;

(iv)  cause Buyer or the Acquired Company to become subject to, or to become liable for the payment of, any Tax;

(iv)  Գնորդին կամ Ձեռքբերված Ընկերությանն ի դասՁնի առկա, կամ պարտավորված վձարելու, որևէ Հարկ;

(v)  cause any of the assets owned by the Acquired Company to be reassessed or revalued by any taxing authority or other Governmental Body;

(v)  առկա չի դասՁնի Ձեռքբերված Ընկերության կողմից տնօրինվող որևէ գույք վերագնահատվելու կամ վերաարժեքավորվելու որևէ հարկային մարմնի կամ այլ Կառավարական Մարմնի կողմից;

(vi)  contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; or

(vi)  չի հակասի, բախման մեջ գտնվի, կամ խախտման արդյունք հանդիսանա որևէ Կիրառելի Պայմանագրի համար, կամ որևէ Անձին իրավունք չի վերապահի խախտում ձանաչելու կամ իրավունքի պաշտպանության միջոց ձեռք բերելու, կամ լուծումը կամ կատարումն արագացնելու, կամ դադարեցնելու, լուծելու, չեղյալ համարելու, կամ փոփոխելու որևէ Կիրառելի Պայմանագիր, կամ

(vii)  result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by the Acquired Company.

(vii)  արդյունք չի հանդիսանա որևէ Ծանրաբեռնման կիրառման կամ ստեղծման համար Ձեռքբերված Ընկերության կողմից տնօրինվող կամ օգտագործվող որևէ գույքի

22

 Նկատմամբ կամ հանդեպ:

Except as set forth in Part 3.2 of the Disclosure Letter, no Seller or Acquired Company is or will be required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

Բացի Բացահայտման Նամակի Բաժին 3.2-ում ներկայացվածից, Վաճառողներից ոչ մեկից կամ Ձեռքբերված Ընկերությունից չի պահանջվում որևիցե որևէ ծանուցնել կամ Համաձայնություն ձեռք բերել որևէ Անձից սույն Պայմանագրի ստորագրման եւ կատարման կամ Նախատեսված Գործառքներից որևէ մեկի կատարման կամ իրականացման վերաբերյալ:

(c)     Sellers are acquiring the Promissory Notes for their own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act.

(զ)     Վաճառողները ձեռք են բերում Մուրհակներ իրենց սեփական հաշվին դրանք չշաշխելու նպատակով՝ համաձայն Արժեթղթերի Ակտի Բաժին 2(11)-ի իմաստի:

3.3    **Capitalization**.  Sellers are and will be on the Closing Date the record and beneficial owners and holders of the Shares, free and clear of all Encumbrances.  A owns 33% of the Shares, B owns 33% of the Shares, and C owns 34% of the Shares.   No legend or other reference to any purported Encumbrance appears upon any certificate representing equity securities of the Acquired Company.  All of the outstanding equity securities of each Acquired Company have been duly authorized and validly issued and are fully paid and nonassessable.  There are no Contracts relating to the issuance, sale, or transfer of any equity securities or other securities of the Acquired Company.  None of the outstanding equity securities or other securities of the Acquired Company was issued in violation of any other Legal Requirement.  The Acquired Company does not own, or has any Contract to

3.3    Կապիտալիզացիա:  Վաճառողները հանդիսանում են եւ Կատարման Ամսաթվին կհանդիսանան Բաժնեմասների գրանցված եւ շահառու սեփականատիրեր, Բաժնեմասերն ազատ եւ զերծ լինելով բոլոր Ծանրաբեռնումներից:  Ա-ն տնօրինում է Բաժնեմասի 33%-ը, Բ-ն տնօրինում է Բաժնեմասի 33%-ը, Գ-ն տնօրինում է Բաժնեմասի 34%-ը:  Ձեռքբերված Ընկերության արժեթղթերը ներկայացնող որևէ վկայագրում չի հիշատակվում կամ այլ կերպ հղում չի կատարվում որևէ ենթադրվող Ծանրաբեռնման մասին: Յուրաքանչյուր Ձեռքբերված Ընկերության կանոնադրական արժեթղթերը պատշաճ կերպով լիազորված եւ թողարկված են, ամբողջությամբ վճարվել են հարկային պարտավորություններ չեն կրում: Գոյություն չունեն որևէ Պայմանագրեր Ձեռքբերված Ընկերության որևէ կանոնադրական արժեթղթերի կամ այլ արժեթղթերի թողարկման, վաճառքի կամ փոխանցման վերաբերյալ: Ձեռքբերված Ընկերության կանոնադրական

does not own, or has any Contract to acquire, any equity securities or other securities of any Person or any direct or indirect equity or ownership interest in any other business.

**3.4** **Financial Statements**. Sellers have delivered to Buyer any of the following which exist: (a) balance sheets of the Acquired Company as at December 1, 2003 and the related statements of income, changes in stockholders' equity, and cash flow for each of the fiscal years then ended, (b) a balance sheet of the Acquired Company as at December 1, 2003 (including the notes thereto, the "Balance Sheet"), and the related statements of income, changes in shareholders' equity, and cash flow for the fiscal year then ended.

**3.5** **Books and Records**. The books of account, minute books, share record books, and other records of the Acquired Company, all of which have been made available to Buyer, are complete and correct and have been maintained in accordance with sound business practices and legal requirements, including the maintenance of an adequate system of internal controls. The minute books of the Acquired Company contains accurate and complete records of all meetings held of, and corporate action taken by the Acquired Company, and no meeting has been held for which minutes have not been prepared and are not contained in such minute books. At the Closing, all of those books and records will be in the possession of the Acquired Company.

արժեթղթերից ոչ մեկը չի բռնարկվել որևէ այլ Օրենքի Պահանջի խախտումամբ։ Ձեռքբերված Ընկերությունն չի տնօրինում, յուցի որևէ Պայմանագիր ձեռք բերելու համար, այլ Անձի որևէ կանոնադրական արժեթուղթ կամ այլ արժեթղթեր, կամ ուղղակի կամ անուղղակի մասնաբաժին կամ սեփականություն այլ ընկերություններում։

**3.4** **Ֆինանսական Հաշվետվություններ։** Վաճառողները Գնորդին տրամադրել են գոյություն ունեցող հետևյալից յուրաքանչյուրը. (ա) Ձեռքբերված Ընկերության հաշվեկշիռները 2003թ-ի դեկտեմբերի 1-ի դրությամբ եւ համապատասխան եկամտահարկի, բաժնետերերի բաժնեմասերի փոփոխության, կանխիկ հոսքերի հաշվետվությունները համապատասխան տարիների համար, (բ) Ձեռքբերված Ընկերության հաշվեկշիռը (ներառյալ ծանոթները՝ «Հաշվեկշիռ»), եւ համապատասխան եկամտահարկի, բաժնետերերի բաժնեմասերի փոփոխության, կանխիկ հոսքերի հաշվետվությունները համապատասխան տարիների համար։

**3.5** **Հաշվապահական Գրքեր եւ Գրանցումներ։** Ձեռքբերված Ընկերության հաշվապահական գրքերը, արձանագրությունների գրքերը, բաժնեմասերի գրանցման գրքերը, եւ այլ գրքերը՝ բոլորը տրամադրված լինելով ներկայացվել են Գնորդին, ամբողջական եւ ճիշտ են եւ վարվել են գործարար լավլավույն սովորույթների եւ իրավական պահանջների համաձայն, ներառյալ կիրառելով ներքին վերահսկողության համապատասխան համակարգ։ Ձեռքբերված Ընկերության արձանագրությունների գրքերը ներառում են Ձեռքբերված Ընկերության կողմից հրավիրված բոլոր ժողովների, եւ ձեռնարկատիրական որոշումների կայացման մասին ճիշտ եւ ամբողջական արձանագրությունները, եւ չեն հրավիրվել ժողովներ որոնց արձանագրությունները չեն կազմվել եւ չեն ներառվել այս

24

Acquired Company.

### 3.6    Title to Properties; Encumbrances.

Part 3.6 of the Disclosure Letter contains a complete and accurate list of all real property, leaseholds, lieenses, or other interests therein owned by the Acquired Company. Sellers have delivered to Buyer copies of the deeds and other instruments (as recorded) by which the Acquired Company acquired such real property and interests, and copies of all title insurance policies, opinions, abstracts, and surveys in the possession of Sellers or the Acquired Company and relating to such property or interests. The Acquired Company owns (with good and marketable title in the case of real property, subject only to the matters permitted by the following sentence) all the properties, licenses, and assets (whether real, personal, or mixed and whether tangible or intangible) that it purports to own located in the facilities owned or operated by the Acquired Company or reflected as owned in the books and records of the Acquired Company, including all of the properties and assets reflected in the Balance Sheet and the Interim Balance Sheet (except for assets held under capitalized leases disclosed or not required to be disclosed in Part 3.6 of the Disclosure Letter and personal property sold since the date of the Balance Sheet and the Interim Balance Sheet, as the case may be, in the Ordinary Course of Business), and all of the properties and assets purchased or otherwise acquired by the Acquired Company since the date of the Balance Sheet (except for personal property acquired and sold since the date of the Balance Sheet in the Ordinary Course of Business and consistent with past practice).

### 3.6    Գույքի նկատմամբ Սեփականումտյան Իրավունքը;

Ծանրաբեռնումներ: Բացահայտման Նամակի Բաժին 3.6-ը ներառում է Ձեռքբերված Ընկերության տնօրինման տակ գտնվող բոլոր անշարժ գույքի, վարձակալությունների, լիցենզիաների, կամ այլ շահերի ամբողջական ես ճիշտ ցուցակը: Վաճառողները Գնորդին են տրամադրել Ձեռքբերված Ընկերության բոլոր փաստաթղթերի ես այլ գործառքների պատճենները (գրանցումների համաձայն) որոնց համաձայն ձեռք են բերվել այդ անշարժ գույքը ես շահերը, ինչպես նաեւ Վաճառողների կամ Ձեռքբերված Ընկերության տրամադրության տակ գտնվող, նշված գույքի կամ շահերի սեփականունտյան վերաբերյալ ապահովագրական պոլիսների, մասնագիտական կարծիքների, համառոտ նկարագրությունների կամ ուսումնասիրությունների պատճենները: Ձեռքբերված Ընկերությունը տնօրինում է (անշարժ գույքի մասով ամբողջական ես լիկվիդային՝ հետեւյալ նախադասությունում սահմանված բացառությունների առկա միայն) Ձեռքբերված Ընկերության տրամածրում տեղադրված կամ Ձեռքբերված Ընկերության գրքերում ես գրանցումներում որպես այդպիսիե արտացոլված՝ որպես սեփականունտյուն ճհտվող ամբողջ գույքը, լիցենզիաները ես միջոցները (լինեն դրանք անշարժ, շարժական, կամ խառը, ես նյութական կամ ոչ նյութական), ներառյալ Հաշվեկշռում ես Նախնական Հաշվեկշռում արտացոլված գույքը ես միջոցները (բացառությամբ Բացահայտման Նամակի Բաժին 3.6-ում բացահայտված կամ բացահայտման անհրաժեշշտություն չունեցող՝ կապիտալացված վարձակալության տակ գտնվող միջոցները ես Գործունեության Բնականոն Ընթացքում Հաշվեկշռի կամ Նախնական Հաշվեկշրի ամսաթվից հետո վաճառված շարժական

25

Business and consistent with past practice). All material properties and assets reflected in the Balance Sheet and the Interim Balance Sheet are free and clear of all Encumbrances and are not, in the case of real property, subject to any rights of way, building use restrictions, exceptions, variances, reservations, or limitations of any nature except, with respect to all such properties and assets, (a) mortgages or security interests shown on the Balance Sheet or the Interim Balance Sheet as securing specified liabilities or obligations, with respect to which no default (or event that, with notice or lapse of time or both, would constitute a default) exists, (b) mortgages or security interests incurred in connection with the purchase of property or assets after the date of the Interim Balance Sheet (such mortgages and security interests being limited to the property or assets so acquired), with respect to which no default (or event that, with notice or lapse of time or both, would constitute a default) exists, (c) liens for current taxes not yet due, and (d) with respect to real property, (i) minor imperfections of title, if any, none of which is substantial in amount, materially detracts from the value or impairs the use of the property subject thereto, or impairs the operations of the Acquired Company, and (ii) zoning laws and other land use restrictions that do not impair the present or anticipated use of the property subject thereto. All buildings, plants, and structures owned by the Acquired Company lies wholly within the boundaries of the real property owned by the Acquired Company and do not encroach upon the property of, or otherwise conflict with the property rights of, any other Person.

գույքը), եւ Ձեռքբերված Ընկերության կողմից Հաշվեկշռին անսամքվից հետո գնված ամբողջ գույքը եւ միջոցները (բացառությամբ Գործունեության Ընական անձ Ընթացքում եւ նախկին գործունեությանն համապատասխան Հաշվեկշռին անսամքվից հետո գնված եւ վաճառված շարժական գույքը): Հաշվեկշռում եւ Նախնական Հաշվեկշռում արտացոլված բոլոր նյութական ամնեքներն եւ միջոցները ազատ եւ զերծ են բոլոր Ծանրաբեռնումներից եւ, անշարժ գույքի դեպքում, առկա չեն սերվիտուտներից, կառուցների օգտագործման սահմանափակումների, բացառությունների, վեճերի, կամ որեւէ բնույթի սահմանափակումների բացի, այդ գույքի եւ միջոցների մասով, (ա) Հաշվեկշռում կամ Նախնական Հաշվեկշռում որպես տվյալ պարտավորությունների կամ պարտավականությունների ապահովող արտացոլված գրավները կամ գրավադրումները , որոնց նկատմամբ գոյություն չունեն որեւէ խախտում (կամ դեպք որը, ծանուցմամբ կամ ժամանակի ընթացքում կամ երկու դեպքում էլ, կհամարվեր խախտում), (բ) գրավներ կամ գրավադրումներ որոնք առաջացել են գույքի կամ միջոցների գնման արդյունքում Նախնական Հաշվեկշռի անսամքվից հետո (գրավները եւ գրավադրումները տարածվելով բացառապես գնված գույքի կամ միջոցների վրա), որոնց նկատմամբ գոյություն չունի որեւէ խախտում (կամ դեպք որը, ծանուցմամբ կամ ժամանակի ընթացքում կամ երկու դեպքում էլ, կհամարվեր խախտում), (գ) ընթացիկ հարկերի վճարման ժամկետը դեռ չի մոտեցել, եւ (դ) անշարժ գույքի մասով (i) սեփականության չնչին թերությունները, եթե կան, որոնցից ոչ մեկը գումարի իմաստով զգալի չէ, նյութականորեն չեն պակասեցնում նշված գույքի արժեքը կամ բացասաբար չեն ազդում դրա օգտագործման վրա, կամ բացասաբար չեն ազդում Ձեռքբերված Ընկերության գործունեության վրա, եւ (ii) գոտիավորման օրենքները եւ հողի օգտագործման այլ սահմանափակումները բացասաբար չեն ազդում սույնի առայժմ գույքի ներկա կամ սպասվող օգտագործման վրա: Ձեռքբերված

26

Ընկերության կողմից տնօրինվող բոլոր շենքերը, գործարանները, եւ կառույցները տեղակայված են Ձեռքբերված Ընկերության կողմից տնօրինվող անշարժ գույքի սահմաններից ներս, եւ չեն տարածվում կամ այլ կերպ բաժանում մեջ չեն գտնվում այլ Անձի գույքի վրա կամ դրա գույքային իրավունքների հետ:

### 3.7 Condition and Sufficiency of Assets.

The buildings, plants, structures, and equipment of the Acquired Company are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, or equipment is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The building, plants, structures, and equipment of the Acquired Company are sufficient for the continued conduct of the Acquired Company's business after the Closing in substantially the same manner as conducted prior to the Closing.

### 3.7 Գույքի Վիճակը եւ Բավարարությունը:

Ձեռքբերված Ընկերության շենքերը, գործարանները, կառույցները, եւ սարքավորումները կառուցվածքային տեսանկյունից պատշաճ վիճակում են, աշխատունակ են, եւ վիճակում են վերանորոգված են, եւ համապատասխանում են իրենց օգտագործման նպատակին, եւ այդ շենքերից, գործարաններից, կառույցներից կամ սարքավորումներից ոչ մեկը կարիք չունի վերանորոգման կամ նորոգման բացի սովորական, առժամանակյա սպասարկումը եւ վերանորոգումը որը իր բնույթով կամ արժեքով էական չէ: Ձեռքբերված Ընկերության շենքերը, գործարանները, կառույցները, եւ սարքավորումները բավարար են Ձեռքբերված Ընկերության շարունակական գործունեության համար Կատարումից հետո հիմնականորեն նույն ձեւով ինչպես իրականացվել է մինչեւ Կատարումը:

### 3.8 Accounts Receivable.

All accounts receivable of the Acquired Company that are reflected on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Acquired Company as of Closing Date (collectively, the "Accounts Receivable") represent or will represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Unless paid prior to the Closing Date, the Accounts Receivable are or will be as of the Closing Date current and collectible net of the respective reserves shown on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Acquired Company as of the

### 3.8 Սպասվող Հասույթը:

Ձեռքբերված Ընկերության Հաշվեկշռում կամ Նախնական Հաշվեկշռում արտացոլված ամբողջ սպասվող հասույթը Կատարման Ամսաթվի դրությամբ (միասնաբար՝ «Սպասվող Հասույթ») ներկայացնում է կամ կներկայացնի Գործունեության Բնականոն Ընթացքում փաստացիորեն կատարված վաճառքի կամ ծառայությունների մատուցումից առաջացած պատշաճ պարտավորություններ: Բացի մինչեւ Կատարման Ամսաթիվը վճարված լինելու դեպքերից, Սպասվող Հասույթը Կատարման Ամսաթվի դրությամբ հանդիսանում է, կամ կհանդիսանա ընթացիկ եւ ատացման տեսանկյունից հուսալի պարտավորություն ինչպես

27

records of the Acquired Company as of the Closing Date (which reserves are adequate and calculated consistent with past practice and, in the case of the reserve as of the Closing Date, will not represent a greater percentage of the Accounts Receivable as of the Closing Date than the reserve reflected in the Interim Balance Sheet represented of the Accounts Receivable reflected therein and will not represent a material adverse change in the composition of such Accounts Receivable in terms of aging). Subject to such reserves, each of the Accounts Receivable either has been or will be collected in full, without any set-off, within ninety days after the day on which it first becomes due and payable. There is no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable. Part 3.8 of the Disclosure Letter contains a complete and accurate list of all Accounts Receivable as of the date of the Interim Balance Sheet, which list sets forth the aging of such Accounts Receivable.

3.9    **Inventory**. All inventory of the Acquired Company, whether or not reflected in the Balance Sheet or the Interim Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course of Business, except for obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value in the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Acquired Company as of the Closing Date, as the case may be. All inventories not written off have been priced at the lower of cost or market value basis. The quantities

ներկայացված է Հաշվեկռռում եւ Նախնական Հաշվեկռռում կամ Ձեռքբերված Ընկերության հաշվապահական գրանցումներում Կատարման Ամսաթվի դրությամբ (որոնք համապատասխանում են եւ հաշվարկված են անցած ժամանակաշրջանների փորձի համաձայն, եւ Կատարման Ամսաթվին որպես սպասելիր գրանցված լինելու դեպքում, դրանք գումարով Սպասվող Հասույթի առավել մեծ մաս չեն լինի քան նշված է Հաշվեկռռում կամ Նախնական Հաշվեկռռում եւ չի փոխի Սպասվող Հասույթի կազմի ժամանակի ընթացքում): Նշված գրանցումների պայմանով, Սպասվող Հասույթից յուրաքանչյուրը կամ արդեն ամբողջապես ստացվել է, կամ էլ ամբողջապես կստացվի, առանց հաշվանցման, վճարման ենթակա դառնալու ամսաթվից հիսնուն օրվա ընթացքում: Գոյություն չունի որեւէ անհամաձայնություն, հայց, կամ հաշվանցման իրավունք, բացի Գործունեության Բնականոն Ընթացքում վճարվելուց, որեւէ Պայմանագրի համաձայն որեւէ պարտապանի հետ Սպասվող Հասույթի մասով կապված Սպասվող Հասույթի ստացվելիք գումարների հետ: Բացահայտումած Նամակի Բաժին 3.8-ը Ներառում է ամբողջ Սպասվող Հասույթի ամբողջ եւ ճիշտ ցուցակը Նախնական Հաշվեկշռի ամսաթվի դրությամբ, որը ներկայացնում է Սպասվող Հասույթների ստացման ժամանակացույցը:

3.9    **Մնացորդ**: Ձեռքբերված Ընկերության բոլոր մնացորդները, անկախ Հաշվեկռռում կամ Նախնական Հաշվեկռռում արտացոլված լինելու հանգամանքից, բաղկացած են Գործունեության Բնականոն Ընթացքում օգտագործելի եւ իրացվելի որակից եւ քանակից, բացառությամբ պիտանիությունը կորցրած եւ ցածրորակ մրախորհերին, որոնք բոլորը դուրս են գրվել կամ գրանցվել են իրենց ինքնարժեքով Հաշվեկռռում կամ Նախնական Հաշվեկռռում կամ Ձեռքբերված Ընկերության հաշվապահական գրանցումներում Կատարման Ամսաթվի դրությամբ, կախված դեպքից: Դուրս չգրված բոլոր մնացորդներն

28

cost or market value basis. The quantities of each item of inventory (whether raw materials, work-in-process, or finished goods) are not excessive, but are reasonable in the present circumstances of the Acquired Company.

3.10  **No Undisclosed Liabilities**. Except as set forth in Part 3.10 of the Disclosure Letter, the Acquired Company has no liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) except for liabilities or obligations reflected or reserved against in the Balance Sheet or the Interim Balance Sheet.

3.11  **Taxes**.

(a)    The Acquired Company has filed or caused to be filed all Tax Returns that are or were required to be filed by or with respect to any of it, either separately or as a member of a group of corporations, pursuant to applicable Legal Requirements. Sellers have delivered to Buyer copies of, and Part 3.11 of the Disclosure Letter contains a complete and accurate list of, all such Tax Returns. The Acquired Company has paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to those Tax Returns or otherwise, or pursuant to any assessment received by the Acquired Company, except such Taxes, if any, as are listed in Part 3.11 of the Disclosure Letter and are being contested in good faith and as to which adequate reserves have been provided in the Balance Sheet and the Interim Balance

գնահատվել են իրենց շուկայական արժեքով: Մնացորդի յուրաքանչյուր միավորի ծավալները (լինի դա հումք, կիսաարտադրանք, կամ պատրաստի արտադրանք) չափից ավելի չեն, սակայն ողջամիտ են ներկա Ձեռքբերված Ընկերության ներկա իրավիճակում:

3.10  Չբացահայտված Պարտավորությունների Բացակայություն: Բացի Բացահայտման Նամակի Բաժին 3.10-ում նշվածից, Ձեռքբերված Ընկերությունը չունի որեւէ պարտավորություն կամ որեւէ բնույթի պարտք (լինի դա հայտնի թե անհայտ, իրական, տեղկատվ բարդդված, պայմանով, կամ այլ ձեւ) բացի Հաշվեկշռում կամ Նախնական Հաշվեկշռում արտացոլված կամ նախատեսված պարտավորություններից եւ պարտքերից:

3.11  Հարկեր:

(ա)  Ձեռքբերված Ընկերությունը ներկայացրել է, կամ ներկայացնել է տվել բոլոր Հարկային Հաշվետվությունները որոնք անհրաժեշտ են, կամ եղել են անհրաժեշտ ներկայացման իր կողմից կամ իր հետ կապված, լինի դա առանձին կամ որպես ընկերությունների խմբի միջոցով ներկայացված, գործող Օրենքի Պահանջի համաձայն: Վաճառողները Գնորդին են տրամադրել պատճեններ, եւ Բացահայտման Նամակի Բաժին 3.11-ն իր մեջ ներառում է ամբողջական եւ միշտ ցուցական բոլոր ճնած Հարկային Հաշվետվությունների: Ձեռքբերված Ընկերությունը վճարել է, կամ հատկացրել է վճարելու համար, բոլոր Հարկերը որոնք պետք է կամ հնարավոր է որ առաջ լինելի վճարման համար համաձայն այդ Հարկային Հաշվետվությունների կամ այլ կերպ, կամ Ձեռքբերված Ընկերության որեւէ ստուգմման համաձայն, բացի Հարկերից, եթե

29

Sheet and the Interim Balance Sheet.

(b)    The Tax Returns of the Acquired Company subject to such Taxes have been audited by all the relevant authorities or are closed by the applicable statute of limitations for all taxable years through the date of Closing.  Part 3.11 of the Disclosure Letter contains a complete and accurate list of all audits of all such Tax Returns, including a reasonably detailed description of the nature and outcome of each audit.  All deficiencies proposed as a result of such audits have been paid, reserved against, settled, or, as described in Part 3.11 of the Disclosure Letter, are being contested in good faith by appropriate proceedings.  Part 3.11 of the Disclosure Letter describes all adjustments for all taxable years since 1999.  Except as described in Part 3.11 of the Disclosure Letter, no Seller or Acquired Company has given or been requested to give waivers or extensions (or is or would be subject to a waiver or extension given by any other Person) of any statute of limitations relating to the payment of Taxes of the Acquired Company or for which the Acquired Company may be liable.

այլապիսիր կան, որոնք ներկայացված են Բացահայտման Նամակի Բաժնի 3.11-ում եւ որոնց վճարումը վիճարկվում է բարի կամքով եւ որոնց վճարման համար համապատասխանական մնացորդներ պահվել են Հաշվեկշռում եւ Նախնական Հաշվեկշռում:

(բ)    Հարկերի վերաբերյալ Ձեռքբերված Ընկերության Հարկային Հաշվետվությունները ենթարկվել են աուդիտի բոլոր համապատասխանական մարմինների կողմից կամ փակվել են գործող հայցային վաղեմության պատմառառ հարկվող բոլոր տարիների համար մինչեւ Կատարման ամսաթիվը: Բացահայտման Նամակի Բաժին 3.11-ը ներառում է Հարկային Հաշվետվությունների բոլոր ստուգումների ամբողջական եւ ճիշտ ցուցակը, ներառյալ յուրաքանչյուր ստուգման արդյունքի ոզջմտորեն մանրամասն նկարագրությունը: Յուրաքանչյուր ստուգման արդյունքներում առաջարկված բոլոր տարբերությունները վճարվել, հատկացվել, հաշտեցվել են, կամ, ինչպես նկարագրված է Բացահայտման Նամակի Բաժնի 3.11-ում, վիճարկվում են բարի կամքով համապատասխան վարույթներում: Բացահայտման Նամակի Բաժնի 3.11-ը նկարագրում է հարկային տարիների համար կատարված բոլոր ճշտումները 1999թ-ից սկսած: Բացի Բացահայտման Նամակի Բաժնի 3.11-ում նկարագրվածից, Ձեռքբերված Ընկերությունից կամ որեւէ Վաճառողից չի պահանջվել հրաժարվել հայցային վաղեմության որեւէ ժամկետից կամ երկարացնել հայցային որեւէ ժամկետ (կամ չեն ենթարկվել կամ չեն ենթարկվել որեւէ Անձի կողմից հայցային որեւէ ժամկետից հրաժառման կամ հայցային որեւէ ժամկետի երկարացման) որը վերաբերվում է

30

(c)    The charges, accruals, and reserves with respect to Taxes on the respective books of the Acquired Company are adequate and are at least equal to the Acquired Company's liability for Taxes.  There exists no proposed tax assessment against the Acquired Company except as disclosed in the Balance Sheet or in Part 3.11 of the Disclosure Letter. All Taxes that the Acquired Company is or was required by Legal Requirements to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Body or other Person.

(d)    All Tax Returns filed by (or that include on a consolidated basis) the Acquired Company are true, correct, and complete.  There is no tax sharing agreement that will require any payment by the Acquired Company after the date of this Agreement.

**3.12    No Material Adverse Change.**  Since the date of the Balance Sheet, there has not been any adverse change in the business, operations, properties, prospects, assets, or condition of the Acquired Company, and no event

Ձեռքբերված Ընկերության Հարկերի, կամ Հարկերի որևից վճարման համար Ձեռքբերված Ընկերությունը կարող է պարտավորված համարվել, վճարումը:

(գ)    Ձեռքբերված Ընկերության համապատասխան գրքերում Հարկերի մասով կատարված գանձումները, հավելումները եւ հատկացումներն շվարկներն համապատասխան են եւ առնվազն հավասար են Հարկերի մասով Ձեռքբերված Ընկերության պարտավորությանը: Ձեռքբերված Ընկերության նկատմամբ գոյություն չունի իրականացված որեւէ ստուգում բացի Հաշվեկշռում արտացոլվածներից կամ Բացահայտման Նամակի Բաժին 3.11-ում ներկայացվածներից: Բոլոր Հարկերը, որոնք Ձեռքբերված Ընկերությունն Օրենքի Պահանջի համաձայն պետք է պահեր կամ ստանար պատշաճ կերպով պահվել կամ ստացվել են եւ, պահանջվող չափով, վճարվել են համապատասխան Կառավարական Մարմնին կամ այլ Անձին:

(դ)    Ձեռքբերված Ընկերության կողմից ներկայացված (կամ միասնական ձեռոք ներկայացված) բոլոր Հարկային Հաշվետվությունններն ճիշտ են, ճշմարիտ են, եւ ամբողջական են: Գոյություն չունի հարկերի բաժանմման որեւէ պայմանագիր համաձայն որի կպահանջվեն վճարումներ Ձեռքբերված Ընկերության կողմից սույն Պայմանագրի ամսաթվից հետո:

**3.12    Նյութական Բացասական Փոփոխության Բացակայություն:** Հաշվեկշռի ամսաթվից սկսած, չի եղել Ձեռքբերված Ընկերության գործունեության, աշխատանքներն, գույքերի, հեռանկարների, միջոցների, կամ

of the Acquired Company, and no event has occurred or circumstance exists that may result in such a material adverse change.

**3.13** **Employee benefits.**

(a)    Part 3.13(i) of the Disclosure Letter contains a complete and accurate list of all Company employee benefit plans and obligations.

(b)    The consummation of the Contemplated Transactions will not result in the payment, vesting, or acceleration of any benefit.

**3.14** **Compliance with Legal Requirements; Governmental Authorizations.**

(a)    Except as set forth in Part 3.14 of the Disclosure Letter:

(i)    The Acquired Company is, and at all times has been, in full compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets;

(ii)    no event has occurred or circumstance exists that (with or without

վիճակի բացասական փոփոխություն, եւ չի պատահել որեւէ դեպք կամ գոյություն չունի որեւէ հանգամանք որի արդյունքում կարող է տեղի ունենալ նման նյութական բացասական փոփոխությունը:

**3.13    Աշխատողների Արտոնություններ:**

(ա) . Բացահայտման Նամակի Բաժին 3.13(i)-ը ներառում է Ընկերության աշխատողների արտոնությունների եւ դրա վերաբերյալ պարտավորությունների ամբողջական եւ ճիշտ ցուցակը:

(բ)    Նախատեսված Գործարքների իրականացումն արդյունք չի հանդիսանա որեւէ արտոնության վճարման, տրման կամ ծավալման համար:

**3.14    Օրենքի Պահանջին Ենթարկվելը; Կառավարական Լիազորություններ:**

(ա)    Բացի Բացահայտման Նամակի Բաժին 3.14-ում ներկայացվածի.

(i)    Ձեռքբերված Ընկերությունը ամբողջովին ենթարկվում է, եւ բոլոր ժամանակներում ամբողջովին ենթարկվել է իրեն, իր գործունեության կամ դրա վարմանը, իր ջանկացած միջոցների տնօրինմանը կամ օգագործմանը վերաբերող յուրաքանչյուր Օրենքի Պահանջին;

(ii)    տեղի չի ունեցել որեւէ դեպք կամ գոյություն չունի որեւէ

exists that (with or without notice or lapse of time) (A) may constitute or result in a violation by the Acquired Company of, or a failure on the part of the Acquired Company to comply with, any Legal Requirement, or (B) may give rise to any obligation on the part of the Acquired Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature; and

(iii)    The Acquired Company has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement, or (B) any actual, alleged, possible, or potential obligation on the part of the Acquired Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(b)    Part 3.14 of the Disclosure Letter contains a complete and accurate list of each Governmental Authorization that is held by the Acquired Company or that otherwise relates to the business of, or to any of the assets owned or used by, the Acquired Company. Each Governmental Authorization listed or required to

հանգամանք որը (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում) (Ա) կարող է համավել կամ այդյունք հանդիսանալ Ձեռքբերված Ընկերության կողմից որևէ Օրենքի Պահանջի խախտման կամ չենթարկվելուն, եւ (Բ) կարող է առաջացնել Ձեռքբերված Ընկերության կողմից որևէ, բնույթի փոխխատուցման գործողության կամ դրա որևէ մասի կատարման, եւ

(iii)    Ձեռքբերված Ընկերությունը չի ստացել, երբևէ, որևէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որևէ Կառավարական Մարմնից կամ այլ Անձից որը վերաբերվում է (Ա) որևէ Օրենքի Պահանջի որևէ փաստացի, պասիվ ենթադրվող, հնարավոր կամ պոտենցիալ խախտմանը, կամ դրան չենթարկվելուն, կամ (Բ) Ձեռքբերված Ընկերության կողմից որևէ փաստացի, պասիվ ենթադրվող, հնարավոր, կամ պոտենցիալ պարտավորությանը հատուցելու, կամ ամբողջովին կամ մասամբ վճարելու որևէ բնույթի որևէ փոխխատուցում:

(բ)    Բացահայտման Նամակի Բաժին 3.14-ը ներառում է Ձեռքբերված Ընկերությունը պատկանող կամ նրա գործունեությանը, միջոցների ունիորիճմանը կամ օգտագործմանը վերաբերող բոլոր Կառավարական Լիազորություններն ամբողջական եւ ճիշտ ցուցակը: Բացահայտման Նամակի Բաժին 3.14-ում

33

Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter is valid and in full force and effect.  Except as set forth in Part 3.14 of the Disclosure Letter:

      (i)    The Acquired Company is, and at all times has been, in full compliance with all of the terms and requirements of each Governmental Authorization identified or required to be identified in Part 3.14 of the Disclosure Letter;

      (ii)    no event has occurred or circumstance exists that may (with or without notice or lapse of time) (A) constitute or result directly or indirectly in a violation of or a failure to comply with any term or requirement of any Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter, or (B) result directly or indirectly in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter;

ներկայացված կամ ներկայացման ենթակա յուրաքանչյուր Կառավարական Լիազորություն իսկական է եւ ունի լրիվ իրավական ուժ եւ ունակություն: Բացի Բացահայտման Նամակի Բաժնի 3.14-ում ներկայացվածի`

      (i)    Ձեռքբերված Ընկերությունը ամբողջությամբ ենթարկվում եւ բոլոր ժամանակներում ամբողջությամբ ենթարկվել է Բացահայտման Նամակի Բաժնի 3.14-ում ներկայացված կամ ներկայացման ենթակա յուրաքանչյուր Կառավարական Լիազորության բոլոր պայմաններին եւ պահանջներին,

      (ii)    տեղի չի ունեցել որեւէ դեպք եւ գոյություն չունի որեւէ հանգամանք որը կարող է (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում) (Ա)ուղղակիորեն կամ անուղղակիորեն հանդիսանա կամ պատճառ դառնա Բացահայտման Նամակի Բաժնի 3.14-ում ներկայացված կամ ներկայացման ենթակա որեւէ Կառավարական Լիազորության որեւէ պայմանի կամ պահանջի խախտման կամ չենթարկվելուն, կամ (Բ) ուղղակիորեն կամ անուղղակիորեն պատառաո հանդիսանա Բացահայտման Նամակի Բաժնի 3.14-ում ներկայացված կամ ներկայացման ենթակա որեւէ Կառավարական Լիազորության չեղյալ

(iii)    The Acquired Company has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with any term or requirement of any Governmental Authorization, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Governmental Authorization; and

(iv)    all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Part 3.14 of the Disclosure Letter have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been

(iii)    Ձեռքբերված Ընկերությունը չի ստացել, երբեւէ, որեւէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որեւէ Կառավարական Մարմնից կամ այլ Անձից որը վերաբերվում է (Ա) որեւէ Կառավարական Լիազորության որեւէ պայմանի կամ պահանջի որեւէ փաստացի, պարտադրվող, հնարավոր կամ պոտենցիալ խախտմանը, կամ դրան չենթարկվելուն, կամ (Բ) որեւէ Կառավարական Լիազորության որեւէ փաստացի, պարտադրվող, հնարավոր, կամ պոտենցիալ չեղյալ հայտարարելուն, հետ վերցնելուն, առկախմանը, չեզոքացմանը, կամ վերացմանը, կամ փոփոխմանը, եւ

(iv)    Բացահայտման Նամակի Բաժին 3.14-ում ներկայացված կամ ներկայացման ենթակա Կառավարական Լիազորությունների նորացման համար պահանջվող բոլոր դիմումները պատշաճ կերպով եւ ժամանակին ներկայացվել են համապատասխան Կառավարական Մարմիններին, եւ այդ Կառավարական Լիազորությունների

35

Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies.

կապակցությամբ պահանջվող բոլոր այլ գրանցումները պատշաճ կերպով եւ ժամանակին կատարվել են համապատասխան Կառավարական Մարմինների մոտ:

The Governmental Authorizations listed in Part 3.14 of the Disclosure Letter collectively constitute all of the Governmental Authorizations necessary to permit the Acquired Company to lawfully conduct and operate their businesses in the manner they currently conduct and operate such businesses and to permit the Acquired Company to own and use their assets in the manner in which they currently own and use such assets.

Բացահայտման Նամակի Բաժին 3.14-ում ներկայացված Կառավարական Լիազորությունները միասնաբար հանդիսանում են այն բոլոր Կառավարական Լիազորությունները, որոնք անհրաժեշտ են Ձեռքբերված Ընկերության գործունեությունը օրինականորեն վարելու համար այնպես ինչպես վարվում է տվյալ պահին, ինչպես նաեւ Ձեռքբերված Ընկերությանը թույլ տալու համար որպեսզի այն տնօրինի եւ օգտագործի իր միջոցները այնպես ինչպես այն տնօրինվում եւ օգտագործվում է ներկա պահին:

3.15    **Legal Proceedings; Orders.**

3.15    Իրավական Վարույթներ; Հրամաններ

(a)    Except as set forth in Part 3.15 of the Disclosure Letter, there is no pending Proceeding:

(ա)    Բացահայտման Նամակի Բաժին 3.15-ում նշվածից բացի գոյություն չունեն ընթացքում գտնվող Վարույթներ`

(i)    that has been commenced by or against the Acquired Company or that otherwise relates to or may affect the business of, or any of the assets owned or used by, the Acquired Company; or

(i)    որոնք սկսվել են Ձեռքբերված Ընկերության կողմից կամ դեմ կամ այլ կերպ առնչվում են կամ կարող են ազդել Ձեռքբերված Ընկերության գործունեությանը կամ նրա կողմից տնօրինվող կամ օգտագործվող որեւէ միջոցներին, կամ

36

(ii)    that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

To the Knowledge of Sellers and the Acquired Company, (1) no such Proceeding has been Threatened, and (2) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Proceeding. Sellers have delivered to Buyer copies of all pleadings, correspondence, and other documents relating to each Proceeding listed in Part 3.15 of the Disclosure Letter. The Proceedings listed in Part 3.15 of the Disclosure Letter will not have a material adverse effect on the business, operations, assets, condition, or prospects of the Acquired Company.

(b)    Except as set forth in Part 3.15 of the Disclosure Letter:

(i)    there is no Order to which the Acquired Company, or any of the assets owned or used by the Acquired Company, is subject;

(ii)    no Seller is subject to any Order that relates to the business of, or any of the assets owned or used by, the Acquired Company; and

(ii)    որը սպառնում է, կամ կարող է արգելել, հետաձգել, անօրինական դարձնել, կամ այլ կերպ խանգարել Նախատեսվող Գործարքներից որևէ մեկին:

Վաճառողների եւ Ձեռքբերված Ընկերության Իմացությամբ, (1) ոչ մի նման Վարույթ չի Սպառնում, եւ (2) ոչ մի դեպք տեղի չի ունեցել կամ գործություն չունի որևէ հանգամանք որը կարող է առաջացնել կամ հիմք հանդիսանալ որևէ նման Վարույթի հարուցմանը: Վաճառողները Գնորդին տրամադրել են Բացահայտման Նամակի Բաժնի 3.15-ում ներկայացված յուրաքանչյուր Վարույթին առնչվող բոլոր միջնորդությունները, նամակագրությունը, եւ այլ փաստաթղթերը: Բացահայտման Նամակի Բաժնի 3.15-ում ներկայացված Վարույթները չեն ունենա Գյուղական բացասական ազդեցություն Ձեռքբերված Ընկերության գործունեության, աշխատանքների, միջոցների, վիճակի, կամ հեռանկարների վրա:

(բ)    Բացահայտման Նամակի Բաժնի 3.15-ում նշվածից բացի.

(i)    գործություն չունի Հրաման որին ենթակա է Ձեռքբերված Ընկերությունը, կամ նրա տնօրինմ ան կամ օգտագործման տակ գտնվող որևէ միջոցները,

(ii)    ոչ մի Վաճառող ենթակա չի որևէ Հրամանի որն առնչվում է Ձեռքբերված Ընկերության գործունեությանը, կամ նրա տնօրինման կամ

37

Company; and

(iii)    no officer, director, agent, or employee of the Acquired Company is subject to any Order that prohibits such officer, director, agent, or employee from engaging in or continuing any conduct, activity, or practice relating to the business of the Acquired Company.

(c)    Except as set forth in Part 3.15 of the Disclosure Letter:

(i)    The Acquired Company is, and at all times has been, in full compliance with all of the terms and requirements of each Order to which it, or any of the assets owned or used by it, is or has been subject;

(ii)    no event has occurred or circumstance exists that may constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement of any Order to which the Acquired Company, or any of the assets owned or used by the Acquired Company, is

օգտագործման տակ գտնվող որևէ միջոցներին, եւ

(iii)    Ձեռքբերված Ընկերության ոչ մի պաշտոնյա, տնօրեն, գործակալ, կամ աշխատող ենթակա չի որևէ Հրամանի որն արգելում է այդ պաշտոնյային, տնօրենին, գործակալին, կամ աշխատողին զբաղվելու կամ շարունակելու Ձեռքբերված Ընկերության գործունեության հետ առնչվող որևէ գործողություն, գործունեություն, կամ աշխատանքը:

(գ)    Բացահայտման Նամակի Բաժին 3.15-ում նշվածից բացի՝

(i)    Ձեռքբերված Ընկերությունը ամբողջովին ենթարկվում է, եւ բոլոր ժամանակներում ամբողջովին ենթարկվել է իրեն, իր գործունեության կամ դրա վարմանը, իր ցանկացած միջոցների տնօրինմանը կամ օգտագործմանը ներկայումս կամ անցյալում վերաբերող յուրաքանչյուր Հրամանի;

(ii)    տեղի չի ունեցել որևէ դեպք կամ գոյություն չունի որևէ հանգամանք որը (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում) կարող է համարվել կամ արդյունք հանգեցնած Ձեռքբերված Ընկերության կողմից Ձեռքբերված Ընկերությանը, կամ նրա կողմից տնօրինվող

Acquired Company, is subject; and

(iii)    the Acquired Company has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any term or requirement of any Order to which the Acquired Company, or any of the assets owned or used by the Acquired Company, is or has been subject.

3.16    **Absence of Certain Changes and Events**. Except as set forth in Part 3.16 of the Disclosure Letter, since the date of the Balance Sheet, the Acquired Company has conducted its businesses only in the Ordinary Course of Business and there has not been any:

(a)    change in the Acquired Company's authorized or issued capital; grant of any share option or right to purchase shares of capital of the Acquired Company; issuance of any security convertible into such capital stock; grant of any registration rights; purchase, redemption, retirement, or other acquisition by the Acquired Company of any shares; or declaration or payment of any

---

կամ օգտագործվող ցանկացած միջոցներին վերաբերող որտեղ Հրամանի որեւէ պայմանի կամ պահանջի խախտմանն կամ չենթարկվելուն, եւ

(iii)    Ձեռքբերված Ընկերությունը չի ստացել, երբեւէ, որեւէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որեւէ Կառավարական Մարմնից կամ այլ Անձից որը վերաբերվում է Ձեռքբերված Ընկերությանը, կամ նրա կողմից տնօրինվող կամ օգտագործվող որեւէ միջոցներին վերաբերող որեւէ Հրամանի որեւէ պայմանի կամ պահանջի որեւէ փաստացի, պատատադրվող, հնարավոր կամ պոտենցիալ խախտմանը, կամ դրան չենթարկվելուն:

3.16    Որոշակի Փոփոխությունների եւ Դեպքերի Բացակայություն: Բացառությամբ Նամակի Բաժին 3.16-ում ներկայացվածից բացի, Հաշվեկշռի ամսաթվից սկսած, Ձեռքբերված Ընկերությունն իր գործունեությունն վարել է բացառապես Գործունեության Բնականոն Ընթացքով եւ չի եղել որեւէ.

(ա)    Ձեռքբերված Ընկերության կանոնադրական կամ թողարկված կապիտալի փոփոխություն, Ձեռքբերված Ընկերության որեւէ բաժնեմասի կամ բաժնեմասի գնման իրավունքի շնորհում, բաժնեմասի փոխակերպվող արժեթղթերի որեւէ թողարկում, որեւէ գրանցման իրավունքների շնորհում, գնում, մարում, վերացում, կամ Ձեռքբերված Ընկերության կողմից ցանկացած բաժնեմասի ձեռք

39

declaration or payment of any dividend or other distribution or payment;

(b) amendment to the Organizational Documents of the Acquired Company;

(c) payment or increase by the Acquired Company of any bonuses, salaries, or other compensation to any stockholder, director, officer, or (except in the Ordinary Course of Business) employee or entry into any employment, severance, or similar Contract with any director, officer, or employee;

(d) adoption of, or increase in the payments to or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance, pension, retirement, or other employee benefit plan for or with any employees of the Acquired Company;

(e) damage to or destruction or loss of any asset or property of the Acquired Company, whether or not covered by insurance, materially and adversely affecting the properties, assets, business, financial condition, or prospects of the Acquired Company, taken as a whole;

(f) entry into, termination of, or receipt of notice of termination of (i) any license,

բերում, կամ դիվիդենտների հայտարարում կամ վճարում կամ վճարումների այլ տեսակի բաշխում,

(բ) Ձեռքբերվող Ընկերության Կազմակերպչական Փաստաթղթերի փոփոխություն,

(q) Ձեռքբերվող Ընկերության կողմից որևէ բաժնետերերին, տնօրեններին, պաշտոնյաներին, կամ (բացի Գործունեության Բնականոն Ընթացքից) աշխատողներին որևէ հավելումների, աշխատավարձերի, կամ այլ փոխհատուցումների վճարում կամ ավելացում կամ աշխատանքային, արձակման նպաստի, կամ համանման Պայմանագրի ստորագրում որևէ տնօրենի, պաշտոնյայի, կամ աշխատողի հետ,

(դ) Ձեռքբերվող Ընկերության աշխատողների հետ որևէ շահույթի կիսման, հավելյան, փոլայի փոխհատուցման, խնայման, ապահովագրման, կենսաթոշակի, թոշակի անցնելու, կամ այլ աշխատանքային արտոնությունների ընդունում, կամ վճարման մեջ հավելյալ կամ այլ արտոնություն,

(ե) Ձեռքբարվող Ընկերության որևէ միջոցի կամ գույքի վնասում, վատնում կամ կորուստ, լինի ապահովագրված կամ ոչ, Ձեռքբերված Ընկերության ամբողջությամբ վերցրած նյութականորեն կամ բացասականորեն գույքի, միջոցների, գործունեության, ֆինանսական իրավիճակի, կամ հեռանկարների վրա ազդող,

(զ) (i) ցանկացած լիցենզիայի, ստեղտրպային ներկայացուցչության, դիլերային,

of termination of (i) any license, distributorship, dealer, sales representative, joint venture, credit, or similar agreement, or (ii) any Contract or transaction involving a total remaining commitment by or to the Acquired Company of at least $1,000.00 USD;

վաճառքի ներկայացուցչության, համատեղ ձեռնարկության, վարկի, կամ համանման պայմանագրերի, կամ (ii) Ձեռքբերված Ընկերության կողմից առնվազն $1,000.00 ԱՄՆ Դոլարի ընդհանուր մնացորդային պարտավորվածություն պահանջող ցանկացած Պայմանագրի կամ գործարքի կնքում, լուծում, կամ լուծման ծանուցման ստացում,

(g)     sale (other than sales of inventory in the Ordinary Course of Business), lease, or other disposition of any asset or property of the Acquired Company or mortgage, pledge, or imposition of any lien or other encumbrance on any material asset or property of the Acquired Company, including the sale, lease, or other disposition of any of the Intellectual Property Assets;

(է)     Ձեռքբերված Ընկերության որևէ միջոցի կամ գույքի վաճառք (բացի Գործունեության Բնականոն Ընթացքում ապրանքների վաճառքից), վարձակալություն, կամ այլ տեղաբաշխում, կամ Ձեռքբերված Ընկերության որևէ նյութական միջոցի կամ գույքի գրավադրում, գրավ, կամ այլ պարտավորության տեղաբաշխում կամ ծանրաբեռնում, ներառյալ որևէ Մտավոր Սեփականության Միջոցների վաճառքը, վարձակալությունը, կամ այլ կերպ տեղաբաշխումը,

(h)     cancellation or waiver of any claims or rights with a value to the Acquired Company;

(թ)     արժեք ունեցող որևէ պահանջի կամ իրավունքի վերացումն կամ դրանցից հրաժարվելը Ձեռքբերված Ընկերության նկատմամբ,

(i)     material change in the accounting methods used by the Acquired Company; or

(ժ)     Ձեռքբերված Ընկերության կողմից օգտագործվող հաշվապահական մեթոդների նյութական փոփոխությունը, կամ

(j)     agreement, whether oral or written, by the Acquired Company to do any of the foregoing.

(ի)     Ձեռքբերված Ընկերության համաձայնությունը, բանավոր կամ գրավոր, վերոհիշյալից որևէ մեկն իրականացնելու վերաբերյալ:

### 3.17    Contracts; No Defaults.

3.17    Պայմանագրեր, Խախտման Բացակայություն:

(a)     Part 3.17(a) of the Disclosure Letter contains a

(ա)     Բացահայտման Նամակի Բաժինը 3.17(ա)-ն

41

Disclosure Letter contains a complete and accurate list, and Sellers have delivered to Buyer true and complete copies, of:

(i)      each Applicable Contract that involves performance of services or delivery of goods or materials by the Acquired Company;

(ii)     each Applicable Contract that involves performance of services or delivery of goods or materials to the Acquired Company;

(iii)    each Applicable Contract that was not entered into in the Ordinary Course of Business;

(iv)     each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Applicable Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property;

Ներառում է ամբողջական եւ ճիշտ ցուցակը, եւ Վաճառողներն Գնորդին տրամադրել են հետեւյալը.

(i)
յուրաքանչյուր Կիրառելի Պայմանագիրը որը ներառում է Ձեռքբերված Ընկերության կողմից ծառայությունների մատուցում կամ ապրանքների կամ նյութերի առաքում,

(ii)
յուրաքանչյուր Կիրառելի Պայմանագիրը որը ներառում է Ձեռքբերված Ընկերությանը ծառայությունների մատուցում կամ ապրանքների եւ նյութերի առաքում,

(iii)
յուրաքանչյուր Կիրառելի Պայմանագիրը որը չի ստորագրվել Գործունեության Բնականոն Ընթացքում,

(iv)
յուրաքանչյուր վարձակալությունը, վարձույթի կամ օգտագործման պայմանագիրը, լիցենզիան, պայմանական եւ տեղադրման վճարովի պայմանագիր, այլ Կիրառելի Պայմանագիրը որն ազդում է որեւէ անշարժ կամ շարժական գույքի տնօրինմանը, վարձակալմանը, սեփականատիրման իրավունքին, օգտագործմանը, վարձակալությամբ տրմանը կամ այլ գործարքին,

42

(v)     each licensing agreement or other Applicable Contract with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of the Intellectual Property Assets;

(vi)     each collective bargaining agreement and other Applicable Contract to or with any labor union or other employee representative of a group of employees;

(vii)     each joint venture, partnership, and other Applicable Contract (however named) involving a sharing of profits, losses, costs, or liabilities by the Acquired Company with any other Person;

(viii)     each Applicable Contract containing covenants that in any way purport to restrict the business activity of the Acquired Company or any Affiliate of the Acquired Company or limit the

(v)
յուրաքանչյուր լիցենզիայի պայմանագիր կամ այլ Կիրառելի Պայմանագիրն առնչվող պատենտներին, առեւտրային նշաններին, հեղինակային իրավունքներին, կամ այլ մտավոր սեփականությանը, ներառյալ պայմանագրերը ներկա եւ նախկին աշխատողների, խորհրդատուների, կամ կապալառուների հետ կամ Մտավոր Սեփականության Միջոցների չբացահայտմանն վերաբերյալ,

(vi)
յուրաքանչյուր կոլեկտիվ պայմանագիր կամ այլ Կիրառելի Պայմանագիր արհեստակցական միության հետ կամ միջ կամ այլ աշխատողների խմբի ներկայացուցչի,

(vii)
յուրաքանչյուր համատեղ ձեռնարկության, համագործակցության, եւ այլ Կիրառելի Պայմանագիր (ինչպես էլ որ անվանված լինի) որը ներառում է Ձեռքբերված Ընկերության կողմից որեւէ այլ Անձի հետ շահույթի, կորուստի, ինքնարժեքի կամ պարտավորությունների բաշխում,

(viii)
յուրաքանչյուր Կիրառելի Պայմանագիր որն ներառում է պարտավորություններ որոնք ինչ որ ձեւով հնարավոր է որ արգելակեն Ձեռքբերված Ընկերության

43

Company or limit the freedom of the Acquired Company or any Affiliate of the Acquired Company to engage in any line of business or to compete with any Person;

կամ Չեռքերված Ընկերության որեւէ Աֆիլացված Անձի գործունեությունը կամ սահմանափակեն Չեռքերված Ընկերության կամ Աֆիլացված Անձի ազատությունը զբաղվելու գործունեության ցանկացած տեսակով կամ մրցակցել այլ Անձի հետ,

(ix)    each Applicable Contract providing for payments to or by any Person based on sales, purchases, or profits, other than direct payments for goods;

(ix)    յուրաքանչյուր Կիրառելի Պայմանագիր որը սահմանում է որեւէ Անձին կամ նրանից վճարում կատարված վաճառքի, գնումների, կամ շահույթի հետ` բացի ապրանքների համար ուղղակի վճարումները,

(x)    each power of attorney that is currently effective and outstanding;

(x)    յուրաքանչյուր լիազորագիր որը ներկայումս գործում է ուժի մեջ կամ ժամկետանց է,

(xi)    each Applicable Contract entered into other than in the Ordinary Course of Business that contains or provides for an express undertaking by the Acquired Company to be responsible for consequential damages;

(xi)    յուրաքանչյուր Կիրառելի Պայմանագիր որը ստորագրվել է Գործունեության Բնականոն Ընթացքից դուրս որը ներառում կամ սահմանում է Չեռքերված Ընկերության կողմից արդյունքում ստեղծված վնասների համար հստակ պատասխանատվություն,

(xii)    each Applicable Contract for capital expenditures in excess of Two Thousand United States Dollars ($2,000.00);

(xii)    յուրաքանչյուր Կիրառելի Պայմանագիր Երկու Հազար ($2,000.00) ԱՄՆ Դոլարից ավելի արժողությամբ կապիտալ ծախսեր պահունակող,

44

(xiii)    each written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by the Acquired Company other than in the Ordinary Course of Business; and

(xiv)    each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

Part 3.17(a) of the Disclosure Letter sets forth reasonably complete details concerning such Contracts, including the parties to the Contracts, the amount of the remaining commitment of the Acquired Company under the Contracts, and the Acquired Company's office where details relating to the Contracts are located.

(b)    Except as set forth in Part 3.17(b) of the Disclosure Letter:

(i)    No Seller (and no Related Person of a Seller) has or may acquire any rights under, and no Seller has or may become subject to any obligation or liability under, any Contract that relates to the business

(xiii)    յուրաքանչյուր գրավոր երաշխիք, երաշխավորություն, եւ կամ այլ համանման պարտավորություն առնչվող Ձեռքբերված Ընկերության կողմից Գործունեության Բնականոն Ընթացքից դուրս պայմանագրային պարտավորությունների կատարմանը, եւ

(xiv)    յուրաքանչյուր փոփոխություն, հավելում, եւ նորացում (լինի բանավոր կամ գրավոր) վերոհիշյալին առնչվող:

Բացառությամբ Նամակի Բաժին 3.17(ա)-ն ներկայացնում է նման Պայմանագրերի ողջամտորեն ավարտուն մանրամասները, ներառյալ Պայմանագրի կողմերին, Պայմանագրերի համաձայն Ձեռքբերված Ընկերության պարտավորությունների մնացորդները, եւ Ձեռքբերված Ընկերության գրասենյակը որտեղ տեղադրված են Պայմանագրերին առնչվող մանրամասները:

(բ)    Բացառությամբ Նամակի Բաժին 3.17(բ)-ում ներկայացվածից բացի՝

(i)    ոչ մի Վաճառող (եւ որեւէ Վաճառողի ոչ մի Փոխկապակցված Անձ) չունի կամ չի կարող ձեռք բերել որեւէ իրավունք, եւ ոչ մի Վաճառող չունի եւ չի կարող մաս կազմել որեւէ

45

that relates to the business of, or any of the assets owned or used by, the Acquired Company; and

Պայմանագրի պարտավորությունը կամ պատասխանատվությանն որն առնչվում է. Ձեռքբերված Ընկերության գործունեությանը, նրա կողմից տնօրինվող կամ օգտագործվող միջոցներին, եւ

(ii)     no officer, director, agent, employee, consultant, or contractor of the Acquired Company is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant, or contractor to (A) engage in or continue any conduct, activity, or practice relating to the business of the Acquired Company, or (B) assign to the Acquired Company or to any other Person any rights to any invention, improvement, or discovery.

(ii)     Ձեռքբերված Ընկերության ոչ մի պաշտոնյա, տնօրեն, գործակալ, աշխատող, խորհրդատու, կամ կապալառու պարտավորված չէ որեւէ Պայմանագրով որը հնարավոր է որ սահմանափակի նման պաշտոնյայի, տնօրենի, գործակալի, աշխատողի, խորհրդատուի, կամ կապալառուի ունակությունը (Ա) զբաղվելու կամ շարունակելու զբաղվել գործով, գործունեությամբ, կամ աշխատանքով առնչվող Ձեռքբերված Ընկերության գործունեությանը, կամ (Բ) Ձեռքբերված Ընկերությանը կամ ցանկացած այլ Անձին շնորհելու ցանկացած գյուտի, բարելավման, կամ հայտնագործության իրավունքներ:

(c)     Except as set forth in Part 3.17(c) of the Disclosure Letter, each Contract identified or required to be identified in Part 3.17(a) of the Disclosure Letter is in full force and effect and is valid and enforceable in accordance with its terms.

(q)     Բացահայտման Նամակի Բաժին 3.17(q)-ում ներկայացվածից բացի, Բացահայտման Նամակի Բաժին 3.17(ա)-ում ներկայացված կամ ներկայացման ենթակա յուրաքանչյուր Պայմանագիր ունի լրիվ իրավական ուժ եւ իսկական է եւ կիրառելի է իր պայմաններին համաձայն:

(d)     Except as set forth in Part 3.17(d) of the Disclosure Letter:

(դ)     Բացահայտման Նամակի Բաժին 3.17(դ)-ում ներկայացվածից բացի`

46

Letter:

(i) The Acquired Company is, and at all times has been, in full compliance with all applicable terms and requirements of each Contract under which the Acquired Company has or had any obligation or liability or by which the Acquired Company or any of the assets owned or used by the Acquired Company is or was bound;

(ii) each other Person that has or had any obligation or liability under any Contract under which the Acquired Company has or had any rights is, and at all times has been, in full compliance with all applicable terms and requirements of such Contract;

(iii) no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with, or result in a violation or breach of, or give the Acquired Company or other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; and

(i) Ձեռքբերված Ընկերությունը ամբողջովին ենթարկվում է, եւ բոլոր ժամանակներում ամբողջովին ենթարկվել է իրեն, իր գործունեության կամ դրա վարմանը, իր ցանկացած միջոցների տնօրինման կամ օգագործման նկատմամբ ներկայուում կամ անցյալում կիրառելի յուրաքանչյուր Պայմանագրի պայմաններին եւ պահանջներին;

(ii) յուրաքանչյուր այլ Անձ որն ունի կամ ունեցել է որեւէ պարտավորություն համաձայն որեւէ Պայմանագրի համաձայն որի Ձեռքբերված Ընկերությունն ունի կամ ունեցել է որեւէ իրավունք ամբողջովին ենթարկվում է, եւ բոլոր ժամանակներում ամբողջովին ենթարկվել է նման Պայմանագրի գործող պայմաններին եւ պահանջներին;

(iii) տեղի չի ունեցել որեւէ դեպք կամ գոյություն չունի որեւէ հանգամանք որը (ծանուցմանմբ կամ առանց դրա կամ ժամանակի ընթացքում) կարող է որեւէ Կիրառելի Պայմանագրին հակասել, բախման պատճառ հանդիսանալ, կամ արդյունքում խախտել կամ չենթարկվել, կամ Ձեռքբերված Ընկերությանը կամ այլ Անձի իրավունք տալ խախտում հայտարարելու կամ

47

Applicable Contract; and

(iv) the Acquired Company has not given to or received from any other Person, at any time, any notice or other communication (whether oral or written) regarding any actual, alleged, possible, or potential violation or breach of, or default under, any Contract.

(e) There are no renegotiations of, attempts to renegotiate, or outstanding rights to renegotiate any material amounts paid or payable to the Acquired Company under current or completed Contracts with any Person and no such Person has made written demand for such renegotiation.

(f) The Contracts relating to the sale, design, manufacture, or provision of products or services by the Acquired Company has been entered into in the Ordinary Course of Business and have been entered into without the commission of any act alone or in concert with any other Person, or any consideration having been paid or promised, that

փոխհատուցում պահանջելու, կամ կատարումը կամ լուծումն արագացնելու, կամ չեղյալ համարելու, լուծելու, կամ փոփոխելու այն, եւ

(iv) Ձեռքբերված Ընկերությունը չի ստացել, երբեք, որեւէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որեւէ Կատավարական Մարմնից կամ այլ Անձից որը վերաբերվում է Ձեռքբերված Ընկերությանը, կամ նրա կողմից տնօրինվող կամ օգտագործվող որեւէ միջոցներին վերաբերող որեւէ Պայմանագիր որեւէ պայմանի կամ պահանջի որեւէ փաստացի, պարտադրվող, հնարավոր կամ պոտենցիալ խախտմանը, կամ դրան չենթարկվելուն:

(ե) Գոյություն չունեն որեւէ վերաբանակցությունները, վերաբանակցելու փորձեր, կամ իրավունքներ վերաբանակցելու որեւէ Գյութական գումար վճարվված կամ վճարվելիք Ձեռքբերված Ընկերությանը ներկա կամ կատարված Պայմանագրերով որեւէ Անձի հետ եւ ոչ մի նման Անձ չի պահանջել գրավոր նման վերաբանակցության վերաբերյալ:

(զ) Ձեռքբերված Ընկերության վաճառքներին, նախագծմանը, արտադրությանը, կամ ապրանքների կամ ծառայությունների մատակարարմանը վերաբերող Պայմանագրերը կնքվել են Գործունեության Բնականոն Ընթացքում եւ կնքվել են առանց այլ Անձի կողմիսին վճարների եւ առանց նրանց ներգրավման, կամ առանց որեւէ խոստման կամ վճարի որը

having been paid or promised, that is or would be in violation of any Legal Requirement.

### 3.18 Insurance.

(a)    Sellers have delivered to Buyer:

(i)    true and complete copies of all policies of insurance to which the Acquired Company is a party or under which the Acquired Company, or any official of the Acquired Company, is or has been covered at any time;

(ii)    true and complete copies of all pending applications for policies of insurance; and

(iii)    any statement by the auditor of the Acquired Company's financial statements with regard to the adequacy of such entity's coverage or of the reserves for claims.

(b)    Part 3.18(b) of the Disclosure Letter describes:

(i)    any self-insurance arrangement by or affecting the Acquired

համարվում է կամ կարող է համարվել որևէ Օրենքի Պահանջի խախտում:

### 3.18    Ապահովագրություն:

(ա)    Վաճառողները Գնորդին տրամադրել են.

(i)    բոլոր ապահովագրական պոլիսների ամբողջական պատճենները որոնցում Ձեռքբերված Ընկերությունը հանդիսանում է որպես կողմ, կամ որոնցով Ձեռքբերված Ընկերության որևէ պաշտոնյա որևէ ժամանակ ապահովագրվել է,

(ii)    ապահովագրական պոլիսների համար ներկայացված ընթացքում գտնվող բոլոր դիմումների ճիշտ և ամբողջական պատճենները, և

(iii)    Ձեռքբերված Ընկերության ֆինանսական հաշվետվությունների աուդիտորի կողմից կատարած որևէ հայտարարություն առնչվող նշված մարմնի ապահովագրությանը կամ կատարած հայցապահանջների վերաբերյալ վերապահումները:

(բ)    Բացահայտման Նամակի Բաժին 3.18(բ) ներկայացնում է`

(i)    Ձեռքբերված Ընկերությանը վերաբերվող կամ նրա կողմից

affecting the Acquired Company, including any reserves established thereunder;

կատարված ինքնապահովագրության վերաբերյալ բոլոր գործառույթները, ներառյալ դրանցով նախատեսված ցանկացած պահուստային ֆոնդերը,

(ii)    any contract or arrangement, other than a policy of insurance, for the transfer or sharing of any risk by the Acquired Company; and

(ii)    բոլոր գործառույթները եւ պայմանագրերը՝ ապահովագրական պոլիսներից բացի, որոնցով փոխանցվում կամ բաշխվում են Ձեռքբերված Ընկերության ցանկացած ռիսկեր, եւ

(iii)    all obligations of the Acquired Company to third parties with respect to insurance (including such obligations under leases and service agreements) and identifies the policy under which such coverage is provided.

(iii)    Ձեռքբերված Ընկերության երրորդ կողմերի նկատմամբ ապահովագրությունը վերաբերող բոլոր պարտավորությունները (ներառյալ վարձակալության եւ ծառայությունների պայմանագրերով սահմանվածները) եւ պոլիսները որոնցով տրվում են այդ ապահովագրությունները:

(c)    Part 3.18(c) of the Disclosure Letter sets forth, by year, for the current policy year and each of the preceding policy years:

(գ)    Բացահայտման Նամակի Բաժին 3.18(գ)-ն ներկայացնում է, տարիների կտրվածքով, ընթացիկ պոլիսային տարվա եւ անցած պոլիսային տարիների համար՝

(i)    a summary of the loss experience under each policy;

(i)    յուրաքանչյուր պոլիսի ներքո կրած առաջացման պրակտիկայի կրճատ ներկայացությունը,

(ii)    a statement describing each claim under an insurance policy which sets forth:

(ii)    ապահովագրական պոլիսի ներքո ներկայացված

50

sets forth:

(A)    the name of the claimant;

(B)    a description of the policy by insurer, type of insurance, and period of coverage; and

(C)    the amount and a brief description of the claim; and

(iii)    a statement describing the loss experience for all claims that were self-insured, including the number and aggregate cost of such claims.

(d)    Except as set forth on Part 3.18(d) of the Disclosure Letter:

(i)    All policies to which the Acquired Company is a party or that provide coverage to any Seller, the Acquired Company, or any officer of the Acquired Company:

(A)    are valid, outstanding,

---

յուրաքանչյուր հայցը ճկարագրող հաշվետվության որը ներկայացնում է՝

(Ա)    հայցվորի անունը,

(Բ)    ապահովագր ողի կողմից պոլիսի ճկարագրությունը եւ ապահովագրության ժամանակարժեացքը, եւ

(Գ)    հայցի գումարը եւ կրճատ ճկարագրությունը, եւ

(iii)    ինքնապահովգրվ ած բոլոր դեպքերի հայցերի համար վնասի առաջացման պրակտիկայի, ներառյալ հայցերի թվաքանակի եւ ընդհանուր գումարի վերաբերյալ հաշվետվություն:

(դ)    Բացահայտման Նամակի Բաժին 3.18(դ)-ում ներկայացվածից բացի՝

(i)    բոլոր պոլիսները որոնցում Ձեռքբերված Ընկերությունը համարվում է կողմ կամ որոնք ապահովագրություն են տարածում որեւէ Վաճառողի, Ձեռքբերված Ընկերության, կամ Ձեռքբերված Ընկերության որեւէ պաշտոնյայի վրա՝

(Ա)    իսկական են,

51

valid, outstanding, and enforceable;

(B) are issued by an insurer that is financially sound and reputable;

(C) · taken together, provide adequate insurance coverage for the assets and the operations·of the Acquired Company and for all risks to which businesses such as the Acquired Company are normally exposed;

(D) are sufficient for compliance with all Legal Reqúirements and Contracts to which the Acquired Company is a party or by which it is bound;

(E) will continue in full force and effect following the consummation of the Contemplated Transactions; and

իրական, եւ
կիրառելի,

(Բ)
սրամադրվա
ծ են
ապահովագրողի
կողմից որը
ֆինանսապես
ապահով է եւ ունի
բարի համբավ,

(Գ)
միասին
վերցրած,
Ձեռքբերված
Ընկերության
միջոցների եւ
գործունեության
նկատմամբ, եւ
Ձեռքբերված
Ընկերության
գործունեյան
տեսակի համար
սովորական
համարվող ռիսկերի
համար
տրամադրում են
համապատասխան
ապահովագրություն,

('Դ.)
բավարար են
ենթարկվելու համար
բոլոր Օրենքի
Պահանջներին եւ
Պայմանագրերին
որոնցում
Ձեռքբերված
Ընկերությունը
համարվում է կողմ
կամ որոնք կիրառելի
են իր նկատմամբ,

(Ե)
կշարունակվե
ն ամբողջ իրավական
ուժով եւ
ունակությամբ
Նախատեսվող
Գործարքների

52

կատարումից հետո,

եւ

(F)  do not provide for any retrospective premium adjustment or other experienced-based liability on the part of the Acquired Company.

(2) Չերքբելիված Ընկերության նկատմամբ չեն սահմանում որեւէ հետոից ուժ ունեցող պարտավորություննե ր վճարման առումով կամ այլ՝ նախկին փորձի հիման վրա սահմանված պարտավորություննե ր:

(ii)   No Seller or the Acquired Company has received (A) any refusal of coverage or any notice that a defense will be afforded with reservation of rights, or (B) any notice of cancellation or any other indication that any insurance policy is no longer in full force or effect or will not be renewed or that the issuer of any policy is not willing or able to perform its obligations thereunder.

(ii)   ոչ մի վաճառող կամ Չերքբերված Ընկերություն չի ստացել (Ա) ապահովագրության որեւէ մերժում կամ իրավունքների վերապահումով պաշտպանանության ծանուցում, կամ (Բ) չեղյալ համարելու որեւէ ծանուցում կամ ցանկացած այլ փաստարկ առ այն որ որեւէ ապահովագրական պոլիս այլես լրիվ իրավական ուժ կամ ունեկություն չունի կամ որ այն չի նորացվի կամ որ ապահովագրողը չի կարող կամ չի ուզում կատարել իր պարտավորությունները:

(iii)   The Acquired Company has paid all premiums due, and have otherwise performed all of their respective obligations, under each policy to which the Acquired Company is a party or that provides coverage to the Acquired Company or director thereof.

(iii)   Չերքբերված Ընկերությունը վճարել է պահանջվող բոլոր ապահովագրական վճարները, եւ այլ կերպ կատարել է իր բոլոր պարտականությունները, յուրաքանչյուր պոլիսի ներքո որում կողմ է հանդիսանում Չերքբերված Ընկերությունը կամ որն ապահովագրություն է տրամադում Չերքբերված Ընկերության կամ նրա

53

տնօրենի նկատմամբ։

(iv)    The Acquired Company has given notice to the insurer of all claims that may be insured thereby.

(iv)    Ձեռքբերված Ընկերությունը ծանուցել է ապահովագրողին նրա կողմից ապահովագրության ենթակա բոլոր հայցերի վերաբերյալ։

### 3.19    Environmental Matters.
Except as set forth in part 3.19 of the disclosure letter:

3.19    Միջավայրային Խնդիրներ։ Բացահայտման Նամակի Բաժին 3.19-ում սահմանվածից բացի՝

(a)    The Acquired Company is, and at all times has been, in full compliance with, and has not been and is not in violation of or liable under, any Environmental Law.  No Seller or the Acquired Company has any basis to expect, nor has any of them or any other Person for whose conduct they are or may be held to be responsible received, any actual or Threatened order, notice, or other communication from (i) any Governmental Body or private citizen acting in the public interest, or (ii) the current or prior owner or operator of any Facilities, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or Threatened obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has had an interest, or with respect to any property or Facility at or to which Hazardous Materials were generated, manufactured, refined, transferred, imported, used, or processed by Sellers, the Acquired

(ա)    Ձեռքբերված Ընկերությունը ամբողջությամբ ենթարկվում է, եւ բոլոր ժամանակներում ամբողջությամբ ենթարկվել է ցանկացած Միջավայրային Օրենքին, չի խախտում եւ չի խախտել այն։ Ոչ մեկ Վաճառող կամ Ձեռքբերված Ընկերություն հիմք չունեն սպասելու, ոչ էլ նրանցից որեւէ մեկը կամ ցանկացած այլ Անձ որի գործելակերպի համար նրանք պատասխանատու են կամ կարող են ճանաչվել այդպիսին, ստանալ փաստացի կամ Սպառնացող հրաման, ծանուցում, կամ այլ հաղորդագրություն (i) հանրային շահերը ներկայացնող որեւէ Կառավարական Մարմնից կամ մասնավոր քաղաքացուց, կամ (ii) որեւէ Միջոցների ներկայիս տիրոջից կամ աշխատեցնողից, որեւէ Միջավայրային Օրենքի որեւէ փաստացի կամ պոտենցիալ խախտման կամ չենթարկվելու վերաբերյալ, կամ որեւէ Միջավայրային, Առողջական, կամ Անվտանգության Պարտավորությունների ծախսերը կրելու կամ կատարելու որեւէ փաստացի կամ Սպառնացող պարտավորություն որեւէ Միջոցների կամ այլ գույքի (լինի այն անշարժ, շարժական կամ խառը) վերաբերյալ, որոնց հետ կապված Վաճառողները կամ Ձեռքբերված Ընկերությունն ունեցել են

54

processed by Sellers, the Acquired Company, or any other Person for whose conduct they are or may be held responsible, or from which Hazardous Materials have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(b)    There are no pending or, to the Knowledge of Sellers and the Acquired Company, Threatened claims, Encumbrances, or other restrictions of any nature, resulting from any Environmental, Health, and Safety Liabilities or arising under or pursuant to any Environmental Law, with respect to or affecting any of the Facilities or any other properties and assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has or had an interest.

(c)    No Seller or Acquired Company has any basis to expect, nor has any of them or any other Person for whose conduct they are or may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning, or other communication that relates to Hazardous Activity.

բաժնեմասեր, կամ որևէ գույքի կամ Միջոցների վերաբերյալ որոնց վրա կամ որոնց նկատմամբ կուտակվել, արտադրվել, ցամքվել, փոխանցվել, ներկրվել, օգտագործվել, կամ վերամշակվել են Վտանգավոր Նյութերը Վաճառողների, Ձեռքբերված Ընկերության, կամ որևէ այլ Անձի կողմից որի գործելակերպի համար պատասխանատու են կամ կարող են այդպիսին համարվել նրանք, կամ որոնցից Վտանգավոր նյութերր փոխադրվել, վերամշակվել, պահեստավորվել, օգտագործվել, տեղափոխվել, տնօրինվել, շրջանառվել, կամ ստացվել են:

(p)    Գույության չունեն ընթացքում գտնվող կամ, Վաճառողների եւ Ձեռքբերված Ընկերության Իմացությամբ, Սպառնացող հայցեր, Ծանրաբեռնումներ, կամ որևէ բնույթի այլ սահմանափակումներ, որոնք արդյունք են Միջավայրային, Առողջապահական, կամ Անվտանգության Պարտավորությունների կամ սկիզբ են առնում որևէ Միջավայրային օրենքից համաձայն կամ համապատասխանած, որոնք վերաբերվում են կամ ազդում են որևէ Միջոցների կամ ցանկացած այլ գույքերի եւ միջոցների վրա (լինեն դրանք անշարժ, շարժական կամ խառը) որոնցում Վաճառողները կամ Ձեռքբերված Ընկերությունը ունեն կամ ունեցել են բաժնեմաս:

(q)    ոչ մի Վաճառող կամ Ձեռքբերված Ընկերություն չունի որևէ հիմք սպասելու, ոչ էլ նրանցից որևէ մեկը կամ որևէ այլ Անձ որի գործելակերպի համար իրենք պատասխանատու են կամ կարող են այդպիսին համարվել, ստանալ որևէ հղում, ուղղություն, հարցում, Հրաման, կանչ, զգուշացում, կամ այլ հաղորդագրություն որը

55

that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Acquired Company had an interest, or with respect to any property or facility to whioh Hazardous Materials generated, manufactured, refined, transferred, imported, used, or processed by Sellers, the Acquired Company, or any other Person for whose conduct they are or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(d) No Seller ór the Acquired Company, or any other Person for whose conduct they are or may be held responsible, has any Environmental, Health, and Safety Liabilities with respect to the Facilities or with respect to any other properties and assets (whether real, personal, or mixed) in which Sellers or the Acquired Company (or any predecessor), has or had an interest, or at any property

վերաբերվում է Վտանգավոր Գործունեությանը, Վտանգավոր Նյութերին, կամ ցանկացած ենթադրվող, փաստացի, կամ պոտենցյալ խախտմանը կամ չենթարկվելուն որևէ Միջավայրային Օրենքին, կամ որևէ ենթադրվող, փաստացի կամ պոտենցյալ պարտավորության կրելու կամ կատարելու որևէ Միջավայրային Օրենքի, Առողջապահական, կամ Անվտանգության Պարտավորությունների ծախսերը որևէ Միջոցների կամ այլ գույքի կամ միջոցների (լինի այն անշարժ, շարժական կամ խառը) վերաբերյալ, որոնցում Վտանգավոր Նյութերը կամ Ձեռքբերված Ընկերությունն ունեցել են բաժնեմասեր, կամ որևէ գույքի կամ Միջոցների վերաբերյալ որոնց վրա կամ որոնց ընկատմանբ կուտակվել, արտադրվել, զտվել, փոխանցվել, ներկրվել, օգտագործվել, կամ վերամշակվել են Վտանգավոր Նյութեր Վաճառողների, Ձեռքբերված Ընկերության, կամ որևէ այլ Անձի կողմից որի գործելակերպի համար պատասխանատու են կամ կարող են այդպիսին համարվել նրանք, կամ որոնցից Վտանգավոր նյութերը փոխադրվել, վերամշակվել, պահեստավորվել, օգտագործվել, տեղափոխվել, տնօրինվել, շրջանառվել, կամ ստացվել են:

(դ) Ոչ մի Վաճառող կամ Ձեռքբերված Ընկերություն, կամ այլ Անձ որի գործելակերպի համար նրանք պատասխանատու են կամ կարող են այդպիսին համարվել, ունեն որևէ Միջավայրային, Առողջապահական, կամ Անվտանգության Պարտավորություններ առնչվող Միջոցների կամ առնչվող ցանկացած այլ գույքին կամ միջոցներին (լինի դրանք անշարժ, շարժական, կամ խառը) որոնցում

56

interest, or at any property geologically or hydrologically adjoining the Facilities or any such other property or assets.

(e)    There are no Hazardous Materials present on or in the Environment at the Facilities or at any geologically or hydrologically adjoining property, including any Hazardous Materials contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Facilities or such adjoining property, or incorporated into any structure therein or thereon. No Seller, the Acquired Company, any other Person for whose conduct they are or may be held responsible, or any other Person, has permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has or had an interest.

(f)    There has been no Release or, to the Knowledge of Sellers and the Acquired Company, Threat of Release, of any Hazardous Materials at or from the

Վաճառողները կամ Ձեռքբերված Ընկերությունը (կամ ցանկացած այլ նախկին սեփականատեր), ունեն կամ ունեն բաժնեմաս, կամ այլ գույքին որը երկրաբանորեն կամ ջրաբանորեն միանում է Միջոցներին կամ ցանկացած այլ գույքին եւ միջոցներին:

(ե)    Գ-ոյություն չունեն Վտանգավոր Նյութեր Միջոցների Միջավայրում կամ այլ երկրաբանորեն կամ ջրաբանորեն միացված գույքերում, ներառյալ տակառներում, վերգետնյա եւ ստորգետնյա պատեստավային տարաներում, հորերում, ստորգետնյա փոսերում, աղբահորերում, սարքավորումներում (լինեն դրանք անշարժ կամ շարժական) կամ այլ տարաներում, հիմնական եւ ժամանակավոր, տեղաբաշխված կամ տեղավորված հողի, ջրի, առուների մեջ, կամ Միջոցների այլ մասերում կամ համակցված այլ գույքում, կամ միակցված ցանկացած կառուցվածքում ամենում: Ոչ մեկ Վաճառող, Ձեռքբերված Ընկերությունը, կամ այլ Անձը որի գործունեկերպի համար պատասխանատու են կամ կարող են այդպիսին ճանաչվել, նրանք, կամ ցանկացած այլ Անձ, չի թույլատրել կամ կատարել, Միջոցների կամ ցանկացած այլ գույքի եւ միջոցների (լինեն դրանք անշարժ, շարժական, կամ խառը) որոնցում Վաճառողները կամ Ձեռքբերված Ընկերությունը ունի կամ ունեցել է բաժնեմաս, ընկառումբ կատարվյած ցանկացած Վտանգավոր Գործունեություն, կամ տեղյակ չէ այդ մասին:

(զ)    Չի կատարվել որեւէ Արտանետում կամ, Վաճառողների եւ Ձեռքբերված Ընկերության Իմացությամբ, Արտանետման Վտանգ, որեւէ Վտանգավոր Նյութի

57

Hazardous Materials at or from the Facilities or at any other locations where any Hazardous Materials were generated, manufactured, refined, transferred, produced, imported, used, or processed from or by the Facilities, or from or by any other properties and assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has or had an interest, or any geologically or hydrologically adjoining property, whether by Sellers, the Acquired Company, or any other Person.

(g)    Sellers have delivered to Buyer true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Sellers or the Acquired Company pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance by Sellers, the Acquired Company, or any other Person for whose conduct they are or may be held responsible, with Environmental Laws.

3.20    **Employees.**

(a)    Part 3.20 of the Disclosure Letter contains a complete and accurate list of the

Միջոցներից կամ Միջոցների նկատմամբ կամ ցանկացած այլ տեղում որտեղ կուտակվել, արտադրվել, զտվել, տեղափոխվել, պատրաստվել, ներկրվել, օգտագործվել, կամ վերամշակվել են Վտանգավոր Նյութերը Միջոցների կողմից կամ Միջոցներով, կամ ցանկացած այլ գույքի կամ միջոցների կողմից կամ դրանցով (լինեն դրանք անշարժ, շարժական, կամ խառը) որոնցում Վաճառողները կամ Ձեռքբերված Ընկերությունը ունի կամ ունեցել է բաժնեմաս, կամ որևէ երկրաբանորեն կամ ջրաբանորեն փոխկապակցված միջոցներում, լինի դա Վաճառողների, Ձեռքբերված Ընկերության, կամ ցանկացած այլ Անձի կողմից։

(է)    Վաճառողները տրամադրել են Գնորդին Վաճառողների կամ Ձեռքբերված Ընկերության տրամադրության տակ գտնվող կամ նրանց կողմից սկզբնավորված՝ Միջոցների մեջ, վրա կամ տակ եղած Վտանգավոր Նյութերին կամ Վտանգավոր Գործողություններին վերաբերող կամ Վաճառողների, Ձեռքբերված Ընկերության, կամ ցանկացած այլ Անձի որի գործողակերպի համար նրանք պատասխանատու են կամ կարող են այդպիսին համարվել, Միջավայրային Օրենքներին ենթարկվելու վերաբերյալ ցանկացած զեկույցների, ուսումնասիրությունների, վերլուծությունների, փորձարկումների, կամ դիտարկումների ճիշտ եւ ամբողջական պատճեները եւ արդյունքները։

3.20    Աշխատողներ։

(ա)    Բացահայտման Նամակի Բաժին 3.20-ը ներկայացնում է ամբողջական եւ

58

complete and accurate list of the following information for each employee, official, or participant of the Acquired Company, including each employee on leave of absence or layoff status: employer; name; job title; current compensation paid or payable and any change in compensation since January 1, 2003; vacation accrued; and service credited for purposes of vesting and eligibility to participate under the Acquired Company's pension, retirement, profit-sharing, thrift-savings, deferred compensation, stock bonus, stock option, cash bonus, employee stock ownership (including investment credit or payroll stock ownership), severance pay, insurance, medical, welfare, or vacation plan, other Employee Pension Benefit Plan or Employee Welfare Benefit Plan, or any other employee benefit plan or any other plan.

(b) No employee or official of the Acquired Company is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, noncompetition, or proprietary rights agreement, between such employee or director and any other Person ("Proprietary Rights Agreement") that in any way adversely affects or will affect (i) the performance of his duties as an employee or director of the Acquired Companies, or (ii) the ability of the Acquired Company to

ճիշտ ցուցակը Ձեռքբերված Ընկերության յուրաքանչյուր աշխատողի, պաշտոնյայի, կամ մասնակցի վերաբերյալ հետևյալ տեղեկության մասին, ներառյալ արձակուրդում գտնվող կամ հեռացված կարգավիճակի աշխատողները. գործատուն, անունը, պաշտոնը, վճարվելիք կամ վճարվող ընթացիկ փոխխատուցումն կամ փոխհատուցման ցանկացած փոփոխություն սկսած 2003թ-ի հունվարի 1-ից, անձնացված արձակուրդը, Ձեռքբերված Ընկերության կանսաբոշակը, թոշակը, շահույթի բաշխումը, խնայումը, փոլլային փոխխատուցումը, բաժնեմասի նկատմամբ արտոնությունը, աշխատողի կողմից բաժնեմասի տնօրինումը (ներառյալ ներդրումային վարկավորումը կամ բաժնեմասան վարձատրումային տնօրինումը), արձակման նպաստը, ապահովագրությունը, բժշկական, կենսաթոշակային, կամ արձակուրդային պլանը, այլ Աշխատողի Թոշակի Արտոնության Պլանը կամ Աշխատողի Կենսաթոշակի Արտոնության Պլանը, կամ ցանկացած այլ աշխատողի արտոնության կամ այլ պլանը աշխատողի վրա տարածելու գործառնները:

(բ) Ձեռքբերված Ընկերության ոչ մի աշխատող կամ պաշտոնյա կողմ չի հանդիսանում, կամ այլ կերպ պարտավորված չէ, որևէ պայմանագրի կամ գործառնքի, ներառյալ ցանկացած գաղտնապահության, մրցակցելու, կամ սեփականության իրավունքի պայմանագրերը, նման աշխատողի կամ տնօրենին ու ցանկացած այլ Անձի միջև («Սեփականության Իրավունքի Պայմանագիր») որը որևէ ձևով բացասականորեն ազդում է կամ կազդի (i) որպես Ձեռքբերված Ընկերության աշխատող կամ տնօրեն իր

ability of the Acquired Company to conduct its business, including any Proprietary Rights Agreement with Sellers or the Acquired Company by any such employee or director.

(c)    Part 3.20 of the Disclosure Letter also contains a complete and accurate list of the following information for each retired employee or director of the Acquired Company, or their dependents, receiving benefits or scheduled to receive benefits in the future: name, pension benefit, pension option election, retiree medical insurance coverage, retiree life insurance coverage, and other benefits.

**3.21    Labor Relations; Compliance.** The Acquired Company has not been and is not a party to any collective bargaining or other labor Contract. The Acquired Company has complied in all respects with all Legal Requirements relating to employment, the payment of social security and similar taxes, occupational safety and health, and other employee relations. Acquired Company is not liable for the payment of any compensation, damages, taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the applicable Legal Requirements.

վարտականությունները կատարելու վրա, կամ (ii) Ձեռքբերված Ընկերության կողմից իր գործունեությունը, ներառյալ որևէ Վաճառողների կամ Ձեռքբերված Ընկերության ցանկացած Սեփականության Իրավունքի Պայմանագիրը նման աշխատողի կամ տնօրենի կողմից իրականացնելու վրա:

(q)    Բացահայտման Նամակի Բաժին 3.20-ը նաև ներառում է ամբողջական ու ճիշտ ցուցակը Ձեռքբերված Ընկերության լուրաբանչյուր թոշակի անցած աշխատողի կամ տնօրենի, կամ դրանց ընտանիքի անդամների, որոնք ստանում են կամ սպասվում է որ ապագայում կստանան արտոնություններ, վերաբերյալ. անունը, թոշակի արտոնությունը, թոշակի այլընտրանքի ընտրությունը, թոշակի անցածի բժշկական ապահովագրության տարածումը, եւ այլ արտոնություններ:

**3.21    Աշխատանքային Հարաբերություններ. Ենթարկում:** Ձեռքբերված Ընկերությունը մաս չի կազմում, եւ չի կազմել որեւէ կոլեկտիվ համաձայնության կամ այլ աշխատանքային Պայմանագրի: Ձեռքբերված Ընկերությունը ենթարկվել է բոլոր առումներով բոլոր Օրենքի Պահանջներին աշխատանքին ընդունմանը, սոցաս եւ համանման հարկերի վճարման, աշխատանքային անվտանգության եւ առողջապահության, եւ այլ աշխատանքային հարաբերությունների հետ առնչվող: Ձեռքբերված Ընկերությունը պատասխանավոր չէ վճարել որեւէ փոխհատուցում, վնասներ, հարկեր, տուգանքներ, տույժեր, կամ այլ գումարներ, որոնք ինչ որ կերպ առնչություն ունեն որեւէ գործող Օրենքի Պահանջին չհետեւարկելու հետ:

3.22   **Intellectual Property.**

    (a)   Intellectual Property Assets. The term "Intellectual Property Assets" includes:

    (i)   the names SHA, LLC and Hankavan Mine, all fictional business names, trading names, registered and unregistered trademarks, service marks, and applications (collectively, "Marks");

    (ii)   all patents, patent applications, and inventions and discoveries that may be patentable (collectively, "Patents");

    (iii)   all copyrights in both published works and unpublished works (collectively, "Copyrights"); and

    (iv)   all know-how, trade secrets, confidential information, software, technical information, data, process technology, plans, drawings, and blue prints , including but not limited to all relevant GKZ records.

3.22   Մտավոր Սեփականություն:

    (ա)   Մտավոր Սեփականության Միջոցներ: «Մտավոր Սեփականության Միջոցներ» սահմանումը ներառում է.

    (i)   ՍՀԱ, ՍՊԸ եւ Հանքավանի Հանքավայր անվանումները, բոլոր մտածածին ձեռնարկատիրական անվանումները, առեւտրային անունները, գրանցված եւ չգրանցված ֆիրմային անվանումները, ծառայական նշանները, եւ դրանց կիրառումները (միասնաբար՝ «Նշաններ»),

    (ii)   բոլոր պատենները, պատենների կիրառումները, եւ գյուտերը եւ հայտնագործությունները որոնք կարող են պատենտավորվել (միասնաբար՝ «Պատենները),

    (iii)   բոլոր հեղինակային իրավունքները հրապարակված կամ չհրապարակված աշխատանքների վերաբերյալ (միասնաբար՝ «Հեղինակային Իրավունք»), եւ

    (iv)   Ձեռքբերված Ընկերության կողմից որպես լիցենզատու կամ լիցենզատու տնօրինվող, օգտագործվող, կամ լիցենզավորվող բոլոր ճնու-հաուները, առեւտրային գաղտնիքները, գաղտնի ինֆորմացիան, կոմպյուտերային ծրագրերը,

61

relevant GKZ records, (collectively, "Trade Secrets"); owned, used, or licensed by the Acquired Company as licensee or licensor.

(b)    Agreements.  Part 3.22(b) of the Disclosure Letter contains a complete and accurate list and summary description, including any royalties paid or received by the Acquired Company, of all Contracts relating to the Intellectual Property Assets to which the Acquired Company is a party or by which the Acquired Company is bound There are no outstanding and, to Sellers' Knowledge, no Threatened disputes or disagreements with respect to any such agreement.

(c)    Know-How Necessary for the Business.

(i)    The Intellectual Property Assets are all those necessary for the operation of the Acquired Company's businesses as they are currently conducted and contemplated to be conducted.  The Acquired Company is the owner of all right, title, and interest in and to each of the Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances, equities, and

տեխնիկական ինֆորմացիան, տեխներությունը, վերամշակման տեխնոլոգիան, ծրագրերը, գծագրերը, եւ գլաֆիկները, ներառյալ սասյալ չատմանատիտկված ՊՎՀ գրանցումները (միասնաբար "Առեստրային Գաղտնիք"):

(բ)    Պայմանագրեր: Բացահայտման Նամակի Բաժին 3.22(բ)-ն ներկայացնում է Մտավոր Սեփականության Միջոցներին առնչվող Պայմանագրերի ամբողջական եւ ճիշտ ցուցակը եւ կրճատ նկարագրությունը, ներառյալ Ձեռքբերված Ընկերության կողմից վճարված կամ ստացված բոլոր ռոյալթիները, որոնց Ձեռքբերված Ընկերությունը կողմ է կամ որոնք տարածվում են Ձեռքբերված Ընկերության վրա: Գոյություն չունեն ընթացքի մեջ գտնվող եւ, Վաճառողների Իմացությամբ, Սպառնացող վեճեր կամ անհամաձայնություններ այդ պայմանագրերի հետ կապված:

(գ)    Գործունեության համար անհրաժեշտ Նոու-Հաու:

(i)    Մտավոր Սեփականության Միջոցները Ձեռքբերված Ընկերության գործունեության համար անհրաժեշտ միջոցներն են որոնցով ներկայումս այդ գործունեությունն իրականացվում կամ նախատեսվում է իրականացվել: Ձեռքբերված Ընկերությունն տնօրինում է յուրականչյուր եւ ցանկացած Մտավորական Սեփականության Միջոցների ամբողջ իրավունքը, տիտղոսը, եւ բաժնեմասը ազատ եւ զերծ

62

encumbrances, equities, and other adverse claims, and has the right to use without payment to a third party all of the Intellectual Property Assets.

(ii)    Except as set forth in Part 3.22(c) of the Disclosure Letter, no employee of the Acquired Company has entered into any Contract that restricts or limits in any way the scope or type of work in which the employee may be engaged or requires the employee to transfer, assign, or disclose information concerning his work to anyone other than the Acquired Company.

(d)    Patents.

(i)    Part 3.22(d) of the Disclosure Letter contains a complete and accurate list and summary description of all Patents. The Acquired Company is the owner of all right, title, and interest in and to each of the Patents, free and clear of all liens, security interests, charges, encumbrances, entities, and other adverse claims.

բոլոր գրավներից, կալանադրումներից, ջամձումներից, ծանրաբեռնումներից, այլ անձանց բաժնեմասներից, եւ այլ բացասական բնույթի հայցերից, եւ ունի բոլոր Մտավոր Սեփականության Միջոցներն առանց երրորդ անձանց վճարման օգտագործելու իրավունք:

(ii)    Բացառությամբ Նամակի Բաժին 3.22(գ)-ում ներկայացվածից բացի, Ձեռքբերված Ընկերության ոչ մի աշխատող Պայմանագրի մեջ չի մտել որն իրեն արգելում կամ սահմանափակում է որեւէ ձեւով աշխատանքի կողմից հնարավոր ներգրավված աշխատանքի բնույթը կամ բնագավառը կամ պահանջում է որպեսզի աշխատողը փոխանցի, նշանակի, կամ բացահայտի իր աշխատանքի վերաբերյալ տեղեկություններ որեւէ մեկին Ձեռքբերված Ընկերությունից բացի:

(դ)    Պատենտներ:

(i)    Բացառությամբ Նամակի Բաժին 3.22(դ)-ն ներկայացնում է բոլոր Պատենտների ամբողջական եւ ճիշտ ցուցակը եւ կրճատ նկարագրությունն: Ձեռքբերված Ընկերությունը տնօրինում է յուրաքանչյուր Պատենտի բոլոր իրավունքները, տիտղոսը, եւ բաժնեմասը, ազատ եւ զերծ բոլոր գրավներից, կալանադրումներից,

63

other adverse claims.

ganownumbphig, danpuptenumbphig, ayl uncangg pujncuunbphig, ew ayl pugueuuuun punnipph huygbphig:

(ii)     All' of the issued Patents are currently in compliance with formal legal requirements (including payment of filing, examination, and maintenance fees and proofs of working or use), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

(ii)     punnp punuuплqwud Դuuuenumbbpp ubpqwnumu huuuuuuuuuuunuuunumu bu puuuuununuuquu upbuph puuhungunbphu (ubpunniyuul qpunguuu, uunniquuu, ew puuhuyuuunuu, ew qnpdbynu ew ogquuuqnpdbynu uunuuguuyguubph huuuup uuununiuubph), ppuuquu ew uppunbph bu, ew buupuuuu zbu npbul puuhuyuuuunuu uuununiuubph quu huppbph quu ayl qnpdunnnpbnibpph npnup uytunp k uuunuuunbl Կuunuununuuu Ամսաթիվ phuuunnuu ophuu punuuuggnuu:

(iii)     No Patent has been or is now involved in any interference, reissue, reexamination, or opposition proceeding.  To Sellers' Knowledge, there is no potentially interfering patent or patent application of any third party.

(iii)     Ns uh Դuuuenuu sh buptupunuunbl uuuhuuunuuuuuunuuu, ubpuupnnuuunuuuuuu, ubpuuunniquuu, quu pnnnpunuununuuu qnpdupupugh: Վuuduunnnubph Իuuугnipuuuup, qnuniupuniu suuuuh bppnpn uuudunuud unnuupg uuunuuunuun uuutunuu quu uuuuu uuutunuunuuuh huuuup ubpuuuyunuugunuud uppuunu:

(iv)     No Patent is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way.  None of the products manufactured and sold, nor any process or know-how used, by the Acquired Company infringes or is alleged to infringe any patent or other

(iv)     Ns uh Դuuuenuu uuuhuuuuuuunuuunbuuud sk quu, Վuuduunnnubph Իuuuugnuipuuuup, pnnnpuupunuuud quu npbuu qbpuu quuuunuudh uuuu npuuud sk: Ձbnppbpunuud Ընubpuinipuuu unnuuuhg unnuuunnnuud quu uuuduununuuud ns uh uuunuuup, ogquuuqnpdunuud ns uh

infringe any patent or other proprietary right of any other Person.

(e)    Trademarks.

(i)    Part 3.22(e) of Disclosure Letter contains a complete and accurate list and summary description of all Marks. The Acquired Company is the owner of all right, title, and interest in and to each of the Marks, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

(ii)    All Marks that have been registered are currently in compliance with all formal legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

ընթացք կամ նու-հաու, չի սահմանափակում կամ ենթարդրվում որ.կարող է սահմանափակել որևէ երրորդ Անձին պատկանող որևէ պատենտ կամ որևէ. առաջնային իրավունք:

(ե)    Առևտրային Նշաններ:

(i)    Բացահայտման Նամակի Բաժին 3.22(ե)-ն ներկայացնում է բոլոր Նշանների ամբողջական ես ճիշտ ցուցակը ես կրճատ նկարագրություն։ Ձեռքբերված Ընկերությունը տանձնում է յուրաքանչյուր Նշանի բոլոր իրավունքները, տիտղոսը, ես բաժնեմասը, ազատ ես զերծ բոլոր գրավներից, կալանադրումներից, գանձումներից, ծանրաբեռնումներից, այլ անձանց բաժնեմասերից, ես այլ բացասական բնույթի հայցերից:

(ii)    բոլոր գրանցված Նշանները ներկայումս համապատասխանում են պաշտոնական օրենքի պահանջներին (ներառյալ օգտագործման ապացույցների ժամանակին գրանցումը ես մրցակցությունը ես նորացման համար դիմումները), իրական ես կիրառելի են, ես ենթակա չեն որևէ պահպանման վճարումների կամ հարկերի կամ այլ գործողությունների որոնք պետք է կատարվել Կատարման Ամսաթվից իննսուն օրվա ընթացքում:

65

(iii)    No Mark has been or is now involved in any opposition, invalidation, or cancellation and, to Sellers' Knowledge, no such action is Threatened with the respect to any of the Marks.

(iv)    To Sellers' Knowledge, there is no potentially interfering trademark or trademark application of any third party.

(v)    No Mark is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way.  None of the Marks used by the Acquired Company infringes or is alleged to infringe any trade name, trademark, or service mark of any third party.

(vi)    All products and materials containing a Mark bear the proper federal registration notice where permitted by law.

(f)    Copyrights.

(i)    Part 3.22(f) of the Disclosure Letter contains a complete and accurate list and summary

(iii)    Ոչ մի Նշան չի ենթարկվում եւ չի ենթարկվել բողոքարկման, չեղյալ չի համարվել, չի դադարեցվել կամ ոչնչացվել եւ, Վաճառողների Իմացությամբ, ոչ մի նման գործողություն չի Սպառնում Նշաններից որեւէ մեկին:

(iv)    Վաճառողների Իմացությամբ, գոյություն չունի որեւէ երրորդ անձի պոտենցիալ խանգարող առեւտրային Նշան կամ առեւտրային Նշանի դիմում:

(v)    Ոչ մի Նշան սահմանափակված չէ կամ, Վաճառողների Իմացությամբ, բողոքարկված կամ որեւէ կերպ կասկածի տակ դրված չէ: Ձեռքբերված Ընկերության կողմից օգտագործվող որեւէ Նշան չի սահմանափակում կամ ենթադրվում որ կարող է սահմանափակել որեւէ երրորդ կողմի պատականող որեւէ առեւտրային անուն, առեւտրային Նշան, կամ ծառայության Նշան:

(vi)    Նշանը կրող բոլոր ապրանքներն եւ նյութերը կրում են պետական գրանցման նիշը' օրենքով թույլատրվող դեպքերում:

(q)    Հեղինակային Իրավունքներ:

(i)    Բացահայտման Նամակի Բաժին 3.22(q)-ն

66

accurate list and summary description of all Copyrights. The Acquired Company is the owner of all right, title, and interest in and to each of the Copyrights, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

(ii)    All the Copyrights have been registered and are currently in compliance with formal legal requirements, are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the date of Closing.

(iii)    No Copyright is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way. None of the subject matter of any of the Copyrights infringes or is alleged to infringe any copyright of any third party or is a derivative work based on the work of a third party.

ներկայացնում է բոլոր Հեղինակային Իրավունքների ամբողջական եւ ճիշտ ցուցակը եւ կրճատ նկարագրությունը: Ձեռքբերված Ընկերությունն տնօրինում է յուրաքանչյուր Հեղինակային Իրավունքի բոլոր իրավունքները, տիտղոսը, եւ բաժնեմասը, ազատ եւ զերծ բոլոր գրավներից, կալանադրումներից, գանձումներից, ծանրաբեռնումներից, այլ անձանց բաժնեմասերից, եւ այլ բացասական բնույթի հայցերից:

(ii)    բոլոր Հեղինակային Իրավունքները գրանցված են եւ ներկայումս համապատասխանում են պաշտոնական օրենքի պահանջներին, իրական եւ կիրառելի են, եւ ենթակա չեն որեւէ պահպանման վճարումների կամ հարկերի կամ այլ գործողությունների որոնք պետք է կատարվել Կատարման Ամսաթվից իննսուն օրվա ընթացքում:

(iii)    Ոչ մի Հեղինակային Իրավունք սահմանափակված չէ կամ, Վաճառողների Իմացությամբ, բողոքարկված կամ որեւէ ձերպ կասկածի տակ դրված չէ: Ձեռքբերված Ընկերության կողմից օգտագործվող որեւէ Հեղինակային Իրավունքը չի սահմանափակում կամ ենթադրվում որ կարող է սահմանափակել որեւէ երրորդ կողմին պատկանող որեւէ հեղինակային

67

իրավունք կամ չի
հանդիսանում երրորդ անձի
որևէ աշխատանքի
ածանցյալը:

(iv)    All works
encompassed by the
Copyrights have been
marked with the proper
copyright notice.

(vi)
Հեղինակային
Իրավունքի մեջ ներառված
բոլոր աշխատանքները
կրում են համապատասխան
հեղինակային իրավունքի
նշանը:

(g)    Trade Secrets.

(է)    Առևտրային
Գաղտնիքը:

(i)    With respect
to each Trade Secret, the
documentation relating to
such Trade Secret is current,
accurate, and sufficient in
detail and content to identify
and explain it and to allow
its full and proper use
without reliance on the
knowledge or memory of
any individual.

(i)
Յուրաքանչյուր
Առևտրային Գաղտնիքի
մասով, այդ Առևտրային
Գաղտնիքին վերաբերող
փաստաթղթերն արդիական,
ճիշտ, և բավարար են
մանրամասների և իմաստի
առումով այն սահմանելու և
բացատրելու համար և թույլ
են տալիս դրա ամբողջական
և պատշաճ օգտագործումն
առանց որևէ
անհատավորության
իմացության կամ
հիշողության վրա հենվելու:

(ii)    Sellers and
the Acquired Company have
taken all reasonable
precautions to protect the
secrecy, confidentiality, and
value of their Trade Secrets.

(ii)
Վաճառողները և
Ձեռքբերված Ընկերությունը
ձեռք են առել բոլոր
զգուշության միջոցները
պաշտպանելու համար
Առևտրային Գաղտնիքների
գաղտնիությունը,
խորհրդապահությունը, և
արժեքը:

(iii)    The Acquired
Company has good title and
an absolute right to use the
Trade Secrets.  The Trade
Secrets are not part of the

(iii)    Ձեռքբերված
Ընկերությունը տնօրինում է
Առևտրային Գաղտնիքներն
ամբողջությամբ և դրանց
օգտագործման նկատմամբ

68

Secrets are not part of the public knowledge or literature, and, to Sellers' Knowledge, have not been used, divulged, or appropriated either for the benefit of any Person (other than the Acquired Company) or to the detriment of the Acquired Company. No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way.

ունի անսահմանափակ իրավունք: Առետրային Գաղտնիքները հանրային իմացության կամ գրականության առարկա չեն, եւ, Վաճառողների Իմացությամբ, չեն օգտագործվել, բացահայտվել, կամ փոխանցվել ի շահ որեւէ Անձի (բացի Ձեռքբերված Ընկերությունից) կամ ի վնաս Ձեռքբերված Ընկերության: Ոչ մի Առետրային Գաղտնիք ենթակա չէ որեւէ բացասական հայցի, չի բողոքարկվել կամ սպառնալիքի ենթարկվել որեւէ այլ կերպ:

**3.23** **Certain Payments**. Neither the Acquired Company nor any participant, officer, agent, or employee of the Acquired Company, or any other Person associated with or acting for or on behalf of the Acquired Company, has directly or indirectly (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (i) to obtain favorable treatment in securing business, (ii) to pay for favorable treatment for business secured, (iii) to obtain special concessions or for special concessions already obtained, for or in respect of the Acquired Company or any Affiliate of the Acquired Company, or (iv) in violation of any Legal Requirement, (b) established or maintained any fund or asset that has not been recorded in the books and records of the Acquired Companies.

**3.23** **Որոշակի Վճարումներ**: Ոչ Ձեռքբերված Ընկերությունը եւ ոչ էլՁեռքբերված Ընկերության որեւէ մասնակից, պաշտոնյա, կամ աշխատող, կամ Ձեռքբերված Ընկերության հետ կապ ունեցող կամ նրա անունից գործող որեւէ այլ Անձ, ուղղակիորեն կամ անուղղակիորեն չի տվել (ա) որեւէ ներդրում, նվեր, կաշառք, զեղչ, վճար, ազդեցության վճման, շնորհավճար, կամ այլ վճար որեւէ Անձի, հանրորեն կամ առանձին, անկախ ձեւից, գումարով, գույքով, կամ ծառայություններիի ձեւով (i) ձեռք բերելու գործունեության ապահովության համար բարենպաստ վերաբերմունք, (ii) վարծահատուցը լինելու համար գործունեության ապահովության բարենպաստ վերաբերմունքի համար, (iii) Ձեռքբերված Ընկերության կամ Ձեռքբերված Ընկերության որեւէ Փոխկապակցված Անձի համար կամ առնչությամբ ձեռք բերելու համար հատուկ զիջումներ կամ վարձահատույց լինելու ձեռք բերված հատուկ զիջումների համար, կամ (iv) որեւէ Օրենքի Պահանջի խախտումով, (բ) ստեղծել կամ պահել է որեւէ դրամագլուխ կամ գույք որը չի գրանցվել Ձեռքբերված Ընկերության գրքերում եւ գրանցումներում:

**3.24** **Disclosure.**

(a) No representation or warranty of Sellers in this Agreement and no statement in the Disclosure Letter omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

(b) No notice given pursuant to Section 5.5 will contain any untrue statement or omit to state a material fact necessary to make the statements therein or in this Agreement, in light of the circumstances in which they were made, not misleading.

(c) There is no fact known to either Seller that has specific application to any Seller or the Acquired Company (other than general economic or industry conditions) and that materially adversely affects the assets, business, prospects, financial condition, or results of operations of the Acquired Companies (on a consolidated basis) that has not been set forth in this Agreement or the Disclosure Letter.

**3.25** **Relationships with Related Persons**. No Seller or any Related Person of Sellers or of the Acquired Company has.

**3.24** **Բացահայտում:**

(ա) Վաճառողների` Սույն Պայմանագրում արված ոչ մի հայտարարություն կամ տրված երաշխիքը եւ Բացահայտման Նամակում կատարված ոչ մի հայտարարություն չի պարունակում ոչ մի էական փաստի բացթողում որն անհրաժեշտ է լ յութաբանչյուր փաստաթղթում կատարված հայտարարությունը ոչ ապակողմնորոշող դարձնելու համար` հանգամանքներում որոնցում դրանք կատարվում են:

(բ) Բաժին 5.5-ի համաձայն տրված ծանուցումներից ոչ մեկը չի պարունակի որեւէ ոչ ճիշդ հայտարարություն կամ որեւէ էական փաստի բացթողում որն անհրաժեշտ է կատարված հայտարարությունները դրանցում կամ սույն Պայմանագրում` հանգամանքներում որոնցում դրանք արվել են, ոչ ապակողմնորոշող դարձնելու համար:

(գ) Գոյություն չունի որեւէ Վաճառողին հայտնի փաստ որը հատուկ կիրառում ունի որեւէ Վաճառողի կամ Ձեռքբերված Ընկերության նկատմամբ (բացի ընդհանուր տնտեսական կամ արտադրական վիճակը) եւ որը ն յութականորեն բացասական ազդեցություն ունի Ձեռքբերված Ընկերության գույքի, գործունեության, հեռանկարների, ֆինանսական վիճակի կամ գործունեության արդյունքների վրա (միասնական հիմունքներով) որը չի ներկայացվել սույն Պայմանագրում կամ Բացահայտման Նամակում:

**3.14** **Փոխկապակցված Անձանց հետ Հարաբերություններ:** Ոչ մի Վաճառող կամ Վաճառողի կամ Ձեռքբերված կամ Վաճառողի կամ Ձեռքբերված

70

of Sellers or of the Acquired Company has, or since has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to the Acquired Company's businesses. No Seller or any Related Person of Sellers or of the Acquired Company is, or since has owned (of record or as a beneficial owner) an equity interest or any other financial or profit interest in, a Person that has (i) had business dealings or a material financial interest in any transaction with the Acquired Company, or (ii) engaged in competition with the Acquired Company with respect to any line of activities of the Acquired Company (a "Competing Business") in any market presently served by the Acquired Company.  Except as set forth in Part 3.25 of the Disclosure Letter, no Seller or any Related Person of Sellers or of the Acquired Company is a party to any Contract with, or has any claim or right against, the Acquired Company.

Ընկերության հետ Փոխկապակցված Անձ յունի, եւ չի ունեցել, որեւէ բաժնեմաս ոլել. գույքի մեջ (լինի դա անշարժ, շարժական, կամ խառը եւ նյութական կամ ոչ նյութական), որն օգտագործվում է կամ առնչվում է Ձեռքբերված Ընկերության գործունեությանը: Ոչ մի Վաճառող կամ Վաճառողի կամ Ձեռքբերված Ընկերության հետ Փոխկապակցված Անձ չի տնօրինում, եւ չի տնօրինել (որպես ուղղակի կամ անուղղակի սեփականատեր) որեւէ բաժնեմաս կամ որեւէ ֆինանսական կամ շահութային բաժնեմաս մի Անձի մոտ որը (i) գործնական շփումներ կամ նյութական ֆինանսական շահեր է ունեցել որեւէ գործարքում Ձեռքբերված Ընկերության հետ, կամ (ii) ներգրավված է եղել Ձեռքբերված Ընկերության հետ Ձեռքբերված Ընկերության որեւէ գործունեության բնագավառում («Մրցակցող Ձեռնարկություն») Ձեռքբերված Ընկերության կողմից ներկայումս ծառայող որեւէ շուկայում: Բացառությամբ Նասախի Բաժնի 3.25-ում ներկայացվածից բացի, ոչ մի Վաճառող կամ Վաճառողներից կամ Ձեռքբերված Ընկերությանը Փոխկապակցված Անձ կողմ չի հանդիսանում որեւէ Պայմանագրի, կամ չունի որեւէ հայց կամ իրավունք, Ձեռքբերված Ընկերության հետ:

### 3.26    Brokers or Finders.
Sellers and their agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

### 3.26    Բրոկերներ եւ Գտնողներ:

Վաճառողները եւ նրանց գործակալները չունեն որեւէ պարտավորություններ կամ պարտականություն, պայմանական կամ այլ կերպ, բրոկերների կամ գտնողների վճարների կամ գործակալների շահավճարների կամ այլ համանման վճարների մասով սույն Պայմանագրի հետ կապված:

## 4.    REPRESENTATIONS AND WARRANTIES OF BUYER.  Buyer represents and warrants to Sellers as follows:

## 4.    ԳՆՈՐԴԻ ՀԱՅՏԱՐԱՐՈՒԹՅՈՒՆՆԵՐ ԵՒ ԵՐԱՇԽԻՔՆԵՐ: Գնորդը հայտարարում եւ երաշխավորում է Վաճառողների հետեւյալով.

71

4.1 **Organization and Good Standing**. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, USA.

4.2 **Authority; No Conflict.**

(a) This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of the Escrow Agreement and the Promissory Notes (collectively, the "Buyer's Closing Documents"), the Buyer's Closing Documents will constitute the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms. Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and the Buyer's Closing Documents and to perform its obligations under this Agreement and the Buyer's Closing Documents.

(b) Except as set forth in Schedule 4.2, neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the Contemplated Transactions by Buyer will give any Person the right to prevent, delay, or otherwise interfere with any of the

---

4.1 Կազմավորում եւ Պատշաճ Վիճակ: Գնորդը ԱՄՆ Դելավեր նահանգի օրենդրությամբ պատշաճ կազմավորված, իրավականորեն գոյություն ունեցող, եւ պատշաճ վիճճակում գտնվող սահմանափակ պատասխանատվության ընկերություն է:

4.2 Լիազորություն; Շահերի Բախման Բացակայություն:

(ա) Սույն Պայմանագիրը սահմանում է Գնորդի իրավական, պատշաճ եւ Գնորդին պարտավորեցնող պարտավորություն՝ կիրառելի իր դրույթների համաձայն: Գնորդի կողմից Էսքրոյ Պայմանագրի եւ Մուրհակի ստորագրումից եւ տրամադրումից հետո (միասնաբար՝ «Գնորդի Կատարման Փաստաթղթեր»), Գնորդի Կատարման Փաստաթղթերը կսահմանեն Գնորդի իրավական, պատշաճ եւ պարտավորեցնող պարտավորությունները՝ Գնորդների հանդեպ կիրառելի իրենց համապատասխան դրույթների համաձայն: Գնորդն ունի բացարձակ եւ անսահմանափակ իրավունք, իշխանություն, իրավասություն, եւ ունակություն ստորագրելու եւ կատարելու սույն Պայմանագիրը եւ Գնորդի Կատարման Փաստաթղթերը եւ կատարելու սույն Պայմանագրով եւ Գնորդի Կատարման Փաստաթղթերով սահմանված պարտավորությունները:

(բ) Բացի Բացահայտման Նսմակի Բաժին 4.2-ում նշված, սույն Պմմանագրի ստորագրումը եւ կատարումը, կամ Գնորդի կողմից որեւէ Նախատեսված Գործարքների իրականացումը կամ կատարումը չի շնորհի որեւէ Անձի իրավունքով արգելելու, ուշացնելու, կամ այլ կերպ խանգարելու որեւէ Նախատեսված Գործարքներ համաձայն:

72

interfere with any of the Contemplated Transactions pursuant to:

> (i)    any provision of Buyer's Organizational Documents;

> (ii)    any resolution adopted by the board of directors or the stockholders of Buyer;

> (iii)    any Legal Requirement or Order to which Buyer may be subject; or

> (iv)    any Contract to which Buyer is a party or by which Buyer may be bound.

Except as set forth in Schedule 4.2, Buyer is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

4.3    **Investment Intent**.  Buyer is acquiring the Shares for its own account.

4.4    **Certain Proceedings**.  There is no pending Proceeding that has been commenced against Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.  To Buyer's Knowledge, no such Proceeding has been Threatened.

> (i)    Գնորդի Կազմավորման Փաստաթղթերի,

> (ii)    Գնորդի տնօրենների կամ բաժնետերերի ժողովի կողմից կայացրած որոշման,

> (iii)    որեւէ Օրենքի Պահանջի կամ Հրամանի որին Գնորդը կարող է ենթակա լինել, կամ

> (iv)    որեւէ Պայմանագրի որին կողմ է Գնորդը կամ որով Գնորդը կարող է պարտավորվել:

Բացառությամբ Նմանակի Բաժին 4.2-ում ներկայացվածից բացի, Գնորդից չի պահանջվում ձեռք բերել որեւէ Համաձայնություն որեւէ Անձից սույն Պայմանագրի ստորագրման եւ կատարման կամ Նախատեսված Գործարքներից որեւէ մեկի կատարման կամ իրականացման վերաբերյալ:

4.3    **Ներդնելու Նպատակը**:  Գնորդը Բաժնեմասը ձեռք է բերում իր հաշվին:

4.4    **Որոշ Գործընթացներ**:  Գոյություն չունեն ընթացքի մեջ գտնվող Գործարքներ որոնք մեկնարկվել են Գնորդի դեմ եւ որոնք սպառնում են, կամ կարող են արգելել, ուշացնել, անօրինական դարձնել, կամ այլ կերպ խանգարել Նախատեսված Գործարքներից որեւէ մեկը: Գնորդի Իմացությամբ, նման ոչ մի Գործընթաց չի սպառնացել:

4.5    **Brokers or Finders**.  Buyer and its officers and agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and will indemnify and hold Sellers harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or its officers or agents.

5.    **COVENANTS OF SELLERS PRIOR TO CLOSING DATE**.

5.1    **Access and investigation**. Between the date of this Agreement and the Closing Date, Sellers will, and will cause the Acquired Company and its Representatives to, (a) afford Buyer and its Representatives and prospective lenders and their Representatives (collectively, "Buyer's Advisors") full and free access to the Acquired Company's personnel, properties (including subsurface testing), contracts, books and records, and other documents and data, (b) furnish Buyer and Buyer's Advisors with copies of all such contracts, books and records, and other existing documents and data as Buyer may reasonably request, and (c) furnish Buyer and Buyer's Advisors with such additional financial, operating, and other data and information as Buyer may reasonably request.

4.5    Բրոկերներ եւ Գտնողներ: Գնորդը եւ իր պաշտոնյաները եւ գործակալները չունեն որեւէ պարտավորություններ կամ պատասխանատվություն, պայմանական կամ այլ կերպ, բրոկերների կամ գտնողների վճարների կամ գործակալների շահավճարների կամ այլ համանման վճարների մասով սույն Պայմանագրի հետ կապված, եւ կփոխհատուցեն Գնորդի Վաճառողներին զերծ կպահեն Գնորդի միջոցով վճարման առկա որպես Գնորդի եւ իր պաշտոնյաների գործողությունների առո ւ լունէ ենքաղդվող բոլոր նման վճարներից:

5.    ՎԱՃԱՌՈՂԻ ՊԱՐՏԱՎՈՐՈՒԹՅՈՒՆՆԵՐԸ ՄԻՆՉԵՒ ԿԱՏԱՐՄԱՆ ԱՄՍԱԹԻՎԸ:

5.1    Մուտք եւ Ստուգում: Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Վաճառողներն անձամբ, եւ Ձեռքբերված Ընկերության եւ նրա Ներկայացուցիչների միջոցով, (ա) Գնորդի եւ նրա ներկայացուցիչներին եւ հեռանկարային վարկատուներին եւ նրանց Ներկայացուցիչներին (միասնաբար՝ «Գնորդի Խորհրդատուներ») կգնորդեն ազատ եւ անկաշկանդ մուտքով Ձեռքբերված Ընկերության աշխատակազմի, գույքի (ներառյալ ստորգետնյա ստուգումների), պայմանագրերի, գրքերի եւ գրանցումների , եւ այլ փաստաթղթերի եւ տեղեկույքին ընկասնամք, (բ) Գնորդին եւ Գնորդի Խորհիրդատուներին կտրամադրեն նման բոլոր պայմանագրերի, գրքերի եւ գրանցումների, եւ այլ գոյություն ունեցող փաստաթղթերի եւ տեղեկույության պատճեներով համաձայն Գնորդի ողջամիտ խնդրանքի, եւ (գ) Գնորդին եւ Գնորդի Խորհիրդատուներին կտրամադրեն նման հավելյալ ֆինանսական, աշխատանբրային, եւ այլ տեղեկատվույամբ համաձայն Գնորդի ողջամիտ խնդրանքի:

**5.2** **Operation of the Businesses of the Acquired Company.** Between the date of this Agreement and the Closing Date, Sellers will, and will cause the Acquired Company to:

(a) conduct the business of such Acquired Company only in the Ordinary Course of Business;

(b) use their Best Efforts to preserve intact the current business organization of such Acquired Company, keep available the services of the current officers, employees, and agents of the Acquired Company, and maintain the relations and good will with suppliers, customers, landlords, creditors, employees, agents, and others having business relationships with the Acquired Company;

(c) confer with Buyer concerning operational matters of a material nature; and

(d) otherwise report periodically to Buyer concerning the status of the business, operations, and finances of the Acquired Company.

**5.3** **Negative Covenant.** Except as otherwise expressly permitted by this Agreement, between the date of this Agreement and the Closing Date, Sellers

**5.2** **Ձեռքբերված Ընկերության Գործունեության Կառավարումն:** Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում Վաճառողներն անձամբ, եւ Ձեռքբերված Ընկերության միջոցով՝

(ա) Ձեռքբերված Ընկերության գործունեությունն կկառավարեն բացառապես Գործունեության Բնականոն Ընթացքով,

(բ) կգործադրեն իրենց Լավագույն Ջանքերը ամբողջական պահպանելու համար Ձեռքբերված Ընկերության գործունարական կազմավորվածությունը, կպահպանեն Ձեռքբերված Ընկերության ընթացիկ պաշտոնյաների եւ գործակալների ծառայությունները, եւ կպահպանեն մատակարարների, հաճախորդների, գույքատերերի, վարկատուների, աշխատողների, գործակալների, եւ այլոց հետ ունեքեր գործմնական հարաբերություններ ունեն Ձեռքբերված Ընկերության հետ բարի հարաբերություններ եւ բարի կամք:

(գ) կխորհրդակցեն Գնորդի հետ նյութական բնույթ ունեցող աշխատանքային հարցերով, եւ

(դ) այլ կերպ պարբերաբար կզեկուցեն Գնորդին Ձեռքբերված Ընկերության գործունեության, աշխատանքի, եւ ֆինանսների վերաբերյալ:

**5.3** **Բացասական Պարտավորություն:** Սույն Պայմանագրում հստակորեն այլ կերպ սահմանվածից բացի, սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած

Agreement and the Closing Date, Sellers will not, and will cause the Acquired Company not to, without the prior consent of Buyer, take any affirmative action, or fail to take any reasonable action within their or its control, as a result of which any of the changes or events listed in Section 3.16 is likely to occur.

ժամանակահատվածում, Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության միջոցով, առանց Գ-նորդի նախորդ համաձայնության, չեն կատարի որեւէ պատասխանատու գործողություն, կամ որեւէ անգործություն իրենց իրավասությունների սահմաններում, որի արդյունքում կարող են առաջանալ Բաժնե 3.16-ում նախատեսված փոփոխություններից կամ դեպքերից որեւէ մեկը:

### 5.4 Required Approvals.

As promptly as practicable after the date of this Agreement, Sellers will, and will cause each Acquired Company to, make all filings required by Legal Requirements to be made by them in order to consummate the Contemplated Transactions. Between the date of this Agreement and the Closing Date, Sellers will, and will cause each Acquired Company to, (a) cooperate with Buyer with respect to all filings that Buyer elects to make or is required by Legal Requirements to make in connection with the Contemplated Transactions, and (b) cooperate with Buyer in obtaining all consents identified in Schedule 4.2.

### 5.4 Պահանջվող Հաստատումներ:

Սույն Պայմանագրի ամսաթվից ինչքան հնարավոր է շուտ, Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության միջոցով, կկատարեն Օրենքի Պահանջով պահանջվող բոլոր գրանցումները իրականացնելու համար Նախատեսված Գործարքները: Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածի ընթացքում, Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության միջոցով, (ա) կհամագործակցեն Գ-նորդի հետ Գ-նորդի կողմից ընտրված կամ Օրենքի Պահանջով պահանջվող բոլոր գրանցումներում Նախատեսված Գործարքների հետ կապված, եւ (բ) կհամագործակցեն Գ-նորդի հետ Բաժնե 4.2-ում նախանշված բոլոր թույլտվությունների ստացման գործում:

### 5.5 Notification.

Between the date of this Agreement and the Closing Date, each Seller will promptly notify Buyer in writing if such Seller or the Acquired Company becomes aware of any fact or condition that causes or constitutes a Breach of any of Sellers' representations and warranties as of the date of this Agreement, or if such Seller or the Acquired Company becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a Breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of

### 5.5 Ծանուցումներ:

Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում ընթացքում, յուրաքանչյուր Վաճառող անմիջապես գրավոր կծանուցի Գ-նորդին եթե այդ Վաճառողը կամ Ձեռքբերված Ընկերությունը տեղեկանան որեւէ փաստի կամ իրավիճակի մասին որը հարուցում կամ սահմանում է Վաճառողների որեւէ հայտարարությունների եւ երաշխիքների Խախտում սույն Պայմանագրի ամսաթվի դրությամբ, կամ եթե Վաճառողը կամ Ձեռքբերված Ընկերությունը սույն Պայմանագրի ամսաթվից հետո տեղեկանան ճնան փաստի կամ իրավիճակի մասին որը կհարուցեր կամ կսահմաներ որեւէ հայտարարության կամ

76

as of the time of occurrence or discovery of such fact or condition. Should any such fact or condition require any change in the Disclosure Letter if the Disclosure Letter were dated the date of the occurrence or discovery of any such fact or condition, Sellers will promptly deliver to Buyer a supplement to the Disclosure Letter specifying such change. During the same period, each Seller will promptly notify. Buyer of the occurrence of any Breach of any covenant of Sellers in this Section 5 or of the occurrence of any event that may make the satisfaction of the conditions in Section 7 impossible or unlikely.

Երաշխիքի Խախտում եթե այդ փաստը կամ իրավիճակը հայտնաբերվելիս կամ գոյություն ունենայի այդ հայտարարությունների կամ երաշխիքների կատարման ժամանակ: Եթե նման փաստը կամ իրավիճակը պահանջի Բացահայտման Նամակի որեւէ փոփոխություն այն դեպքում երբ Բացահայտման Նամակը ամսագրված լիներ նման փաստի կամ իրավիճակի հայտնաբերման կամ գոյություն ունենալու ժամանակ, ապա Վաճառողները Գնորդին անհապաղ կտրամադրեն այդ փոփոխությունն արտացոլող Բացահայտման Նամակի հավելված: Նույն ժամանակահատվածի ընթացքում, յուրաքանչյուր Վաճառող Գնորդին անհապաղ կտեղեկացնի Բաժնի 5-ում սահմանված Վաճառողի որեւէ պարտավորության որեւէ Խախտման առաջացման վերաբերյալ կամ որեւէ դեպքի կամ երեւույթի վրա հանգելու վերաբերյալ որը կարող է Բաժնի 7-ի պայմանների բավարարումն դարձնել անհնար կամ ոչ հավանական:

5.6     **Payment of Indebtedness by Related Persons.** Except as expressly provided in this Agreement, Sellers will cause all indebtedness owed the Acquired Company by any Seller or any Related Person of a Seller to be paid in full prior to Closing.

5.6     **Փոխկապակցված Անձանց կողմից Պարտքերի Վճարումը:** Սույն Պայմանագրում հստակ սահմանվածից բացի, Վաճառողները ամբողջությամբ վճարել կստան Ձեռքբերված Ընկերությանը որեւէ Վաճառողի կամ Վաճառողի Փոխկապակցված Անձի պարտքր մնացած գումարները մինչեւ Կատարումը:

5.7     **No Negotiation.** Until such time, if any, as this Agreement is terminated pursuant to Section 9, Sellers will not, and will cause the Acquired Company and each of its Representatives not to, directly or indirectly solicit, initiate, or encourage any inquiries or proposals from, discuss or negotiate with, provide any non-public information to, or consider the merits of any unsolicited inquiries or proposals from, any Person (other than Buyer) relating to any transaction involving the sale of the business or assets (other than in the Ordinary Course of Business) of the Acquired Company, or any of the capital of

5.7     **Բանակցությունների Բացակայություն:** Բացի մինչեւ այն ժամանակը, եթե տեղի ունենա, երբ սույն Պայմանագիրը կդադարի Բաժնի 9-ի համաձայն, Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության եւ նրա յուրաքանչյուր Ներկայացուցչի միջոցով թույլ չեն տա, ուղղակիորեն կամ անուղղակիորեն կանենա, մեկնարկի, կամ խթանի որեւէ Անձի կողմից որեւէ հարցում կամ առաջարկություն, կամ նրա կողմից որեւէ չպրոտովված հարցման կամ առաջարկության որեւէ խնդրի քննարկում (բացի Գնորդից) առնչվող որեւէ գործառքի որը կներառի Ձեռքբերված Ընկերության գործունեության կամ գույքի վաճառքը

Acquired Company, or any of the capital of the Acquired Company, or any merger, consolidation, business combination, or similar transaction involving the Acquired Company.

**5.8    Best Efforts**.  Between the date of this Agreement and the Closing Date, Sellers will use  their Best Efforts to cause the conditions in Sections 7 and 8 to be satisfied.

## 6.    COVENANTS OF BUYER PRIOR TO CLOSING DATE.

**6.1    Approvals of Governmental Bodies**.  As promptly as practicable after the date of this Agreement, Buyer will, and will cause each of its Related Persons to, make all filings required by Legal Requirements to be made by them to consummate the Contemplated Transactions. Between the date of this Agreement and the Closing Date, Buyer will, and will cause each Related Person to, (i) cooperate with Sellers with respect to all filings that Sellers are required by Legal Requirements to make in connection with the Contemplated Transactions, and (ii) cooperate with Sellers in obtaining all consents identified in Part 3.2 of the Disclosure Letter; provided that this Agreement will not require Buyer to dispose of or make any change in any portion of its business or to incur any other burden to obtain a Governmental Authorization.

**6.2    Best Efforts**.  Except as set forth in the provision to Section 6.1.

**5.8    Լավագույն Ջանքեր:** Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Վաճառողները կգործադրեն իրենց Լավագույն Ջանքերը բավարարելու համար Բաժնի 7-ի եւ Բաժին 8-ի պայմանները:

## 6.    ԳՆՈՐԴԻ ՊԱՐՏԱՎՈՐՈՒԹՅՈՒՆՆԵՐԸ ՄԻՆՉԵՒ ԿԱՏԱՐՄԱՆ ԱՄՍԱԹԻՎԸ:

**6.1    Կառավարական Մարմինների Հաստատումները:** Սույն Պայմանագրի ամսաթվից ինչքան որ հնարավոր է շուտ, Գնորդն անձամբ, եւ իր Փոխկապակցված Անձանց միջոցով, կատարել Օրենքի Պահանջով նախատեսված բոլոր գրանցումները որոնք անհրաժեշտ են իրականացնելու համար Նախատեսված Գործարքները: Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Գնորդն անձամբ, եւ իր Փոխկապակցված Անձանց միջոցով, (i) կհամագործակցի Վաճառողների հետ Օրենքի Պահանջով պահանջվող բոլոր գրանցումների կատարման մեջ կապված Նախատեսված Գործարքների հետ, եւ (ii) կհամագործակցի Վաճառողների հետ Բացահայտման Նամակի Բաժնի 3.2-ում նեևկայացված բոլոր թույլտվությունների ստացման գործում. պայմանով որ սույն Պայմանագիրը չի պահանջի Գնորդին փոխել կամ փոփոխել իր գործունեության առաւկան կամ կրել Կառավարական Լիազորության ստանալու ծանրաբեռնում:

**6.2    Լավագույն Ջանքեր:** Բաժին 6.1-ում ներկայացվածից բացի,

78

forth in the provison to Section 6.1, between the date of this Agreement and the Closing Date, Buyer will use its Best Efforts to cause the conditions in Sections 7 and 8 to be satisfied.

7.    **CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE.**  Buyer's obligation to purchase the Shares and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

7.1    **Accuracy of Representations.**

(a)    All of Sellers' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Disclosure Letter.

(b)    Each of Sellers' representations and warranties in Sections  must have been accurate in all respects as of the date of this Agreement, and must be accurate in all respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Disclosure Letter.

7.    ԳՆՈՐԴԻ ԿԱՏԱՐՄԱՆ ՊԱՐՏԱՎՈՐՈՒԹՅԱՆ ԻՐԱԿԱՆԱՑՄԱՆ ՆԱԽԱՊԱՅՄԱՆՆԵՐԸ: Բաժնեմասը գնելու եւ Կատարման ժամանակ Գ-նորդից պահանջվող այլ գործողությունները կատարելու պարտավորությունը պայմանավորված է յիետեւյալ պայմաններից յուրաքանչյուրի բավարարմամբ (որոնցից ցանկացածը կարող է չեղյալ համարվել Գ-նորդի կողմից, ամբողջությամբ կամ մասամբ) Կատարման ժամանակ կամ դրանից առաջ՝

7.1    Հայտարարությունների Ճշտությունը:

(ա)    Վաճառողների սույն Պայմանագրում արված բոլոր հայտարարությունները եւ երաշխավորությունները (միասնիկ վերցված), եւ յուրաքանչյուր այս հայտարարությունները եւ երաշխավորությունները (առանձին վերցված), պետք է լիներ ճիշտ բոլոր էական առումներով սույն Պայմանագրի ամսաթվի դրությամբ, եւ պետք է լիներ ճիշտ բոլոր էական առումներով Կատարման Ամսաթվի դրությամբ իբր թե կատարվել են Կատարման Ամսաթվի դրությամբ, առանց հավելյալ պատճառելու Բացահայտման Նամակին:

(բ)    Բաժիններում Վաճառողների հայտարարությունները եւ երաշխավորությունները պետք է ճիշտ լիներ բոլոր առումներով սույն Պայմանագրի ամսաթվի դրությամբ, եւ պետք է ճիշտ լիներ բոլոր առումներով Կատարման Ամսաթվի դրությամբ իբր կատարվել են Կատարման Ամսաթվից, առանց

79

Բացահայտման Նամակին
հավելում պատռաներու։

**7.2    Sellers' Performance.**

(a)    All of the covenants and obligations that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

(b)    Each document required to be delivered pursuant to Section 2.4 must have been delivered, and each of the other covenants and obligations in Sections must have been performed and complied with in all respects.

**7.3    Consents.**  Each of the Consents identified in the Disclosure Letter, and each Consent identified in Schedule 4.2, must have been obtained and must be in full force and effect.

**7.4    Additional Documents.** Sellers must have delivered additional documents reasonably by Buyers:

**7.5    No Proceedings.**  Since the date of this Agreement, there must not have been commenced or Threatened against Buyer, or against any Person affiliated with Buyer, any Proceeding (a) involving any challenge to, or seeking damages or other

7.2    Վաճառողի Գործելակերպը։

(ա)    Կատարման ժամանակ կամ դրանից առաջ սույն Պայմանագրի համաձայն Վաճառողների կողմից կատարման ենթակա բոլոր պարտավորությունները եւ պարտականությունները (միասին վերցված), եւ յուրաքանչյուր այս պարտավորությունները եւ պարտականությունները (առանձին վերցված), պետք է պատշաճ ձեւով կատարված եւ իրականացված բոլոր էական առումներով։

(բ)    Բաժին 2.4-ի համաձայն տրամադրման ենթակա բոլոր փաստաթղթերը պետք է տրամադրված լինեն, եւ Բաժիններում ներկայացված յուրաքանչյուր այլ պարտավորությունները եւ պարտականությունները պետք է կատարված եւ իրականացված լինեն բոլոր առումներով։

7.3    Համաձայնություններ։ Բացահայտման Նամակում ներկայացված բոլոր Համաձայնությունները, եւ Բաժին 4.2-ում ներկայացված յուրաքանչյուր Համաձայնություն պետք է ձեռք բերված լինի, եւ լինի լրիվ ուժի մեջ եւ ունենա ունակություն։

7.4    Հավելյալ Փաստաթղթեր։ Վաճառողները պետք է տրամադրած լինեն Գնորդի կողմից ողջամտորեն պահանջված փաստաթղթերը։

7.5    Վարույթների Բացակայություն։ Սույն Պայմանագրի ամսաթվից Գնորդի, կամ Գնորդի հետ աֆիլացված այլ Անձի դեմ չպետք է սկսված կամ Սպառնացած լինեն, որեւէ Վարույթներ (ա) որոնք ներառում են որեւէ սպառնալիք որեւէ Նախատեսված Գործարքի

challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the Contemplated Transactions.

նկատմամբ, կամ վնասների կամ այլ փոխհատուցման խնդիրներ դնելով հետ կապված, կամ (բ) որը կարող է արգելել, ուշացնել, անօրինական դարձնել, կամ այլ կերպ խանգարել ագրեցությունում ունենալ որևէ Նախատեսված Գործարքի նկատմամբ:

**7.6    No Claim Regarding Stock Ownership or Sale Proceeds**.  There must not have been made or Threatened by any Person any claim asserting that such Person (a) is the holder or the beneficial owner of, or has the right to acquire or to obtain beneficial ownership of, any stock of, or any other voting, equity, or ownership interest in, the Acquired Company, or (b) is entitled to all or any portion of the Purchase Price payable for the Shares.

**7.6    Բաժնետմասի Սեփինության կամ Վաճառքի Գումարների Վերաբերյալ Հայցի Բացակայություն:** Չպետք է ներկայացվլի կամ Սպառնա ներկայացվելու որևէ հայց որևէ Անձի կողմից պնդումով որ այդ Անձը (ա) Ձեռքբերված Ընկերության տիրապետումը կամ անուղղակի սեփականատերն է, կամ ունի դրա, դրա որևէ բաժնետմասի, կամ դրա որևէ ձայնի, գույքի, կամ բաժնետմասի ձեռքբերման կամ անուղղակի սեփականանիրման իրավունք, կամ (բ) իրավասու է Բաժնետմասի Գուման Գնի կամ դրա որևէ մասի նկատմամբ:

**7.7    No Prohibition**.  Neither the consummation nor the performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, conflict with, or result in a material violation of, or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any applicable Legal Requirement or Order, or (b) any Legal Requirement or Order that has been published, introduced, or otherwise proposed by or before any Governmental Body.

**7.7    Արգելման Բացակայություն:** Նախատեսված Գործարքների իրականացումը կամ կատարումը ուղղակիորեն կամ անուղղակիորեն (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում), Գնորդացնորեն չի հակասի, կամ բախումով առաջացնի, կամ Գնորդական խախտման արդյունքը հանդիսանա, կամ Գնորդին կամ Գնորդի հետ Փոխկապակցված Անձին հարուցի սոււնդել որևէ Գնորդականորեն բացասական հետևանքներից որոնք առաջանում են (ա) որևէ գործող Օրենքի Պահանջի կամ Հրամանի արդյունքում, կամ (բ) որևէ Օրենքի Պահանջից կամ Հրամանից որը հրատարակվել է, ներկայացվել է, կամ այլ կերպ առաջարկվել է որևէ Կառավարական Մարմնի կողմից կամ ճռսն:

**8.    CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE**.  Sellers' obligation to sell the Shares and to take the other actions required to be taken by Sellers at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Sellers, in whole or in part):

**8.    ՎԱՃԱՌՈՂԻ ԿԱՏԱՐՄԱՆ ՊԱՐՏԱՎՈՐՈՒԹՅԱՆ ԻՐԱԿԱՆԱՑՄԱՆ ՆԱԽԱՊԱՅՄԱՆՆԵՐԸ:** Բաժնետմասը վաճառելու եւ Կատարմման ժամանակ Վաճառողներից պահանջվող այլ գործողությունները կատարելու պարտավորությունը պայմանավորված է հետեւյալ պայմաններից յուրաքանչյուրի բավարարմամբ (որոնցից ցանկացածը կարող է չեղյալ համարվել Վաճառողների

81

waived by Sellers, in whole or in part):

**8.1    Accuracy of Representations**. All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

**8.2    Buyer's Performance**.

(a)    All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b)    Buyer must have delivered each of the documents required to be delivered by Buyer pursuant to Section 2.4 and must have made the cash payments required to be made by Buyer pursuant to Sections 2.4(b)(i) and 2.4(b)(ii).

**8.3    Consents**. Each of the Consents identified in the Disclosure Letter must have been obtained and must be in full force and effect.

կողմից, ամբողջությամբ կամ մասամբ)
Կատարման ժամանակ կամ դրանից առաջ

**8.1    Հայտարարությունների Ճշտություն**: Գնորդի սույն Պայմանագրում արված բոլոր հայտարարությունները եւ երաշխավորությունները (միասնին վերցված), եւ յուրաքանչյուր այս հայտարարությունները եւ երաշխավորությունները (առանձին վերցված), պետք է լինեն ճիշտ բոլոր էական առումներով սույն Պայմանագրի ամսաթվի դրությամբ, եւ պետք է լինեն ճիշտ բոլոր էական առումներով Կատարման Ամսաթվի դրությամբ իբր թե կատարվել են Կատարման Ամսաթվի դրությամբ, առանց հավելյալ պատճառելու Բացահայտման Նամակին:

**8.2    Գնորդի Գործելակերպ:**

(ա)    Կատարման ժամանակ կամ դրանից առաջ սույն Պայմանագրի համաձայն Գնորդի կողմից կատարման ենթակա բոլոր պարտավորությունները (միասնին վերցված), եւ յուրաքանչյուր այս պարտավորությունները եւ պարտականությունները (առանձին վերցված), պետք է պատշաճ ձեւով կատարվեն եւ իրականացվեն բոլոր էական առումներով:

(բ)    Գնորդը պետք է տրամադրած լինի Բաժին 2.4-ի համաձայն Գնորդի կողմից տրամադրման ենթակա բոլոր փաստաթղթերը, եւ կատարած լինի Գնորդի կողմից վճարման ենթակա կանխիկ վճարումները համաձայն Բաժիններ 2.4(բ)(i) եւ 2.4(բ)(ii)-ի:

**8.3    Համաձայնություններ:** Բացահայտման Նամակում ներկայացված բոլոր Համաձայնությունները պետք է ձեռք բերված լինեն, եւ լինեն լրիվ ուժի մեջ եւ ունենան ունակություն:

82

*84*

**8.4    Additional Documents**.  Buyer must have delivered to Sellers additional documents reasonably requested by Sellers.

**8.5    No Injunction**.  There must not be in effect any Legal Requirement or any injunction or other Order that (a) prohibits the sale of the Shares by Sellers to Buyer, and (b) has been adopted or issued, or has otherwise become effective, since the date of this Agreement.

**9.    TERMINATION**.

**9.1    Termination Events**.  This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)    by either Buyer or Sellers if a material Breach of any provision of this Agreement has been committed by the other party and such Breach has not been waived;

(b)    (i) by Buyer if any of the conditions in Section 7 has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date; or (ii) by Sellers, if any of the conditions in Section 8 has not been satisfied of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Sellers to comply with their obligations under this Agreement) and Sellers have

**8.4    Հավելյալ Փաստաթղթեր**: Գնորդը Վաճառողներին պետք է տրամադրած լինեն Վաճառողների կողմից ողջամտորեն պահանջված փաստաթղթեր:

**8.5    Դատական Արգելանքի Բացակայություն**: Ոչ մի Օրենքի Պահանջ կամ որևէ դատական արգելանք չպետք է ուժի մեջ գտնվի որը (ա) կարգելի Բաժնեմասի վաճառքը Վաճառողների կողմից Գնորդին, և

(բ) որն ընդունված կլինի, կամ այլ կերպ ուժ մեջ մտած կլինի, սույն Պայմանագրի ամսաթվից հետո:

**9.    ԴԱԴԱՐՈՒՄ**

**9.1    Դադարման Դեպքեր**: Սույն Պայմանագիրը կարող է, մինչև Կատարումը կամ դրա ժամանակ ծանուցում տալու միջոցով, դադարել`

(ա)    կամ Գնորդի կամ Վաճառողների կողմից եթե սույն Պայմանագրի որևէ դրույթի Էական Խախտում կատարվել մյուս կողմ կողմից ու այդ Խախտումը չեղյալ չհամարվի,

(բ)    (i) Գնորդի կողմից եթե Բաժին 7-ի որևէ պայմանի չբավարարվի Կատարման Ամսաթվի դրությամբ կամ եթե նման պայմանի բավարարումը համարվի կամ դառն անհնար (բացի Գնորդի կողմից սույն Պայմանագրով իր պարտավորությունների չկատարման դեպքերի միջոցով) և Գնորդը չեղյալ չհամարի նման պայմանը Կատարման Ամսաթվից առաջ կամ դրա ժամանակ, կամ (ii) Վաճառողների կողմից եթե Բաժին 8-ի որևէ պայմանի չբավարարվի Կատարման Ամսաթվի դրությամբ կամ եթե նման պայմանի բավարարումը համարվի կամ դառնա անհնարին (բացի Վաճառողների կողմից սույն Պայմանագրով իրենց

83

this Agreement) and Sellers have not waived such condition on or before the Closing Date;

(c) by mutual consent of Buyer and Sellers; or

(d) by either Buyer or Sellers if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before December 31, 2003, or such later date as the parties may agree upon.

**9.2     Effect of Termination.**
Each party's right of termination under Section 9.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties under this Agreement will terminate, except that the obligations in Sections 11.1 and 11.3 will survive; provided, however, that if this Agreement is terminated by a party because of the Breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

պարտավորությունների չկատարման դեպքերի միջոցով) եւ Վաճառողները չեղյալ չհամարեն նման պայմանը Կատարման Ամսաթվից առաջ կամ դրա ժամանակ,

(q) Գնորդի եւ Վաճառողների երկուստեք համաձայնությամբ, կամ

(դ) կամ Գնորդի կամ Վաճառողների կողմից եթե Կատարումը տեղի չունենա (բացի սույն Պայմանագրի դադարման մեջ շահագրգռված կողմի կողմից սույն Պայմանագրով սահմանված իր պարտավորությունների կատարումից խուսափելու դեպքերը) 2003թ-ի դեկտեմբերի 31-ը, կամ կողմերի կողմից համաձայնած ավելի ուշ ժամկետ:

**9.2     Դադարման Հետեւանքը:**
Բաժին 9.1-ի համաձայն յուրաքանչյուր կողմի դադարեցնելու իրավունքը հավելում է սույն Պայմանագրով կամ այլ կերպ նրանց ունեցած ցանկացած իրավունքներին, եւ դադարեցնելու իրավունքի օգտագործումը չի նշանակում վճաումների փոխխատուցման ընտրություն: Եթե սույն Պայմանագիրը դադարի Բաժին 9.1-ի համաձայն, սույն Պայմանագրով սահմանված կողմերի բոլոր հետագա պարտավորությունները դադարում են, բացի Բաժիններ 11.1-ում եւ 11.3-ում սահմանված պարտավորությունները որոնք մնում են ուժի մեջ, պայմանով, սակայն, որ եթե սույն Պայմանագիրը դադարի որեւէ կողմի կողմից մյուս կողմի կողմից Պայմանագրի Խախտման պատճառով կամ դադարեցնող կողմի սույն Պայմանագրով սահմանված մեկ կամ մի քանի պայմանները մյուս կողմի սույն Պայմանագրով սահմանված իր պարտավորությունները չկատարելու հետեւանքով չբավարարելու պատճառով, դադարեցնող կողմի իրավական փոխխատուցում հետապնդելու իրավունքը սլեթր է մնա ուժի մեջ:

84

## 10.    INDEMNIFICATION; REMEDIES.

### 10.1    Survival; Right to Indemnification not Affected by Knowledge.    All representations, warranties, covenants, and obligations in this Agreement, the Disclosure Letter, the supplements to the Disclosure Letter, the certificate delivered pursuant to Section 2.4(a)(v), and any other certificate or document delivered pursuant to this Agreement will survive the Closing. The right to indemnification, payment of Damages or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of Damages, or other remedy based on such representations, warranties, covenants, and obligations.

### 10.2    Indemnification and Payment of Damages by Sellers.    Sellers, jointly and severally, will indemnify and hold harmless Buyer, the Acquired Company, and their respective Representatives, stockholders, controlling persons, and affiliates (collectively, the

## 10.    ՓՈԽՀԱՏՈՒՑՈՒՄ

### 10.1    Ուժի Մեջ Մնալը, Իմացության Հետևանքը Չունենալը Փոխհատուցման Վրա: Սույն Պայմանագրի, Բացահայտման Նամակի, Բացահայտման Նամակի հավելյալների, Բաժին 2.4(ա)(v)-ի համաձայն տրամադրված վկայականների, եւ սույն Պայմանագրի համաձայն ցանկացած այլ տրամադրված վկայականի կամ փաստաթղթի բոլոր հայտարարությունները, երաշխավորությունները, խոստումները, եւ պարտավորությունները մնում են ուժի մեջ Կատարումից հետո: Փոխհատուցման, Վնասների վճարման, կամ այլ փոխհատուցման իրավունքը հիմնված այդ հայտարարությունների, երաշխավորությունների, խոստումների, եւ պարտավորությունների վրա չպետք է խախտվի որեւէ ճանապարհարկության, երաշխիքի, խոստման, կամ պարտավորության ճշտության կամ անճշտության կամ դրանց իրականացման վերաբերյալ կատարված որեւէ ստուգման, կամ դրա վերաբերյալ որեւէ Ժամանակ ձեռք բերված (կամ ձեռք բերման հնարավորության) Իմացության, լինի դա սույն Պայմանագրի ստորագրումից եւ տրամադրումից կամ Կատարման Ամսաթվից առաջ կամ հետո, հանգամանքներում: Որեւէ հայտարարության կամ երաշխավորության, կամ որեւէ խոստման կամ պարտավորության կատարման որեւէ պայմանին չեղյալ համարելը չի ազդում այդ հայտարարության, երաշխավորության, խոստման կամ պարտավության հիմնի վրա փոխհատուցման, Վնասների վճարման, կամ այլ փոխհատուցման իրավունքի վրա:

### 10.2    Վաճառողների Կողմից Փոխհատուցումը եւ Վնասների Վճարումը: Վաճառողները, միասնաբար եւ առանձին, Գնորդին, Ձեռքբերված Ընկերությանը, եւ իրանց համապատասխան Ներկայացուցիչներին, բաժնետերերին, վերահսկող անձանց, եւ փոխկապակցված

85

persons, and affiliates (collectively, the "Indemnified Persons") for, and will pay to the Indemnified Persons the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, "Damages"), arising, directly or indirectly, from or in connection with:

անձանց (միասնաբար՝ «Փոխհատուցված Անձանց») կփոխհատուցեն եւ զերծ կպահեն, ցանկացած կորստից, պարտավորությունից, հայցից, վնասից (ներառյալ պատահական եւ իրրեհետեւանք առաջացած վնասները), ծախսից (ներառյալ ստուգման եւ պաշտպանության եւ փաստաբանների ողջամիտ ծախսերը) կամ արժեքի անկումից, անկախ երրոր կողմից հայցի ներառմամ հանգամանքից (միասնաբար՝ «Վնասներ»), եւ Փոխհատուցված Անձանց կվճարեն այն համապատասխան գումարները, որոնք կծագեն, ուղղակիորեն կամ անուղղակիորեն, հետեւյալից կամ դրա հետ կապված.

(a)    any Breach of any representation or warranty made by Sellers in this Agreement (without giving effect to any supplement to the Disclosure Letter), the Disclosure Letter, the supplements to the Disclosure Letter, or any other certificate or document delivered by Sellers pursuant to this Agreement;

(ա)    սույն Պայմանագրում (առանց Բացահայտման Նամակի վրա ազդելու կամ հավելյալ առաջացնելու), Բացահայտման Նամակում, Բացահայտման Նամակի հավելյումներում, կամ սույն Պայմանագրի համաձայն Վաճառողների կողմից տրամադրած որեւէ վկայագրում կամ փաստատթղթում Վաճառողների կողմից կատարված ցանկացած հայտարարության կամ երաշխավորության Խախտումից,

(b)    any Breach of any representation or warranty made by Sellers in this Agreement as if such representation or warranty were made on and as of the Closing Date without giving effect to any supplement to the Disclosure Letter, other than any such Breach that is disclosed in a supplement to the Disclosure Letter and is expressly identified in the certificate delivered pursuant to Section 2.4(a)(v) as having caused the condition specified in Section 7.1 not to be satisfied;

(բ)    սույն Պայմանագրում Վաճառողների կողմից կատարված որեւէ հայտարարության կամ երաշխավորության Խախտումը՝ իբր ճման հայտարարությունը կամ երաշխիքը կատարված լինի Կատարման Ամսաթվի դրությամբ առանց Բացահայտման Նամակին հավելյալ հարուցելու, բացի Բացահայտման Նամակում բացահայտված եւ Բաժին 2.4(ա)(v)-ի համաձայն տրամադրված վկայագրում հստակորեն նկարագրված ցանկացած Խախտում որի հետեւանքով Բաժին 7.1-ում սահմանված պայմանը չի

86

(c)     any Breach by either Seller of any covenant or obligation of such Seller in this Agreement;

(d)     any product shipped or manufactured by, or any services provided by, the Acquired Company prior to the Closing Date;

(e)     any matter disclosed in the Disclosure Letter; or

(f)     any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any such Person with either Seller or the Acquired Company (or any Person acting on their behalf) in connection with any of the Contemplated Transactions.

The remedies provided in this Section 10.2 will not be exclusive of or limit any other remedies that may be available to Buyer or the other Indemnified Persons. The Buyer also has athe right of set off against any royalty payments.

**10.3   Indemnification and Payment of Damages by Sellers; Environmental Matters**  In addition to the provisions of Section 10.2, Sellers,

բավարարվել

(գ)     սույն Պայմանագրի՝ Վաճառողների կողմից ցանկացած Խախտումը, կամ, Վաճառողների կողմից կատարված որևէ խոստման կամ պարտավորության խախտումը,

(դ)     մինչև Կատարման Ամսաթիվը Ձեռքբերված Ընկերության կողմից ուղղարկված կամ արտադրված որևէ ապրանքը, կամ մատուցված որևէ ծառայությունը,

(ե)     Բացահայտման Նամակում բացահայտված որևէ խնդիրը, կամ

(զ)     բրոկերների կամ գտնողների վճարների կամ շահավճարների վերաբերյալ ցանկացած Անձի հայցը որը հիմնված է նման ցանկացած Անձի եւ որևէ Վաճառողի կամ Ձեռքբերված Ընկերության (կամ նրանց կողմից գործող ցանկացած Անձի) հետ ենթադրվող պայմանագրի վրա կապված որևէ Նախատեսված Գործարքի հետ:

Սույն Բաժին 10.2-ում ներկայացված փոխհատուցումները բացառիկ չեն կամ չեն սահմանափակում որևէ այլ փոխհատուցում Գնորդին կամ այլ Փոխհատուցված Անձին հասանելի ցանկացած այլ փոխհատուցումները։ Գնորդը նաեւ իրավունք ունեի հաշվանցումներ կատարելու ցանկացած ռոյալթիի վճարման նկատմամբ:

10.3    Վաճառողների Կողմից Փոխհատուցումն եւ Վնասների Վճարումը, Միջավայրային Խնդիրներ: Ի լրումն Բաժին 10.2-ի դրույթների, Վաճառողները, մինսից

87

the provisions of Section 10.2, Sellers, jointly and severally, will indemnify and hold harmless Buyer, the Acquired Company, and the other Indemnified Persons for, and will pay to Buyer, the Acquired Company, and the other Indemnified Persons the amount of, any Damages (including costs of cleanup, containment, or other remediation) arising, directly or indirectly, from or in connection with:

(a)    any Environmental, Health, and Safety Liabilities arising out of or relating to:  (i) (A) the ownership, operation, or condition at any time on or prior to the Closing Date of the Facilities or any other properties and assets (whether real, personal, or mixed and whether tangible or intangible) in which Sellers or the Acquired Company has or had an interest, or (B) any Hazardous Materials or other contaminants that were present on the Facilities or such other properties and assets at any time on or prior to the Closing Date; or (ii) (A) any Hazardous Materials or other contaminants, wherever located, that were, or were allegedly, generated, transported, stored, treated, Released, or otherwise handled by Sellers or the Acquired Company or by any other Person for whose conduct they are or may be held responsible at any time on or prior to the Closing Date, or (B) any Hazardous Activities that were, or were allegedly, conducted by Sellers or the Acquired Company or by any other Person for whose conduct they are or may be held responsible; or

եւ առանձին, Գ-նորդին, Ձեռքբերված Ընկերությանը, եւ այլ Փոխհատուցված Անձանց կփոխհատուցեն եւ զերծ կպահեն ցանկացած Վնասներից (ներառյալ մաքրման, մեկուսացման, կամ այլ վերականգնման ծախսերը), եւ Գ-նորդին, Ձեռքբերված Ընկերությանը, եւ այլ Փոխհատուցված Անձանց կվճարեն գումարները, որոնք կծագեն, ուղղակիորեն կամ անուղղակիորեն, հետեւյալից կամ դրա հետ կապված.

(ա)    ցանկացած Միջավայրային, Առողջապահական, կամ Անվտանգության Պարտավորությունից որը ծագում է կամ կապված է. (i) (Ա) Միջոցների կամ ցանկացած այլ գույքի կամ միջոցների (լինի անշարժ, շարժական, կամ խառը եւ նյութական կամ ոչ նյութական) մին՞չեւ Կատարման Ամսաթիվը որեւէ ժամանակ տնօրինելուց, աշխատեցնելուց, կամ այլ վիճակից, որոնցում Վաճառողները կամ Ձեռքբերվա Ընկերություն ունեցել է բաժնեմաս, կամ (Բ) որեւէ Վտանգավոր Նյութից կամ այլ աղտոտիչից որոնք առկա են եղել Միջոցների, կամ նման այլ գույքի կամ միջոցների վրա Կատարման Ամսաթվից առաջ որեւէ ժամանակ, կամ (ii) (Ա) որեւէ Վտանգավոր Նյութից կամ այլ աղտոտիչից, անկախ տեղանքից, որոն եղել կամ ենթադրվում է որ եղել են կուտակվ��ծ, տեղափոխված, պահեստավորված, մշակված, Արտանետված, կամ այլ կերպ օգտագործված Վաճառողների կամ Ձեռքբերված Ընկերության կամ ցանկացած այլ Անձի կողմից որի գործելակերպի համար պատասխանատու են կամ կարող են պատասխանատու համարվել նրանք ցանկացած ժամանակ մին՞չեւ Կատարման Ամսաթիվը, կամ (Բ) ցանկացած Վտանգավոր Գործողություններից որոնք եղել են, կամ ենթադրվում է որ եղել են, կատարված Վաճառողների կամ

(b)    any bodily injury (including illness, disability, and death, and regardless of when any such bodily injury occurred, was incurred, or manifested itself), personal injury, property damage (including trespass, nuisance, wrongful eviction, and deprivation of the use of real property), or other damage of or to any Person, including any employee or former employee of Sellers or the Acquired Company or any other Person for whose conduct they are or may be held responsible, in any way arising from or allegedly arising from any Hazardous Activity conducted or allegedly conducted with respect to the Facilities or the operation of the Acquired Company prior to the Closing Date, or from Hazardous Material that was (i) present or suspected to be present on or before the Closing Date on or at the Facilities (or present or suspected to be present on any other property, if such Hazardous Material emanated or allegedly emanated from any of the Facilities and was present or suspected to be present on any of the Facilities on or prior to the Closing Date) or (ii) Released or allegedly Released by Sellers or the Acquired Company or any other Person for whose conduct they are or may be held responsible, at any time on or prior to the Closing Date.

Ձեռքբերված Ընկերության կամ ցանկացած այլ Անձի կողմից որի գործելակերպի համար պատասխանատու են կամ կարող են պատասխանատու գտնվել նրանք, կամ

(բ)    ցանկացած մարմնական վնասվածքից (ներառյալ հիվանդությունը, անդամալուծությունը, եւ մահը, եւ անկախ հանգամանքից թե երբ է ճման մարմնական վնասվածք առաջացել, ենթարկվել որ առաջացել է, թե իր մասին հայտնի դարձել), անձնական վնասվածքից, գույքի վնասվածքից (ներառյալ անշարժ գույքի զարտաշահումը, վիշացումը, ապօրինի տիրապետումը, օգտագործման իրեն բացառումը), կամ ցանկացած Անձի կողմից կամ Անձին հասցրած վնասից, ներառյալ Վաճառողների կամ Ձեռքբերված Ընկերության կամ ցանկացած Անձի՝ որի գործելակերպի համար նրանք պատասխանատու են կամ կարող են համարվել պատասխանատու, ցանկացած աշխատողի կամ նախկին աշխատողին, որեւ կերպ որեւէ Վտանգավոր Գործունեությունից՝ Միջոցների ենկատմամբ կատարված կամ ենթադրյալ կատարված, կամ Ձեռքբերված Ընկերության աշխատանքից միճյեւ Կատարման Ամսաթիվը, բխող կամ ենթադրյաբար բխող կամ Վտանգավոր Նյութերից որոնք (i) միճյեւ Կատարման Ամսաթիվը կամ դրա ժամանակ առկա են եղել կամ կասկածվում է որ առկա են եղել Միջոցներում կամ դրանից վրա (կամ առկա են եղել կամ կասկածվում են որ առկա են եղել որեւ այլ գույքերի վրա, եթե այդ Վտանգավոր Նյութերը ծագել են կամ ենթադրվում է որ ծագել են Միջոցներից եւ առկա են եղել կամ ենթադրվում է որ առկա են եղել որեւ Միջոցների վրա միճյեւ Կատարման Ամսաթիվը) բխող կամ

89

ենթադրյալ բխող, կամ (ii)
Վաճառողների, Ջեռքբերված
Ընկերության կամ որեւէ այլ Անձի
կողմից՝ որի գործելակերպի համար
պատասխանատու են կամ կարող
են պատասխանատու լինել նրանք,
Արտանետված կամ ենթադրյալ
Արտանետված որեւէ ժամանակ
միֆչեւ Կատարման Ամսաթիվը:

Գնորդ իրավասու կլինի
վերահսկելու որեւէ Մաքրում, որեւէ
կապակցված Վարույթ, եւ, բացի
հաջորդ նախադասությունում
սահմանվածից, ցանկացած այլ
Վարույթ որի առնչությամբ կարող է
հետապնդվել փոխհատուցում Բաժին
10.3-ի համաձայն: Բաժին 10.9-ում
նկարագրված գործընթացը
կկիրառվի բաժին 10.3-ից առկա որեւէ
խնդրի հետ կապված գումարային
վնասների վերաբերյալ ցանկացած
հայցի նկատմամբ:

Buyer will be entitled to control any
Cleanup, any related Proceeding, and,
except as provided in the following
sentence, any other Proceeding with respect
to which indemnity may be sought under
this Section 10.3. The procedure described
in Section 10.9 will apply to any claim
solely for monetary damages relating to a
matter covered by this Section 10.3.

### 10.4   Indemnification and Payment of Damages by Buyer.  Buyer will indemnify and hold harmless Sellers, and will pay to Sellers the amount of any Damages arising, directly or indirectly, from or in connection with (a) any Breach of any representation or warranty made by Buyer in this Agreement or in any certificate delivered by Buyer pursuant to this Agreement, (b) any Breach by Buyer of any covenant or obligation of Buyer in this Agreement, or (c) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with Buyer (or any Person acting on its behalf) in connection with any of the Contemplated Transactions.

### 10.4   Գնորդի Կողմից Կատարվող Փոխհատուցումը եւ Վնասների Վճարումը: Գնորդը կփոխհատուցի եւ Վաճառողներին զերծ կպահի, եւ Վաճառողներին կվճարի ցանկացած Վնասների գումարներ որոնք կառաջանան, ուղղակիորեն կամ անուղղակիորեն, (ա) սույն Պայմանագրում կամ Գնորդի կողմից սույն Պայմանագրի համաձայն տրամադրված որեւէ այլ վկայագրում Գնորդի կողմից արված որեւէ հայտարարության կամ երաշխիքի որեւէ Խախտման, (բ) սույն Պայմանագրով Գնորդի կողմից տրված որեւէ խոստումնի կամ պարտավորության որեւէ Խախտման, կամ (գ) որեւէ Անձի կողմից բրոկերների կամ գտնողների վճարների կամ շահավճարների կամ համանման վճարումների հետ կապված որեւէ հայցից այն Անձի եւ Գնորդի (կամ նրա անունից գործող այլ Անձի) միֆեւ պայմանագրի կամ ենթադրյալ պայմանագրի կամ պայմանավորվածության հիման վրա` կատված Նախատեսված Գործարքներից որեւէ մեկի հետ:

**10.5    Time Limitations**. If the Closing occurs, Sellers will have no liability (for indemnification or otherwise) with respect to any representation or warranty, or covenant or obligation to be performed and complied with prior to the Closing Date, other than those in Sections 3.3, 3.11, 3.13, and 3.19, unless on or before January 1, 2007 Buyer notifies Sellers of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by Buyer; a claim with respect to Section 3.3, 3.11, 3.13, or 3.19, or a claim for indemnification or reimbursement not based upon any representation or warranty or any covenant or obligation to be performed and complied with prior to the Closing Date, may be made at any time. If the Closing occurs, Buyer will have no liability (for indemnification or otherwise) with respect to any representation or warranty, or covenant or obligation to be performed and complied with prior to the Closing Date

**10.6    Procedure for Indemnification**--Third Party Claims.

(a)    Promptly after receipt by an indemnified party under Section 10.2, 10.4, or (to the extent provided in the last sentence of Section 10.3) Section 10.3 of notice of the commencement of any Proceeding against it, such indemnified party will, if a claim is to be made against an indemnifying party under such Section, give notice to the indemnifying party of the commencement of such claim, but the failure to notify the indemnifying party will not relieve

**10.5    Ժամանակի** Սահմանափակում: Եթե Կատարումը տեղի ունենա, Վաճառողները չեն ունենա որևէ պարտավորություն (փոխհատուցման կամ այլ) առնչվող որևէ հայտարարության կամ երաշխավորության, կամ խոստման կամ պարտավորության կատարման և իրականացմա հետ մինչև Կատարման Ամսաթիվը՝ բացի Բաժիններ 3.3, 3.11, 3.13 և 3.19-ում նշվածները, եթե Գնորդը՝ 2007թ-ի հունվարի 1-ին կամ դրանից առաջ Վաճառողներին չծանուցի որևէ հայցի մասին մասնավորելով այդ հայցի փաստացի հիշը ողջամիտ մանրամասներով և Գնորդին հայտնի չափով. Բաժիններ 3.3, 3.11, կամ 3.19-ի, կամ որևէ հայտարարության կամ երաշխավորության կամ որևէ խոստման կամ պարտավորության մինչև Կատարման Ամսաթիվը իրականացման վրա չհիմնված փոխհատուցման կամ վճառման հատուցման հայցերը կարող են ներկայացվել ցանկացած ժամանակ: Եթե Կատարումը տեղի ունենա, Գնորդը չի ունենա որևէ պարտավորություն (փոխհատուցման համար կամ այլ) առնչվող որևէ հայտարարության կամ երաշխավորության, կամ խոստման կամ պարտավորության՝ մինչև Կատարման Ամսաթիվը կատարված կամ իրականացված լինելու հետ:

**10.6    Փոխհատուցման Գործընթացը** -- Երրորդ Կողմի Հայցեր:

(ա)    Փոխհատուցվող կողմի կողմից Բաժիններ 10.2, 10.4, կամ (Բաժնի 10.3-ի վերջին նախադասության մեջ ներկայացված չափով) Բաժին 10.3-ի համաձայն իր դեմ որևէ Վարույթի սկսելու վերաբերյալ ծանուցում ստանալուց անմիջապես հետո այդ փոխհատուցված կողմը կծանուցի փոխհատուցող կողմին նման հայցի ներկայացված առնչությամբ եթե հայցը պետք է ներկայացվի փոխհատուցող կողմին համաձայն նշված Բաժնի, սակայն փոխհատուցող կողմին չծանուցելը

91

indemnifying party will not relieve the indemnifying party of any liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the indemnifying party's failure to give such notice.

(b)    If any Proceeding is brought against an indemnified party and it gives notice to the indemnifying party of the commencement of such Proceeding, the indemnifying party will, unless the claim involves Taxes, be entitled to participate in such Proceeding and, to the extent that it wishes (unless (i) the indemnifying party is also a party to such Proceeding and the indemnified party determines in good faith that joint representation would be inappropriate, or (ii) the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capacity to defend such Proceeding and provide indemnification with respect to such Proceeding), to assume the defense of such Proceeding with counsel satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will not, as long as it diligently conducts such defense, be liable to the indemnified party under this Section 10 for any fees of other counsel or any other expenses with respect to the defense of such

չի ազատի փոխհատուցող կողմին որեւէ փոխհատուցված կողմի ընկատմամբ ունեցած որեւէ պարտավորությունից, բացի այն դեպքերից երբ փոխհատուցող կողմն ակնառու կերպով ցույց տա որ այդ հայցի պաշտպանությունը էականորեն թույլատում է փոխհատուցված կողմից նշված ծանուցումը չներկայացնելու վիասստով:

(p)    Եթե որեւէ Վարույթ հարուցվի փոխհատուցված կողմի դեմ եւ նա ծանուցի փոխհատուցող կողմին նշված Վարույթի հարուցման մասին, փոխհատուցող կողմը` բացի այն դեպքից երբ հայցը ներառում է Հարկերին վերաբերող խնդիրներ, իրավասու կլինի մասնակցել այդ Վարույթին և իմ ցանկությամբ որոշված չափով (բացառությամբ այն դեպքերի երբ (i) փոխհատուցող կողմը նույնպես հանդիսանում է այդ Վարույթի կողմ եւ երբ փոխհատուցվող կողմը որոշում է բարի կամքի համաձայն որ միասնական ներկայացուցչությունը նպատակահարմար չէ, կամ (ii) փոխհատուցող կողմը փոխհատուցված կողմին չի ներկայացնում իմ ֆինանսական ունակության վերաբերյալ հավաստիացումներ նման Վարույթը պաշտպանելու եւ նման Վարույթի վերաբերյալ փոխհատուցում տրամադրելու վերաբերյալ), փոխհատուցված կողմին բավարարող խորհրդատուտի մասնակցությամբ ընդունի Վարույթում պաշտպանությունը եւ, փոխհատուցող կողմից նման Վարույթի պաշտպանությունը ընդունելու միասնի ծանուցումը փոխհատուցված կողմին տրամադրելուց հետո, փոխհատուցող կողմն այլեւս պարտավորություն չի ունենա փոխհատուցված կողմի նտավկմամբ

92

respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding, other than reasonable costs of investigation. If the indemnifying party assumes the defense of a Proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; (ii) no compromise or settlement of such claims may be effected by the indemnifying party without the indemnified party's consent unless (A) there is no finding or admission of any violation of Legal Requirements or any violation of the rights of any Person and no effect on any other claims that may be made against the indemnified party, and (B) the sole relief provided is monetary damages that are paid in full by the indemnifying party; and (iii) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its consent. If notice is given to an indemnifying party of the commencement of any Proceeding and the indemnifying party does not, within ten days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will be bound by any determination made in such Proceeding or any compromise or settlement effected by the indemnified party.

սույն Բաժնի 10-ի համաձայն այլ խորհրդատուներին վճարների կամ նշված Վարույտում պաշտպանության յուրաքանչյուր դեպքում նշված Վարույտում փոխհատուցված կողմի համար պաշտպանության վերաբերյալ այլ ծախսերի մասով բացի դեն այն պատշաճ կերպով իրականացնում է, այդ պաշտպանությունը՝ քննության ողջամիտ ծախսերից բացի: Եթե փոխհատուցող կողմն ընդունի Վարույթի պաշտպանությունը, (i) սույն Պայմանագրի նպատակներով անկերկա կհաստատվի որ այդ Վարույտում ներկայացված հայցերը գտնվում են փոխհատուցման շրջանակներում և համապատասխանում են դրա առարկային, (ii) առանց փոխհատուցված կողմի համաձայնության նշված հայցի վերաբերյալ փոխխատուցող կողմի կողմից չի կատարվի որևէ զիջում կամ ձեռք չի բերվի որևէ համաձայնություն բացառությամբ այն դեպքերեի երբ (Ա) չի պարզվել կամ հաստատերվել Օրենքի Պահանջի որևէ խախտում կամ որևէ Անձի իրավունքների որևէ խախտում և գործություն չունեն ագդեցություն փոխհատուցված անձի դեմ հնարավոր ցանկացած այլ հայցի վրա, եւ (Բ) միակ փոխհատուցումը դրամական փոխհատուցումներ են որոնք վճարվում են ամբողջականորեն փոխհատուցող անձի կողմից, եւ (iii) փոխհատուցվող անձը չի ունենա որևէ պատասխանատվություն առնչվող որևէ զիջման կամ համաձայնության հետ որոնք տրվել են առանց իր համաձայնության: Եթե որևէ Վարույթի մասին ծանուցումները տրվել են փոխհատուցող կողմին եւ փոխհատուցող անձը փոխհատուցվաց անձից ծանուցումը ստանալուց հետո փոխհատուցված անձին չի ծանուցում Վարույթի պաշտպանությունն ընդունելու

93

վերաբերյալ, փոխհատուցող անձի պարտավորված կլինի տվյալ Վարույթի որեւէ որոշմամբ կամ որեւէ զիջմամբ կամ համաձայնությամբ որը կընդունվի փոխհատուցված անձի կողմից:

(q) Չնայած վերը նշվածին, եթե փոխհատուցված անձը որոշի բարի կամքի համաձայն որ գոյություն ունի ողջամիտ հնարավորություն որ Վարույթը կարող է բացասաբար ազդել իր կամ իր փոխկապակցված անձանց վերաբերյալ բացի զուտ դրամական վնասներից որոնց համար նա իրավասու է փոխհատուցման սույն Պայմանագրի համաձայն, փոխհատուցվող անձը կարող է, փոխհատուցող անձին ծանուցելով, ընդունել բացառիկ իրավունքը պաշտպանելու, զիջելու, կամ համաձայնության գալու նման Վարույթում, սակայն փոխհատուցող անձը պարտավորված չի լինի Վարույթի որեւէ որոշմամբ եթե այն պաշտպանվի կամ զիջվի կամ դրա նկատմամբ համաձայնություն ձեռքբերվի առանց իր համաձայնության (որը չի կարող անողջամտորեն մերժվել):

(c) Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise, or settle such Proceeding, but the indemnifying party will not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld).

(դ) Վաճառողներն սույնով համաձայնում են որեւէ դատարանի ոչ բացառիկ ընդդատությանը որտեղ որեւէ Վարույթ կիրառվում է որեւէ Փոխհատուցված Անձի դեմ որեւէ հայցի նպատակներով որը Փոխհատուցված Անձը կարող է ունենալ սույն Պայմանագրի համաձայն նման Վարույթի առնչությամբ կամ դրանում ենթադրվող խնդիրների վերաբերյալ, եւ համաձայն է որ գործընթացը կարող է կիրառվել Վաճառողներին նկատմամբ նման հայցի առնչությամբ աշխարհի որեւէ մասում:

(d) Sellers hereby consent to the non-exclusive jurisdiction of any court in which a Proceeding is brought against an Indemnified Person for purposes of any claim that an Indemnified Person may have under this Agreement with respect to such Proceeding or the matters alleged therein, and agree that process may be served on Sellers with respect to such a claim anywhere in the world.

94



10.7 **Procedure for Indemnification--Other Claims**. A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

11. **GENERAL PROVISIONS**.

11.1 **Expenses**. Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of agents, representatives, counsel, and accountants in connection with this Agreement and the Contemplated Transactions. Sellers will cause the Acquired Companies not to incur any out-of-pocket expenses in connection with this Agreement. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

11.2 **Public Announcements**. Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued, if at all, at such time and in such manner as Buyer determines. Unless consented to by Buyer in advance or required by Legal Requirements, prior to the Closing Sellers shall, and shall cause the Acquired Company to, keep this Agreement strictly confidential and may not make any disclosure of this Agreement to any Person. Sellers and Buyer will consult with each other concerning the means by which the Acquired Company's

10.7 **Փոխհատուցման Գործընթացը -- Այլ Հայցեր:** Նյրրոր անձի հայց չպարունակող որևէ խնդրի վերաբերյալ փոխհատուցման հայցը կարող է հարուցվել ծանուցման միջոցով անձին ումից պահանջվում է փոխհատուցում:

11. **ԸՆԴՀԱՆՈՒՐ ԴՐՈՒՅԹՆԵՐ:**

11.1 **Ծախսեր:** Սույն Պայմանագրում այլ կերպ մերկայացվածից բացի, սույն Պայմանագրի յուրաքանչյուր կողմ կկրի իր համապատասխան ծախսերը որոնք կգոյանան սույն Պայմանագրի ու Նախատեսված Գործարքների պատրաստման, ստորագրման, և իրականացման հետ կապված, ներառյալ բոլոր գործծակալների, ներկայացուցիչների, խորհրդատուի, և հաշվապահների վճարները և ծախսերը կապված սույն Պայմանագրի և Նախատեսված Գործարքների հետ: Վաճառողները Ձեռքբերված Ընկերություններին թույլ չեն տա կրել որևէ կողմնակի ծախսեր կապված սույն Պայմանագրի հետ: Սույն Պայմանագրի դադարման դեպքում, յուրաքանչյուր կողմի պարտավորությունը կապված իր սեփական ծախսերի կրման հետ կկախմ մյուս կողմի կողմից սույն Պայմանագրի խախտումից ծագած այդ կողմմե ցանկացած իրավունքներիի մասը:

11.2 **Հանրային Հայտարարություններ:** Սույն Պայմանագրի կամ Նախատեսված Գործարքների հետ կապված որևէ հանրային հայտարարություն կկատարվի, եթե ընդհանրապես կատարվի, Գնորդի կողմից որոշված Ժամանակ և ձեռով: Բացի Գնորդի կողմից նախնորդ համաձայնելն և Օրենքի Պահանջով սահմանվաԾ դեպքերից, մինչև Կատարման Ամսաթիվը Վաճառողները անձամբ, և ՁեռքբերվաԾ Ընկերության միջոցով, պետք է պահեն սույն Պայմանագիրը հույժ գաղտնի և չպետար է բացահայտեն սույն Պայմանագիրը որևէ Անձի: Վաճառողները և Գնորդը կխորհրդակցեն միմյանց հետ

95

means by which the Acquired Company's employees, customers, and suppliers and others having dealings with the Acquired Companies will be informed of the Contemplated Transactions, and Buyer will have the right to be present for any such communication.

**11.3    Confidentiality.** Between the date of this Agreement and the Closing Date, Sellers will maintain in confidence, and will cause the officers, employees, agents, and advisors of Buyer and the Acquired Company to maintain in confidence this Agreement or the Contemplated Transactions, unless (a) such information is already known to such party or to others not bound by a duty of confidentiality or such information becomes publicly available through no fault of such party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the Contemplated Transactions, or (c) the furnishing or use of such information is required by legal proceedings.

**11.4    Notices.** All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier

Նախատեսված Գործարքների մասին Ձեռքբերված Ընկերության աշխատողներին, հաճախորդներին, եւ առաքողներին եւ այլ գործ ունեցողներին կողմից տեղեկանալու միջոցների վերաբերյալ, եւ Գնորդը իրավունք կունենա ներկա գտնվելու նման յուրաքանչյուր տեղեկացման ժամանակ:

11.3    Գաղտնապահություն: Սույն Պայմանագրի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Վաճառողները գաղտնի կպահեն, եւ Ձեռքբերված Ընկերության եւ Գնորդի պաշտոնյաներին, աշխատողներին, գործակալներին, եւ խորհրդատուներին գաղտնի պահել կտան սույն Պայմանագիրը եւ Նախատեսված Գործարքները, բացառությամբ, եթե (ա) նշված տեղեկությունն արդեն հայտնի է այդ կողմերին կամ գաղտնապահության պարտավորված այլ կողմերին կամ եթե նշված տեղեկությունը դառնում է հայտնի հանրության առանց նման կողմի մեղքի, (բ) նշված տեղեկության օգտագործումն անհրաժեշտ է համապատասխան է որեւէ գրանցում կատարելու կամ որեւէ համաձայնություն կամ հաստատում ստանալու համար որը կպահանջվի Նախատեսված Գործարքների իրականացման համար, կամ (գ) նշված տեղեկության տրամադրումը կամ օգտագործումը պահանջվում է իրավական գործընթացներով:

11.4    Ծանուցումներ: Սույն Պայմանագրով սահմանված բոլոր ծանուցումները, համաձայնությունները, եւ այլ հաղորդագրությունները պետք է լինեն գրավոր եւ կհամարվեն պատշաճ կերպով տրված երբ (ա) ուղղարկվել անձամբ (ստացմման գրավոր հաստատումով), (բ) ուղղարկվել հեռապատճեններ (ստացման գրավոր հաստատումով), պայմանով որ պատճեներ ուղղարկվել գրանցված փոստով, ստացման ստացական պահանջվելով, կամ (գ) երբ ստացվում է հասցեատիրոջ կողմից, եթե ուղղարկվել է ազգորեն հանրահայտ սպրհանոզակային ծառայությամբ (ստացական պահանջվելով), յուրաքանչյուր դեպքում ուղղարկված լիներով

such other addresses and telecopier numbers as a party may designate by notice to the other parties):

11.5      **Arbitration ;Jurisdiction; Service of Process**. The Parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this Agreement as the standard. The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days. During this thirty (30) day period, any party with ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute. After thirty day's effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators. In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrator; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose. On a case-by-case basis, the parties may also agree to alternative dispute resolution methods. Such an Agreement must be in writing and signed by both parties.

համապատասխանական հասցեով կամ հեռապատճենիչն ինչպես նշված է (կամ այլ հասցեներին կամ հեռապատճենի համարներին որոնք կողմերը կներկայացնեն միմյանց ծանուցման միջոցով):

11.5      Արբիտրաժ, Ընդդատություն, Գործընթաց: Կողմերն ընդունում են, որ կնքում են սույն Պայմանագիրը եւ պետք է գործեն ըստ սույնի բարի կամքի հիմամբ վրա, եւ որ ցանկացած վեճ պետք է լուծվի ըստ բարի կամքի՝ սույն Պայմանագրի ոգով եւ տառին համապատասխանած: Կողմերը պետք է իրենց ուժերի սահմաններում գործադրեն բոլոր ջանքերը իրենց միջև ծագած վեճերը երեսուն (30) օրվա ընթացքում լուծելու համար: Այդ երեսուն (30) օրվա ընթացքում ցանկացած կողմ տաս (10) օր առաջ ծերկայացված ծանուցմամբ կարող է դիմել մյուս կողմին հանդիպման համար, եւ մյուս կողմը պետք է համաձայնվի հանդիպել բարի կամքով վեճը լուծելու համար: Երեսուն օրվա ջանքերից հետո, եթե վեճը դեռ չի լուծված, ցանկացած կողմ կարող է վեճն ուղղել Առևտրի Միջազգային Պալատի (Լոնդոն, Անգլիա) Հաշտեցման եւ Արբիտրաժի Կանոններով (Կանոններ) լուծման համար, երեք արբիտրաժը բաղկացած դատարանի միջոցով: Ըստ Կանոնների վեճի լուծման դեպքում յուրաքանչյուր կողմ պետք է նշանակի մեկ արբիտոր, եւ այդ երկու արբիտորները պետք է նշանակեն երրորդ արբիտորին. պայմանով, որ եթե բոլոր երեք արբիտորները չեն նշանակվում վեճը լուծման ներկայացնող կողմի մյուս կողմին այդ ներկայացման մասին տեղյակ պահելուց հետո երեսուն (30) օրվա ընթացքում, սույնի յուրաքանչյուր կողմ կարող է դիմել Միջազգային Առևտրի Պալատ մնացած արբիտորներին նշանակելու համար: Ըստ Կանոնների վեճի լուծման արբիտրաժի վայրը պետք է հանդիսանա Նյու- Յորք քաղաքը, կամ կողմերի ընտրությամբ մեկ այլ վայր: Որոշ դեպքերում կողմերը կարող են նաեւ համաձայնել վեճերի լուծման այլընտրանքային եղանակների շուրջ: Նմա Համաձայնագիրը պետք է լինի գրավոր եւ ստորագրվի երկու կողմերի

97

signed by both parties.

կողմից:

**11.6 Applicable Law, Institution.**
This Agreement is an international Agreement and shall be governed and construed in accordance with the substantive laws of New York, without regard to conflict of laws provisions. Each party hereto hereby irrevocably and unconditionally agrees that any action to enforce a decision rendered in an arbitration proceeding described in Article 8 may be instituted (i) in Armenian courts, (ii) in the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts thereof, or (iii) in the courts of the United Kingdom and hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection of the convenience of the forum of any such legal suit, action or proceeding and irrevocably submits generally and unconditionally to the jurisdiction in any such court in any suit, action or proceeding.

**11.6    Կիրառվող Օրենք,**
**Իրավաճանաչում:** Սույն Պայմանագիրը համարվում է Միջազգային Պայմանագիր, եւ պետք է դեկավարվի եւ մեկնաբանվի Նյու Յորքի հանապատասխան օրենքների համաձայն, առանց կոլիզիոն նորմերի կիրառման: Յուրաքանչյուր կողմ հաստակորեն եւ անվերապահորեն համաձայնվում է, որ Հոդված 8-ում ներկայացված արբիտրաժի որոշման կատարմանն ուղղված ցանկացած գործողություն կարող է իրականացվել. (i) Հայաստանի դատարաններում, (ii) Նյու Յորքի Նահանգի դատարաններում, Ամերիկայի Միացյալ Նահանգների Նյու Յորքի Հարավային Շրջանի դատարաններում եւ նման վճռաբեկ դատարաններում, կամ (iii) Միացյալ Թագավորության դատարաններում, եւ սույնով կիրառելի օրենքով սահմանված առավելագույն չափով հրաժարվում է ցանկացած առարկությունից, որն ինքը կարող է ունենալ այժմ կամ հետագայում նման դատավարության, դատական պրոցեսի տեղի, դատարանի ընտրության, կամ նման դատավարության տեղի հարմարության վերաբերյալ, ինչպես նաև անվերապահես եւ անվերապահորեն ընդունում է նման դատարանի որոշումները ցանկացած հայցի կամ այլ գործողության վերաբերյալ:

**11.7    Further Assurances.** The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

**11.7    Հետագա**
**Հավաստիացումներ:** Կողմերը համաձայն են (ա) ըստ միմյանց խնդրանքների միմյանց ներկայացնել տեղեկություններ, (բ) ստորագրել եւ միմյանց տրամադրել այլ փաստաթղթեր, եւ (գ) կատարել այլ նման քայլեր եւ գործառույթներ, որոնք մյուս կողմը կարող է ողջամտորեն պահանջել սույն Պայմանագրի եւ սույն Պայմանագրում սահմանված փաստաթղթերի միտումը կատարելու համար:

**11.8    Waiver.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither

**11.8    Հրաժարում:** Սույն Պայմանագրի կողմերի իրավունքները եւ իրավական միջոցները հավաքական են եւ

98

are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

### 11.9 Entire Agreement and Modification.

This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

ոչ ընտրողական: Սույն Պայմանագրով կամ սույն Պայմանագրում սահմանված որևէ վատատաքրքի համաձայն որևէ իրավունքի, իրավասության կամ արտոնության չկիրառում չի սահմանում ճման իրավունքից, իրավասությունից կամ արտոնությունից հրաժարում, և ճման իրավունքի, իրավասության կամ արտոնության մեկ անգամյա կամ մասնակի կիրառում չի սահմանափակում այդ իրավունքի հետագա կիրառումը: Ղ-ործող օրենսդրությամբ սահմանված առավելագույն չափով, (ա) սույն Պայմանագրից կամ սույն Պայմանագրով սահմանված վատատաքրերից բխող ոչ մի հայց կամ իրավունք չի կարող սպառվել կողմերից մեկի կողմից, ամբողջությամբ կամ մասամբ, հայցից կամ իրավունքից հրաժարման կամ չեղյալ համարելու միջոցով բացի մյուս կողմի կողմից գրավոր և ստորագրված վատատաքրի ներկայացման դեպից, (բ) կողմերից մեկի կողմից տրված հրաժարումը չի կարող կիրառելի դառնալ բացի որոշակի դեպքում որի համար տրվել է, և (զ) որևէ կողմին ներկայացված որևէ ծանուցում կամ պահանջ չի կարող համարվել այդ կողմի որևէ պարտատվրությունից հրաժարում կամ ծանուցումը կամ պահանջը ներկայացնող կողմի սույն Պայմանագրի կամ սույն Պայմանագրով սահմանված վատատաքրերի համաձայն հետագա քայլեր առանց ծանուցման կամ պահանջ ներկայացնելու կիրառման որևէ իրավունքից հրաժարում:

### 11.9 Ամբողջ Համաձայնություն և Փոփոխություն:

Սույն Պայմանագիրը գերակայում է կողմերի միջև սույն խնդրի վերաբերյալ բոլոր նախկին պայմանագրերի նկատմամբ և հանդիսանում է (սույն Պայմանագրում սահմանված վատատաքրերի հետ միասին) կողմերի միջև սույն խնդրո առարկայի վերաբերյալ պայմանագրի պայմանների մասին ամբողջական և բացարկիկ համաձայնություն: Սույն Պայմանագիրը չի կարող փոփոխվել բացի փոփոխությանը ենթարկվող կողմի գրավոր համաձայնության:

99

### 11.10  Disclosure Letter.

(a)    The disclosures in the Disclosure Letter, and those in any Supplement thereto, must relate only to the representations and warranties in the Section of the Agreement to which they expressly relate and not to any other representation or warranty in this Agreement.

(b)    In the event of any inconsistency between the statements in the body of this Agreement and those in the Disclosure Letter (other than an exception expressly set forth as such in the Disclosure Letter with respect to a specifically identified representation or warranty), the statements in the body of this Agreement will control.

11.11  **Assignments,** Successors and No Third Party Rights.  Neither party may assign any of its rights under this Agreement without the prior consent of the other parties, which will not be unreasonably withheld, except that Buyer may assign any of its rights under this Agreement to any Subsidiary of Buyer. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this

---

11.10  Բացահայտման Նամակ:

(ա)    Բացահայտման Նամակում կատարված բացահայտումները, եւ դրա Հավելվածի մեջ կատարված բացահայտումները, պետք է վերաբերվեն սույն Պայմանագրի այն Բաժնում կատարված հայտարարություններին եւ երաշխավորություններին որոնց դրանք վերաբերվում են, եւ ոչ սույն Պայմանագրի ցանկացած այլ հայտարարության կամ երաշխիքին:

(բ)    Սույն Պայմանագրի եւ Բացահայտման Նամակի որեւէ սահմանումների միջեւ անհամապատասխանության դեպքում (բացի Բացահայտման Նամակում հստակ կերպով սահմանված բացառության մասնավորապես հստակեցված հայտարարության կամ երաշխիքի առնչությամբ արված), գերակայում են սույն Պայմանագրի սահմանումները:

11.11  Փոխանցումներ:
Իրավահաջորդներ եւ Երրորդ Կողմերի Իրավունքների Բացակայություն: Կողմերից ոչ մեկն էլ կարող փոխանցել սույն Պայմանագրով սահմանված իր որեւէ իրավունքները առանց մյուս կողմերի նախնական համաձայնության, որը չպետք է մերժվի անոռնչամտորեն, բացառությամբ որ Գնորդը կարող է փոխանցել սույն Պայմանագրով իր ցանկացած իրավունքները իր որեւէ Դուստր Ընկերությանը: Նախորդ նախադասության պայմանով, սույն Պայմանագիրը կկիրառվի, կպարտավորեցնի բոլոր առումներով, եւ կիրավունագվի կողմերի իրավահաջորդների եւ ներկայացուցիչների ընկատմամբ: Սույն Պայմանագրում սահմանված ոչինչ չի կարող մեկնաբանվել որպես սույն Պայմանագրի կողմերից բացի

100

this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

որեւէ Անձին իրավական կամ օրինական իրավունք, փոխհատուցում, կամ սույն Պայմանագրի կամ նրա որեւէ դրույթի համաձայն որեւէ հայց շնորհող: Սույն Պայմանագրի բոլոր դրույթները եւ պայմանները պետք է ծառայեն միայն եւ բացառապես սույն Պայմանագրի կողմերին եւ նրանց իրավահաջորդներին եւ ներկայացուցիչներին:

**11.12  Severability.**  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**11.12  Տրոհելիություն:**  Եթե սույն Պայմանագրի որեւէ դրույթ ճանաչվի ոչ իրական կամ ոչ կիրառելի որեւէ ընդդատություն ունեցող դատարանի կողմից, սույն Պայմանագրի մնացած դրույթները կմնան ուժի մեջ: Սույն Պայմանագրի որեւէ դրույթ որը ճանաչվում է ոչ իրական կամ ոչ կիրառելի որեւէ մասով կամ աստիճանով կմնա ուժի մեջ եւ կիրառելի մնացած մասով կամ ասստիճանով:

**11.13  Section Headings, Construction.**  The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

**11.13  Բաժինների Վերնագրեր, Կառուցվածքը:**  Սույն Պայմանագրի Բաժինների վերնագրերը ներկայացված են բացառապես հարմարության համար եւ չեն ազդում դրա կառուցվածքի կամ մեկնաբանման վրա: «Բաժին»-ին կամ «Բաժիններ»-ին կատարված բոլոր հղումները վերաբերվում են սույն Պայմանագրի Բաժնին կամ Բաժիններին կատարված: Սույն Պայմանագրում օգտագործվող բոլոր բառերը պետք է մեկնաբանվեն սեռով կամ թվով ինչպես պահանջեն հանգամանքները: Բացառությամբ այլ կերպ սահմանվածի, «ներառյալ» բառը չի սահմանափակում նախորդ բառերը կամ սահմանումները:

**11.14  Time of Essence.**  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**11.14  Ժամանակի Կարեւորությունը:**  Սույն Պայմանագրում ներկայացված ամսաթվերի եւ ժամանակահատվածների առումով, ժամանակը կարեւոր է:

**11.15  Governing Law.**  This Agreement will be governed by the laws of the State of New York without regard to

**11.15  Կիրառվող Օրենք:**  Սույն Պայմանագիրը պետք է ղեկավարվի Նյու Յորքի նահանգի օրենքներով` առանց

101

the State of New York without regard to conflicts of laws principles.

**11.16  Counterparts, Language**.
This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. This Agreement has been prepared in English. All documents, notices, waivers and all other communication written or otherwise between the parties hereto in connection with this Agreement shall be in English. This Agreement shall also be translated into and executed in Armenian. If there is any inconsistency betweeen the versions, English version shall prevail.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the date first written above.

կումգիհոց նորմերի կիրառման:

**11.16  Կրկնօրինակներ, Լեզուն**:
Սույն Պայմանագիրը կարող է ստորագրվել մեկ կամ մի քանի կրկնօրինակներով, որոնցից յուրաքանչյուրը պետք է համարվի սույն Պայմանագրի բնօրինակն եւ որոնցից բոլորը, միասին վերցված, պետք է համարվեն մեկ եւ միեւնույն պայմանագիրը: Սույն Պայմանագիրը պատրաստվել է անգլերեն լեզվով: Սույն Պայմանգրի հետ կապված, կողմերի միջեւ գրավոր կամ այլ կերպ կատարվող բոլոր փաստաթղթերը, ծանուցումները, հրաժարումները եւ այլ հաղորդագրությունները պետք է լինեն անգլերեն: Սույն Պայմանագիրը պետք է նաեւ թարգմանվի եւ ստորագրվի հայերեն լեզվով: Տարբերակների միջեւ որեւէ անհամապատասխանության դեպքում գերակայում է անգլերեն տարբերակը:

Ի ՎԿԱՅՈՒԹՅՈՒՆ ՈՐԻ, կողմերը ստորագրում եւ տրամադրում են սույն Պայմանագիրը վերը նշված ամսաթվին:

| Signed for and on behalf of the Sellers | Signed for and on behalf of the Buyers | Ստորագրված է Վաճառողների անունից եւ կումից | Ստորագրված է Գնորդի անունից եւ կումից |
|---|---|---|---|

Yuri Talazaryan

Van Krikorian
Vice President
Global Gold
Mining, LLC

Մayren Batoyan

Edward Janibekian

Լ....զարյան

Վան Գրիկորյան
Փոխնախագահ
Global Gold
Mining, LLC

Մայրեն
Բ...որյան

Էդվարդ
Ջանիբեկյան

Երկու հազար չորս թվականի ___ *Թիյվագոյին վաաշգիստ* ___

սույն պայմանագիրը վավերացված է իմ  *Կենտրոն* նոտարական տարածքի նոտար

*Էլենա Բ. Սարգսյանիս* կողմից:

Կողմերը պայմանագիրը ստորագրեցին իմ ներկայությամբ: Կողմերի, նրանց ներկայացուցիչների ինքնությունը, գործունակությունը և (կամ) իրավունակությունը ստուգված են:

Գրանցված է սեղանամատյանում ___ *2606* ___ -ով

Գանձված են պետական և ծառայության տուրքեր համաձայ Պետական տուրքի մասին և Ստոարդիատի մասին օրենքնեա

Նոտար

Երևանում _____ վնաց թվականի _____ 

Ես, ՀՀ « ԿԵՆՏՐՈՆ » նոտարական տարածքի նոտար Նունե Սարգսյանս
վավերացնում եմ սույն պատճենի իսկությունը իսկականի հետ: Վերջինում
ուղղումներ, ջնջված բառեր և այլ չճանաթագրված ուղղումներ կամ ուրիշ
առանձնահատկություններ չհայտնաբերվեցին:

« ՀՀ Նոտարիատի մասին » օրենքի 65 հոդվածի համաձայն հաստատում
եմ փաստաթղթի պատճենի համապատասխանությունը բնօրինակի հետ, այլ
ոչ թե դրանում շարադրված փաստերը:

Գրանցված է սեղանամատյանում հ. *199 49*

Գանձված է տուրք և ծառայության
վճար համաձայն
ՀՀ« Պետական տուրքի մասին » և
« Նոտարիատի մասին » օրենքների

Ն. ՍԱՐԳՍՅԱՆ





DISCLOSURE LETTER

December 21, 2003
Global Gold Mining, LLC
104 Field Point Road
Greenwich, CT 06830

Gentlemen:

We refer to the Stock Purchase Agreement (the "Agreement") to be entered into today between the undersigned individuals ("Sellers") and Global Gold Mining, LLC ("Buyer") pursuant to which Sellers are to sell and Buyer is to purchase all of the issued and outstanding capital stock of SHA, LLC (the "Company") as provided in the Agreement.

This letter constitutes the Disclosure Letter referred to in Section 3 of the Agreement. The representations and warranties of Sellers in Section 3 of the Agreement are made and given subject to the disclosures in this Disclosure Letter. The disclosures in this Disclosure Letter are to be taken as relating to the representations and warranties in the section of the Agreement to which they expressly relate and to no other representation or warranty in the Agreement.

Terms defined in the Agreement are used with the same meaning in this Disclosure Letter. References to Appendices are to the Appendices to this Disclosure Letter.

ԲԱՑԱՀԱՅՏՄԱՆ ՆԱՄԱԿ

21 դեկտեմբերի, 2003թ
Global Gold Mining, LLC
104 Field Point Road
Greenwich, CT 06830

Պարոնայք.

Սույնը վերաբերում է Բաժնեմասի Գնման Պայմանագրին («Պայմանագիր») որը ստորագրվում է այսօր՝ ներքոհիշյալ անձանց («Վաճառողներ») եւ Global Gold Mining, LLC-ի («Գնորդ») կողմից, որի համաձայն Վաճառողները վաճառում իսկ Գնորդը ձեռք է բերում ՍՀԱ ՍՊԸ-ի («Ընկերություն») ամբողջ թողարկված եւ սովորական կապիտալ բաժնեմասը Պայմանագրում սահմանված կարգով:

Սույն նամակը համարվում է Պայմանագրի Բաժին 3-ում հիշատակվկած Բացահայտումման Նամակը: Պայմանագրի Բաժին 3-ում ներկայացված Վաճառողների հայտարարությունները եւ երաշխավորությունները կատարված եւ արված են սույն Բացահայտումման Նամակի բացահայտումների համաձայն: Սույն Բացահայտման Նամակի բացահայտումները պետք է ընդունվեն Պայմանագրի կրճները բաժնում կատարված հայտարարությունների եւ երաշխավորությունների կապակցությամբ որոնց նրանք հստակորեն վերաբերվում են, եւ ոչ Պայմանագրի այլ հայտարարությունների կամ երաշխավորությունների կապակցությամբ:

Պայմանագրում սահմանված սահմանումները սույն Բացահայտման Նամակում օգտագործվում են նույն իմաստներով: Հավելվածներին կատարված հղումները կատարված են սույն Բացահայտման Նամակի Հավելվածներին նկատմամբ:

Պայմանագրի Բաժին 3-ի մասով

By reference to Section 3 of the Agreement (using the numbering in such Section), the following matters are disclosed:

3.1 **Acquired Company:**
SHA, LLC

**Jurisdiction:**
Republic of Armenia

**Other Jurisdiction**:
None

**Capitalization:**

| | | |
|---|---|---|
| Yurik Lalazarian | – | 33% |
| Mayren Batoyan | – | 33% |
| Edward Janibekian | – | 34% |

**Certificate of Foundation and Charter:**

Attached (Armenian & English)

3.2 **Exceptions:**
None

3.4 **Financial Statements:**
Attached

3.6 **Property:**
Valid Armenian General Exploration License – Attached with property description (Armenian & English), Valid and exclusive exploration rights to Hankavan and Marjan mines – Attached with property description (Armenian & English)

3.8 **Accounts Receivable:**
None

3.10 **Liabilities:**
None

---

(թվագրությունը նշված Բաժնի համաձայն բերված լինելով), բացահայտվում է հետևյալը.

3.1 <u>Ձեռքբերված Ընկերությունը</u>
ՍՀԱ, ՍՊԸ

<u>Օրենսդրությունը</u>
Հայաստանի Հանրապետություն

<u>Այլ Օրենսդրություն</u>
Չկա

<u>Կապիտալիզացիա</u>

| | | | |
|---|---|---|---|
| Յուրիկ Լալազարյան | -- | 33% | |
| Մայրեն Բատոյան | -- | | 33% |
| Էդվարդ Ջանիբեկյան | -- | 34% | |

<u>Գրանցման Վկայագիր և Կանոնադրությունը</u>
Կցվում են (հայերեն և անգլերեն)

3.2 <u>Բացառություններ</u>
Չկան

3.4 <u>Ֆինանսական Հաշվետվություններ</u>
Կցվում են

3.6 <u>Գույք</u>
Գործող Հայկական Ընդհանուր Հետախուզման Լիցենզիա --Կցվում է գույքի նկարագրության հետ (հայերեն և անգլերեն) Հանքավանի և Մարջանի հանքավայրերի Իրական և Բացառիկ Հետախուզման Իրավունքներ -- Կցվում են գույքի նկարագրության հետ (հայերեն և անգլերեն)

3.8 <u>Ստասվող Հասույթ</u>
Չկա

3.10 <u>Պարտավորություններ</u>
Չկան

3.11 <u>Հարկեր/խսսսություններ</u>

3.11    **Taxes/Returns:**
No liabilities, no returns due, no audits

3.13    **Employee Benefits**:
None, no employees

3.14    **Legal Compliance with Law: Government Authorizations:**
No exceptions, 25 year Exploration License, Exclusive Rights to Hankavan and Marjan Mines – Attached (Armenian & English), no exceptions to validity

3.15    **Legal Proceedings:**
None

3.16    **Absence of Changes:**

No disclosures applicable

3.17    **Contracts:**
Hankavan and Marjan Mines Exploration Agreements Attached (Armenian & English)

3.17(a)   **Contract Details:**
(see attached)

3.17(b), (c), and (d)    **Contract Matters:**
No exceptions

3.18    **Insurance:**
No insurance

3.19    **Environmental Matters:**
No exceptions

3.20    **Employees:**
No employees

3.22    **Intellectual Property:**
Not applicable

Պարտավորություններ չկան, հասույթներ չեն սպասվում, աուդիտներ չկան

3.13    Աշխատողների Արտոնություններ`
Չկան, աշխատողներ չկան

3.14    Օրենքին Ենթարկվելը. Կառավարական Լիազորություններ. Առանց բացառությունների, 25 տարվա Հետախուզության Լիցենզիա, Հանքավանի եւ Մարջանի Հանքավայրերի նկատմամբ բացառիկ իրավունքներ -- Կցվում են (հայերեն եւ անգլերեն), իսկական լինելու իմաստով բացառություններ չկան

3.15    Իրավական Վարույթներ`
Չկան

3.16    Փոփոխությունների Բացակայություն`
Կիրառելի բացահայտումներ չկան

3.17    Պայմանագրեր`
Հանքավանի եւ Մարջանի հանքավայրերի հետախուզությունների պայմանագրեր Կցվում են (հայերեն եւ անգլերեն)

3.17(ա)  Պայմանագրերի մանրամասներ (տես կից)

3.17(բ),(գ), եւ (դ)   Պայմանագրերի Խնդիրներ`
Բացառություններ չկան

3.18    Ապահովագրություն`
Ապահովագրություն չկա

3.19    Միջավայրային Խնդիրներ`
Բացառություններ չկան

3.20    Աշխատողներ`
Աշխատողներ չկան

3.22    Մտավոր Սեփականություն`
Չի կիրառվում

Not applicable

Not applicable

Very truly yours,

Հարգանքով`

_____

_____

Sellers

Վաճառողներ

Buyer acknowledges receipt of the
Disclosure Letter of which this is a
duplicate (including the Appendices
referred to therein).

Գնորդը հաստատում է Բացահայտման
Նամակի ստացումը որի պատճեն է
հանդիսանում սույնը (ներառյալ սույնում
հիշատակվսծ Հավելվածները):

Dated: _____

Ամսաթիվ` _

BUYER:

ԳՆՈՐԴ`

By:

# EXHIBIT B

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas     New York, NY 10036-6710     212.336.2000     fax 212.336.2222     www.pbwt.com

November 2, 2006

Scott Horton
(212) 336-2820
shorton@pbwt.com

Mr. Yurik Lalazaryan
66 Spandarian Street
Etchmiadzin, Armenia

Ms. Mayren Batoyan
Apt. 28, b.135, A. Babajanian Street
Yerevan, Armenia

Mr. Edward Janibekian
Apt. 44, b.18, A. Khachatryan Street
Yerevan, Armenia

Mr. Vardan Ayvazian
Building 22, Block 6
Apt. 16
Charentsavan, Kotaik Region
Armenia
10 Alex Manukian Street
Yerevan, Armenia

### NOTICE OF DISPUTE UNDER SECTION 11.5 OF DECEMBER 21, 2003 SHA, LLC SHARE PURCHASE AGREEMENT

Dear Ms. Batoyan and Messrs. Ayvazian, Janibekyan, and Lalazarian:

This firm represents Global Gold Mining, LLC ("Global Gold") which was the Buyer and your counterpart in the December 21, 2003 share purchase agreement (the "SPA") of all of your shares in the Armenian company SHA, LLC, the license holder to the Marjan and Hankavan mines. Mr. Ayvazian, you are named with the other sellers because based on information from law enforcement authorities, we have learned that in fact you were an undisclosed principal, reviewed and approved the SPA before it was signed, authorized its signature, controlled the transaction, and personally received payment of the purchase price. None of this was known to Global Gold at the time of the transaction. Nevertheless, under the governing law of the SPA stated in Section 11.15 of both the English and the Armenian language versions, you are personally jointly and severally liable for breaches as if you signed the contract in your own name.

Through this letter, and as contemplated in Section 11.5 of the SPA, Global Gold advises you that you have materially breached the SPA in a manner entitling Global Gold to monetary damages and equitable remedies. This letter begins the dispute resolution process provided in Section 11.5 of the SPA. There is now a thirty-day period to resolve our disputes on a good-faith, amicable basis prior to the right to commence international arbitration. For example, and without limiting the generality of the foregoing, the SPA represented and warranted that the licenses for Hankavan and Marjan were valid through 2017. In Mr. Ayvazian's official capacity, however, he has himself purported to terminate the licenses and in

November 2, 2006
Page 2

the case of Hankavan actually issued a competing illegal license to another company, which is a mere shell. In addition, there have been multiple interferences with Global Gold's and SHA's abilities to operate under the transferred licenses and a complete failure to act in good faith. All of this has been documented and unfortunately been made the subject of media attention and libelous statements by Mr. Ayvazian. This course of behavior and situation has resulted in actual and potential damage to Global Gold which if not corrected we expect to be in the millions of dollars.

In beginning this process, we hope that we can agree to a solution that will eliminate this damage and allow the actions agreed in the SPA to go forward as anticipated and agreed at the time. You or your attorney can contact me via the fax or email coordinates on this letter with a mandatory copy to Global Gold's Regional Director in Yerevan. You should understand that your diligent attention to this matter is necessary. As a convenience to you an Armenian translation of this letter is also provided. We look forward to an amicable resolution, but please be assured that if none is forthcoming promptly, enforcement of Global Gold's rights under domestic and international law will not be compromised.

Very truly yours,

Scott Horton

Cc: Global Gold Mining
    Greenwich, CT - Yerevan, Armenia

1321349v1

# EXHIBIT C

# Rules of Arbitration

in force as from 1 January 1998

**Cost scales effective as of 1 July 2003**



**International Chamber of Commerce**
*The world business organization*

**International Court of Arbitration**
38, Cours Albert 1er, 75008 Paris, France
Tel. +33 1 49 53 29 05  Fax +33 1 49 53 29 33
E-mail arb@iccwbo.org
**www.iccarbitration.org**

Of the various languages in which the ICC Rules of Arbitration may be published, the English and French versions are the only official texts.

ICC, the ICC logo, CCI, the CCI logo, International Chamber of Commerce, World Business Organization, WBO, International Court of Arbitration, ICC International Court of Arbitration (including Spanish, French, German and Arabic translations) are all trademarks of ICC, registered in several countries.

© **International Chamber of Commerce 2005**
All rights reserved. No part of this publication may be reproduced by whatever means (electronic, electrostatic, mechanical, photocopying, recording or otherwise) or translated, without the prior permission in writing of the ICC International Court of Arbitration.

## STANDARD ICC ARBITRATION CLAUSE

It is recommended that all parties wishing to make reference to ICC arbitration in their contracts use the following standard clause.

Parties are reminded that it may be desirable for them to stipulate in the arbitration clause itself the law governing the contract, the number of arbitrators and the place and language of the arbitration. The parties' free choice of the law governing the contract and of the place and language of the arbitration is not limited by the ICC Rules of Arbitration.

Attention is called to the fact that the laws of certain countries require that parties to contracts expressly accept arbitration clauses, sometimes in a precise and particular manner.

"All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules."

## STANDARD CLAUSE FOR AN ICC
## PRE-ARBITRAL REFEREE PROCEDURE AND ICC ARBITRATION

Parties wishing to have recourse to both the ICC pre-arbitral referee procedure and ICC arbitration should make specific reference to both procedures in their contracts. The following standard clause is recommended:

"Any party to this contract shall have the right to have recourse to and shall be bound by the pre-arbitral referee procedure of the International Chamber of Commerce in accordance with its Rules for a Pre-Arbitral Referee Procedure.

All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules of Arbitration."

For translations of the above clause, please consult the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

# RULES OF ARBITRATION

## INTRODUCTORY PROVISIONS

### Article 1
### International Court of Arbitration

1

The International Court of Arbitration (the "Court") of the International Chamber of Commerce (the "ICC") is the arbitration body attached to the ICC. The statutes of the Court are set forth in Appendix I. Members of the Court are appointed by the World Council of the ICC. The function of the Court is to provide for the settlement by arbitration of business disputes of an international character in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "Rules"). If so empowered by an arbitration agreement, the Court shall also provide for the settlement by arbitration in accordance with these Rules of business disputes not of an international character.

2

The Court does not itself settle disputes. It has the function of ensuring the application of these Rules. It draws up its own Internal Rules (Appendix II).

3

The Chairman of the Court or, in the Chairman's absence or otherwise at his request, one of its Vice-Chairmen shall have the power to take urgent decisions on behalf of the Court, provided that any such decision is reported to the Court at its next session.

4

As provided for in its Internal Rules, the Court may delegate to one or more committees composed of its members the power to take certain decisions, provided that any such decision is reported to the Court at its next session.

5

The Secretariat of the Court (the "Secretariat") under the direction of its Secretary General (the "Secretary General") shall have its seat at the headquarters of the ICC.

### Article 2
### Definitions

In these Rules:

(i)   "Arbitral Tribunal" includes one or more arbitrators.

(ii)  "Claimant" includes one or more claimants and "Respondent" includes one or more respondents.

(iii) "Award" includes, *inter alia*, an interim, partial or final Award.

### Article 3
### Written Notifications or Communications;
### Time Limits

1

All pleadings and other written communications submitted by any party, as well as all documents annexed thereto, shall be supplied in a number of copies sufficient to provide one copy for each party, plus one for each arbitrator, and one for the Secretariat. A copy of any communication from the Arbitral Tribunal to the parties shall be sent to the Secretariat.

2

All notifications or communications from the Secretariat and the Arbitral Tribunal shall be made to the last address of the party or its representative for whom the same are intended, as notified either by the party in question or by the other party. Such notification or communication may be made by delivery against

receipt, registered post, courier, facsimile transmission, telex, telegram or any other means of telecommunication that provides a record of the sending thereof.

3

A notification or communication shall be deemed to have been made on the day it was received by the party itself or by its representative, or would have been received if made in accordance with the preceding paragraph.

4

Periods of time specified in or fixed under the present Rules shall start to run on the day following the date a notification or communication is deemed to have been made in accordance with the preceding paragraph. When the day next following such date is an official holiday, or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall commence on the first following business day. Official holidays and non-business days are included in the calculation of the period of time. If the last day of the relevant period of time granted is an official holiday or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall expire at the end of the first following business day.

## COMMENCING THE ARBITRATION

**Article 4**
**Request for Arbitration**

1

A party wishing to have recourse to arbitration under these Rules shall submit its Request for Arbitration (the "Request") to the Secretariat, which shall notify the Claimant and Respondent of the receipt of the Request and the date of such receipt.

2

The date on which the Request is received by the Secretariat shall, for all purposes, be deemed to be the date of the commencement of the arbitral proceedings.

3

The Request shall, *inter alia*, contain the following information:

a) the name in full, description and address of each of the parties;

b) a description of the nature and circumstances of the dispute giving rise to the claim(s);

c) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) claimed;

d) the relevant agreements and, in particular, the arbitration agreement;

e) all relevant particulars concerning the number of arbitrators and their choice in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

f) any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

4

Together with the Request, the Claimant shall submit the number of copies thereof required by Article 3(1) and shall make the advance payment on administrative expenses required by Appendix III ("Arbitration Costs and Fees") in force on the date the Request is submitted. In the event that the Claimant fails to comply with either of these requirements, the Secretariat may fix a time limit within which the Claimant must comply, failing which the file shall be closed without prejudice to the right of the Claimant to submit the same claims at a later date in another Request.

5

The Secretariat shall send a copy of the Request and the documents annexed thereto to the Respondent for its Answer to the Request once the Secretariat has sufficient copies of the Request and the required advance payment.

6

When a party submits a Request in connection with a legal relationship in respect of which arbitration proceedings between the same parties are already pending under these Rules, the Court may, at the request of a party, decide to include the claims contained in the Request in the pending proceedings provided that the Terms of Reference have not been signed or approved by the Court. Once the Terms of Reference have been signed or approved by the Court, claims may only be included in the pending proceedings subject to the provisions of Article 19.

## Article 5
## Answer to the Request; Counterclaims

1

Within 30 days from the receipt of the Request from the Secretariat, the Respondent shall file an Answer (the "Answer") which shall, *inter alia*, contain the following information:

a) its name in full, description and address;

b) its comments as to the nature and circumstances of the dispute giving rise to the claim(s);

c) its response to the relief sought;

d) any comments concerning the number of arbitrators and their choice in light of the Claimant's proposals and in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

e) any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

2

The Secretariat may grant the Respondent an extension of the time for filing the Answer, provided the application for such an extension contains the Respondent's comments concerning the number of arbitrators and their choice and, where required by Articles 8, 9 and 10, the nomination of an arbitrator. If the Respondent fails to do so, the Court shall proceed in accordance with these Rules.

3

The Answer shall be supplied to the Secretariat in the number of copies specified by Article 3(1).

4

A copy of the Answer and the documents annexed thereto shall be communicated by the Secretariat to the Claimant.

5

Any counterclaim(s) made by the Respondent shall be filed with its Answer and shall provide:

a) a description of the nature and circumstances of the dispute giving rise to the counterclaim(s); and

b) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) counterclaimed.

6

The Claimant shall file a reply to any counterclaim within 30 days from the date of receipt of the counterclaim(s) communicated by the Secretariat. The Secretariat may grant the Claimant an extension of time for filing the reply.

## Article 6
## Effect of the Arbitration Agreement

1

Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted *ipso facto* to the Rules in effect on the date of commencement of the arbitration proceedings, unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement.

2

If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without

prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.

3

If any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure.

4

Unless otherwise agreed, the Arbitral Tribunal shall not cease to have jurisdiction by reason of any claim that the contract is null and void or allegation that it is non-existent, provided that the Arbitral Tribunal upholds the validity of the arbitration agreement. The Arbitral Tribunal shall continue to have jurisdiction to determine the respective rights of the parties and to adjudicate their claims and pleas even though the contract itself may be non-existent or null and void.

## THE ARBITRAL TRIBUNAL

### Article 7
### General Provisions

1

Every arbitrator must be and remain independent of the parties involved in the arbitration.

2

Before appointment or confirmation, a prospective arbitrator shall sign a statement of independence and disclose in writing to the Secretariat any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties. The Secretariat shall provide such information to the parties in writing and fix a time limit for any comments from them.

3

An arbitrator shall immediately disclose in writing to the Secretariat and to the parties any facts or circumstances of a similar nature which may arise during the arbitration.

4

The decisions of the Court as to the appointment, confirmation, challenge or replacement of an arbitrator shall be final and the reasons for such decisions shall not be communicated.

5

By accepting to serve, every arbitrator undertakes to carry out his responsibilities in accordance with these Rules.

6

Insofar as the parties have not provided otherwise, the Arbitral Tribunal shall be constituted in accordance with the provisions of Articles 8, 9 and 10.

### Article 8
### Number of Arbitrators

1

The disputes shall be decided by a sole arbitrator or by three arbitrators.

2

Where the parties have not agreed upon the number of arbitrators, the Court shall appoint a sole arbitrator, save where it appears to the Court that the dispute is such as to warrant the appointment of three arbitrators. In such case, the Claimant shall nominate an arbitrator within a period of 15 days from

the receipt of the notification of the decision of the Court, and the Respondent shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the nomination made by the Claimant.

3

Where the parties have agreed that the dispute shall be settled by a sole arbitrator, they may, by agreement, nominate the sole arbitrator for confirmation. If the parties fail to nominate a sole arbitrator within 30 days from the date when the Claimant's Request for Arbitration has been received by the other party, or within such additional time as may be allowed by the Secretariat, the sole arbitrator shall be appointed by the Court.

4

Where the dispute is to be referred to three arbitrators, each party shall nominate in the Request and the Answer, respectively, one arbitrator for confirmation. If a party fails to nominate an arbitrator, the appointment shall be made by the Court. The third arbitrator, who will act as chairman of the Arbitral Tribunal, shall be appointed by the Court, unless the parties have agreed upon another procedure for such appointment, in which case the nomination will be subject to confirmation pursuant to Article 9. Should such procedure not result in a nomination within the time limit fixed by the parties or the Court, the third arbitrator shall be appointed by the Court.

## Article 9
## Appointment and Confirmation of the Arbitrators

1

In confirming or appointing arbitrators, the Court shall consider the prospective arbitrator's nationality, residence and other relationships with the countries of which the parties or the other arbitrators are nationals and the prospective arbitrator's availability and ability to conduct the arbitration in accordance with these Rules. The same shall apply where the Secretary General confirms arbitrators pursuant to Article 9(2).

2

The Secretary General may confirm as co-arbitrators, sole arbitrators and chairmen of Arbitral Tribunals persons nominated by the parties or pursuant to their particular agreements, provided they have filed a statement of independence without qualification or a qualified statement of independence has not given rise to objections. Such confirmation shall be reported to the Court at its next session. If the Secretary General considers that a co-arbitrator, sole arbitrator or chairman of an Arbitral Tribunal should not be confirmed, the matter shall be submitted to the Court.

3

Where the Court is to appoint a sole arbitrator or the chairman of an Arbitral Tribunal, it shall make the appointment upon a proposal of a National Committee of the ICC that it considers to be appropriate. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, the Court may repeat its request or may request a proposal from another National Committee that it considers to be appropriate.

4

Where the Court considers that the circumstances so demand, it may choose the sole arbitrator or the chairman of the Arbitral Tribunal from a country where there is no National Committee, provided that neither of the parties objects within the time limit fixed by the Court.

5

The sole arbitrator or the chairman of the Arbitral Tribunal shall be of a nationality other than those of the parties. However, in suitable circumstances and provided that neither of the parties objects within the time limit fixed by the Court, the sole arbitrator or the chairman of the Arbitral Tribunal may be chosen from a country of which any of the parties is a national.

6

Where the Court is to appoint an arbitrator on behalf of a party which has failed to nominate one, it shall make the appointment upon a proposal of the National Committee of the country of which that party is a

national. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, or if the country of which the said party is a national has no National Committee, the Court shall be at liberty to choose any person whom it regards as suitable. The Secretariat shall inform the National Committee, if one exists, of the country of which such person is a national.

**Article 10**
**Multiple Parties**

1

Where there are multiple parties, whether as Claimant or as Respondent, and where the dispute is to be referred to three arbitrators, the multiple Claimants, jointly, and the multiple Respondents, jointly, shall nominate an arbitrator for confirmation pursuant to Article 9.

2

In the absence of such a joint nomination and where all parties are unable to agree to a method for the constitution of the Arbitral Tribunal, the Court may appoint each member of the Arbitral Tribunal and shall designate one of them to act as chairman. In such case, the Court shall be at liberty to choose any person it regards as suitable to act as arbitrator, applying Article 9 when it considers this appropriate.

**Article 11**
**Challenge of Arbitrators**

1

A challenge of an arbitrator, whether for an alleged lack of independence or otherwise, shall be made by the submission to the Secretariat of a written statement specifying the facts and circumstances on which the challenge is based.

2

For a challenge to be admissible, it must be sent by a party either within 30 days from receipt by that party of the notification of the appointment or confirmation of the arbitrator, or within 30 days from the date when the party making the challenge was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such notification.

3

The Court shall decide on the admissibility and, at the same time, if necessary, on the merits of a challenge after the Secretariat has afforded an opportunity for the arbitrator concerned, the other party or parties and any other members of the Arbitral Tribunal to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

**Article 12**
**Replacement of Arbitrators**

1

An arbitrator shall be replaced upon his death, upon the acceptance by the Court of the arbitrator's resignation, upon acceptance by the Court of a challenge, or upon the request of all the parties.

2

An arbitrator shall also be replaced on the Court's own initiative when it decides that he is prevented *de jure* or *de facto* from fulfilling his functions, or that he is not fulfilling his functions in accordance with the Rules or within the prescribed time limits.

3

When, on the basis of information that has come to its attention, the Court considers applying Article 12(2), it shall decide on the matter after the arbitrator concerned, the parties and any other members of the Arbitral Tribunal have had an opportunity to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

4

When an arbitrator is to be replaced, the Court has discretion to decide whether or not to follow the original nominating process. Once reconstituted, and after having invited the parties to comment, the Arbitral Tribunal shall determine if and to what extent prior proceedings shall be repeated before the reconstituted Arbitral Tribunal.

5

Subsequent to the closing of the proceedings, instead of replacing an arbitrator who has died or been removed by the Court pursuant to Articles 12(1) and 12(2), the Court may decide, when it considers it appropriate, that the remaining arbitrators shall continue the arbitration. In making such determination, the Court shall take into account the views of the remaining arbitrators and of the parties and such other matters that it considers appropriate in the circumstances.

## THE ARBITRAL PROCEEDINGS

### Article 13
### Transmission of the File to the Arbitral Tribunal

The Secretariat shall transmit the file to the Arbitral Tribunal as soon as it has been constituted, provided the advance on costs requested by the Secretariat at this stage has been paid.

### Article 14
### Place of the Arbitration

1

The place of the arbitration shall be fixed by the Court unless agreed upon by the parties.

2

The Arbitral Tribunal may, after consultation with the parties, conduct hearings and meetings at any location it considers appropriate unless otherwise agreed by the parties.

3

The Arbitral Tribunal may deliberate at any location it considers appropriate.

### Article 15
### Rules Governing the Proceedings

1

The proceedings before the Arbitral Tribunal shall be governed by these Rules and, where these Rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.

2

In all cases, the Arbitral Tribunal shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case.

### Article 16
### Language of the Arbitration

In the absence of an agreement by the parties, the Arbitral Tribunal shall determine the language or languages of the arbitration, due regard being given to all relevant circumstances, including the language of the contract.

**Article 17**
**Applicable Rules of Law**

1

The parties shall be free to agree upon the rules of law to be applied by the Arbitral Tribunal to the merits of the dispute. In the absence of any such agreement, the Arbitral Tribunal shall apply the rules of law which it determines to be appropriate.

2

In all cases the Arbitral Tribunal shall take account of the provisions of the contract and the relevant trade usages.

3

The Arbitral Tribunal shall assume the powers of an *amiable compositeur* or decide *ex aequo et bono* only if the parties have agreed to give it such powers.

**Article 18**
**Terms of Reference; Procedural Timetable**

1

As soon as it has received the file from the Secretariat, the Arbitral Tribunal shall draw up, on the basis of documents or in the presence of the parties and in the light of their most recent submissions, a document defining its Terms of Reference. This document shall include the following particulars:

a) the full names and descriptions of the parties;

b) the addresses of the parties to which notifications and communications arising in the course of the arbitration may be made;

c) a summary of the parties' respective claims and of the relief sought by each party, with an indication to the extent possible of the amounts claimed or counterclaimed;

d) unless the Arbitral Tribunal considers it inappropriate, a list of issues to be determined;

e) the full names, descriptions and addresses of the arbitrators;

f) the place of the arbitration; and

g) particulars of the applicable procedural rules and, if such is the case, reference to the power conferred upon the Arbitral Tribunal to act as *amiable compositeur* or to decide *ex aequo et bono*.

2

The Terms of Reference shall be signed by the parties and the Arbitral Tribunal. Within two months of the date on which the file has been transmitted to it, the Arbitral Tribunal shall transmit to the Court the Terms of Reference signed by it and by the parties. The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

3

If any of the parties refuses to take part in the drawing up of the Terms of Reference or to sign the same, they shall be submitted to the Court for approval. When the Terms of Reference have been signed in accordance with Article 18(2) or approved by the Court, the arbitration shall proceed.

4

When drawing up the Terms of Reference, or as soon as possible thereafter, the Arbitral Tribunal, after having consulted the parties, shall establish in a separate document a provisional timetable that it intends to follow for the conduct of the arbitration and shall communicate it to the Court and the parties. Any subsequent modifications of the provisional timetable shall be communicated to the Court and the parties.

**Article 19**
**New Claims**

After the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the Arbitral Tribunal, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances.

**Article 20**
**Establishing the Facts of the Case**

1

The Arbitral Tribunal shall proceed within as short a time as possible to establish the facts of the case by all appropriate means.

2

After studying the written submissions of the parties and all documents relied upon, the Arbitral Tribunal shall hear the parties together in person if any of them so requests or, failing such a request, it may of its own motion decide to hear them.

3

The Arbitral Tribunal may decide to hear witnesses, experts appointed by the parties or any other person, in the presence of the parties, or in their absence provided they have been duly summoned.

4

The Arbitral Tribunal, after having consulted the parties, may appoint one or more experts, define their terms of reference and receive their reports. At the request of a party, the parties shall be given the opportunity to question at a hearing any such expert appointed by the Tribunal.

5

At any time during the proceedings, the Arbitral Tribunal may summon any party to provide additional evidence.

6

The Arbitral Tribunal may decide the case solely on the documents submitted by the parties unless any of the parties requests a hearing.

7

The Arbitral Tribunal may take measures for protecting trade secrets and confidential information.

**Article 21**
**Hearings**

1

When a hearing is to be held, the Arbitral Tribunal, giving reasonable notice, shall summon the parties to appear before it on the day and at the place fixed by it.

2

If any of the parties, although duly summoned, fails to appear without valid excuse, the Arbitral Tribunal shall have the power to proceed with the hearing.

3

The Arbitral Tribunal shall be in full charge of the hearings, at which all the parties shall be entitled to be present. Save with the approval of the Arbitral Tribunal and the parties, persons not involved in the proceedings shall not be admitted.

4

The parties may appear in person or through duly authorized representatives. In addition, they may be assisted by advisers.

**Article 22**
**Closing of the Proceedings**

1

When it is satisfied that the parties have had a reasonable opportunity to present their cases, the Arbitral Tribunal shall declare the proceedings closed. Thereafter, no further submission or argument may be made, or evidence produced, unless requested or authorized by the Arbitral Tribunal.

2

When the Arbitral Tribunal has declared the proceedings closed, it shall indicate to the Secretariat an approximate date by which the draft Award will be submitted to the Court for approval pursuant to Article 27. Any postponement of that date shall be communicated to the Secretariat by the Arbitral Tribunal.

**Article 23**
**Conservatory and Interim Measures**

1

Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, the Arbitral Tribunal may, at the request of a party, order any interim or conservatory measure it deems appropriate. The Arbitral Tribunal may make the granting of any such measure subject to appropriate security being furnished by the requesting party. Any such measure shall take the form of an order, giving reasons, or of an Award, as the Arbitral Tribunal considers appropriate.

2

Before the file is transmitted to the Arbitral Tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for interim or conservatory measures. The application of a party to a judicial authority for such measures or for the implementation of any such measures ordered by an Arbitral Tribunal shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the Arbitral Tribunal. Any such application and any measures taken by the judicial authority must be notified without delay to the Secretariat. The Secretariat shall inform the Arbitral Tribunal thereof.


AWARDS


**Article 24**
**Time Limit for the Award**

1

The time limit within which the Arbitral Tribunal must render its final Award is six months. Such time limit shall start to run from the date of the last signature by the Arbitral Tribunal or by the parties of the Terms of Reference or, in the case of application of Article 18(3), the date of the notification to the Arbitral Tribunal by the Secretariat of the approval of the Terms of Reference by the Court.

2

The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

**Article 25**
**Making of the Award**

1

When the Arbitral Tribunal is composed of more than one arbitrator, an Award is given by a majority decision. If there be no majority, the Award shall be made by the chairman of the Arbitral Tribunal alone.

2

The Award shall state the reasons upon which it is based.

3

The Award shall be deemed to be made at the place of the arbitration and on the date stated therein.

**Article 26**
**Award by Consent**

If the parties reach a settlement after the file has been transmitted to the Arbitral Tribunal in accordance with Article 13, the settlement shall be recorded in the form of an Award made by consent of the parties if so requested by the parties and if the Arbitral Tribunal agrees to do so.

**Article 27**
**Scrutiny of the Award by the Court**

Before signing any Award, the Arbitral Tribunal shall submit it in draft form to the Court. The Court may lay down modifications as to the form of the Award and, without affecting the Arbitral Tribunal's liberty of decision, may also draw its attention to points of substance. No Award shall be rendered by the Arbitral Tribunal until it has been approved by the Court as to its form.

**Article 28**
**Notification, Deposit and Enforceability of the Award**

1

Once an Award has been made, the Secretariat shall notify to the parties the text signed by the Arbitral Tribunal, provided always that the costs of the arbitration have been fully paid to the ICC by the parties or by one of them.

2

Additional copies certified true by the Secretary General shall be made available on request and at any time to the parties, but to no one else.

3

By virtue of the notification made in accordance with Paragraph 1 of this Article, the parties waive any other form of notification or deposit on the part of the Arbitral Tribunal.

4

An original of each Award made in accordance with the present Rules shall be deposited with the Secretariat.

5

The Arbitral Tribunal and the Secretariat shall assist the parties in complying with whatever further formalities may be necessary.

6

Every Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.

**Article 29**
**Correction and Interpretation of the Award**

1

On its own initiative, the Arbitral Tribunal may correct a clerical, computational or typographical error, or any errors of similar nature contained in an Award, provided such correction is submitted for approval to the Court within 30 days of the date of such Award.

2

Any application of a party for the correction of an error of the kind referred to in Article 29(1), or for the interpretation of an Award, must be made to the Secretariat within 30 days of the receipt of the Award by such party, in a number of copies as stated in Article 3(1). After transmittal of the application to the Arbitral Tribunal, the latter shall grant the other party a short time limit, normally not exceeding 30 days, from the receipt of the application by that party, to submit any comments thereon. If the Arbitral Tribunal decides to

correct or interpret the Award, it shall submit its decision in draft form to the Court not later than 30 days following the expiration of the time limit for the receipt of any comments from the other party or within such other period as the Court may decide.

3

The decision to correct or to interpret the Award shall take the form of an addendum and shall constitute part of the Award. The provisions of Articles 25, 27 and 28 shall apply *mutatis mutandis*.

## COSTS

### Article 30
### Advance to Cover the Costs of the Arbitration

1

After receipt of the Request, the Secretary General may request the Claimant to pay a provisional advance in an amount intended to cover the costs of arbitration until the Terms of Reference have been drawn up.

2

As soon as practicable, the Court shall fix the advance on costs in an amount likely to cover the fees and expenses of the arbitrators and the ICC administrative costs for the claims and counterclaims which have been referred to it by the parties. This amount may be subject to readjustment at any time during the arbitration. Where, apart from the claims, counterclaims are submitted, the Court may fix separate advances on costs for the claims and the counterclaims.

3

The advance on costs fixed by the Court shall be payable in equal shares by the Claimant and the Respondent. Any provisional advance paid on the basis of Article 30(1) will be considered as a partial payment thereof. However, any party shall be free to pay the whole of the advance on costs in respect of the principal claim or the counterclaim should the other party fail to pay its share. When the Court has set separate advances on costs in accordance with Article 30(2), each of the parties shall pay the advance on costs corresponding to its claims.

4

When a request for an advance on costs has not been complied with, and after consultation with the Arbitral Tribunal, the Secretary General may direct the Arbitral Tribunal to suspend its work and set a time limit, which must be not less than 15 days, on the expiry of which the relevant claims, or counterclaims, shall be considered as withdrawn. Should the party in question wish to object to this measure, it must make a request within the aforementioned period for the matter to be decided by the Court. Such party shall not be prevented, on the ground of such withdrawal, from reintroducing the same claims or counterclaims at a later date in another proceeding.

5

If one of the parties claims a right to a set-off with regard to either claims or counterclaims, such set-off shall be taken into account in determining the advance to cover the costs of arbitration in the same way as a separate claim insofar as it may require the Arbitral Tribunal to consider additional matters.

### Article 31
### Decision as to the Costs of the Arbitration

1

The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitral proceedings, as well as the fees and expenses of any experts appointed by the Arbitral Tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.

2

The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case. Decisions on costs other than those fixed by the Court may be taken by the Arbitral Tribunal at any time during the proceedings.

3

The final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.

## MISCELLANEOUS

### Article 32
### Modified Time Limits

1

The parties may agree to shorten the various time limits set out in these Rules. Any such agreement entered into subsequent to the constitution of an Arbitral Tribunal shall become effective only upon the approval of the Arbitral Tribunal.

2

The Court, on its own initiative, may extend any time limit which has been modified pursuant to Article 32(1) if it decides that it is necessary to do so in order that the Arbitral Tribunal or the Court may fulfil their responsibilities in accordance with these Rules.

### Article 33
### Waiver

A party which proceeds with the arbitration without raising its objection to a failure to comply with any provision of these Rules, or of any other rules applicable to the proceedings, any direction given by the Arbitral Tribunal, or any requirement under the arbitration agreement relating to the constitution of the Arbitral Tribunal, or to the conduct of the proceedings, shall be deemed to have waived its right to object.

### Article 34
### Exclusion of Liability

Neither the arbitrators, nor the Court and its members, nor the ICC and its employees, nor the ICC National Committees shall be liable to any person for any act or omission in connection with the arbitration.

### Article 35
### General Rule

In all matters not expressly provided for in these Rules, the Court and the Arbitral Tribunal shall act in the spirit of these Rules and shall make every effort to make sure that the Award is enforceable at law.

# APPENDIX I
## STATUTES OF THE INTERNATIONAL
## COURT OF ARBITRATION

### Article 1
### Function

1

The function of the International Court of Arbitration of the International Chamber of Commerce (the "Court") is to ensure the application of the Rules of Arbitration of the International Chamber of Commerce, and it has all the necessary powers for that purpose.

2

As an autonomous body, it carries out these functions in complete independence from the ICC and its organs.

3

Its members are independent from the ICC National Committees.

### Article 2
### Composition of the Court

The Court shall consist of a Chairman, Vice-Chairmen, and members and alternate members (collectively designated as members). In its work it is assisted by its Secretariat (Secretariat of the Court).

### Article 3
### Appointment

1

The Chairman is elected by the ICC World Council upon the recommendation of the Executive Board of the ICC.

2

The ICC World Council appoints the Vice-Chairmen of the Court from among the members of the Court or otherwise.

3

Its members are appointed by the ICC World Council on the proposal of National Committees, one member for each Committee.

4

On the proposal of the Chairman of the Court, the World Council may appoint alternate members.

5

The term of office of all members is three years. If a member is no longer in a position to exercise his functions, his successor is appointed by the World Council for the remainder of the term.

### Article 4
### Plenary Session of the Court

The Plenary Sessions of the Court are presided over by the Chairman or, in his absence, by one of the Vice-Chairmen designated by him. The deliberations shall be valid when at least six members are present. Decisions are taken by a majority vote, the Chairman having a casting vote in the event of a tie.

**Article 5**
**Committees**

The Court may set up one or more Committees and establish the functions and organization of such Committees.

**Article 6**
**Confidentiality**

The work of the Court is of a confidential nature which must be respected by everyone who participates in that work in whatever capacity. The Court lays down the rules regarding the persons who can attend the meetings of the Court and its Committees and who are entitled to have access to the materials submitted to the Court and its Secretariat.

**Article 7**
**Modification of the Rules of Arbitration**

Any proposal of the Court for a modification of the Rules is laid before the Commission on Arbitration before submission to the Executive Board and the World Council of the ICC for approval.

**APPENDIX II**
**INTERNAL RULES OF THE INTERNATIONAL**
**COURT OF ARBITRATION**

**Article 1**
**Confidential Character of the Work of the International Court of Arbitration**

1

The sessions of the Court, whether plenary or those of a Committee of the Court, are open only to its members and to the Secretariat.

2

However, in exceptional circumstances, the Chairman of the Court may invite other persons to attend. Such persons must respect the confidential nature of the work of the Court.

3

The documents submitted to the Court, or drawn up by it in the course of its proceedings, are communicated only to the members of the Court and to the Secretariat and to persons authorized by the Chairman to attend Court sessions.

4

The Chairman or the Secretary General of the Court may authorize researchers undertaking work of a scientific nature on international trade law to acquaint themselves with Awards and other documents of general interest, with the exception of memoranda, notes, statements and documents remitted by the parties within the framework of arbitration proceedings.

5

Such authorization shall not be given unless the beneficiary has undertaken to respect the confidential character of the documents made available and to refrain from any publication in their respect without having previously submitted the text for approval to the Secretary General of the Court.

6

The Secretariat will in each case submitted to arbitration under the Rules retain in the archives of the Court all Awards, Terms of Reference and decisions of the Court, as well as copies of the pertinent correspondence of the Secretariat.

7

Any documents, communications or correspondence submitted by the parties or the arbitrators may be destroyed unless a party or an arbitrator requests in writing within a period fixed by the Secretariat the return of such documents. All related costs and expenses for the return of those documents shall be paid by such party or arbitrator.

**Article 2**
**Participation of Members of the International Court of Arbitration in ICC Arbitration**

1

The Chairman and the members of the Secretariat of the Court may not act as arbitrators or as counsel in cases submitted to ICC arbitration.

2

The Court shall not appoint Vice-Chairmen or members of the Court as arbitrators. They may, however, be proposed for such duties by one or more of the parties, or pursuant to any other procedure agreed upon by the parties, subject to confirmation.

3

When the Chairman, a Vice-Chairman or a member of the Court or of the Secretariat is involved in any capacity whatsoever in proceedings pending before the Court, such person must inform the Secretary General of the Court upon becoming aware of such involvement.

4

Such person must refrain from participating in the discussions or in the decisions of the Court concerning the proceedings and must be absent from the courtroom whenever the matter is considered.

5

Such person will not receive any material documentation or information pertaining to such proceedings.

## Article 3
### Relations between the Members of the Court and the ICC National Committees

1

By virtue of their capacity, the members of the Court are independent of the ICC National Committees which proposed them for appointment by the ICC World Council.

2

Furthermore, they must regard as confidential, vis-à-vis the said National Committees, any information concerning individual cases with which they have become acquainted in their capacity as members of the Court, except when they have been requested by the Chairman of the Court or by its Secretary General to communicate specific information to their respective National Committees.

## Article 4
### Committee of the Court

1

In accordance with the provisions of Article 1(4) of the Rules and Article 5 of its Statutes (Appendix I), the Court hereby establishes a Committee of the Court.

2

The members of the Committee consist of a Chairman and at least two other members. The Chairman of the Court acts as the Chairman of the Committee. If absent, the Chairman may designate a Vice-Chairman of the Court or, in exceptional circumstances, another member of the Court as Chairman of the Committee.

3

The other two members of the Committee are appointed by the Court from among the Vice-Chairmen or the other members of the Court. At each Plenary Session the Court appoints the members who are to attend the meetings of the Committee to be held before the next Plenary Session.

4

The Committee meets when convened by its Chairman. Two members constitute a quorum.

5

(a)     The Court shall determine the decisions that may be taken by the Committee.
(b)     The decisions of the Committee are taken unanimously.
(c)     When the Committee cannot reach a decision or deems it preferable to abstain, it transfers the case to the next Plenary Session, making any suggestions it deems appropriate.
(d)     The Committee's decisions are brought to the notice of the Court at its next Plenary Session.

## Article 5
### Court Secretariat

1

In case of absence, the Secretary General may delegate to the General Counsel and Deputy Secretary General the authority to confirm arbitrators, to certify true copies of Awards and to request the payment of a provisional advance, respectively provided for in Articles 9(2), 28(2) and 30(1) of the Rules.

2

The Secretariat may, with the approval of the Court, issue notes and other documents for the information of the parties and the arbitrators, or as necessary for the proper conduct of the arbitral proceedings.

**Article 6**
**Scrutiny of Arbitral Awards**

When the Court scrutinizes draft Awards in accordance with Article 27 of the Rules, it considers, to the extent practicable, the requirements of mandatory law at the place of arbitration.

**APPENDIX III**
**ARBITRATION COSTS AND FEES**

**Article 1**
**Advance on Costs**

1

Each request to commence an arbitration pursuant to the Rules must be accompanied by an advance payment of US$ 2,500 on the administrative expenses. Such payment is non-refundable, and shall be credited to the Claimant's portion of the advance on costs.

2

The provisional advance fixed by the Secretary General according to Article 30(1) of the Rules shall normally not exceed the amount obtained by adding together the administrative expenses, the minimum of the fees (as set out in the scale hereinafter) based upon the amount of the claim and the expected reimbursable expenses of the Arbitral Tribunal incurred with respect to the drafting of the Terms of Reference. If such amount is not quantified, the provisional advance shall be fixed at the discretion of the Secretary General. Payment by the Claimant shall be credited to its share of the advance on costs fixed by the Court.

3

In general, after the Terms of Reference have been signed or approved by the Court and the provisional timetable has been established, the Arbitral Tribunal shall, in accordance with Article 30(4) of the Rules, proceed only with respect to those claims or counterclaims in regard to which the whole of the advance on costs has been paid.

4

The advance on costs fixed by the Court according to Article 30(2) of the Rules comprises the fees of the arbitrator or arbitrators (hereinafter referred to as "arbitrator"), any arbitration-related expenses of the arbitrator and the administrative expenses.

5

Each party shall pay in cash its share of the total advance on costs. However, if its share exceeds an amount fixed from time to time by the Court, a party may post a bank guarantee for this additional amount.

6

A party that has already paid in full its share of the advance on costs fixed by the Court may, in accordance with Article 30(3) of the Rules, pay the unpaid portion of the advance owed by the defaulting party by posting a bank guarantee.

7

When the Court has fixed separate advances on costs pursuant to Article 30(2) of the Rules, the Secretariat shall invite each party to pay the amount of the advance corresponding to its respective claim(s).

8

When, as a result of the fixing of separate advances on costs, the separate advance fixed for the claim of either party exceeds one half of such global advance as was previously fixed (in respect of the same claims and counterclaims that are the subject of separate advances), a bank guarantee may be posted to cover any such excess amount. In the event that the amount of the separate advance is subsequently increased, at least one half of the increase shall be paid in cash.

9

The Secretariat shall establish the terms governing all bank guarantees which the parties may post pursuant to the above provisions.

10

As provided in Article 30(2) of the Rules, the advance on costs may be subject to readjustment at any time during the arbitration, in particular to take into account fluctuations in the amount in dispute, changes in the amount of the estimated expenses of the arbitrator, or the evolving difficulty or complexity of arbitration proceedings.

11

Before any expertise ordered by the Arbitral Tribunal can be commenced, the parties, or one of them, shall pay an advance on costs fixed by the Arbitral Tribunal sufficient to cover the expected fees and expenses of the expert as determined by the Arbitral Tribunal. The Arbitral Tribunal shall be responsible for ensuring the payment by the parties of such fees and expenses.

## Article 2
## Costs and Fees

1

Subject to Article 31(2) of the Rules, the Court shall fix the fees of the arbitrator in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its discretion.

2

In setting the arbitrator's fees, the Court shall take into consideration the diligence of the arbitrator, the time spent, the rapidity of the proceedings, and the complexity of the dispute, so as to arrive at a figure within the limits specified or, in exceptional circumstances (Article 31(2) of the Rules), at a figure higher or lower than those limits.

3

When a case is submitted to more than one arbitrator, the Court, at its discretion, shall have the right to increase the total fees up to a maximum which shall normally not exceed three times the fees of one arbitrator.

4

The arbitrator's fees and expenses shall be fixed exclusively by the Court as required by the Rules. Separate fee arrangements between the parties and the arbitrator are contrary to the Rules.

5

The Court shall fix the administrative expenses of each arbitration in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its discretion. In exceptional circumstances, the Court may fix the administrative expenses at a lower or higher figure than that which would result from the application of such scale, provided that such expenses shall normally not exceed the maximum amount of the scale. Further, the Court may require the payment of administrative expenses in addition to those provided in the scale of administrative expenses as a condition to holding an arbitration in abeyance at the request of the parties or of one of them with the acquiescence of the other.

6

If an arbitration terminates before the rendering of a final Award, the Court shall fix the costs of the arbitration at its discretion, taking into account the stage attained by the arbitral proceedings and any other relevant circumstances.

7

In the case of an application under Article 29(2) of the Rules, the Court may fix an advance to cover additional fees and expenses of the Arbitral Tribunal and may make the transmission of such application to the Arbitral Tribunal subject to the prior cash payment in full to the ICC of such advance. The Court shall fix at its discretion any possible fees of the arbitrator when approving the decision of the Arbitral Tribunal.

8

When an arbitration is preceded by an attempt at amicable resolution pursuant to the ICC ADR Rules, one half of the administrative expenses paid for such ADR proceedings shall be credited to the administrative expenses of the arbitration.

9

Amounts paid to the arbitrator do not include any possible value added taxes (VAT) or other taxes or charges and imposts applicable to the arbitrator's fees. Parties have a duty to pay any such taxes or charges; however, the recovery of any such charges or taxes is a matter solely between the arbitrator and the parties.

**Article 3**
**ICC as Appointing Authority**

Any request received for an authority of the ICC to act as appointing authority will be treated in accordance with the Rules of ICC as Appointing Authority in UNCITRAL or Other *Ad Hoc* Arbitration Proceedings and shall be accompanied by a non-refundable sum of US$ 2,500. No request shall be processed unless accompanied by the said sum. For additional services, ICC may at its discretion fix administrative expenses, which shall be commensurate with the services provided and shall not exceed the maximum sum of US$ 10,000.

**Article 4**
**Scales of Administrative Expenses and Arbitrator's Fees**

1

The Scales of Administrative Expenses and Arbitrator's Fees set forth below shall be effective as of 1 July 2003 in respect of all arbitrations commenced on or after such date, irrespective of the version of the Rules applying to such arbitrations.

2

To calculate the administrative expenses and the arbitrator's fees, the amounts calculated for each successive slice of the sum in dispute must be added together, except that where the sum in dispute is over US$ 80 million, a flat amount of US$ 88,800 shall constitute the entirety of the administrative expenses.

### A. ADMINISTRATIVE EXPENSES

| Sum in dispute (in US Dollars) | | | Administrative expenses[*] |
|---|---|---|---|
| up to | | 50 000 | $ 2 500 |
| from | 50 001 | to 100 000 | 3.50% |
| from | 100 001 | to 500 000 | 1.70% |
| from | 500 001 | to 1 000 000 | 1.15% |
| from | 1 000 001 | to 2 000 000 | 0.70% |
| from | 2 000 001 | to 5 000 000 | 0.30% |
| from | 5 000 001 | to 10 000 000 | 0.20% |
| from | 10 000 001 | to 50 000 000 | 0.07% |
| from | 50 000 001 | to 80 000 000 | 0.06% |
| over | 80 000 000 | | $ 88 800 |

*(\*) For illustrative purposes only, the table on the following page indicates the resulting administrative expenses in US$ when the proper calculations have been made.*

### B. ARBITRATOR'S FEES

| Sum in dispute (in US Dollars) | | | Fees[**] | |
|---|---|---|---|---|
| | | | minimum | maximum |
| up to | | 50 000 | $ 2 500 | 17.00% |
| from | 50 001 | to 100 000 | 2.00% | 11.00% |
| from | 100 001 | to 500 000 | 1.00% | 5.50% |
| from | 500 001 | to 1 000 000 | 0.75% | 3.50% |
| from | 1 000 001 | to 2 000 000 | 0.50% | 2.75% |
| from | 2 000 001 | to 5 000 000 | 0.25% | 1.12% |
| from | 5 000 001 | to 10 000 000 | 0.10% | 0.616% |
| from | 10 000 001 | to 50 000 000 | 0.05% | 0.193% |
| from | 50 000 001 | to 80 000 000 | 0.03% | 0.136% |
| from | 80 000 001 | to 100 000 000 | 0.02% | 0.112% |
| over 100 000 000 | | | 0.01% | 0.056% |

*(\*\*) For illustrative purposes only, the table on the following page indicates the resulting range of fees when the proper calculations have been made.*

| SUM IN DISPUTE (in US Dollars) | | A ADMINISTRATIVE EXPENSES(*) (in US Dollars) | B ARBITRATOR'S FEES (**) (in US Dollars) | |
|---|---|---|---|---|
| | | | Minimum | Maximum |
| jusqu'à | 50000 | 2500 | 2500 | 17.00% of amount in dispute |
| from 50001 to | 100000 | 2500 + 3.50% of amt.over 50000 | 2500 + 2.00% of amt. over 50000 | 8500 + 11.00% of amt. over 50000 |
| from 100001 to | 500000 | 4250 + 1.70% of amt. over 100000 | 3500 + 1.00% of amt. over 100000 | 14000 + 5.50% of amt. over 100000 |
| from 500001 to | 1000000 | 11050 + 1.15% of amt. over 500000 | 7500 + 0.75% of amt. over 500000 | 36000 + 3.50% of amt. over 500000 |
| from 1000001 to | 2000000 | 16800 + 0.70% of amt. over 1000000 | 11250 + 0.50% of amt. over 1000000 | 53500 + 2.75% of amt. over 1000000 |
| from 2000001 to | 5000000 | 23800 + 0.30% of amt. over 2000000 | 16250 + 0.25% of amt. over 2000000 | 81000 + 1.12% of amt. over 2000000 |
| from 5000001 to | 10000000 | 32800 + 0.20% of amt. over 5000000 | 23750 + 0.10% of amt. over 5000000 | 114600 + 0.616% of amt. over 5000000 |
| from 10000001 to | 50000000 | 42800 + 0.07% of amt. over 10000000 | 28750 + 0.05% of amt. over 10000000 | 145600 + 0.193% of amt. over 10000000 |
| from 50000001 to | 80000000 | 70800 + 0.06% of amt. over 50000000 | 48750 + 0.03% of amt. over 50000000 | 222600 + 0.136% of amt. over 50000000 |
| from 80000001 to | 100000000 | 88800 | 57750 + 0.02% of amt. over 80000000 | 265400 + 0.112% of amt. over 80000000 |
| over | 100000000 | 88800 | 61750 + 0.01% of amt. over 100000000 | 286800 + 0.056% of amt. over 100000000 |

(*)(**) See preceding page

25 / 25

ICC Publication No. 838

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                     :

GLOBAL GOLD MINING, LLC,                :

                         Petitioner,       :

                                       :          07 Civ. 10492 (GEL)

     -v-                         :

                                       :       **OPINION AND ORDER**

PETER M. ROBINSON, et al.,        :

                          Respondents.     :

-----------------------------------------------------------------x

Edward G. Kehoe (Louisa B. Childs, of counsel), King
& Spalding LLP, New York, NY, for petitioner.

Louis B. Kimmelman, Allen & Overy LLP, New York,
NY, for respondents.

GERARD E. LYNCH, District Judge:

      This case presents an interesting question regarding the reviewability of a decision by the

International Court of Arbitration ("ICC Court") of the International Chamber of Commerce

("ICC") finding a dispute prima facie not arbitrable. Petitioner Global Gold Mining, LLC

("GGM"), seeks an injunction requiring the ICC Court to refer the question of the arbitrability of

a dispute between GGM and one Vardan Ayvazian to an arbitral panel. The ICC respondents[1]

move to dismiss for failure of service, lack of in personam jurisdiction, and failure to state a

claim on which relief can be granted. Because petitioner has failed to state a claim, respondents'

motion pursuant to Rule 12(b)(6), Fed. R. Civ. P., will be granted, and the case dismissed.

---

[1] The named respondents are Peter M. Robinson, sued as President of the International
Chamber of Commerce (which he may or may not be) and the ICC Court. For convenience, the
Court will generally refer to these parties as "the ICC respondents."

## BACKGROUND

The facts set forth below are drawn from the allegations in GGM's petition, which are to be taken as true for purposes of this motion, and the various documents that are cited and relied upon in that petition, including the underlying Share Purchase Agreement ("SPA") and the ICC Rules of Arbitration ("ICC Rules").

In December 2003, GGM entered into a contract (the SPA) to purchase the shares of an Armenian company from its three shareholders. The SPA contained an arbitration clause providing for arbitration of disputes in New York under the ICC Rules. The ICC Court, located in Paris, is the organ of the ICC that administers ICC arbitrations under those rules. In December 2006, GGM initiated an arbitration against the three shareholders who were signatories to the SPA and a fourth individual, Ayvazian, who was alleged to be an undisclosed shareholder, by filing a request for arbitration with the ICC Court.[2] None of the named parties responded to the demand for arbitration.

Under Article 6(2) of the ICC Rules, when a respondent objects to arbitrability, or fails to respond to an arbitration demand, the ICC Court makes an initial determination of the existence of an arbitration agreement governing the dispute. In this case, the ICC Court ruled that it was prima facie satisfied that an arbitration agreement existed between GGM and the three shareholders who were signatories to the SPA. It made a negative determination, however, with respect to Ayvazian, who was not a signatory to the contract containing the arbitration clause, and denied GGM's request to reconsider this determination. Accordingly, the ICC Court

---

[2] Ayvazian, the petition alleges, was at one point Armenia's Minister of the Environment.

2

referred GGM's dispute with the three signatory shareholders to an arbitral tribunal, but declined

to refer the dispute with Ayvazian to the tribunal.

GGM thereupon petitioned the Supreme Court of the State of New York for New York

County, seeking an order directing the ICC Court to refer the dispute with Ayvazian, including

the question of its arbitrability, to the tribunal convened to arbitrate the dispute involving the

other shareholders.  The ICC respondents timely removed the matter to this Court, and moved to

dismiss, arguing that the petition had not been properly served, that New York lacks in personam

jurisdiction over the ICC Court, and that the petition fails to state a claim on which relief may be

granted.

## DISCUSSION

In its reply memorandum, the ICC respondents make no reference to their claim of

improper service, thus effectively abandoning that argument, and concede that GGM has made at

least a prima facie showing of in personam jurisdiction, such that the Court at a minimum has an

adequate jurisdictional basis to address the substantive motion to dismiss for failure to state a

claim.  (Reply Mem. 1-2 n.2.)  The Court thus proceeds directly to that motion.  The principal

issue presented by the motion is whether this Court has authority to review the decision of the

ICC Court and enjoin that body to refer the question of arbitrability of the dispute against

Ayvazian to the same arbitral tribunal convened to resolve GGM's disputes against the three

shareholders that actually signed the SPA.

The arbitration clause in the SPA binds all signatories, including GGM, to arbitrate "any

dispute" related to the SPA under the ICC Rules.  (Childs Dec. Ex 2, SPA § 11.5.)  "When the

parties agree upon an arbitration clause referring to the ICC Rules of Arbitration, they thereby

3

entrust the ICC International Court of Arbitration with certain decision-making powers assigned

to it under the Rules." Shäfer, Verbist and Imhoos, ICC Arbitration in Practice, at 15 (2005); see

also ICC Rules, Arts. 6(1), 9. Among other commitments made, by agreeing to these rules the

parties have demonstrated an "intent to arbitrate arbitrability" pursuant to the ICC Rules,

including Article 6, Section 2. See Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 122

(2d Cir. 2003).

Under Article 6(2) of the ICC Rules, if the respondents fail to answer a demand for

arbitration or object to arbitrability, the ICC Court "may decide, without prejudice [to any

objection to arbitrability made before the tribunal], that the arbitration shall proceed if it is *prima*

*facie* satisfied that an arbitration agreement under the Rules may exist." On the other hand, "[i]f

the [ICC] Court is not so satisfied, the parties shall be notified that the arbitration cannot

proceed. In such a case, any party retains the right to ask any court having jurisdiction whether

or not there is a binding arbitration agreement." ICC Rules, Art. 6(2).[3] The ICC Rules are thus

clear that if the ICC Court decides, upon initial screening, that a dispute may be prima facie

---

[3] Article 6(2) provides, in its entirety, that:

> If the Respondent does not file an Answer, as provided by Article
> 5, or if any party raises one or more pleas concerning the
> existence, validity or scope of the arbitration agreement, the Court
> may decide, without prejudice to the admissibility or merits of the
> plea or pleas, that the arbitration shall proceed if it is *prima facie*
> satisfied that an arbitration agreement under the Rules may exist.
> In such a case, any decision as to the jurisdiction of the Arbitral
> Tribunal shall be taken by the Arbitral Tribunal itself. If the Court
> is not so satisfied, the parties shall be notified that the arbitration
> cannot proceed. In such a case, any party retains the right to ask
> any court having jurisdiction whether or not there is a binding
> arbitration agreement.

arbitrable, the dispute will be referred to an arbitration panel, which then will make its own

"decision as to [its] jurisdiction." Id. The Rules are somewhat less clear as to what happens next

if the ICC Court determines that a dispute is *not* prima facie arbitrable, or that a dispute may be

arbitrable against some parties but not others. The Rules clearly permit the disappointed party

demanding arbitration to put the question of arbitrability to a court, but the manner in which that

is to be done is less clear. GGM argues that the ICC Rules permit an action for "judicial review"

of the ICC Court's decision, brought by the party seeking arbitration against the ICC Court itself.

The ICC respondents argue that the proper vehicle is an action to compel arbitration against the

party that failed to submit to arbitration. See, e.g., 9 U.S.C. §§ 4, 206.

Under both New York and federal law, whether a dispute is arbitrable is a question for

the courts, unless the parties clearly indicated their intention to have such issues decided by an

arbitrator. Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 45-46 (1997); First Options

of Chicago v. Kaplan, 514 U.S. 938, 944 (1995); AT & T Techs., Inc. v. Commc'ns Workers of

America, 475 U.S. 643, 649 (1986). However, when parties agree to arbitrate "any and all

controversies," such as is the case here, the question of arbitrability is itself arbitrable. Shaw,

322 F.3d at 121. GGM attempts to draw from this principle the conclusion that the ICC Court is

in effect required by law to submit any disputed question of arbitrability to the arbitral tribunal,

or face an action in which a court will review that decision.

But GGM's reasoning is incorrect. First, it ignores the ICC Rules, by which the parties

to the SPA, including GGM, declared their intention to be bound. Those rules expressly provide

for an initial decision by the ICC Court regarding whether a dispute is prima facie arbitrable. If

GGM were correct that in every case the question of arbitrability is to be decided by the

5

arbitrators themselves, this screening process would be pointless and the rule providing for it a nullity. The purpose of the rule is clear. If the ICC Court, a permanent administrative body of the ICC, decides against arbitrability in its entirety, the trouble and expense of convening a panel is obviated. Likewise, if the ICC Court decides against arbitrability as to a particular party, the trouble and expense of involving that party in the construction and composition of a panel, and of addressing the arguments of that party, is obviated. The ICC Court's *negative* decision ends the matter, so far as the ICC is concerned, and returns the matter to the courts. The ICC Court's *positive* decision indicates that the convening of a tribunal (or the participation of an additional party in the process of convening the tribunal and litigating before it) is appropriate. In such a case, however, the decision regarding the ultimate arbitrability of the dispute is provisional: the matter is referred to an arbitral tribunal without prejudice to that tribunal's ultimate decision as to arbitrability. If a negative decision also resulted in the convening of a tribunal and referral of the case to the arbitrators themselves, or in the participation of an additional party against whom there is no prima facie arbitrable dispute, the ICC Court's function under Article 6(2) would be defeated.[4]

---

[4] Although the undesirability of GGM's interpretation is clearest where the ICC Court's decision avoids convening an arbitral panel at all, referring an additional party to an already convened panel likely would hardly be costless. First, of course, there would be costs to the additional party. The parties normally split the costs of arbitration, see ICC Rules, Art. 30, and asking the additional party to split those costs may prove to be a substantial burden on that party. Here, for example, the advance budget for the arbitration between GGM and the three shareholders is $280,000. (See Childs Decl. Ex. 5.) Adding Ayvazian would thus impose significant costs on him, including the legal fees associated with defending against a claim halfway across the world. Requiring the ICC Court to include in the referral an individual as to whom the ICC Court has already decided there is no prima facie arbitrable dispute would be neither efficient nor fair. Second, adding an extra party or parties whose amenability to the arbitration is doubtful would also increase the costs to the co-respondents. For example, the additional party would have a right to influence the composition of the arbitrable tribunal. See

Second, GGM's point somewhat mistakes the nature of the legal rule on which it relies. That the parties have referred the question of arbitrability to the arbitration process speaks to the division of functions between the court and the arbitrating organization, not to the division of functions within that organization. The parties have agreed to refer their dispute, including ultimately the question of arbitrability, to arbitration by the ICC under its particular rules. If those rules call for the ICC Court to make a determination, those rules are to be followed, and that determination respected. GGM cannot use the fact that it has agreed to refer the question of arbitrability to the ICC arbitration process as a device to trump the very rules of that process. No one forced GGM to agree to arbitrate pursuant to the ICC process, and if GGM had preferred another process it could have agreed to arbitrate under that process instead.

Third, GGM's proposed method of resolving the question involves the Court in determining the question of arbitrability no less than does the ICC respondents' proposed method. The ICC Court having initially decided, in the ordinary course of the arbitration process under the ICC Rules, that the dispute between GGM and Ayvazian is not apparently arbitrable, GGM and the ICC respondents *both* agree, and the ICC Rules make explicit, that GGM may next ask the Court to revisit that question. They disagree only about the procedural *mechanism* for

---

ICC Rules, Art. 10(1) ("Where there are multiple parties, whether as Claimant or as Respondent, and where the dispute is to be referred to three arbitrators, . . . the multiple Respondents, jointly, shall nominate an arbitrator for confirmation pursuant to Article 9."). Other co-respondents thus may face a heavy burden if they must compromise with the additional party to find an arbitrator with whom all respondents are mutually satisfied, a burden that appears especially unnecessary if the additional party is likely to be knocked out of the case immediately on a finding that the claim against him is not arbitrable. It therefore appears rational that contracting parties would find it in their interest to have a screening mechanism to protect the integrity of the process of convening a tribunal. Third, allowing a petitioner to defeat the ICC Court's gatekeeper function merely by joining an unarbitrable claim to a potentially viable claim against another party could undermine the integrity and perceived fairness of the arbitral process.

putting the matter before the Court. The ICC respondents seek to have the Court decide whether

the dispute should be passed on to the arbitral tribunal via an action to compel arbitration,

brought by GGM against Ayvazian. GGM seeks to put the question before the Court by an

action for judicial review brought directly against the ICC Court. In either case, the Court will

decide in the first instance whether the matter should go to the arbitrators.[5]

While the ICC Rules do not unambiguously resolve the question of how the Court's

judgment is to be invoked, neither the text of the rules nor the general principles of arbitration

favor GGM's interpretation. While GGM repeatedly asserts that the Rules expressly provide for

"judicial review" of the ICC Court's determination (see Pet. Opp. 14, 16), that phrase does not

appear in the rule. Article 6(2) provides that the disappointed party "retains the right to ask any

court having jurisdiction whether or not there is a binding arbitration agreement." This language

does not suggest that the ICC has submitted to "judicial review" in the sense of an appellate

proceeding to revise the ICC Court's judgment, still less does it purport to authorize an action

against that agency itself.

Under American law, a party that wishes to "ask a court . . . whether or not there is a

binding arbitration agreement" (id.) typically sues to compel arbitration by asking a "court

---

[5] GGM suggests that unless an action will lie to enjoin the ICC Court, that body could simply disregard a court's conclusion, in an action against Ayvazian, that a binding arbitration agreement with Ayvazian exists. There is little to fear in this regard. The ICC Rules specifically authorize the party seeking arbitration to put the question to a court if the ICC Court does not find the dispute prima facie arbitrable. Moreover, by arguing to this Court that an action against Ayvazian is the proper method for seeking judicial intervention, the ICC respondents have implicitly represented to the Court that they would abide by the result of such an action and would honor an order compelling arbitration. Whether the ICC respondents could be sued in the event of such an unlikely decision to flout their own rules and a judicial decision they had invited would present a very different question from the issue now before this Court.

having jurisdiction" over the issue to "direct that arbitration be held in accordance with the agreement at any place therein provided for." 9 U.S.C. § 206; see also 9 U.S.C. § 4 (A party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition a court which, "save for such agreement, would have jurisdiction" over the dispute "for an order directing that such arbitration proceed in the manner provided for in such agreement."). GGM does not cite any precedent for bringing an action to compel arbitration against arbitrators or an arbitral organization.

Similarly, parties seeking "review" of an arbitrator's ultimate decision do not normally sue the arbitrator; instead, they bring an action against the counterparties to the arbitration seeking to confirm or vacate the arbitrators' decision. See 9 U.S.C. §§ 9-12. As the Second Circuit mentioned in passing in Shaw, where the ICC Court had determined, pursuant to Rule 6(2), that a petitioner had an arbitrable dispute against one party but not others, an action in federal court involving both that petitioner and those other parties – but not the ICC Court or the ICC – would satisfy Rule 6(2) by allowing the petitioning party "to seek review of the arbitrator's [i.e. the ICC Court's] decision" that the petitioner's dispute against the other parties was not prima facie arbitrable. Shaw, 322 F.3d at 122 n.3. Here, therefore, in order to put the question whether a binding arbitration agreement with Ayvazian exists before a court, GGM must bring a motion to compel arbitration against Ayvazian himself, not in injunctive action against the ICC respondents.

General principles undergirding the law of arbitration also counsel against GGM's approach. The parties devote considerable attention to debating the precise scope of arbitral immunity, debating whether such immunity extends beyond suits for damages to encompass

9

suits for equitable relief, and whether the equitable relief sought here should be characterized as "retrospective" or "prospective."[6] But in this case the precise contours of arbitral immunity are less important than the general principle involved. The Court need not decide whether the ICC respondents are flatly immune from suit, because the principles underlying such immunity are helpful in interpreting the ICC Rules, and lead to the conclusion that the rule permitting a disappointed party seeking arbitration to put the issue to a court should not be read to contemplate an action against the ICC Court itself seeking review of its prima facie decision.

The rationale of arbitral immunity is that such immunity "'is essential to protect the decision-maker from undue influence and protect the decision-making process from reprisals by dissatisfied litigants.'" Austern v. Chicago Bd. of Options Exch., Inc., 898 F.2d 882, 886 (2d Cir. 1990), quoting Corey v. New York Stock Exch., 691 F.2d 1205, 1211 (6th Cir. 1982); see also Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith, 477 F.3d 1155, 1158 (10th Cir. 2007), quoting New England Cleaning Servs., Inc. v. American Arbitration Ass'n, 199 F.3d 542, 545 (1st Cir. 1999). In order to protect the decision-making process, courts should be wary of "claim[s] [which], regardless of [their] nominal title, effectively seek to challenge [a] decisional act" made during the arbitration process. Pfannenstiel, 477 F.3d at 1159.

That rationale extends equally to claims against arbitral administrative institutions, when they perform "functions that are integrally related to the arbitral process." Austern, 898 F.2d at

---

[6] Petitioner claims that arbitral immunity does not necessarily shield an arbitrator from claims for "injunctive relief." (Pet. Opp. 18 & n. 9.) Respondents argue that although arbitral immunity may not extend to claims for *prospective* injunctive relief, the doctrine nonetheless "applies to claims for retrospective equitable or injunctive relief." (Resp. Reply 5-6.)

886.[7] Nor does that rationale apply only to suits for damages. If administrative institutions such as the ICC or the ICC Court can be required to defend their decisions in the national courts of any country in the world, the expenses of defending such potentially far-flung suits could constrain their judgment, and increase the costs of arbitration procedures, every bit as much as potential liability for damages. The real parties in interest to litigate the question of arbitrability are the parties seeking and resisting arbitration, not the arbitrators or arbitral administrators, whose role is solely to render neutral judgment. Any action to ask this or another court "whether or not there is a binding arbitration agreement" must be brought as a motion to compel arbitration against the party resisting arbitration.

There is thus no basis in law for permitting GGM to maintain the present action.

## CONCLUSION

Accordingly, the ICC respondents' motion to dismiss for failure to state a claim is granted, and the petition is dismissed.

SO ORDERED.

Dated:  New York, New York
        February 5, 2008

GERARD E. LYNCH
United States District Judge

---

[7] Once again, GGM's reliance on the fact that, within the ICC arbitration process, the ICC Court functions not as the arbitral tribunal that resolves the dispute, but as an administrative body to facilitate and organize the arbitration (Pet. Opp. 20 n. 11), misses the point. Whether the ICC Court is, within the ICC process, the arbitrator, surely its function within the ICC arbitration process, as defined by the ICC Rules, is as part of the arbitration regime to which the parties have bound themselves. To permit a disappointed party to sue the ICC Court would have exactly the same ill effects as allowing a suit against the arbitrators themselves.

11

# EXHIBIT E

TRANSLATION

International Court of Arbitration of
International Chamber of Commerce

VIA FAX

To the attention of:
Jennifer Sharman
Tel:   +33 1 49 53 28 61
Fax:   + 33 1 49 53 57 80

Dear Sirs:

I received the Request for Arbitration submitted on behalf of Global Gold Mining, LLC (the "Request"), in connection of which I would like to state that I agree with the provisions of the Request, except that I did not violate the SPA provisions, including any representation and warranties made therein on my behalf, since I believed that SHA had all the assets and governmental authorizations, and that SHA complied under legal requirements as represented in the SPA, as I was assured before signing of the SPA, and that I am not responsible for such violations made by other shareholders, including the undisclosed to Global Gold shareholder Vardan Ayvazian.

Specifically, my reservation with the Request point 4 is that I did not lie to Global Gold, based on the aforementioned. Regarding the Request point 14, I acted in good faith during all the time and tried my best not to allow a breach or a dispute, however, I had no control over the other shareholders, including Vardan Ayvazian, to prevent the situation we are facing at this time.

I remained as a director of SHA after signing of the SPA, and worked towards the benefit of SHA, including towards the fulfillment of any and all representations and warranties I made on my behalf to Global Gold. I regret that the other shareholders took this path which concluded into the situation we are all facing now.

Sincerely,

Yurik Lalazarian
March 19, 2007

I as a lawyer of Mr. Yurik Lalazaryan presented and explained the content of the current paper to my client and certify that both Armenian and English version of this letter are identical.

Aram Karakhanyan
march 13, 2007

Միջազգային Աստղի Պարադ
Միջազգային Արբիտրաժային Թատարանին

ՖԱՔՍՒ ՄՒՋՈՑՈՎ

Ջեննիֆեր Շարմանի ուշադրությանը

հեռախոս՝     +33 1 49 53 28 61
ֆաքս՝          +33 1 49 53 57 80

Հարգելի պարոնայք.

Ես ստացել եմ Գ.որա Գ.որ Մայքինզ ՍՊԸ-ի կողմից ներկայացված
Արբիտրաժի Հայցը («Հայց»), ինչ վերաբերյալ հայտնում եմ որ համաձայն եմ
Հայցի դրույթներին, քանի այն որ ես չեմ խախտել ԲՉ-Դ-ի դրույթները, ներառյալ
ԲՉ-Դ-ում իմ կողմից արված հայտարարությունները և ներկայացված
երաշխիքները, քանզի ես համոզված էի որ ՍԱՆ-ն ունեն ԲՉ-Դ-ում ներկայացված
աձբողջ ցուցքը և կատարվածության կողմից արված բոլոր խաղորդությունները, և որ
ՍԱՆ-ն ներդրվել էլ ԲՉ-Դ-ում ներկայացված իրավական պահանջներին, ինչպես
որ ինձ հայտարարածյալ էին միևնու ԲՉ-Դ-ն ստորագրելը, և որ ես
պատասխանատու չեմ այլ մասնակիցների ներառյալ Գ.որա Գ.որին
քաղաքայայքվու ծառայից Վարդան Այվազյանի կողմից իրականացված
խախտումների համար:

Միևնույրապես, հայցի առմիայն վերաբերյալ, իմ վերատացմունք Հայցի կից
վնաս վերաբերյալ, այն էր են ինչ որել Գ.որա Գ.որին: Ես վերատբրում է Հայցի
14ր վնասեն, սակս ես գործեն եմ բարի կամքով ամբողջ ըսբացքում և գործարմվել եմ
իմ լավագույն ջանքերը սույլ չատույ համար դրանք խախտումով կամ վնաս, մտծայ, ես
չեմ կարող վերստանել հույս մասնակիցներին, ներառյալ Վարդան Այվազյանին,
խուսափելու համար ներկա իրավիճակից:

Ես շարունակել եմ աշխատել դրանից ՍԱՆ-ի ստեղծեն ԲՉ-Դ-ն ստորագրելուց
հետո ի շահ ՍԱՆ-ի և իրականացնելու համար Գ.որա Գ.որին իմ կողմից արված
հայտարարությունները և ներկայացված երաշխիքները: Ես օգտարում եմ որ մյուս
մասնակիցները ընտրել են այս ճանապարհը որ և հանցեցրել է ներկա
իրավիճակին:

Հարգանքներով,

Յուրիկ Լազարզյան
19 մարտի, 2007թ

# EXHIBIT F



**hetq**online

INVESTIGATIVE JOURNALISTS OF ARMENIA

◄ Հայերեն    ◄ Русский    ◄ Français

home
about us
politics
society
economy
court
culture
ecology
interview
technologies
photostory
contact us

archive

## economy

◄ Back



# Vardan Ayvazyan Has a Special Fondness for Goldmines

[April 16, 2007]

As we have reported, Minister of Nature Protection Vardan Ayvazyan has registered the majority of his mines in the names of his relatives, friends and employees (**See also:** An Apple of Discord Beneath Hankavan and Vardan Ayvazyan's Business Project). In the case of the Hematite and Grade Redmet Companies, Hasmik Harutyunyan plays this role. She is the wife of Yervand Hovhannisyan, the head of the department responsible for assessing and monitoring the environmental impact of mining activities of the State Nature Protection Inspection. Hematite Ltd is registered at Yervand Hovhannisyan's home address. This ministry official who carries out mine inspections is very close to Vardan Ayvazyan.

The two companies have licenses to explore five gold mines.

| Organization | Location and license type | Term of license | Registration address | Founders |
|---|---|---|---|---|
| **Hematite Ltd** | Syunik Marz, License to explore the Verin Vardanidzor Gold Mine | Dec. 7, 2005 - Dec. 31, 2007 | Yerevan, 23 Mashtots Ave., # 21 (Yervand Hovhanisyan's home address) | Hasmik Harutyunyan (Yervand Hovhanisyan's wife), Mayak Gasparyan |
| **Hematite Ltd** | Syunik Marz, License to explore the Tashtuni Gold Mine | " " " " | " " " " | " " " " |
| **Hematite Ltd** | Aragatsotn Marz, License to explore the Sipan Gold Mine | - " " " " | " " " " | - " " " " |
| **Hematite Ltd** | Syunik Marz, License to explore the Mazra Gold Mine | Dec. 23, 2005 - Dec. 20, 2008 | " " " " | " " " " |
| **Grade Redmet Ltd** | Lori Marz, License to explore the Fioletovo Gold Mine | Feb. 27, 2006 - Dec. 31, 2008 | Yerevan, 7 Arinberd Street | Mayren Batoyan (friend and fellow villager of Vardan Ayvazyan's wife who has also acted as Ayvazyan's representative in other organizations), Vardan Margaryan, Hasmik Harutyunyan |

Mayren Batoyan, a founder of Grade Redmet Ltd., has a close relationship with the Ayvazyans. She is a friend of Mariam Ginosyan's, Vardan Ayvazyan's wife. They both are natives of the village of Karzakh of the Akhaltsikhe region of Georgia. Mayren Batoyan has no relation to mining and works at a Yerevan hospital.

Following our publications, a great many people called us wondering what is going to change now that the facts have been made public. As of now, our response is, nothing. We are simply informing the public what one of our ministers is occupied with. According to our sources, the only thing that has happened at the Ministry of Nation Protection is that representatives of the companies mentioned in our publications have been called into the minister's office. What the minister discussed with them is not yet known.

In the meantime, according to other information, the minister has managed to sell one of the Hematite Ltd. mines.

*To be continued...*

**Edik Baghdasaryan**

# EXHIBIT G

# KING & SPALDING

King & Spalding LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002-5213
Main: 713/751-3200
Fax: 713/751-3290

R. Doak Bishop
Partner
Direct Dial: 713/751-3205
Direct Fax: 713/751-3290
dbishop@kslaw.com

December 28, 2006

The Secretariat of the International Court of Arbitration
38 cours Albert 1er
75008 Paris
France

> **Re:    Global Gold Mining, LLC vs. Vardan Ayvazian, Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan.**

Dear Sir:

Enclosed for filing please find an original and eight (8) copies of a Request for Arbitration, submitted on behalf of Global Gold Mining, LLC, as Claimant in the above-captioned matter. Enclosed as well is a check in the amount of US$2,500.00 as an advance payment on administrative expenses.

Please do not hesitate to contact me if you should have any questions concerning this matter.

Very truly yours,

R. Doak Bishop

Enclosures

cc:    Van Z. Krikorian, Global Gold Mining, LLC
       Vardan Ayvazian
       Mayren Batoyan
       Edward Janibekian
       Yurik Lalazaryan

IN THE INTERNATIONAL COURT OF ARBITRATION

OF THE

INTERNATIONAL CHAMBER OF COMMERCE

In the Matter of

GLOBAL GOLD MINING, LLC,

Claimant,

vs.

VARDAN AYVAZIAN, MAYREN BATOYAN, EDWARD JANIBEKIAN,
and YURIK LALAZARYAN,

Respondents.

---

REQUEST FOR ARBITRATION

---

KING & SPALDING LLP

1100 Louisiana Street
Suite 4000
Houston, Texas, USA  77002
Tel: 001.713.751.3200
Fax: 001.713.751.3290

25 Cannon Street
London, England  EC4M 5SE
Tel: 00.44.20.7551.7500
Fax: 00.44.20.7551.7575

Email: dbishop@kslaw.com

Counsel for Claimant

Claimant Global Gold Mining, LLC ("Global Gold") files this Request for Arbitration against Respondents Vardan Ayvazian ("Ayzavian"), Mayren Batoyan ("Batoyan"), Edward Janibekian ("Janibekian"), and Yurik Lalazaryan ("Lalazaryan"), and requests that this matter be arbitrated pursuant to the arbitration clause of the Share Purchase Agreement between the parties dated December 21, 2003 (the "SPA")[1] and the Rules of Arbitration of the International Chamber of Commerce.

## I.    INTRODUCTION

1.    Global Gold is an American investor in Armenia's mining industry. In December 2003, it purchased from Respondents Batoyan, Janibekian, and Lalazaryan, citizens and residents of Armenia, all the shares in SHA, LLC, an Armenian limited liability company (the "Company"). The Company owned various exploration licenses and other rights in Armenia's Hankavan and Marjan fields, and by law was entitled to mining licenses and concession agreements for those fields. The Company's license rights extended through the year 2017.

2.    When Global Gold signed the SPA and paid the agreed purchase price to the former shareholders, it did so having secured from those shareholders certain specific promises about the assets and the business it was purchasing. Because the Company was in the process of exploring for gold, not yet mining and exploiting it, Global Gold had to be sure that the Company's assets -- and especially its license rights -- were beyond legal interference. Batoyan, Janibekian, and Lalazaryan therefore provided numerous contractual representations and warranties that the Company's governmental authorizations were in order, it was in compliance with all relevant legal requirements, its licenses were for the terms represented, as well as other representations and warranties.

---

[1] The SPA is attached as Exhibit "A."

2

3.      As it turns out, not only were those representations and warranties false, but the entire negotiation and execution of the SPA had been orchestrated and controlled by a fourth shareholder, an undisclosed principal to the agreement -- Ayvazian, who also happened to be and remains Armenia's Minister of the Environment.  In his official capacity, Ayvazian is able to exercise extraordinary control over the Company's assets and business.

4.      For over a year after the execution of the SPA, Ayvazian illegally interfered with, reduced the terms of, and refused to honor the Company's various exploration and license rights. When Global Gold complained of this treatment, Ayvazian demanded a US$ 3 million bribe to "fix" the problems that he had created.  Global Gold subsequently learned of Ayvazian's secret role as an undisclosed principal of the SPA, and that he and the other Respondents had misrepresented the status of the Company's assets, governmental authorizations, and compliance with various legal requirements.  In short, all four Respondents had lied to Global Gold in making their various seller representations and warranties, and they stood in breach of the SPA.

5.      Ayvazian's actions with respect to the Company are not unique.  He has systematically used his position as Minister of the Environment to grant mining exploration licenses to entities owned and controlled by his family members and close associates.  On numerous occasions, Ayvazian has purported to terminate the license of a company that legitimately owns exploration rights in a certain area, only to issue a new license to one of the entities he controls.  As described in more detail below, Ayvazian purported to do exactly that with respect to the Company's right to explore Armenia's Marjan fields.

6.      Global Gold is thus forced to institute this arbitration proceeding for breach of the SPA against the four other parties to the agreement -- (1) signatories Batoyan, Janibekian, and Lalazaryan, and (2) undisclosed principal Ayvazian, who under ICC practice and under the

3

agreement's governing law of New York is just as liable for breaching the SPA (and subject to the SPA's arbitration clause) as the other three Respondents.

## II.   THE PARTIES

7.   Claimant Global Gold is a Delaware, United States, limited liability company. Its legal domicile is 104 Field Point Road, Greenwich, Connecticut, USA 06830. Claimant is represented in this proceeding by:

King & Spalding LLP

R. Doak Bishop
Wade M. Coriell
1100 Louisiana Street
Suite 4000
Houston, Texas, USA 77002
Tel: 001.713.751.3200
Fax: 001.713.751.3290

Kenneth R. Fleuriet
25 Cannon Street
London, England EC4M 5SE
Tel: 00.44.20.7551.7500
Fax: 00.44.20.7551.7575

Email: dbishop@kslaw.com

8.   Respondent Ayvazian is an individual citizen and resident of Armenia. His legal domicile is Building 22, Block 6, Apartment 16, Charentsavan, Kotaik Region, Armenia, 10 Alex Manukian Street, Yerevan, Armenia.

9.   Respondent Batoyan is an individual citizen and resident of Armenia. Her legal domicile is Apartment 28, b.135, A. Babajanian Street, Yerevan, Armenia.

10.   Respondent Janibekian is an individual citizen and resident of Armenia. His legal domicile is Apartment 1344, b.23, Terian Street, Yerevan, Armenia.

11.   Respondent Lalazaryan is an individual citizen and resident of Armenia. His legal domicile is 66 Spandarian Street, Etchmiadzin, Armenia.

4

### III.    THE ARBITRATION AGREEMENT

12.    Section 11.5 of the SPA ("Arbitration; Jurisdiction; Service of Process") provides:

> The Parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this Agreement as the standard. The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days. During this thirty (30) day period, any party with ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute. After thirty days' effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators. In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrator; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose. On a case-by-case basis, the parties may also agree to alternative dispute resolution methods. Such an Agreement must be in writing and signed by both parties.

13.    On November 2, 2006, Global Gold sent a "Notice of Dispute" to Respondents advising them of a dispute under the Contract.[2] The Notice of Dispute informed Respondents that they "have materially breached the SPA in a manner entitling Global Gold to monetary damages and equitable remedies," and that the Notice of Dispute "begins the dispute resolution process provided in Section 11.5 of the SPA." Global Gold expressed its "hope that we can agree to a solution that will eliminate [the] damages [caused by Respondents] and allow the actions agreed in the SPA to go forward as anticipated and agreed at the time." Global Gold provided an Armenian translation of the Notice of Dispute, offered promptly to discuss an amicable resolution with Respondents, and specifically requested that Respondents contact Global Gold to facilitate such a discussion.

---

[2] The Notice of Dispute of November 2, 2006, is attached as Exhibit "B."

14.    Despite Global Gold's offer, Respondents did not attempt to resolve the dispute in good faith since receiving notice of it on November 2, 2006.[3]  The 30-day period provided in Section 11.5 of the SPA has now expired, and the parties have not agreed upon an alternative dispute resolution method.  Global Gold hereby exercises its contractual right to refer the dispute to arbitration under the Rules of Arbitration of the International Chamber of Commerce.

## IV.    OTHER PARTICULARS

15.    Global Gold designates Mr. Jonathan D. Schiller as its party-appointed arbitrator. Mr. Schiller's contract details are as follows:

> Boies, Schiller & Flexner, LLP
> 5301 Wisconsin Avenue NW
> Washington, D.C., USA 20015
> Tel: 001.202.237.5340
> Fax: 001.202.237.6131

16.    Claimant requests that this arbitration be conducted in New York City, as provided by the parties' arbitration agreement:

17.    The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose . . .

18.    Claimant requests that the arbitration be conducted in the English language.

---

[3] Janibekian was the only Respondent to respond to Global Gold's Notice of Dispute, in a convoluted letter in which he essentially denied that the sellers had made any relevant representations and warranties in the SPA in the first place.  Janibekian's letter and Global Gold's response to that letter are attached as Exhibit "C."  Ayvazian's Deputy Minister also responded to the Notice of Dispute, in a letter in which he challenged Global Gold's right to communicate in this manner with the Minister of the Environment. This letter and Global Gold's response, in which it noted that the dispute with Ayvazian is in his individual rather than official capacity, are attached as Exhibit "D."

## V.    NATURE OF THE DISPUTE

### A.    Factual Background

#### 1.    Ayvazian negotiates, approves, and profits from the SPA

19.    Global Gold is a significant investor in the Armenian gold-mining sector. In the spring of 2003, it entered into negotiations with the Company for the purpose of acquiring its Armenian mining properties. On December 21, 2003, Global Gold concluded with Respondents the SPA, under which it purchased from Batoyan, Janibekian, and Lalazaryan all of the issued and outstanding shares of participation in the Company. The SPA was signed by Lalazaryan on behalf of himself and, by power of attorney, his fellow two shareholders.[4]

20.    According to information obtained by Global Gold by law enforcement personnel, Ayvazian, who is Armenia's Minister of the Environment, was a secret participant and beneficial owner in the Company at the time the SPA was signed. Ayvazian actually controlled the transaction on the sellers' side. Specifically, Batoyan, Janibekian, and Lalazaryan negotiated the terms of the SPA on the basis of explicit instructions from Ayvazian, and every term in both the preliminary agreement and the SPA was approved by Ayvazian before the agreement was signed. Moreover, Global Gold understands that after it paid Batoyan, Janibekian, and Lalazaryan for their shares, Ayvazian collected the entire purchase price and distributed the funds to the other Respondents while keeping a share for himself. In other words, Ayvazian was an undisclosed principal of the SPA -- and thus just as much a party to its terms as the other Respondents who were the Company's nominal shareholders. Notably, Ayvazian personally

---

[4] On February 17, 2004, Batoyan, Janibekian, and Lalazaryan all signed the SPA in person in front of a notary public at the Notary Public Office in Yerevan. This was for the purpose of officially registering the SPA.

approved and agreed to the SPA's clause providing for ICC arbitration as well as the selection of New York law as the governing law of the SPA.

21.    In sum, Ayvazian exercised behind-the-scenes control throughout the negotiations that culminated in the signing of the SPA, he approved each material term of the agreement (including the ICC arbitration clause), and he ultimately received the purchase price for the shares sold to Global Gold.  The nominal shareholders of the Company acted as Ayvazian's agents -- without Global Gold's knowledge -- when they negotiated the sale of their shares. Because of Ayvazian's crucial if undisclosed role in the negotiation and signing of the SPA, he is as liable under New York law for its breach as the other Respondents, and he is subject to an ICC tribunal's jurisdiction along with the other Respondents.

### 2.    Seller representations and warranties in the SPA

22.    When Global Gold purchased all shares in the Company from Respondents, it negotiated certain contractual promises from the former shareholders that would serve to protect the Company's assets and value as an ongoing business.  The Company's mining activities depended significantly on the cooperation of Armenian government officials in issuing and respecting licenses, providing certain authorizations for work to be performed, handling official paperwork in a timely fashion, and generally cooperating with the Company in its exploration and mining activities. As a foreign investor, Global Gold sought to protect itself in the event that the Company's Armenian shareholders misrepresented the true value of the Company as an ongoing business, or cooperated illicitly with government officials like Ayvazian to ensure that the Company's shares, once owned by Global Gold, would have little or no real value.  While Global Gold was entirely unaware of Ayvazian's status as an undisclosed principal when the SPA was signed, it was careful to extract commitments from the selling shareholders that, to the

8

best of their knowledge, the Company's licenses, governmental authorizations, and other approvals were in order and as represented.

23.    Respondents made, *inter alia*, the following specific representations and warranties in the SPA:

- Section 3.2(b)(ii) -- Respondents warranted that nothing in the SPA contravened, conflicted with, violated, or gave any person or entity the right to challenge the SPA or exercise any remedy or obtain any relief as against the assets of the Company.

- Section 3.2(b)(iii) -- Respondents warranted that nothing in the SPA contravened, conflicted with, violated, or gave any governmental entity the right to revoke, withdraw, suspend, cancel, terminate, or modify any "Governmental Authorization"[5] held by or related to the business or assets of the Company.

- Section 3.2(b)(v) -- Respondents warranted that nothing in the SPA would cause any of the Company's assets to be reassessed or revalued by any governmental entity.

- Section 3.2(b)(vii) -- Respondents warranted that nothing in the SPA would result in the imposition or creation of any Encumbrance[6] upon or relating to any of the Company's assets.

- Section 3.6 -- Respondents represented that there were absolutely no restrictions or limitations on the Company's ownership of all the assets, including licenses and other Governmental Authorizations, that the Company purported to own as of the date of the SPA.

- Section 3.14 -- Respondents represented that the SPA was signed in compliance with all Governmental Authorizations and Legal Requirements[7] of any sort.

---

[5] Section 1 of the SPA defines a "Governmental Authorization" as "any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement." This is a broad definition that applies to any type of approval or consent -- of whatever form -- required of a governmental entity in order for the Company to carry out its business activities.

[6] Section 1 of the SPA defines an "Encumbrance" as "any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership." This is a broad definition -- especially in its use of such language as "restriction of any kind" -- that applies to any sort of restriction imposed by any person or entity on the ownership or use of any of the Company's assets.

[7] Section 1 of the SPA defines a "Legal Requirement" as "any national, regional, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle

- Section 3.17(b) -- Respondents warranted that neither they nor any of their Related Persons -- including family members or anyone "indirectly controlled" by Respondents -- had or may acquire any rights or obligations under any contract relating to the business or assets of the Company.

- Section 3.17(d) -- Respondents warranted that the Company was and at all times had been in full compliance with all terms and requirements of each contract (including licenses) under which it had or has any obligations; that other parties to each such contract were similarly in full compliance; and that no event had occurred and no circumstance existed that might contravene, conflict with, violate, or permit any person or entity to terminate, cancel, or exercise any remedy under any such contract.

- Section 3.19 -- Respondents represented that the Company was and at all times had been in full compliance with all environmental laws and regulations, and that there were no pending or threatened claims, Encumbrances, or other restrictions of any nature arising from any environmental law and regulations.

- Section 3.24(a) -- Respondents represented that they had made no omissions of material fact or misleading statements in making their representations in the SPA.

- Section 3.24(c) -- Respondents warranted that they had not failed to disclose in the SPA any fact with any specific application to the SPA.

- Section 3.25 -- Respondents warranted that neither they nor any of their Related Persons had any interest in any property pertaining to the Company's businesses, or in any competitive entity or business.

- Section 10.2 -- Respondents indemnified Global Gold for any damages suffered or caused by Respondents' breaches of or misrepresentations relating to any provision of the SPA.

24.    These numerous seller representations and warranties in the SPA were intended to

hold Respondents liable for any misrepresentation they may have made and any relevant fact

they may have failed to disclose in the SPA. Specifically, Respondents were responsible for full

disclosure about the value of the Company's assets and business, the status of any Governmental

Authorizations and Legal Requirements applicable at the time of the SPA or potentially

---

of common law, regulation, statute, or treaty." This is a broad definition that applies to any rule or limitation affecting the Company or its assets by force of law.

applicable in the future, and any actual and potential limitations or restrictions on the Company's assets or business. Moreover, Respondents promised that the Company was in full compliance with all laws and regulations and that no family members or any other individuals indirectly controlled by Respondents were involved in the negotiation of the SPA or in any businesses that competed or might ultimately compete with the Company. In sum, Respondents made multiple warranties as to the status and ownership of the Company as well as the legal and business environment into which Global Gold was entering by purchasing shares in the Company. But almost immediately after the execution of the SPA, Global Gold began to realize that Respondents were guilty of egregious misrepresentations and omissions.

### 3.     The Company's difficulties with Ayvazian

25.     When the SPA was executed in late 2003, the Company owned mining rights to explore the Hankavan and Marjan fields in Armenia through at least the end of the year 2017. The terms for both the Hankavan and Marjan licenses had been fixed in 2002, when they were issued to the Company under the regulatory framework of Armenia's Mineral Code of March 19, 1992. On April 1, 2003, a new Concession Law came into force in Armenia, pursuant to which existing licenses were required to be automatically replaced for administrative reasons by new licenses with the same substantive terms. Specifically, Article 76 of the Concession Law provided that each mining entity owning a mining right prior to the Concession Law's entry into force would be a "transitory license holder" for the 14 months beginning May 1, 2003. The Company was therefore a transitory license holder with respect to the Hankavan and Marjan fields as of the December 2003 execution of the SPA.

26.     During the 14-month transition period, transitory license holders such as the Company were authorized to apply for exploration licenses and special exploration licenses

11

(which authorize the holder to enter into a concession agreement with the government) under which they would be permitted to continue their exploration activities. Under Article 76 of the Concession Law, if a transitory license holder applied for these new licenses, the Armenian Ministry of the Environment -- the government agency responsible for issuing exploration licenses and regulating exploration and mining -- was to provide them on the basis of the original license issued to the licensee under the 1992 Mineral Code. The term of any new license issued under this procedure was to be identical to the term of the old license.

27.    On June 23, 2004 -- prior to the July 1, 2004, end of the transition period under the Concession Law -- the Company applied to Ayvazian's Ministry of the Environment for replacement of its transitory licenses. But although the law envisaged a 15-day period during which new licenses were to be issued, the Ministry failed to issue them to the Company by the deadline of July 8, 2004. Instead, the Ministry issued backdated licenses on July 10, 2004 -- an exploration license certificate for the Hankavan fields valid for one year, and a special exploration license certificate for the Marjan fields set to expire in three years. The license certificates were issued in direct contravention of Article 76 of the Concession Law, which provided (1) special exploration licenses to be issued for Hankavan and Marjan, and  (2) the issuance of new licenses with the same terms as the corresponding original licenses. The new Hankavan license should have been a special exploration license entitling the company to enter into a concession agreement with the government, like the new Marjan license, and both new licenses should have been set to expire in 2017, rather than in 2005 and 2007, respectively.

28.    Meanwhile, the Ministry violated other provisions in the Concession Law. In January 2005, the Company applied to the Ministry for permission to conduct additional exploration works in the Hankavan fields within the scope of the original 2002 license. Article

10 of the Concession Law provides specific time limitations for the issuance of such exploration licenses; if the Ministry fails to respond to an application within one month, the licenses requested are deemed to be automatically granted. The Ministry of the Environment failed to comply with Article 10. In March 2005, after the requested licenses were automatically granted under Armenian law, Ayvazian purported to deny the Company's request to conduct additional exploration works in the Hankavan fields. According to Ayvazian, the Company's requested area for additional exploration fell within 20 kilometers of an exploration area certified to another mining company. Not only was Ayvazian's response outside the strict one-month period provided for in Article 10 of the Concession Law, but it also failed to rely upon any of the specified reasons for refusal of mining licenses listed in Article 13 of the Concession Law. Thus, Ayvazian's refusal to issue the requested exploration licenses for additional Hankavan sites was both procedurally and substantively illegitimate.

29.     In June 2005, the Company applied for a special exploration license for the Hankavan fields, which should have been issued the previous year. As discussed above, such a license is necessary in order for the Company to be permitted to enter into a concession agreement with the government for exploitation of any gold it discovers. The Concession Law as well as government resolutions interpreting that law clearly required that the new license for Hankavan issued in July 2004 be a special exploration license -- just as they clearly required that license's term to extend to 2017. But Ayvazian responded that a special exploration license may not be issued during the existing term of a regular exploration license for the same fields. He advised that the Company should re-apply after the purported expiration of the one-year exploration license. The Company did so on December 28, 2005, but its application remains unanswered over a year later.

13

30.    From the summer of 2004 until the summer of 2005, therefore, Ayvazian engaged in the illegal, illegitimate, and systematic obstruction and repudiation of the Company's rights under Armenian law.  In doing so, he violated the numerous seller representation and warranty provisions of the SPA detailed above.  Although Ayvazian and his fellow Respondents had represented and warranted that the Company's exploration licenses extended through 2017, Ayvazian arbitrarily reduced the terms of those licenses at the first available opportunity. Although Ayvazian and his fellow Respondents had represented and warranted that the Company was in compliance with all Legal Requirements, and that its Governmental Authorizations were valid and in order, Ayvazian decided otherwise in his capacity as Minister of the Environment. He justified his attacks on the Company's licenses and license applications based on the Company's alleged non-compliance with the necessary laws and regulations.  In sum, having made a series of representations to Global Gold about the Company, its licenses, and its legal status, Ayvazian contradicted and reneged on those representations and warranties shortly after the execution of the SPA.

### 4.    Ayvazian attempts extortion by demanding a substantial bribe

31.    On July 25, 2005, Global Gold delivered a letter to Ayvazian detailing its numerous objections to his decisions and actions over the previous year.  Four days later, Global Gold's Regional Director Ashot Poghosyan ("Poghosyan") met with Ayvazian at the latter's office.  Also present at the meeting was Mourad Gouloyan ("Gouloyan"), a member of Armenia's National Assembly and a close associate of Ayvazian.  At this meeting, the nature of Ayvazian's intentions became clear to Global Gold.  Instead of attempting to resolve Global Gold's complaints in good faith, Ayvazian demanded a pay-off.  He introduced Gouloyan as a representative of the Company's former shareholders and instructed Poghosyan to deal with

14

Gouloyan on any matter pertaining to the Company. Gouloyan then took Poghosyan to an adjacent room and threatened to oust Global Gold -- or, in Gouloyan's terms, "the Americans" -- from Hankavan unless it agreed to pay an additional US$ 3 million for the Company shares purchased in 2003. According to Gouloyan, he had been a shareholder in the Company in 2003 but had not authorized the sale or signed the SPA; therefore, the Company as controlled by Global Gold was entitled to none of the licenses and authorizations previously issued by the Ministry of the Environment. Gouloyan personally threatened Poghosyan and stated that all such licenses and authorizations would be canceled by the Ministry of the Environment unless Global Gold paid the amount demanded.

32.    In a July 2006 interview in one of Armenia's weekly periodicals,[8] Ayvazian essentially confirmed that the above-described extortion attempt took place. In response to a question about his arbitrary and changing expectations of Global Gold and other foreign investors dealing with the Ministry of the Environment, Ayvazian brazenly stated, "Well, let them pay me and get rid of the problem. Paying the first time is always the most difficult, and after that they will go on by paying . . . How come they don't pay?"

**5.    Ayvazian steps up his attack on the Company and its assets**

33.    Global Gold categorically refused Ayvazian's demand for a bribe, and thereafter, things only got worse for the Company. As discussed above, the Company has the right under Armenian law to the exploration license it requested for additional Hankavan sites in January 2005, but Ayvazian has illegally refused to issue the license certificate. In the summer of 2006, Global Gold learned that Ayvazian had instead issued the license certificate for additional Hankavan sites to a different entity called Interier, LLC ("Interier"). Interier is a front company

---

[8] An English translation of the interview is attached as Exhibit "E."

15

for Ayvazian and Gouloyan through two of their close associates. The Interier license was issued in contravention of Article 13 of the Concession Law, which prohibits the issuance of exploration licenses covering areas that are already covered by another entity's exploration and mining rights.

34.    Global Gold also learned in the summer of 2006 that Ayvazian had issued the license certificate for the Hankavan fields to an entity called Golden Ore, LLC ("Golden Ore"), which is controlled by Armenia's Minister of Transport and Communication, Andranik Manoukian ("Manoukian"). Manoukian is a close associate of Ayvazian and, through marriage, a relative of Gouloyan. In his dealings with Interier and Golden Ore, Ayvazian has blatantly violated the SPA seller representation that no Related Persons were involved in any way with the Company's assets or any competing business. Ayvazian has behaved similarly in numerous other instances with respect to other rightful owners of mining exploration rights, by illegally issuing conflicting exploration licenses to entities that he controls and from which he profits through his family members and close associates.

35.    On June 2, 2006, Ayvazian sent a letter to the Company purporting to terminate its special exploration license for the Marjan fields. This action was taken in manifest disregard of Armenian law, which requires instances of license default or termination not only to be adjudicated by a competent Armenian court, but also to be preceded by notice and a cure period. Ayvazian ignored these provisions of the law and has continued to do so in response to Global Gold's complaint letters. It is clear that Ayvazian's purported and illegal termination of the Company's Marjan special exploration license -- just like his illegal issuance of a conflicting Hankavan exploration license to an entity controlled by Related Persons under the terms of the SPA -- is a direct response to Global Gold's categorical refusal to make a US$ 3 million pay-off

16

to him. In fact, Ayvazian sent the letter purporting to terminate the Marjan license just one day after having issued the conflicting Hankavan license to Golden Ore. Ayvazian has illegally attempted to sell the Company's Marjan exploration rights to various Russian-owned entities.

36.    In sum, Ayvazian has illegally used his position as Armenia's Minister of the Environment to benefit himself financially and pursue a personal vendetta against Global Gold. He orchestrated Global Gold's purchase of the shares in the Company from the other Respondents in 2003, and then proceeded in violation of the representations and warranties made in the SPA to make Global Gold's business activities in Armenia as difficult as possible. Ayvazian attempted to extort a substantial amount of money from Global Gold, and when this effort failed, Ayvazian continued to attack Global Gold through all means available to him.

37.    Ayvazian's illegal attacks have not been limited to the issuance of improper exploration licenses, the refusal to issue exploration license certificates for additional sites as required by law, the refusal to issue special exploration licenses to which the Company is legally entitled, the issuance of conflicting licenses to competing businesses that his family members and close associates own, and the ultimate purported termination of a special exploration license in manifest disregard of Armenian law. Throughout the past three years, Ayvazian has also, *inter alia*, (1) failed to sign license agreements with the Company as required by law; (2) sent false notices to the Company, for harassment purposes, claiming that it has failed to conduct exploration work, failed to submit required reports, failed to pay concession fees, and illegally transferred mining rights to other entities; (3) conducted inspections of the Company's facilities during which Ministry personnel have urged the Company's employees to report non-existent infringements of certain laws and regulations; (4) ignored letters and other communications from the Company; and (5) refused to provide the Company access to certain information that is

17

required to be public under Armenian law, such as the public roster of mining rights. Ayvazian's actions clearly violate the representations and warranties about the Company, its assets, its Governmental Authorizations, its compliance with necessary Legal Requirements, and the non-involvement of the principals or Related Persons in competitive businesses that Ayvazian and the other Respondents made in signing the SPA.

**B.    Legal Claims**

      **1.    Ayvazian is subject to the SPA's arbitration clause**

38.    In many cases, ICC tribunals have bound non-signatories to the terms of an arbitration clause. When, as in the case of Ayvazian here, the non-signatory controls the transaction at issue through his agents or accepts the benefits of the contract, he can be required to arbitrate as if he had signed the underlying agreement and arbitration clause. *See, e.g., Capital India Power Mauritius I and Energy Enterprises (Mauritius) Company v. Maharashtra Power Development Corp. Ltd, Maharashtra State Electricity Board and the State of Maharashtra*, ICC Case No. 12913/MS, Final Award of 27 April 2005 (applying New York law); *Bridas S.A.I.P.I.C., Bridas Energy International, Ltd., Intercontinental Oil & Gas Ventures, Ltd. and Bridas Corporation v. Government of Turkmenistan, Concern Balkannebitgazsenagat and State Concern Turkmenneft*, ICC Arbitration Case No. 9058/FMS/KGA, Partial Award of 25 June 1995.

39.    Article 11.6 of the SPA provides that the agreement is governed by New York law. Under New York's "undisclosed principal" doctrine, a signatory may bind a non-signatory to a contract's terms when acting within his authority as an agent of the non-signatory. *See Old Republic Ins. Co. v. Hansa World Cargo Service, Inc.*, 51 F.Supp.2d 457, 475 (S.D.N.Y. 1999) (applying New York law). In such an instance, the non-signatory is an "undisclosed principal" of the contract, and he may sue or be sued under its terms as if he were a disclosed signatory to

the agreement. *Rogalsky v. Ryan*, 80 N.Y.S.2d 564 (New York Sup. Ct. 1948); *Kirno Hill Corp. v. Holt*, 476 F.Supp. 134 (S.D.N.Y. 1979) (applying New York law). The doctrine of equitable estoppel provides an additional basis under New York law for binding a non-signatory like Ayvazian to an arbitration agreement. A non-signatory may not object to arbitration "when it receives a 'direct benefit' from a contract containing an arbitration clause." *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d. Cir. 1999). This is because "allow[ing] [a party] to claim the benefit of a contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying the Arbitration Act." *Avila Group, Inc. v. Norma J. of California*, 426 F.Supp. 537, 542 (S.D.N.Y. 1977). *See also Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1064 (2d. Cir. 1994) (binding a non-signatory to arbitration because it knew of the arbitration agreement and "knowingly accepted the benefits of" that agreement).

40.    Ayvazian is clearly subject to the SPA's arbitration clause under these rules of New York law. Batoyan, Janibekian, and Lalazaryan acted as agents for Ayvazian in signing the SPA with Global Gold in December 2003. Ayvazian was a secret participant and beneficial owner in the Company at the time the SPA was signed, and he actually controlled the entire transaction behind the scenes. Every provision of the SPA was communicated to and approved by Ayvazian, as were the preliminary agreements between the nominal shareholders and Global Gold. In short, Batoyan, Janibekian, and Lalazaryan negotiated and contracted with Global Gold through detailed instructions from Ayvazian.

41.    Moreover, Ayvazian benefited financially from the execution of the SPA, just as if he had been a disclosed principal like the other Respondents. Ayvazian received the purchase price from Batoyan, Janibekian, and Lalazaryan after the SPA was executed, and Ayvazian

19

distributed the proceeds to himself and his fellow Respondents. Ayvazian's behavior throughout the negotiation and signing of the SPA is that of an undisclosed principal directing his agents to negotiate certain terms, approving specific contract provisions (including the arbitration clause), and ordering that the purchase price be collected and distributed by him as the party controlling the transaction. Ayvazian is bound by the SPA's arbitration clause and is liable for breaches of the agreement as if he had signed the SPA along with the other Respondents.

## 2. **Respondents breached the SPA**

42.    By signing the SPA with the full knowledge that Ayvazian controlled the transaction and planned to interfere with its assets, business, and legal rights and illegally favor competitors controlled by his associates and family members, Respondents breached, *inter alia*, the seller warranty and representation provisions of the SPA outlined above, for which they are jointly and severally liable:

- Section 3.2(b)(ii) -- Respondents warranted that nothing in the SPA contravened, conflicted with, violated, or gave any person or entity the right to challenge the SPA or exercise any remedy or obtain any relief as against the assets of the Company. But Ayvazian in his position as Minister of the Environment has challenged the Company's rights to several of its licenses on the ground that those licenses were provided to the Company with its original shareholders, not to Global Gold. Because Ayvazian has been working closely from the beginning with the three seller signatories to the SPA -- his agents -- all Respondents breached this section of the agreement.

- Section 3.2(b)(iii) -- Respondents warranted that nothing in the SPA contravened, conflicted with, violated, or gave any governmental entity the right to revoke, withdraw, suspend, cancel, terminate, or modify any "Governmental Authorization" held by or related to the business or assets of the Company. But Ayvazian in his position as Minister of the Environment refused numerous license certificates to the Company, failed to provide the Company with new licenses through 2017 to explore the Hankavan and Marjan fields, and ultimately revoked the Company's Marjan special exploration license.

- Section 3.2(b)(v) -- Respondents warranted that nothing in the SPA would cause any of the Company's assets to be reassessed or revalued by any governmental entity. Again, Ayvazian's failure to provide new licenses under the Concession Law and his revocation of the Marjan special exploration license -- all because Global Gold succeeded to ownership of all shares in the Company -- demonstrate that this representation was false.

20

- Section 3.2(b)(vii) -- Respondents warranted that nothing in the SPA would result in the imposition or creation of any Encumbrance upon or relating to any of the Company's assets. But Ayvazian used the SPA to justify his reduction of the license periods for exploration of the Hankavan and Marjan fields as well as his revocation of the Marjan special exploration license.

- Section 3.6 -- Respondents represented that there were absolutely no restrictions or limitations on the Company's ownership of all the assets, including licenses and other Governmental Authorizations, that the Company purported to own as of the date of the SPA But shortly after the execution of the SPA, Ayvazian in his position as Minister of the Environment began imposing such restrictions and limitations, in the forms discussed in detail above.

- Section 3.14 -- Respondents represented that the SPA was signed in compliance with all Governmental Authorizations and Legal Requirements of any sort. But Ayvazian through his Ministry of the Environment began alleging just the opposite shortly after the execution of the SPA, and when Global Gold refused to pay him off, he continued using the Company's purported non-compliance to justify his Ministry's interference with the Company's assets and business.

- Section 3.17(b) -- Respondents warranted that neither they nor any of their Related Persons -- including family members or anyone "indirectly controlled" by Respondents -- had or may acquire any rights or obligations under any contract relating to the business or assets of the Company. This warranty was false when made, as it turns out that Gouloyan -- someone indirectly controlled by Ayvazian -- was an undisclosed shareholder in the SPA. Gouloyan and Ayvazian's associates also control Interier and Golden Ore, businesses that compete with the Company and that were illegally awarded Hankavan exploration and mining rights that legitimately belong to the Company.

- Section 3.17(d) -- Respondents warranted that the Company was and at all times had been in full compliance with all terms and requirements of each contract (including licenses) under which it had or has any obligations; that other parties to each such contract were similarly in full compliance; and that no event had occurred and no circumstance existed that might contravene, conflict with, violate, or permit any person or entity to terminate, cancel, or exercise any remedy under any such contract. For the same reasons as discussed above, this warranty has turned out to be false.

- Section 3.19 -- Respondents represented that the Company was and at all times had been in full compliance with all environmental laws and regulations, and that there were no pending or threatened claims, Encumbrances, or other restrictions of any nature arising from any environmental law and regulations. But shortly after the execution of the SPA, Ayvazian in his position as Minister of the Environment began to accuse the Company of being in violation of various environmental laws and regulations.

- Section 3.24(a) -- Respondents represented that they had made no omissions of material fact or misleading statements in making their representations in the SPA. In fact, Respondents' numerous omissions and misleading statements have been detailed above, and they include Ayvazian's role as an undisclosed principal, his plan to extort additional payments from Global Gold after the execution of the SPA, and his plan to harass Global Gold continuously while substantially interfering with the Company's assets and business.

- Section 3.24(c) -- Respondents warranted that they had not failed to disclose in the SPA any fact with any specific application to the SPA. Again, Respondents failed to disclose numerous facts relevant to the SPA.

- Section 3.25 -- Respondents warranted that neither they nor any of their Related Persons had any interest in any property pertaining to the Company's businesses, or in any competitive entity or business. This warranty was false when made, as Gouloyan was an undisclosed shareholder in SPA and Gouloyan and Ayvazian's associates control Interier and Golden Ore.

- Section 10.2 -- Respondents indemnified Global Gold for any damages suffered or caused by Respondents' breaches of or misrepresentations relating to any provision of the SPA. Because Global Gold has been damaged by the various misrepresentations and breaches of the SPA by Respondents, Respondents are required to compensate Global Gold for that damage.

## VI.    REMEDIES SOUGHT

43.    Claimant Global Gold respectfully requests that the Tribunal find in favor of Global Gold on all matters and make a Final Award:

44.    Declaring that Respondent Vardan Ayvazian is an undisclosed principal of the SPA, and that he is jointly and severally liable with his agents and disclosed principals, Respondents Mayren Batoyan, Edward Janibekian, and Yurik Lalazaryan, for any breaches of the SPA.

45.    Declaring that Global Gold is entitled to the payment by Respondents of all damages ultimately calculated and claimed based on the facts and contractual and legal grounds expressed herein and in subsequent pleadings. Global Gold reserves the right to quantify at a

later date the damages it has suffered.  At present, it believes those damages will exceed US$ 5 million.

46.     Awarding Global Gold its attorneys' fees, costs, and expenses of the arbitration.

47.     Awarding pre-judgment and/or post-judgment interest on the amounts awarded at the applicable rates under New York law.

23

Houston, Texas
December 28, 2006

Respectfully submitted,

KING & SPALDING LLP

R. Doak Bishop
Wade M. Coriell
1100 Louisiana Street
Suite 4000
Houston, Texas, USA  77002
Tel: 001.713.751.3200
Fax: 001.713.751.3290

Kenneth R. Fleuriet
25 Cannon Street
London, England EC4M 5SE
Tel: 00.44.20.7551.7500
Fax: 00.44.20.7551.7575

Email: dbishop@kslaw.com

# SHA, LLC

# SHARE PURCHASE AGREEMENT

by and between

## Global Gold Mining, LLC

and

## The Participants of SHA, LLC
(for registration purposes)

## ՍՀԱ ՍՊԸ

## ԲԱԺՆԵՄԱՍԻ ԳՆՄԱՆ ՊԱՅՄԱՆԱԳԻՐ

## Global Gold Mining, LLC

եւ

## ՍՀԱ ՍՊԸ ՄԱՍՆԱԿԻՑՆԵՐԻ
կողմից եւ միջեւ
(գրանցման նպատակներով)



## SHARE PURCHASE AGREEMENT

This Share Purchase Agreement ("Agreement") is made as of December 21, 2003, by Global Gold Mining, LLC, a Delaware, United States limited liability company ("Buyer"), SHA, LLC an Armenian limited liability company participants Yurik Lalazaryan, an individual resident in Armenia, ("A"), Mayren Batoyan, an individual resident in Armenia ("B"), and Edward Janibekian, an individual resident in Armenia ("C") (collectively "Sellers").

### RECITALS

Sellers desire to sell, and Buyer desires to purchase, all of the issued and outstanding shares (the "Shares") of participation in SHA, LLC, an Armenian limited liability company (the "Company"), for the consideration and on the terms set forth in this Agreement.

### AGREEMENT

The parties, intending to be legally bound, agree as follows:

1. **DEFINITIONS**. For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1:

"Acquired Company"--the Company and its Subsidiaries if any, collectively.

"Adjustment Amount"--as defined in Section 2.5.

## ԲԱԺՆԵՏՈՄՍԻ ԳՆՄԱՆ ՊԱՅՄԱՆԱԳԻՐ

Սույն Բաժնետոմսի Գնման Պայմանագիրը («Պայմանագիր») կնքվել է 2003թ-ի դեկտեմբերի 21-ին, Global Gold Mining, LLC, ԱՄՆ Դելավեր Նահանգի սահմանափակ պատասխանատվությամբ ընկերության («Գ-Նորդ»), եւ ՍԻԱ, ՍՊԸ, Հայաստանի Հանրապետության սահմանափակ պատասխանատվությամբ ընկերության մասնակիցներ՝ Հայաստանի բնակիչ եւ ֆիզիկական անձ Յուրիկ Լալազարյանի («Ա»), Հայաստանի բնակիչ եւ ֆիզիկական անձ Մայրեն Բատոյանի («Բ»), Հայաստանի բնակիչ եւ ֆիզիկական անձ Էդվարդ Ջանիբեկյանի («Գ») (միասնաբար «Վաճառողներ») միջեւ:

### ԱՌԱՐԿԱՆ

Վաճառողները ցանկանում են վաճառել, իսկ Գ-Նորդը ցանկանում է գնել ՍԻԱ, ՍՊԸ-ի Հայաստանի սահմանափակ պատասխանատվությամբ ընկերության («Ընկերություն») բոլոր թողարկված եւ սպիտակ 640 սպառողական բոլոր բաժնետոմսերը («Բաժնետոմս»)` սույն Պայմանագրի պայմանների եւ դրույթների համաձայն:

### ՊԱՅՄԱՆԱԳԻՐ

Կողմերը` իրավականորեն պարտավորված լինելու միտումով, համաձայնում են հետեւյալի մասին:

1. **ՍԱՀՄԱՆՈՒՄՆԵՐ**: Սույն Պայմանագրի իմաստով, հետեւյալ սահմանումներն ունեն սույն Բաժնի 1-ում մասնավորված կամ ներկայացված իմաստները:

«Ձեռքբերված Ընկերություն» -- Ընկերությունը եւ դրա Դուստր Ընկերությունները եթե կան, միասնաբար:

«Մասնաճշված Գումար» -- ինչպես սահմանված է Բաժնն 2.5-ում:

1

in Section 2.5.

"Applicable Contract"--any Contract (a) under which the Acquired Company has or may acquire any rights, (b) under which the Acquired Company has or may become subject to any obligation or liability, or (c) by which the Acquired Company or any of the assets owned or used by it is or may become bound.

"Balance Sheet"--as defined in Section 3.4.

"Best Efforts"--the efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible.

"Breach"--a "Breach" of a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement will be deemed to have occurred if there is or has been (a) any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision, or (b) any claim (by any Person) or other occurrence or circumstance that is or was inconsistent with such representation, warranty, covenant, obligation, or other provision, and the term "Breach" means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

"Buyer"--as defined in the first paragraph of this Agreement.

«Կիրառելի Պայմանագիր» -- ցանկացած Պայմանագիր (ա) որի համաձայն Ձեռքբերված Ընկերությունն ունի կամ կարող է ձեռք բերել իրավունքներ, (բ) համաձայն որի Ձեռքբերված Ընկերությունը պարտք է կամ կարող է դառնալ որևէ պարտավորության կամ պարտատիրատնատիրության սուբյեկտս, կամ (գ) համաձայն որի Ձեռքբերված Ընկերությունը կամ դրա սեփականությունն հանդիսացնող կամ դրա կողմից օգտագործվող որևէ գույքի ենևատմամբ կարող է կիրառվել արգելանք:

«Հաշվեկշիռ» -- ինչպես սահմանված է Բաժին 3.4-ում:

«Լավագույն Ջանքեր» -- ջանքեր որոնք արդյունքի ձգտող որևէ ողջամիտ Անձ կգործադրեր միանման հանգամանքներում` ապահովելու համար որպեսզի այդ արդյունքը ձեռք բերվի ինչքան հնարավոր է կարծ ժամանակահատվածում:

«Խախտում» -- սույն Պայմանագրի որևէ հայտարարության, երաշխիքի, խոստման, պարտավորության կամ սույն Պայմանագրի որևէ դրույթի կամ սույն Պայմանագրով սահմանված ցանկացած պայմանավորվածության «Խախտումը» կիսմարվի տեղի ունեցած եթե առկա է կամ առկա է եղել (ա) այդ հայտարարության, երաշխիքի, խոստման, պարտավորության կամ որևէ դրույթի իրականացման կամ կատարման որևէ անճշտություն կամ խախտում, կամ (բ) որևէ պնդում (որևէ Անձի կողմից) կամ այլ միջադեպ կամ հանգամանք որբ հակասում է այդ հայտարարությանը, երաշխիքին, խոստմանը, պարտավորությանը կամ որևէ դրույթին, և «Խախտում» սահմանումը նշանակում է ցանկացած նման անճշտություն, խախտում, ձիրականացում, պնդում, հանգամանք կամ միջադեպ:

«Գնորդ» -- ինչպես սահմանված է սույն Պայմանագրի առաջին պարագրաֆում:

2

"Closing"--as defined in Section 2.3.

"Closing Date"--the date and time as of which the Closing actually takes place.

"Company"--as defined in the Recitals of this Agreement.

"Consent"--any approval, consent, ratification, waiver, or other authorization (including any Governmental Authorization).

"Contemplated Transactions"--all of the transactions contemplated by this Agreement, including:

(a)     the sale of the Shares by Sellers to Buyer;

(b)     the execution, delivery, and performance of the Promissory Note, the Sellers' Releases, and the Escrow Agreement;

(c)     the performance by Buyer and Sellers of their respective covenants and obligations under this Agreement; and

(d)     Buyer's acquisition and ownership of the Shares and exercise of control over the Acquired Company.

"Contract"--any agreement, contract, obligation, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding.

«Կատարում» -- ինչպես սահմանված է Բաժին 2.3-ում:

«Կատարման Ամսաթիվ» -- վաստացի Կատարման ամսաթիվն եւ ժամանակը:

«Ընկերություն» -- սույն Պայմանագրի Առարկայում սահմանվածի համաձայն:

«Համաձայնություն» -- ցանկացած հաստատում, համաձայնություն, վավերացում, հրաժարում, կամ այլ լիազորություն (ներառյալ ցանկացած Կառավարական Լիազորություններ):

«Նախատեսված Գործարքներ» -- սույն Պայմանագրով նախատեսված բոլոր գործարքները, ներառյալ.

(ա)     Վաճառողների կողմից Բաժնետոմսերի վաճառքը Գնորդին,

(բ)     Մուրհակի ստորագրումը, իրականացումը եւ կատարումը, Վաճառողների Իրավունքի Փոխանցման Հայտարարությունները, եւ Էսքրոու Պայմանագիրը:

(գ)     Գնորդների եւ Վաճառողի կողմից իրենց համապատասխան խոստումների եւ պարտավորությունների կատարումը սույն Պայմանագրի համաձայն, եւ

(դ)     Գնորդի կողմից Բաժնետոմսերի ձեռք բերումը եւ տնօրինումը, եւ Ձեռքբերված Ընկերության կառավարման իրականացումը:

«Պայմանագիր» -- ցանկացած համաձայնագիր, պայմանագիր, պարտավորություն, խոստում, կամ ստանձնում (լինի գրավոր կամ բանավոր եւ ուղղակի կամ անուղղակի) որն իրավականորեն պարտավորեցնող է:

"Damages"--as defined in Section 10.2.

"Disclosure Letter"--the disclosure letter delivered by Sellers to Buyer concurrently with the execution and delivery of this Agreement.

"Employment Agreements"--as defined in Section 2.4(a)(iii).

"Encumbrance"--any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environment"--soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"Environmental, Health, and Safety Liabilities"--any cost, damages, expense, liability, obligation, or other responsibility arising from or under Environmental Law or Occupational Safety and Health Law and consisting of or relating to:

(a)  any environmental, health, or safety matters or conditions (including

«Վնասներ» -- Բաժին 10.2-ում սահմանվածի համաձայն:

«Բացահայտման Նամակ» -- Վաճառողների կողմից Գնորդին տրված բացահայտման նամակը՝ սրված սույն Պայմանագրի ստորագրման եւ կնքման հետ միաժամանակ:

«Աշխատանքային Պայմանագիր» -- Բաժին 2.4(ա)(iii)-ում սահմանվածի համաձայն:

«Ծանրաբեռնում» -- ցանկացած մեղադրանք, հայց, համայնքի գույքային շահ, պայմանն, փոխադարձ բաժնեմաս, արգելանք, այլընտրանք, գրավ, ապահովված գրավ, առաջնային իրավունք, կամ ցանկացած տեսակի սահմանափակում, ներառյալ օգտագործման, քվեարկության, եկամտի ստացման, կամ սեփականության ցանկացած այլ գործոնի կիրառման ենկատմամբ սահմանափատում:

«Միջավայր» -- հող, հողի մակերես կամ հողածածկույթից ցածր մակերեւույթ, մակերեսային ջրեր (ներառյալ նավարկվող ջրեր, օվկյանոսային ջրեր, հոսանքներ, ջրավազաններ, ղրենածային ավազաններ, խմելու ջրի աղբյուրներ, հոսանքների մնացորդներ, շրջապատի օդ (ներառյալ ներսի օդը), բուսական եւ կենդանական աշխարհ, եւ ցանկացած այլ միջավայր կամ բնական ռեսուրս:

«Միջավայրային, Առողջապահական, եւ Անվտանգության Պարտավորություն» -- Միջավայրային Օրենքից, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքից ծագող կամ դրանց համաձայն ցանկացած արժեք, վնաս, ծախս, պարտավորություն, պարտավորվածություն, կամ այլ պատասխանատվությունը, եւ որը բաղկացած է հետեւյալից կամ կապված է հետեւյալի հետ.

(ա)  ցանկացած միջավայրային, առողջապահական կամ անվտանգության

4

or safety matters or conditions (including on-site or off-site contamination, occupational safety and health, and regulation of chemical substances or products);

(b)    fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and response, investigative, remedial, or inspection costs and expenses arising under Environmental Law or Occupational Safety and Health Law;

(c)    financial responsibility under Environmental Law or Occupational Safety and Health Law for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions ("Cleanup") required by applicable Environmental Law or Occupational Safety and Health Law (whether or not such Cleanup has been required or requested by any Governmental Body or any other Person) and for any natural resource damages; or

(d)    any other compliance, corrective, investigative, or remedial measures required under Environmental Law or Occupational Safety and Health Law.

The terms "removal," "remedial," and "response action," include the types of activities covered by Armenian law.

խնդիրներ կամ պայմաններ (ներառյալ տարածքի ներսում կամ դրանից դուրս աղտոտումը, աշխատանքային անվտանգության եւ առողջապահության, քիմիական նյութերի եւ մարմիններ կարգավորումը);

(p)    Միջավայրային Օրենքից, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքից ծագող կամ դրանց համաձայն տույժեր, տուգանքներ, դատական որոշումներ, վճիռներ, համաձայնություններ, իրավական եւ վարչական վարույթներ, վնասներ, կորուստներ, հայցեր, պահանջներ եւ պատասխանողի, հետաքննական, վերականգնողական, կամ ստուգման ծախսեր եւ արժեքներ,

(q)    ֆինանսական պատասխանատվություն՝ համաձայն Միջավայրային Օրենքի, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքի, մաքրման ծախսերի եւ ուղղիչ գործողությունների, ներառյալ ցանկացած հետաքննական, մաքրման, տեղափոխման, տեղայնացման կամ այլ վերականգնողական կամ պատասխան գործողությունների համար («Մաքրում»), որոնք պահանջվում են Միջավայրային Օրենքի, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքի համաձայն (անկախ այն հանգամանքից թե արդյոք այդ Մաքրումը պահանջվել է որեւէ Կառավարական Մարմնի կամ այլ Անձի կողմից) եւ ցանկացած այլ բնական ռեսուրսի վնասների համար, կամ

(դ)    ցանկացած այլ կատարում, ուղղիչ, հետաքննչական կամ վերականգնողական միջոցներ որոնք պահանջվել են Միջավայրային Օրենքի, կամ Աշխատանքային Անվտանգության եւ Առողջապահական Օրենքի համաձայն:

«Տեղափոխում», «վերականգնում» կամ «պատասխան միջոցներ» սահմանումներն ներառում են Հայաստանի օրենսդրությամբ պահանջվող գործողությունների տեսակները:

5

"Environmental Law"--any Legal Requirement that requires or relates to:

«Միջավայրային Օրենք» -- նշանակում է ցանկացած Օրենքի Պահանջ, որը պահանջում է հետեւյալը կամ կապված է հետեւյալի հետ.

(a)      advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or other prohibitions and of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(ա)      համապատասխան իշխանությունններին, աշխատողներին եւ հանրության թափոննների կամ վտանգավոր նյութերի փաստացի կամ նախատեսվող արտանետումններին, արտանետումններին սահմանափակումնների խախտումններին, կամ այլ արգելքների եւ գործողություններ սկսելու վերաբերյալ տեղեկացնելը, ինչպիսիք են համաձուներ արդյունահանումը կամ շինարարությունը, որոնք կարող են զգալի ազդեցություն ունենալ Միջավայրի վրա,

(b)      preventing or reducing to acceptable levels the release of pollutants or hazardous substances or materials into the Environment;

(բ)      թափոնների կամ վտանգավոր նյութերի Միջավայր արտանետումը կամնիացնե կամ մինչեւ թույլատրելի մակարդակ նվազեցումը,

(c)      reducing the quantities, preventing the release, or minimizing the hazardous characteristics of wastes that are generated;

(գ)      կուտակված թափոննների քանակների, վտանգավորության աստիճանի նվազեցումը կամ դրանց արտանետման կանխումը,

(d)      assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(դ)      ապրանքների ձակման, կազման, փաթեթավորման, եւ օգտագործման ապահովումը ձեւով որը բացառում է ապրանքների օգտագործման կամ տիրապետման ընթացքում մարդու առողջության կամ Միջավայրին անցանկալի վտանգը:

(e)      protecting resources, species, or ecological amenities;

(ե)      ռեսուրսների, կենդանական եւ բուսական աշխարհի, կամ բնական հուշարձանների պաշտպանությունը,

(f)      reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances;

(զ)      վտանգավոր նյութերի, թափոնների, յուղերի կամ պոտենցիալ վտանգավոր այլ նյութերի տեղափոխման հետ կապված վտանգները մինչեւ ընդունելի մակարդակներ նվազեցնելը,

(g)      cleaning up pollutants that have been released, preventing the threat of

(է)      արտանետված թափոննների մաքրումը, արտանետումնների վտանգի

have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or

(h)    making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets.

"Escrow Agreement"--as defined in Section 2.4.

"Facilities"--any real property, leaseholds, or other interests currently or formerly owned or operated by the Acquired Company and any buildings, plants, structures, or equipment (including motor vehicles, tank cars, and rolling stock) currently or formerly owned or operated by the Acquired Company.

"GAAP"--generally accepted United States accounting principles, applied on a basis consistent with the basis on which the Balance Sheet and the other financial statements referred to in Section 3.4(b) were prepared.

"Governmental Authorization"--any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

"Governmental Body"--any:

(a)    nation, state, county, city, town, village, district, or other jurisdiction

կանխումը, կամ նման մաքրման կամ կանխման համար վճարելը, կամ

(բ)    պատասխանատուներին պարտադրելը վճարել մասնավոր կողմերին առողջությանը կամ Միջավայրին վնաս հասցնելու համար, կամ հանրային շահի ներկայացնողներին թույլ տալ փոխխատուցում ստանալ հանրային գույքին հասցված վնասի համար:

«Էսքրոյ Պայմանագիր» -- Բաժին 2.4-ում սահմանվածի համաձայն:

«Միջոցներ» -- ծանկացած անշարժ գույք, վարձակալված գույք, կամ այլ շահ Ձեռքբերված Ընկերության կողմից տնօրինվող կամ օգտագործվող ներկայումս կամ նախկինում եւ Ձեռքբերված Ընկերության կողմից ներկայումս կամ նախկինում տնօրինվող կամ օգտագործվող ցանկացած շենքեր, գործարաններ, կառույցներ, կամ սարքավորումներ (ներառյալ ավտոմեքենաներ, հեղուկատարներ, եւ փոխադրիչներ) :

«GAAP» -- համընդհանուր ընդունված Միացյալ Նահանգների հաշվապահական նորմեր, որոնք կիրառվում են Բաժին 3.4(բ)-ում սահմանված Հաշվեկշռի եւ այլ ֆինանսական հաշվետվությունների հիմնավորումներին համապատասխան:

«Կառավարական Լիազորություն» -- ցանկացած հաստատում, համաձայնություն, լիցենզիա, թույլտվություն, հրաժարում, կամ այլ տրված, շնորհված, ապահովված կամ ցանկացած Կառավարական Մարմնի իշխանության կամ որեւէ Օրենքի Պահանջի համաձայն այլ ձեւով տրամադրված ցանկացած լիազորություն:

«Կառավարական Մարմին» -- ցանկացած

(ա)    երկիր, պետություն, շրջան,

7

town, village, district, or other jurisdiction of any nature;

(b)  federal, state, local, municipal, foreign, or other government;

(c)  governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal);

(d)  multi-national organization or body; or

(e)  body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"Hazardous Activity"--the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, under, about, or from the Facilities or any part thereof into the Environment, and any other act, business, operation, or thing that increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on or off the Facilities, or that may affect the value of the Facilities or the Acquired Company.

"Hazardous Materials"--any waste or other substance that is listed, defined, designated, or classified as, or otherwise

---

քաղաք, ավան, գյուղ, տարածք կամ այլ ցանկացած տեսակի այլ ինքնիշխանություն,

(p)  համերկրային, պետական, տեղական, քաղաքային, օտարերկրյա կամ այլ կառավարություն,

(q)  ցանկացած տեսակի կառավարական կամ կիսակառավարական մարմնի (ներառյալ ցանկացած կառավարական գործակալություն, մասնաճյուղ, վարչություն, պաշտոնյա, կամ մարմին եւ ցանկացած դատարան կամ դատական այլ մարմին),

(դ)  բազմազգային կազմակերպություն կամ մարմին, կամ

(ե)  ցանկացած վարչական, գործադիր, դատական, օրենսդրական, ոստիկանական, կանոնակարգային, կամ հարկային իշխանություն ցանկացած բնույթի իշխանություն իրականացնող կամ իրականացնելու ՛ընանակված մարմին,

«Վնասակար Գործողություն» -- Վնասակար Նյութերը Միջոցների որեւ մասից դեպի Միջավայր կամ Միջավայրում տարածումը, կուտակումը, կիրառումը, ներկրումը, կիրառումը, արտադրումը, զտումը, վերամշտարումը, վերամշակումը, Արտանետումը, պահումը, փոխադրումը, տեղափոխումը, մշակումը կամ օգտագործումը (ներառյալ ընդերքի ջրերի որեւէ ձեւով դուրսբերումն կամ այլ օգտագործումը), եւ վտանգը կամ վտանգի հնարավորությունն ավելացնող, կամ Միջոցների տապածքում կամ դրանից դուրս անձանց կամ գույքին վնասելու վտանգ հարուցող, կամ Միջոցների կամ Ձեռքբերված Ընկերության արժեքի վրա ազդող ցանկացած այլ բայլ, գործունեություն, գործողություն կամ երեւույթ:

«Վնասակար Նյութեր» -- ցանկացած քաղ ին կամ նյութ ներառյալ դրա ցանկացած խառնուրդ կամ լուծույթ, որը նշված է, սահմանված է, նշանակված է,

8

designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefore and asbestos or asbestos-containing materials.

"Intellectual Property Assets"--as defined in Section 3.22.

"Interim Balance Sheet"--as defined in Section 3.4.

"Knowledge"--an individual will be deemed to have "Knowledge" of a particular fact or other matter if:

(a)     such individual is actually aware of such fact or other matter; or

(b)     a prudent individual could be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter.

A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, or who has at any time served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter.

"Legal Requirement"--any national, regional, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

---

կամ որակված է, որպես, կամ այլ կերպ համարվում է վնասակար, ռադիոակտիվ, կամ թունավոր կամ բաղորդ կամ աղտոտող Միջավայրային Օրենքի համաձայն կամ համապատասխան, ժստնավորապես ներառյալ նաևքթ եւ դրա բոլոր փոխակերպումները կամ արիստոնական փոխարինիչները, ինչպես նաև ասբեստո եւ ասբեստ պարունակող նյութերը:

«Մտավոր Սեփականություն» -- Բաժին 3.22-ում սահմանվածի համաձայն:

«Միջանկյալ Հաշվեկշիռ» -- Բաժին 3.4-ում սահմանվածի համաձայն:

«Իմացություն» -- անձնավորությունը կխամարվի որոշակի փաստի կամ այլ խնդրի վերաբերյալ «Իմացություն» ունեցող, եթե.

(ա)     անձնավորությունն իրականում տեղյակ է այդ փաստի կամ այլ խնդրի մասին, կամ

(բ)     ողջամիտ անձնավորությունից պետք է որ հայտնաբերեր կամ այլ կերպ տեղեկանար նման փաստի կամ այլ խնդրի մասին փաստի կամ այլ խնդրի գոյության վերաբերյալ ողջամորեն մանրակրկիտ ուսումնասիրություն կատարելու ընթացքում:

Որեւէ Անձ (անձնավորությունից բացի) կխամարվի որոշակի փաստի կամ այլ խնդրի վերաբերյալ «Իմացություն» ունեցող, եթե որեւէ անձնավորություն որն Անձի մոտ ծառայում է, կամ որեւէ ժամանակ ծառայել է որպես տնօրեն, պաշտոնյա, գործընկեր, գործադիր, կամ հոգաբարձու (կամ ցանկացած նման որակով) ունի, կամ որեւէ ժամանակ ունեցել է Իմացություն նման փաստի կամ այլ խնդրի մասին:

«Օրենքի Պահանջ» -- ցանկացած ազգային, շրջանային, տեղական, քաղաքային, օտարերկրյա, միջազգային, բազմազգային, կամ այլ վարչական հրաման, սահմանադրություն, օրենք, կանոնակարգ, ընդհանուր օրենքի սկզբունք,

9

regulation, statute, or treaty.

"Occupational Safety and Health Law"--any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private (including those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"Order"--any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

"Ordinary Course of Business"--an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if:

(a)     such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person;

(b)     such action is not required to be authorized by the board of such Person (or by any Person or group of Persons exercising similar authority) ; and

(c)     such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the

կարգ, օրենսդրություն կամ միջազգային պայմանագիր:

«Աշխատանքային Անվտանգության եւ Առողջապահական Օրենք» -- ցանկացած Օրենքի պահանջ որը կոչված է. ապահովելու անվտանգ եւ առողջ աշխատանքային պայմաններ եւ մեղմելու աշխատանքային անվտանգության եւ առողջապահական ռիսկերը, եւ ցանկացած կառավարական կամ մասնավոր ծրագիր (ներառյալ արդյունաբերողների միություններ եւ ապահովագրական ընկերություններ կողմից հայտարարված կամ ֆինանսավորվածները) որը կոչված է ապահովելու աշխատանքային անվտանգ եւ առողջ պայմաններ:

«Հրաման» -- ցանկացած դատարանի, վարչական մարմնի, կամ այլ Կառավարական Մարմնի կամ դատավորի կողմից ընդունված, տրված, արված կամ տրամադրված ցանկացած դատավճիռ, որոշում, հրահանգ, վճիռ, հրաման, ցուցում, ծանուցագիր, կամ եզրակացություն:

«Գործունեության Բնականոն Ընթացք» -- որեւէ Անձի կողմից ձեռնարկած միջոցը կհամարվի ձեռնարկված «Գործունեության Բնականոն Ընթացում» միայն այն դեպքում, եթե.

(ա)     ձևան ձեռնարկումը համապատասխանում է այդ Անձի անցած փորձին եւ ձեռնարկվել է տվյալ Անձի առօրյա բնականոն գործունեության ընթացքում,

(բ)     այդ ձեռնարկումը պարտադիր չէ որպեսզի լիազորվի տվյալ Անձի (կամ համանման իրավասություն որեւէ այլ Անձի կամ Անձանց խմբի) խորհրդի կողմից, եւ

(գ)     այդ ձեռնարկումն իր բնույթով եւ կարեւորությամբ համանման է սովորաբար իրականացվող ձեռնարկումներին, առանց տնօրենների (կամ համանման իրավասության որեւէ այլ Անձի կամ Անձանց խմբի) խորհրդի

10

exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Person.

"Organizational Documents"--(a) the articles or certificate of formation a company ; (b) any charter or similar constituent document adopted or filed in connection with the creation, formation, or organization of a Person; and (c) any amendment to any of the foregoing.

"Person"--any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

"Plan"--as defined in Section 3.13.

"Proceeding"--any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

"Promissory Notes"--as defined in Section 2.4(b)(ii).

"Related Person"--with respect to a particular individual:

լիազորության, տվյալ Անձի գործունեության համանման այլ Անձանց գործունեության առօրյա բնականոն ընթացքում կատարված ձեռնարկումներին:

«Կազմակերպչական Փաստաթղթեր» -- (ա) ընկերության կազմավորման հաստատումը կամ վկայականը, (բ) որևէ կանոնադրություն կամ համանման իրավական փաստաթղթ որն ընդունվել կամ տրամադրվել է Անձի ստեղծման, կազմավորման ևև կազմակերպման կապակցությամբ, և (գ) վերոհիշյալի որևէ փոփոխություն:

«Անձ» -- որևէ անձնավորություն, կորպորացիա (ներառյալ շահույթ չհետապնդող ցանկացած կորպորացիա), ընդհանական կամ սահմանափակ պատասխանատվությամբ ընկերակցություն, սահմանափակ պատասխանատվությամբ ընկերություն, համատեղ ձեռնարկություն, գույք, տրաստ, ընկերակցություն, կազմակերպություն, արհեստակցական միություն, կամ այլ կազմավորում կամ Կառավարական Մարմին:

«Ծրագիր» -- Բաժին 3.13-ում սահմանվածի համաձայն:

«Վարույթ» -- ցանկացած ձեռնարկում, արբիտրաժ, աուդիտ, լսում, քննություն, վեճի քննարկում, կամ դատավական գործ (քաղաքացիական, քրեական, վարչական, վերաքննչական, կամ ոչ պաշտոնական) որը սկսվել, հարուցվել, անցկացվել, կամ լսվել է որևէ Կառավարական Մարմնի կամ դատավորի կողմից, միջոցով կամ այլ կերպ ընդգրկմամբ:

«Մուրհակներ» -- Բաժին 2.4(բ)(ii)-ում սահմանվածի համաձայն:

«Փոխկապակցված Անձ» -- կոնկրետ անձնավորության առումով.

11

(a)     each other member of such individual's Family;

(b)     any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family;

(c)     any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

(d)     any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee (or in a similar capacity).

With respect to a specified Person other than an individual:

(a)     any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with such specified Person;

(b)     any Person that holds a Material Interest in such specified Person;

(c)     each Person that serves as a director, officer, partner, executor, or trustee of such specified Person (or in a similar capacity);

(d)     any Person in which such specified Person holds a Material Interest;

(ա)     այդ անձնավորության Ընտանիքի յուրաքանչյուր անդամ,

(բ)     ցանկացած ԱՆձ որն ուղղակիորեն կամ անուղղակիորեն վերահսկվում է այդ անձնավորության կամ նրա Ընտանիքի մեկ կամ ավելի անդամների կողմից,

(գ)     ցանկացած ԱՆձ որում տվյալ անձը կամ նրա Ընտանիքի անդամներն ունեն (առանձին կամ ընդհանուր) Նյութական Շահ, կամ

(դ)     ցանկացած ԱՆձ որի նկատմամբ տվյալ անձնավորություն կամ նրա Ընտանիքի մեկ կամ ավելի անդամները ծառայում են որպես տնօրեն, պաշտոնյա, գործընկեր, գործադիր, կամ հոգաբարձու (կամ համանման պաշտոնում):

Որոշակի ԱՆձի առումով՝ անձնավորությունից բացի.

(ա)     որևէ ԱՆձ որն ուղղակիորեն կամ անուղղակիորեն վերահսկվում է տվյալ ԱՆձին, ուղղակիորեն կամ անուղղակիորեն վերահսկվում է տվյալ ԱՆձի կողմից, կամ ուղղակիորեն կամ անուղղակիորեն ընդհանուր վերահսկման տակ է գտնվում տվյալ ԱՆձի հետ միասին,

(բ)     որևէ ԱՆձ որն ունի Նյութական Շահ տվյալ ԱՆձի մոտ,

(գ)     յուրաքանչյուր ԱՆձ որը տվյալ ԱՆձի մոտ ծառայում է որպես տնօրեն, պաշտոնյա, գործընկեր, գործադիր, կամ հոգաբարձու (կամ համանման պաշտոնում),

(դ)     որևէ ԱՆձ որի մոտ տվյալ ԱՆձն ունի Նյութական Շահ,

12

(c)    any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity); and

(f)    any Related Person of any individual described in clause (b) or (c).

For purposes of this definition, (a) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual, and (b) "Material Interest" means direct or indirect beneficial ownership of voting securities or other voting interests representing at least 25% of the outstanding voting power of a Person or equity securities or other equity interests representing at least 25% of the outstanding equity securities or equity interests in a Person.

"Release"--any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing into the Environment, whether intentional or unintentional.

"Representative"--with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Securities Act"--the United States Securities Act of 1933 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

(ե)    որեէ ԱնՁ որի նկատմամբ տվյալ Անձը ծառայում է որպես գլխավոր գործընկեր կամ հոգաբարձու (կամ համանման պաշտոնում), եւ

(ը)    կետ (բ)-ում եւ (գ)-ում նկարագրված անձնավորությանը ցանկացած Փոխկապակցված Անձ:

Սույն սահմանման իմաստով, (ա) անձնավորության «Ընտանիքը» ներառում է (i) անձնավորությունը, (ii) անձնավորության ամուսնուն/կնոջը, (iii) ցանկացած ֆիզիկական անձ որը կապված է անձնավորության կամ նրա ամուսնուն/կնոջը երկրորդ աստիճանի ազգակցական կապով, եւ (iv) ցանկացած այլ ֆիզիկական անձ որը բնակվում է այդ անձնավորության հետ, եւ (բ) «Նյութական Շահ» նշանակում է Անձի մոտ ուղղակի կամ անուղղակի շահավետ սեփականություն առնվազն 25% ձայնի իրավունք տվող կանոնադրական արժեթղթերի կամ նման ձայնի իրավունք տվող կանոնադրական այլ շահերի նկատմամբ, կամ հասարակ կանոնադրական արժեթղթերի առնվազն 25% նկատմամբ սեփականության կամ գույքային շահ Անձի նկատմամբ:

«Արտանետում» -- ցանկացած տարածում, արտահոսք, ճառագայթում, արտանետում, կուտակում, զրում, հիմնայնացում, նետում, կամ Միջավայրի այլ ձեւով արտանետում՝ լինի դա կանխամտացված կամ ոչ:

«Ներկայացուցիչ» -- կոնկրետ Անձի իմաստով, ցանկացած տնօրեն, պաշտոնյա, աշխատող, գործծակալ, խորհրդատու, խորհրդական, կամ այդ Անձի այլ ներկայացուցիչ, ներառյալ իրավախորհրդատուն, հաշվապահները եւ այլ ֆինանսական խորհրդատուները:

«Արժեթղթերի Ակտ» -- Միացյալ Նահանգների 1933թ-ի Արժեթղթերի Ակտը կամ որեւէ իրավահաջորդ օրենք, եւ կանոնակարգեր եւ կանոններ ընդունված այդ Ակտի կամ որեւէ իրավահաջորդ օրենքի

համաձայն:

"Sellers"--as defined in the first paragraph of this Agreement.

«Վաճառողներ» -- սույն Պայմանագրի առաջին պարբերությունում սահմանվածի համաձայն:

"Sellers' Releases"--as defined in Section 2.4.

«Վաճառողների Իրավունքներից Փոխյանցման Հայտարարություններ» -- Բաժին 2.4-ում սահմանվածի համաձայն:

"Shares"--as defined in the Recitals of this Agreement.

«Բաժնեմաս» -- Սույն Պայմանագրի Առաբկայում սահմանվածի համաձայն:

"Subsidiary"--with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the Owner or one or more of its Subsidiaries; when used without reference to a particular Person, "Subsidiary" means a Subsidiary of the Company.

«Դուստր Ընկերություն» -- որևէ Անձի («Սեփականատեր») իմաստով, ցանկացած կորպորացիա կամ այլ Անձ որի տնօրենների խորհրդի կամ այլ գործադիր մարմնի մեծամասնությունը ընտրելու իրավունքը տվող արժեթղթերը կամ այլ շահերը, կամ այլ կերպ այդ կորպորացիայի կամ այլ Անձի գործունեության ուղղությունները կամ քաղաքականությունը որոշելու իշխանությունը (բացի արժեթղթերից կամ այլ շահերից որոնց իշխանական բնույթը կախված է տեղի չունեցած հանգամանքից) պատկանում է Սեփականատիրոջը կամ դրա մեկ կամ մի քանի Դուստր Ընկերություններից. եթե օգտագործվում է առանց որևէ կոնկրետ Անձի առումով՝ «Դուստր Ընկերություն» նշանակում է Ընկերության Դուստր Ընկերությունը:

"Tax Return"--any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

«Հարկային Հայտարարագիր» -- ցանկացած հայտարարագիր (ներառյալ որևէ տեղեկատվական հայտարարագիր), հաշվետվություն, հայտարարություն, ժամանակացույց, ծանուցում, ձև, կամ այլ փաստաթուղթ կամ տեղեկություն որը ներկայացվել կամ հանձնվել է որևէ Կառավարական Մարմնին որևէ Հարկի սահմանման, ստուգման, գանձման, կամ վճարման, կամ որևէ Հարկի՝ ի կատարումն որևէ Օրենքի Պահանջի վարչավարման, կիրառման, կամ պարտադիր կատարման առնչությամբ:

"Threat of Release"--a substantial likelihood of a Release that may require

«Արտանետման Վտանգ» -- Միջավայրին Արտանետման արդյունքում

14

likelihood of a Release that may require action in order to prevent or mitigate damage to the Environment that may result from such Release.

"Threatened"--a claim, Proceeding, dispute, action, or other matter will be deemed to have been "Threatened" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a claim, Proceeding, dispute, action, or other matter is likely to be asserted, commenced, taken, or otherwise pursued in the future.

## 2.    SALE AND TRANSFER OF SHARES; CLOSING.

2.1    <u>Shares</u>.  Subject to the terms and conditions of this Agreement, at the Closing, Sellers will sell and transfer the Shares to Buyer, and Buyer will purchase the Shares from Sellers.

2.2    <u>Purchase Price</u>.  The purchase price (the "Purchase Price") for the Shares will be Fifteen Thousand US Dollars ($15,000).  Purchase Price is inclusive of and the Sellers are solely and separately responsible for all taxes, fees and levies, duties and other charges applicable now or those which may become applicable in the future, including such taxes, duties or other charges acknowledged retroactive, which may be imposed on any of the Purchase Price (including, but not limited to, the property tax, profit or income tax, VAT) (all taxes, duties or other charges hereinafter collectively referred to as the "Taxes"), associated with, or payment of, such Purchase Price.  Buyer may calculate

վնասի պատճառումից պաշտպանելու կամ մեղմելու միջոցառումների կիրառում պահանջող Արտանետման զգալի հավանականություն:

«Սպառնում» -- հայցը, Վարույթը, վեճը, միջոցը, կամ այլ խնդիրը կհամարվի «Սպառնած» եթե արվել է որևէ պահանջ կամ հայտարարություն (բանավոր կամ գրավոր) կամ ներկայացվել է որևէ ծանուցում (բանավոր կամ գրավոր), կամ որևէ այլ դեպք տեղի է ունեցել կամ այլ հանգամանքներ առկա են, որոնք ողջամիտ Անձին թույլ կտային եզրակացնել որ նման հայցը, Վարույթը, վեճը, միջոցը, կամ այլ խնդիրը հնարավոր է որպեսզի հետապնդում ներկայացվի, սկսվի, կիրառվի, կամ այլ կերպ իրականացվի:

## 2.    ԲԱԺՆԵՏՈՄՍԻ ՎԱՃԱՌՔԸ ԵՒ ՓՈԽԱՆՑՈՒՄԸ. ԿԱՏԱՐՈՒՄ

2.1    <u>Բաժնետոմս</u>:  Սույն Պայմանագրի պայմանների եւ դրույթների համաձայն, Կատարման դրությամբ, Վաճառողները վաճառում եւ փոխանցում են Բաժնետոմսը Գնորդին, իսկ Գնորդը գնում է Բաժնետոմսը Վաճառողներից:

2.2    <u>Գնման Գինը</u>:  Բաժնետոմսի գնման գինը («Գնման Գինը») կազմում է Տասնհինգ Հազար ԱՄՆ Դոլար ($15,000):  Գնման Գինը ներառում է եւ Վաճառողները միանձնյա եւ առանձին-առանձին պատասխանատու են սույն Գնման Գնի կամ դրա վճարման հետ կապված` ներկայումս կամ ապագայում գանձման ենթակա բոլոր եւ ցանկացած հարկերի, տուրքերի եւ այլ վճարների, ներառյալ այն հարկերը, տուրքերը կամ վճարները որոնք կհամարվեն վճարման ենթակա ապագայում, որոնք կարող են կիրառվել Գնման Գնի կամ դրա որեւէ մասի նկատմամբ (ներառյալ, սակայն չսահմանափակված, գույքահարկը, շահութահարկը , եկամտահարկը, ԱԱՀ-ն) (բոլոր հարկերը, տուրքերը կամ այլ վճարները հետայսու միասնաբար

such Purchase Price. Buyer may calculate, and withhold from the Purchase Price and pay any Tax on behalf of the Sellers.

2.3    **Closing**.  The purchase and sale (the "Closing") provided for in this Agreement will take place at the offices of Buyer's counsel at 2a Tamanyan Street, Suite #2 Yerevan , Armenia, at 10:00 a.m. (local time) on December 21,  2003 Subject to the provisions of Section 9, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.3 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.

2.4    **Closing Obligations**.  At the Closing:

(a)    Sellers will deliver to Buyer:

(i)    certificates representing the Shares, duly endorsed (or accompanied by duly executed stock powers or equivalent documents), with signatures for transfer to Buyer;

(ii)    releases in the form of Exhibit 2.4(a)(ii) executed by Sellers (collectively, "Sellers' Releases");

կանվանվեն «Հարկեր»)՝ կասվկած Գնման Գնի կամ դրա վճարման հետ: Գնորդը կարող է հաշվարկել, Գնման Գնից պահել, եւ Վաճառողների փոխարեն վճարել ցանկացած Հարկ:

2.3    Կատարում: Սույն Պայմանագրով սահմանված առքի եւ վաճառքը («Կատարում») տեղի կունենա Հայաստանի Հանրապետության Նրեւան քաղաքի Թամանյան 2ա բնակարանի 2 հասցեում գտնվող Գնորդի իրավախորհրդատուի գրասենյակում, տեղական ժամանակով 10:00-ին, 2003թ-ի դեկտեմբերի 21-ին: Բաժնի 9-ի դրույթների պայմանով, սույն Բաժին 2.3-ում սահմանված ամսաթվին, ժամին եւ նշված տեղում սույն Պայմանագրով սահմանված առք ու վաճառքի գործառքը չավարտելը չի լուծում սույն Պայմանագիրը եւ չի ազատում որեւէ կողմին սույն Պայմանագրով սահմանված իր պարտավորությունների կատարումից:

2.4    Կատարման Պարտավորություններ: Կատարման ժամանակ.

(ա)    Վաճառողները Գնորդին տրամադրում է.

(i)    Բաժնեմասը ներկայացնող վկայագրերը, պատշաճ ձեւով հաստատատված (կամ պատշաճ ձեւով բաժնեմասային իրավունքի հաստատատումով ուղեկցված կամ համապատասխան փաստաթղթեր), Գնորդին փոխանցումը հաստատող ստորագրություններով;

(ii)    Վաճառողների կողմից հաստատատված իրավունքների փոխանցման հայտարարությունները Հավելված 2.4(ա)(ii)-ում նշված ձեւով (միասնաբար՝ «Վաճառողների

16

Իրավունքների Փոխանցման Համաձայնություններ»);

(iii)    an acknowledgment that Buyer is credited with paying Fifteen Thousand US Dollars ($15,000) towards the purchase price paid as of December 21, 2003;

(iii)    հաստատում առ այն, որ Գնորդը վճարել է Տասնհինգ Հազար ($15 000) ԱՄՆ Դոլար գնման գնից 2003թ-ի դեկտեմբերի 21-ին,

(iv)    a certificate executed by Sellers representing and warranting to Buyer that each of Sellers' representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and is accurate in all respects as of the Closing Date as if made on the Closing Date (giving full effect to any supplements to the Disclosure Letter that were delivered by Sellers to Buyer prior to the Closing Date in accordance with Section 5.5. and

(iv)    Վաճառողների կողմից ստորագրված` Գնորդին հավաստող եւ երաշխավորող վկայագիր առ այն, որ Վաճառողների կողմից սույն Պայմանագրում արված յուրաքանչյուր հավաստումները եւ երաշխիքները ճիշտ են եղել բոլոր առումներով սույն Պայմանագրի ամսաթվի դրությամբ եւ ճիշտ են Կատարման Ամսաթվի դրությամբ համարվելով որ արվել են Կատարման Ամսաթվի դրությամբ (իրավական ամբողջական ուժ հաղորդելով Բաժին 5.5-ի համաձայն Գնորդին Վաճառողների կողմից ներկայացված Բացահայտման Նամակի յուրականչյուր հավելմանը), եւ

(v) a resolution of SHA, LLC general meeting of participants authorizing transfer of Shares to Buyer.

(v)    Բաժնեմասը Գնորդին փոխանցելը լիազորող ՍՀԱ, ՍՊԸ մասնակիցների ընդհանուր ժողովի որոշումը:

(b)    Buyer will deliver to Sellers:

(բ)    Գնորդը Վաճառողներին տրամադրում է.

(i)    an acknowledgement canceling Sellers' obligations to repay the Fifteen Thousand US Dollars ($15,000) previously advanced in connection with this transaction:

(i)    սույն գործարքի հետ կապված եւ նախկինում կանխավճարված Տասնհինգ Հազար ԱՄՆ Դոլարը ($15,000) Վաճառողների կողմից վերադարձնելու պարտավորությունը չեղյալ համարելու վերաբերյալ հաստատում;

17

transaction;

(ii)    the draft of a mutually agreeable royalty agreement payable to A, B, and C jointly to pay a royalty of One US Dollar ($1.00) per Ounce of Gold produced at the Hankavan Mine for the first One Hundred Sixty Thousand Ounces of gold produced, which shall be entered between the parties only if and when Buyer determines that the Hankavan Mine can be economically developed and commercial operations commence and all Governmental Authorizations for the proceeding of such mining operations has been obtained, not to exceed in the total amount of One Hundred Sixty Thousand US Dollars ($160,000) in the form of Exhibit 2.4(b) (the "Royalty Agreement"); and

(iii)    a certificate executed by Buyer to the effect that, except as otherwise stated in such certificate, each of Buyer's representations and warranties in this Agreement was accurate in all respects as of the date of this Agreement and is accurate in all respects as of the Closing Date as if made on the Closing Date;

(ii)    Ա-ին, Բ-ին եւ Գ-ին միասնաբար վճարվող եւ երկուսուներ համաձայնություն առայկա հանդիսացող ռոյալթիների պայմանագրի նախագիծր Հանքավանի Հանքում արտադրվյուած ոսկու առաջին Հարյուր Վաթսուն Հազար Ունցիային համար յուրաքանչյուր Ունցիա հաշվարկով Մեկ ԱՄՆ Դոլար ($1,00) վճարման վերաբերյալ, որը պետք է կողմերի միջեւ ստորագրվի միայն այն դեպքում եւ երբ որ Գնորդը որոշի որ Հանքավանի Հանքը կարող է տնտեսապես շահավետորեն զարգացնվել եւ ձեռնարկատիրական աշխատանքները սկսվեն եւ ստացված լիներ բոլոր Կառավարական Լիազորությունները հանքարդյունահանման աշխատանքների համար, վճարվելիք գումարը չգերազանցելով Հարյուր Վաթսուն Հազար ԱՄՆ Դոլարը ($160,000) ինչպես ներկայացված է Հավելված 2.4(բ)-ում («Ռոյալթիի Պայմանագիր»), եւ

(iii)    Գնորդի կողմից հաստատված վկայագիր առ այն, բացի այդ վկայագրում այլ կերպ սահմանված դեպքերի, սույն Պայմանագրով ներկայացված Գնորդի յուրաքանչյուր հավաստումները եւ երաշխիքները ճիշտ են եղել բոլոր առումներով սույն Պայմանագրի ամսավվի դրությամբ եւ ճիշտ են բոլոր առումներով Կատարման Ամսաթվի դրությամբ համարելով որ արվել են Կատարման Ամսաթվի դրությամբ, եւ

3.  **REPRESENTATIONS AND WARRANTIES OF SELLERS.** Sellers represent and warrant to Buyer as follows:

### 3.1  <u>Organization and Good Standing</u>.

(a)  Part 3.1 of the Disclosure Letter contains a complete and accurate list for the Acquired Company of its name, its jurisdiction of incorporation, other jurisdictions in which it is authorized to do business, and its capitalization (including the identity of each participant and the number of shares held by each).  The Acquired Company is a company duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, with full company power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under Applicable Contracts.  The Acquired Company is duly qualified to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

3.  ՎԱՃԱՌՈՂՆԵՐԻ ՀԱՎԱՍՏՈՒՄՆԵՐԸ ԵՒ ԵՐԱՇԽԻՔՆԵՐԸ: Վաճառողները Գնորդին հավաստում եւ երաշխավորում են հետեւյալը.

### 3.1  Կազմավորում եւ Պատշաճ Վիճակ:

(ա)  Բացահայտման Նամակի Բաժին 3.1-ը պարունակում է լիրվ եւ ճիշտ ցուցակ Ներառելով Ձեռքբերված Ընկերության անունը, նրա կազմավորման օրենսդրությունը, այլ երկրների օրենսդրությունների համաձայն գործունեության ծավալելու իրավունքը, եւ նրա կապիտալիզացիան (ներառյալ յուրաքանչյուր մասնակցի ինքնությունը եւ յուրաքանչյուր մասանկցի բաժնեմասերի քանրը): Ձեռքբերված Ընկերությունը պատշաճ կերպով կազմավորված եւ գրանցված է, իրականականորեն գոյություն ունի, եւ գտնվում է պատշաճ վիճակում իր կազմավորման օրենդրության համաձայն, ունի իր գործունեությունը ամբողջությամբ վարելու՝ ինչպես որ այն վարվում է ներկայումս, ցանկացած գույքեր եւ միջոցներ տնօրինելու եւ օգտագործելու, եւ Կիրառելի Պայմանագրերի համաձայն իր բոլոր պարտավորությունները կատարելու իշխանություն եւ իրավասություն: Ձեռքբերված Ընկերությունը պատշաճ կերպով իրավասու է գործելու որպես օտարերկրյա կորպորացիա եւ պատշաճ վիճակում է յուրաքանչյուր օրենդրության համաձայն՝ որոնց համաձայն նրա կողմից տնօրինված կամ օգտագործվող գույքի կամ տնօրինումը կամ օգտագործումը, կամ նրա կողմից իրականացվող գործունեության տեսակները կպահանջեն նման

19

 իրավունակություն:

(բ) Վաճառողները Գ-նորդին տրամադրել են Ձեռքբերված Ընկերության Կազմակերպման Փաստաթղթերի պատճեները՝ ներկայումս իրավական ուժ ունեցող տեսքով:

(b) Sellers have delivered to Buyer copies of the Organizational Documents of the Acquired Company, as currently in effect.

**3.2 Authority; No Conflict.**

3.2 Լիազորություն; Շահերի Բախման Բացակայություն:

(a) This Agreement constitutes the legal, valid, and binding obligation of Sellers, enforceable against Sellers in accordance with its terms. Upon the execution and delivery by Sellers of the documents identified in Article 2.4(a) above, (collectively, the "Sellers' Closing Documents"), the Sellers' Closing Documents will constitute the legal, valid, and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms. Sellers have the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and the Sellers' Closing Documents and to perform their obligations under this Agreement and the Sellers' Closing Documents.

(ա) Սույն Պայմանագիրը սահմանում է Վաճառողների իրավական, պատշաճ և Վաճառողներին պարտավորեցնող պարտավորություն՝ Վաճառողների ընկատմամբ կիրառելի իր դրույթների համաձայն: Վաճառողների կողմից վերը նշված Հոդված 2.4(ա)-ում սահմանված փաստաթղթերի ստորագրումից և տրամադրումից հետո (միասնաբար՝ «Վաճառողների Կատարման Փաստաթղթեր»), Վաճառողների Կատարման Փաստաթղթերը կսահմանեն Վաճառողների իրավական, պատշաճ և պարտավորեցնող պարտավորությունները՝ Վաճառողների հանդեպ կիրառելի իրենց համապատասխան դրույթների համաձայն: Վաճառողներն ունեն բացարձակ և անսահմանափակ իրավունք, իշխանություն, իրավասություն, և ունակություն ստորագրելու և կատարելու սույն Պայմանագիր և Վաճառողների Կատարման Փաստաթղթերը և կատարելու սույն Պայմանագրով և Վաճառողների Կատարման Փաստաթղթերով սահմանված իրենց պարտավորությունները:

(b) Except as set forth in Part 3.2 of the Disclosure Letter, neither the execution and delivery of this Agreement nor the

(բ) Բացի Բացահայտման Նամակի Բաժին 3.1-ում նշվածից, սույն Պայմանագրի ստորագրումը և կատարումը, կամ

20

of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time):

    (i)    contravene, conflict with, or result in a violation of any provision of the Organizational Documents of the Acquired Company, or (B) any resolution adopted by the board of directors or the stockholders of the Acquired Company;

    (ii)    contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under, any Legal Requirement or any Order to which the Acquired Company or a Seller, or any of the assets owned or used by the Acquired Company, may be subject;

    (iii)    contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate,

որեւէ Նախատեսված Գործարքների իրականացումը կամ կատարումը՝ ուղղակիորեն կամ անուղղակիորեն (ծանուցմամբ կամ առանց դրա, կամ ժամանակի ընթացքում).

    (i)    չի հակասի, բախմանă մեջ գտնվի, կամ խախտման արդյունք հանդիսանա Ձեռքբերված Ընկերության Կազմակերպչական Փաստաթղթերի որեւէ դրույթի, կամ (Բ) Ձեռքբերված Ընկերության տնօրենների խորհրդի կամ բաժնետերերի ժողովի կողմից կայացված որեւէ որոշմանը.

    (ii)    չի հակասի, բախմանă մեջ գտնվի, կամ խախտման արդյունք հանդիսանա, կամ որեւէ Կառավարական Մարմնին կամ այլ Անձին իրավունք վերապահի կասկածի տակ դնել որեւէ Նախատեսված Գործարք կամ Ձեռքբերված Ընկերության կամ որեւէ Վաճառողի, Ձեռքբերված Ընկերության տնօրինմանă կամ օգտագործմանă տակ գտնվող որեւէ գույքի հանդեպ կիրառելի որեւէ Օրենքի Պահանջի կամ Հրամանի հիմանă վրա ձեռք բերի իրավունքի պաշտպանությանă կամ պարտավորությու. ՆՆերի կատարումից ազատման միջոց.

    (iii)    չի հակասի, բախմանă մեջ գտնվի, կամ խախտման արդյունք հանդիսանա, կամ որեւէ Կառավարական Մարմնին իրավունք ընձեռի հետ վերցնել, չեղյալ համարել,

21

suspend, cancel, terminate, or modify, any Governmental Authorization that is held by the Acquired Company or that otherwise relates to the business of, or any of the assets owned or used by, the Acquired Company;

(iv)    cause Buyer or the Acquired Company to become subject to, or to become liable for the payment of, any Tax;

(v)    cause any of the assets owned by the Acquired Company to be reassessed or revalued by any taxing authority or other Governmental Body;

(vi)    contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; or

(vii)    result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by the Acquired Company.

կասեցնել, կանցնեցնել, վերացնել, կամ փոփոխել Ձեռքբերված Ընկերության կամ դրա գործունեության, տնօրինվող կամ օգտագործվող գույքի հետ որևէ կերպ առնչվող որևէ Կառավարական Լիազորությունն կամ դրա որևէ դրույթ կամ պայման;

(iv)    Գնորդին կամ Ձեռքբերված Ընկերությանը չի դարձնի առկա, կամ պատասխանատու վճարելու, որևէ Հարկ;

(v)    առկա չի դարձնի Ձեռքբերված Ընկերության կողմից տնօրինվող որևէ գույք վերագնահատվելու կամ վերաարժեքավորվելու որևէ հարկային մարմնի կամ այլ Կառավարական Մարմնի կողմից;

(vi)    չի հակասի, բախման մեջ գտնվի, կամ խախտման արդյունք հանդիսանա որևէ Կիրառելի Պայմանագրի համար, կամ որևէ Անձին իրավունք չի վերապապահի խախտում ճանաչելու կամ իրավունքի պաշտպանության միջոց ձեռք բերելու, կամ լուծումը կամ կատարումն արագացնելու, կամ դադարեցնելու, լուծելու, չեղյալ համարելու, կամ փոփոխելու որևէ Կիրառելի Պայմանագիր, կամ

(vii)    արդյունք չի հանդիսանա որևէ Ծանրաբեռնման կիրառման կամ ստեղծման համար Ձեռքբերված Ընկերության կողմից տնօրինվող կամ օգտագործվող որևէ գույքի

22

Ընտումամբ կամ հանդեպ:

Except as set forth in Part 3.2 of the Disclosure Letter, no Seller or Acquired Company is or will be required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

Բացի Բացահայտմման Նամակի Բաժին 3.2-ում ներկայացվածից, Վաճառողներից ոչ մեկից կամ Ձեռքբերված Ընկերությունից չի պահանջվում որպեսզի նրանք ծանուցեն կամ Համաձայնություն ձեռք բերեն որևէ Անձից սույն Պայմանագրի ստորագրման ու կատարման կամ Նախատեսված Գործարքներից որևէ մեկի կատարման կամ իրականացման վերաբերյալ:

(c)    Sellers are acquiring the Promissory Notes for their own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act.

(q)   Վաճառողները ձեռք են բերում Մուրհակները իրենց սեփական հաշվին դրանք չբաշխելու նպատակով` համաձայն Արժեթղթերի Ակտի Բաժին 2(11)-ի իմաստի:

**3.3    Capitalization.** Sellers are and will be on the Closing Date the record and beneficial owners and holders of the Shares, free and clear of all Encumbrances. A owns 33% of the Shares, B owns 33% of the Shares, and C owns 34% of the Shares.    No legend or other reference to any purported Encumbrance appears upon any certificate representing equity securities of the Acquired Company. All of the outstanding equity securities of each Acquired Company have been duly authorized and validly issued and are fully paid and nonassessable. There are no Contracts relating to the issuance, sale, or transfer of any equity securities or other securities of the Acquired Company. None of the outstanding equity securities or other securities of the Acquired Company was issued in violation of any other Legal Requirement. The Acquired Company does not own, or has any Contract to

3.3    Կապիտալիզացիա: Վաճառողները հանդիսանում են ու Կատարման Ամսաթվին կհանդիսանան Բաժնեմասերի գրանցված ու շահառու սեփականատերեր, Բաժնեմասերն ազատ ու զերծ լինելով բոլոր Ծանրաբեռնումներից: Ա-ն տնօրինում է Բաժնեմասի 33%-ը, Բ-ն տնօրինում է Բաժնեմասի 33%-ը, Գ-ն տնօրինում է Բաժնեմասի 34%-ը: Ձեռքբերված Ընկերության արժեթղթերը ներկայացնող որևէ վկայագրում չի հիշատակվում կամ այլ կերպ հղում չի կատարվում որևէ նախատեսված Ծանրաբեռնման մասին: Յուրաքանչյուր Ձեռքբերված Ընկերության կանոնադրական արժեթղթերը պատշաճ կերպով լիազորված ու թողարկված են, ամբողջությամբ վճարված են հարկային պատռտավորություններ չեն կրում: Գոյություն չունեն որևէ Պայմանագրեր Ձեռքբերված Ընկերության որևէ կանոնադրական արժեթղթերի կամ այլ արժեթղթերի թողարկման, վաճառքի կամ փոխանցման վերաբերյալ: Ձեռքբերված Ընկերության կանոնադրական

23

does not own, or has any Contract to acquire, any equity securities or other securities of any Person or any direct or indirect equity or ownership interest in any other business.

**3.4**    **Financial Statements**. Sellers have delivered to Buyer any of the following which exist: (a) balance sheets of the Acquired Company as at December 1, 2003 and the related statements of income, changes in stockholders' equity, and cash flow for each of the fiscal years then ended, (b) a balance sheet of the Acquired Company as at December 1, 2003 (including the notes thereto, the "Balance Sheet"), and the related statements of income, changes in shareholders' equity, and cash flow for the fiscal year then ended.

**3.5**    **Books and Records**. The books of account, minute books, share record books, and other records of the Acquired Company, all of which have been made available to Buyer, are complete and correct and have been maintained in accordance with sound business practices and legal requirements, including the maintenance of an adequate system of internal controls. The minute books of the Acquired Company contains accurate and complete records of all meetings held of, and corporate action taken by the Acquired Company, and no meeting has been held for which minutes have not been prepared and are not contained in such minute books. At the Closing, all of those books and records will be in the possession of the Acquired Company.

**3.4**    **Ֆինանսական Հաշվետվություններ**: Վաճառողները Գնորդին տրամադրել են գոյություն ունեցող հետևյալից յուրաքանչյուրը. (ա) Չեռքբերված Ընկերության հաշվեկշիռները 2003թ-ի դեկտեմբերի 1-ի դրությամբ եւ համապատասխանած եկամտահարկի, բաժնետերերի բաժնեմասերի փոփոխության, կանխիկ հոսքերի հաշվետվությունները համապատասխանած տարիների համար, (բ) Չեռքբերված Ընկերության հաշվեկշիռը (ներառյալ նշումները՝ «Հաշվեկշիռ»), եւ համապատասխանած եկամտահարկի, բաժնետերերի բաժնեմասերի փոփոխության, կանխիկ հոսքերի հաշվետվությունները համապատասխանած տարիների համար:

**3.5**    **Հաշվապահական Գրքեր եւ Գրանցումներ**: Չեռքբերված Ընկերության հաշվապահական գրքերը, արձանագրությունների գրքերը, բաժնեմասերի գրանցման գրքերը, եւ այլ գրքերը՝ բոլորը տրամադրված լինելով ներկայացվել են Գնորդին, ամբողջական եւ ճիշտ են եւ վարվել են գործարար լավագույն սովորույթների եւ իրավական պահանջների համաձայն, ներառյալ կիրառելով ներքին վերահսկողության համապատասխանած համակարգ: Չեռքբերված Ընկերության արձանագրությունների գրքերը ներառում են Չեռքբերված Ընկերության կողմից հրավիրված բոլոր ժողովների, եւ ձեռնարկատիրական որոշումների կայացման մասին ճիշտ եւ ամբողջական արձանագրությունները, եւ չեն հրավիրվել ժողովներ որոնց արձանագրությունները չեն կազմվել եւ չեն ներառվել այս

Acquired Company.

### 3.6 Title to Properties; Encumbrances.
Part 3.6 of the Disclosure Letter contains a complete and accurate list of all real property, leaseholds, licenses, or other interests therein owned by the Acquired Company. Sellers have delivered to Buyer copies of the deeds and other instruments (as recorded) by which the Acquired Company acquired such real property and interests, and copies of all title insurance policies, opinions, abstracts, and surveys in the possession of Sellers or the Acquired Company and relating to such property or interests. The Acquired Company owns (with good and marketable title in the case of real property, subject only to the matters permitted by the following sentence) all the properties, licenses, and assets (whether real, personal, or mixed and whether tangible or intangible) that it purports to own located in the facilities owned or operated by the Acquired Company or reflected as owned in the books and records of the Acquired Company, including all of the properties and assets reflected in the Balance Sheet and the Interim Balance Sheet (except for assets held under capitalized leases disclosed or not required to be disclosed in Part 3.6 of the Disclosure Letter and personal property sold since the date of the Balance Sheet and the Interim Balance Sheet, as the case may be, in the Ordinary Course of Business), and all of the properties and assets purchased or otherwise acquired by the Acquired Company since the date of the Balance Sheet (except for personal property acquired and sold since the date of the Balance Sheet in the Ordinary Course of Business and consistent with past practice).

արձանագրությունների գրքերի մեջ։ Կատարման պահին բոլոր նման գրքերն ու գրանցումները կլինեն Ձեռքբերված Ընկերության տրամադրության տակ։

### 3.6 Գույքի Նկատմամբ Սեփականության Իրավունքը; Ծանրաբեռնումներ: Բացահայտման Նամակի Բաժին 3.6-ը ներառում է Ձեռքբերված Ընկերության տնօրինման տակ գտնվող բոլոր անշարժ գույքի, վարձակալությունների, լիցենզիաների, կամ այլ շահերի ամբողջական եւ ճիշտ ցուցակը։ Վաճառողները Գնորդին են տրամադրել Ձեռքբերված Ընկերության բոլոր փաստաթղթերի եւ այլ գործառքների պատճեները (գրանցումների համաձայն) որոնց համաձայն ձեռք են բերվել այդ անշարժ գույքը եւ շահերը, ինչպես նաեւ Վաճառողների կամ Ձեռքբերված Ընկերության տրամադրության տակ գտնվող, նշված գույքի կամ շահերի սեփականության վերաբերյալ ապահովագրական պոլիսների, մասնագիտական կարծիքների, համառոտ նկարագրությունների կամ ուսումնասիրությունների պատճեները։ Ձեռքբերված Ընկերությունն տնօրինում է (անշարժ գույքի մասով ամբողջական եւ ֆիկվիդային՝ հետեւյալ նախապատառությունում սահմանված բացառություններին առկա միայն) Ձեռքբերված Ընկերության տարածքում տեղադրված կամ Ձեռքբերված Ընկերության գրքերում եւ գրանցումներում որպես այդպիսին՝ արտացոլված՝ որպես սեփականություն դիտվող ամբողջ գույքը, լիցենզիաներ եւ միջոցները (լինեն դրանք անշարժ, շարժական, կամ խառը, եւ նյութական կամ ոչ նյութական), ներառյալ Հաշվեկշռում եւ Նախնական Հաշվեկշռում արտացոլված գույքը եւ միջոցները (բացառությամբ Բացահայտման Նամակի Բաժին 3.6-ում բացահայտված կամ բացահայտման անհրաժեշտություն չունեցող՝ կապիտալացված վարձակալության տակ գտնվող միջոցները եւ Գործունեության Բնականոն Ընթացքում Հաշվեկշռի կամ Նախնական Հաշվեկշռի ամսաթվից հետո վաճառված շարժական

25

Business and consistent with past practice). All material properties and assets reflected in the Balance Sheet and the Interim Balance Sheet are free and clear of all Encumbrances and are not, in the case of real property, subject to any rights of way, building use restrictions, exceptions, variances, reservations, or limitations of any nature except, with respect to all such properties and assets, (a) mortgages or security interests shown on the Balance Sheet or the Interim Balance Sheet as securing specified liabilities or obligations, with respect to which no default (or event that, with notice or lapse of time or both, would constitute a default) exists, (b) mortgages or security interests incurred in connection with the purchase of property or assets after the date of the Interim Balance Sheet (such mortgages and security interests being limited to the property or assets so acquired), with respect to which no default (or event that, with notice or lapse of time or both, would constitute a default) exists, (c) liens for current taxes not yet due, and (d) with respect to real property, (i) minor imperfections of title, if any, none of which is substantial in amount, materially detracts from the value or impairs the use of the property subject thereto, or impairs the operations of the Acquired Company, and (ii) zoning laws and other land use restrictions that do not impair the present or anticipated use of the property subject thereto. All buildings, plants, and structures owned by the Acquired Company lies wholly within the boundaries of the real property owned by the Acquired Company and do not encroach upon the property of, or otherwise conflict with the property rights of, any other Person.

գույքը), եւ Ձեռքբերված Ընկերության կողմից Հաշվեկշռի ամսաթվից հետո գնված ամբողջ գույքը եւ միջոցները (բացառությամբ Գործունեության Ընականան Ընթացքում եւ նախկին գործունեությանը համապատասխան Հաշվեկշռի ամսաթվից հետո գնված եւ վաճառված շարժական գույքը): Հաշվեկշռում եւ Նախնական Հաշվեկշռում արտացոլված բոլոր նյութական ամեներիլլ եւ միջոցներն ազատ եւ զերծ են բոլոր Ծանրաբեռնումներից եւ, անշարժ գույքի դեպքում, առկա չեն սերվիտուտների, կառուցվածքի օգտագործման սահմանափակումների, բացառությունների, վեճերի, կամ որեւէ բնույթի սահմանափակումների բացի, այդ գույքի եւ միջոցների մասով, (ա) Հաշվեկշռում կամ Նախնական Հաշվեկշռում որպես տվյալ պարտավորությունները կամ պարտականությունները ապահովող արտացոլված գրավները կամ գրավադրումները , որոնց նկատմամբ գոյություն չունի որեւէ խախտում (կամ դեպք որը, ծանուցմամբ կամ ժամանակի ընթացքում կամ երկու դեպքում էլ, կհամարվեր խախտում), (բ) գրավներ կամ գրավադրումներ որոնք առաջացել են գույքի կամ միջոցների գնման արդյունքում Նախնական Հաշվեկշռի ամսաթվից հետո (գրավները եւ գրավադրումները տարածվելով բացառապես գնված գույքի կամ միջոցների վրա), որոնց նկատմամբ գոյություն չունի որեւէ խախտում (կամ դեպք որը, ծանուցմամբ կամ ժամանակի ընթացքում կամ երկու դեպքում էլ, կհամարվեր խախտում), (գ) ընթացիկ հարկերի վճարման ժամկետը դեռ չի մոտեցել, եւ (դ) անշարժ գույքի մասով (i) սեփականության չնչին թերությունները, եթե կան, որոնցից ոչ մեկը գումարի իմաստով զգալի չէ, նյութականորեն չեն պակասեցնում շրջված գույքի արժեքը կամ բացասաբար չեն ազդում դրա օգտագործման վրա, կամ բացասաբար չեն ազդում Ձեռքբերված Ընկերության գործունեության վրա, եւ (ii) գոտիավորման օրենքները եւ հողի օգտագործման այլ սահմանափակումները բացասաբար չեն ազդում սույնի առաջկա գույքի ներկա կամ սպասվող օգտագործման վրա: Ձեռքբերված

Ընկերության կողմից տնօրինվող թույլ ձեռքերը, գործառանմերը, եւ կառույցները տեղակայված են Ձեռքբերված Ընկերության կողմից տնօրինվող անշարժ գույքի սահմաններից ներս, եւ չեն տպավածվում կամ այլ կերպ բախման մեջ չեն գտնվում այլ Անձի գույքի վրա կամ դրա գույքային իրավունքների հետ:

**3.7    Condition and Sufficiency of Assets.** The buildings, plants, structures, and equipment of the Acquired Company are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, or equipment is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The building, plants, structures, and equipment of the Acquired Company are sufficient for the continued conduct of the Acquired Company's business after the Closing in substantially the same manner as conducted prior to the Closing.

3.7    Գույքի Վիճակը եւ Բավարարությունը: Ձեռքբերված Ընկերության շենքերը, գործառանմերը, կառույցները, եւ սարքավորումները կառուցվածքայնի տեսանկյունից պատշաճ վիճակում են, աշխատանքայնի լավ վիճակում եւ վերանորոգված են, եւ համապատասխանում են իրենց օգտագործման նպատակին, եւ այդ շենքերից, գործառանմերից, կառույցներից կամ սարքավորումներից ոչ մեկը կարիք չունի վերանորոգման կամ նորոգման բացի սովորական, առժամանակյա սպասարկումը եւ վերանորոգումը որը իր բնույթով կամ արժեքով էական չէ: Ձեռքբերված Ընկերության շենքերը, գործառանմերը, կառույցները, եւ սարքավորումները բավարար են Ձեռքբերված Ընկերության չարունակական գործունեության համար Կատարումից հետո հիմնականրեն նույն ձեռով ինչպես իրականացվել է մինչեւ Կատարումը:

**3.8    Accounts Receivable.** All accounts receivable of the Acquired Company that are reflected on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Acquired Company as of the Closing Date (collectively, the "Accounts Receivable") represent or will represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Unless paid prior to the Closing Date, the Accounts Receivable are or will be as of the Closing Date current and collectible net of the respective reserves shown on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Acquired Company as of the

3.8    Ստացվող Հասույթ: Ձեռքբերված Ընկերության Հաշվեկշռում կամ Նախնական Հաշվեկշռում արտացոլված ամբողջ ստացվող հասույթը Կատարման Ամսաթվի դրությամբ (միասնաբար՝ «Ստացվող Հասույթ») ներկայացնում է կամ կներկայացնի Գործունեության Բնականոն Ընթացքում փաստացիորեն կատարված վաճառքի կամ ծառայությունների մատուցումից առաջացած պատշաճ պարտավորություններ: Բացի մինչեւ Կատարման Ամսաթիվն վճարված լինելու դեպքերից, Ստացվող Հասույթը Կատարման Ամսաթվի դրությամբ հանդիսանում է, կամ կհանդիսանա ընթացիկ եւ ստացման տեսանկյունից հուսալի պարտավորություն ինչպես

27

records of the Acquired Company as of the Closing Date (which reserves are adequate and calculated consistent with past practice and, in the case of the reserve as of the Closing Date, will not represent a greater percentage of the Accounts Receivable as of the Closing Date than the reserve reflected in the Interim Balance Sheet represented of the Accounts Receivable reflected therein and will not represent a material adverse change in the composition of such Accounts Receivable in terms of aging). Subject to such reserves, each of the Accounts Receivable either has been or will be collected in full, without any set-off, within ninety days after the day on which it first becomes due and payable. There is no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable. Part 3.8 of the Disclosure Letter contains a complete and accurate list of all Accounts Receivable as of the date of the Interim Balance Sheet, which list sets forth the aging of such Accounts Receivable.

3.9    **Inventory**. All inventory of the Acquired Company, whether or not reflected in the Balance Sheet or the Interim Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course of Business, except for obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value in the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Acquired Company as of the Closing Date, as the case may be. All inventories not written off have been priced at the lower of cost or market value basis. The quantities

ներկայացված է Հաշվեկշռում եւ Նախնական Հաշվեկշռում կամ Ձեռքբերված Ընկերության հաշվապահական գրանցումներում Կատարման Ամսաթվի դրությամբ (որոնք համապատասխանում են եւ հաշվարկված են անցած ժամանակաշրջանների փորձի համաձայն, եւ Կատարման Ամսաթվին որպես սպասվելիք գրանցված լինելու դեպքում, դրանք զումարող Սպասվող Հաշույթի առավել մեծ մաս չեն լինի քան նշված է Հաշվեկշռում կամ Նախնական Հաշվեկշռում եւ չի փոխի Սպասվող Հաշույթի կազմը ժամանակի ընթացքում): Նշված գրանցումների պայմանով, Սպասվող Հաշույթից յուրաքանչյուրը կամ արդեն ամբողջապես ստացվել է, կամ էլ ամբողջապես կստացվի, առանց հաշվանցման, վճարման ենթակա դառնալու ամսաթվից ինnamed օրվա ընթացքում: Գոյություն չունի որեւէ անհամաձայնություն, հայց, կամ հաշվանցման իրավունք, բացի Գործունեության Բնականոն Ընթացքում վճարվելուց, որեւէ Պայմանագրի համաձայն որեւէ պարտապանի հետ Սպասվող Հաշույթի մասով՝ կապված Սպասվող Հաշույթի ստացվելիք զումարների հետ: Բացահայտ ման Նամակի Բաժին 3.8-ը ներառում է ամբողջ Սպասվող Հաշույթի ամբողջ եւ ճիշտ ցուցակը Նախնական Հաշվեկշռի ամսաթվի դրությամբ, որը ներկայացնում է Սպասվող Հաշույթերի ստացման ժամանակացույցը:

3.9    **Մնացորդ**. Ձեռքբերված Ընկերության բոլոր մնացորդները, անկախ Հաշվեկշռում կամ Նախնական Հաշվեկշռում արտացոլված լինելու հանգամանքից, բաղկացած են Գործունեության Բնականոն Ընթացքում օգտագործելի եւ իրացվելի որակից եւ քանակից, բացառությամբ փախնունությունը կորցրած եւ ցածորակ մ ակավորներից, որոնք բոլորը դուրս են գրվել կամ գրանցվել են իրենց իսկ իրացնելֆ արժեքով Հաշվեկշռում կամ Նախնական Հաշվեկշռում կամ Ձեռքբերված Ընկերության հաշվապահական գրանցումներում Կատարման Ամսաթվի դրությամբ, կախված դեպքից: Դուրս չգրված բոլոր մնացորդները

cost or market value basis. The quantities of each item of inventory (whether raw materials, work-in-process, or finished goods) are not excessive, but are reasonable in the present circumstances of the Acquired Company.

3.10 **No Undisclosed Liabilities**. Except as set forth in Part 3.10 of the Disclosure Letter, the Acquired Company has no liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent, or otherwise) except for liabilities or obligations reflected or reserved against in the Balance Sheet or the Interim Balance Sheet.

3.11 **Taxes.**

(a)    The Acquired Company has filed or caused to be filed all Tax Returns that are or were required to be filed by or with respect to any of it, either separately or as a member of a group of corporations, pursuant to applicable Legal Requirements. Sellers have delivered to Buyer copies of, and Part 3.11 of the Disclosure Letter contains a complete and accurate list of, all such Tax Returns. The Acquired Company has paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to those Tax Returns or otherwise, or pursuant to any assessment received by the Acquired Company, except such Taxes, if any, as are listed in Part 3.11 of the Disclosure Letter and are being contested in good faith and as to which adequate reserves have been provided in the Balance Sheet and the Interim Balance

գնահատովել են իրենց շուկայական ամենացածր արժեքով: Մնացորդի յուրաքանչյուր միավորի ծավալները (լինի դա հումք, կիսաարտադրանք, կամ պատրաստի արտադրանք) չափից ավելի չեն, սակայն ողջամիտ են ներկա Ձեռքբերված Ընկերության ներկա իրավիճակում:

3.10 Չբացահայտված Պարտավորությունների Բացակայություն: Բացի Բացահայտման Նամակի Բաժին 3.10-ում նշվածից, Ձեռքբերված Ընկերությունը չունի որևէ պարտավորություն կամ որևէ բնույթի պարտք (լինի դա հայտնի թե անհայտ, իրական, տոկոսով բարդված, պայմանով, կամ այլ ձև) բացի Հաշվեկշռում կամ Նախնական Հաշվեկշռում արտացոլված կամ նախատեսված պարտավորություններից և պարտքերից:

3.11 Հարկեր:

(ա)    Ձեռքբերված Ընկերությունը ներկայացրել է, կամ ներկայացնել է տվել բոլոր Հարկային Հաշվետվությունները որոնք անհրաժեշշտ են, կամ եղել են անհրաժեշշտ ներկայացման իր կողմից կամ իր հետ կապակցված, լինի դա առանձին կամ որպես ընկերությունների խմբի միջոցով ներկայացված, գործող Օրենքի Պահանջի համաձայն: Վաճառողները Գնորդին են տրամադրել պատճեններ, և Բացահայտիման Նամակի Բաժին 3.11-Ը իր մեջ ներառում է ամբողջական և ճիշշտ ցուցակը բոլոր նման Հարկային Հաշվետվությունների: Ձեռքբերված Ընկերությունը վճարել է, կամ հատկացրել է վճարելու համար, բոլոր Հարկերը որոնք պետք է կամ հնարավոր է որ առկա լինելի վճարման համար համաձայն այդ Հարկային Հաշվետվությունների կամ այլ կերպ, կամ Ձեռքբերված Ընկերության որևէ ստուգման համաձայն, բացի Հարկերից, եթե

Sheet and the Interim Balance Sheet.

(b)    The Tax Returns of the Acquired Company subject to such Taxes have been audited by all the relevant authorities or are closed by the applicable statute of limitations for all taxable years through the date of Closing.  Part 3.11 of the Disclosure Letter contains a complete and accurate list of all audits of all such Tax Returns, including a reasonably detailed description of the nature and outcome of each audit.  All deficiencies proposed as a result of such audits have been paid, reserved against, settled, or, as described in Part 3.11 of the Disclosure Letter, are being contested in good faith by appropriate proceedings.  Part 3.11 of the Disclosure Letter describes all adjustments for all taxable years since 1999.  Except as described in Part 3.11 of the Disclosure Letter, no Seller or Acquired Company has given or been requested to give waivers or extensions (or is or would be subject to a waiver or extension given by any other Person) of any statute of limitations relating to the payment of Taxes of the Acquired Company or for which the Acquired Company may be liable.

այդպիսիք կան, որոնք ներկայացված են Բացահայտման Նամակի Բաժին 3.11-ում եւ որոնց վճարումը վիճարկվում է բարի կամքով եւ որոնց վճարման համար համապատասխանել մնացորդներ պահվել են Հաշվեկշռում եւ Նախնական Հաշվեկշռում:

(բ)    Հարկերի վերաբերյալ Ձեռքբերված Ընկերության Հարկային Հաշվետվությունները ենթարկվել են աուդիտի բոլոր համապատասխան մարմինների կողմից կամ փակվել են գործող հայցային վաղեմության պատճառով հարկվող բոլոր տարիների համար մինչեւ Կատարման ամսաթիվը: Բացահայտման Նամակի Բաժին 3.11-ը ներառում է Հարկային Հաշվետվությունների բոլոր ստուգումների ամբողջական եւ ճիշտ ցուցակը, ներառյալ յուրաքանչյուր ստուգման արդյունքի ողջամտորեն մանրամասն նկարագրությունը: Յուրաքանչյուր ստուգման արդյունքում առաջարկված բոլոր տարբերությունները վճարվել, հատկացվել, հաշտեցվել են, կամ, ինչպես նկարագրված է Բացահայտման Նամակի Բաժին 3.11-ում, վիճարկվում են բարի կամքով համապատասխան վարույթներում: Բացահայտման Նամակի Բաժին 3.11-ը նկարագրում է հարկային տարիների համար կատարված բոլոր ճշգրտումները 1999թ-ից սկսած: Բացի Բացահայտման Նամակի Բաժին 3.11-ում նկարագրվածից, Ձեռքբերված Ընկերությունից կամ որեւէ Վաճառողից չի պահանջվել հրաժարվել հայցային վաղեմության որեւէ ժամկետից կամ երկարացնել հայցային որեւէ ժամկետ (կամ չեն ենթարկվում կամ չեն ենթարկվել որեւէ Անձի կողմից հայցային որեւէ ժամկետից հրաժառման կամ հայցային որեւէ ժամկետի երկարացման) որը վերաբերվում է

Չեռքերըվաձ Ընկերութyան Հարկերի, կամ Հարկերի դունց վճարման համար Չեռքերըվաձ Ընկերությունը կարող է պարտավորված համարվել, վճարմանը:

(c)     The charges, accruals, and reserves with respect to Taxes on the respective books of the Acquired Company are adequate and are at least equal to the Acquired Company's liability for Taxes.  There exists no proposed tax assessment against the Acquired Company except as disclosed in the Balance Sheet or in Part 3.11 of the Disclosure Letter. All Taxes that the Acquired Company is or was required by Legal Requirements to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Body or other Person.

(q)     Չեռքերըվաձ Ընկերությyան համապատասխան գրքերում Հարկերի մասով կատարված գանձումները, հավելումները եւ հատկացումները շվարկները համապատասխան են եւ առնվազն հավասար են Հարկերի մասով Չեռքերըվաձ Ընկերությyան պարտավորությանը: Չեռքերըվաձ Ընկերությyան ընկատմամբ գոյություն չունի իրականացված որեեե ստուգում բացի Հաշվեկշռում արտացոլվածները կամ Բացահայտման Նամակի Բաժին 3.11-ում ներկայացվածները: Բոլոր Հարկերը, որոնք Չեռքերըվաձ Ընկերությyուն Օրենքի Պահանջի համաձայն պետք է պահեր կամ ստանար պատշաճ կերպով պահվել կամ ստացվել են եւ, պահանջվող չափով, վճարվել են համապատասխան Կառավարական Մարմնին կամ այլ Անձին:

(d)     All Tax Returns filed by (or that include on a consolidated basis) the Acquired Company are true, correct, and complete.  There is no tax sharing agreement that will require any payment by the Acquired Company after the date of this Agreement.

(դ)     Չեռքերըվաձ Ընկերությyան կողմից ներկայացված (կամ միասնական ձեւով ներկայացված) բոլոր Հարկային Հաշվետվությունները ճիշտ են, ճշմարիտ են, եւ ամբողջական են: Գոյություն չունի հարկերի բաժանմման որեեե պայմանագիր համաձայն որի կպահանջվեն վճարումներ Չեռքերըվաձ Ընկերությyան կողմից սույն Պայմանագրի ամսաթվից հետո:

**3.12    No Material Adverse Change.**  Since the date of the Balance Sheet, there has not been any adverse change in the business, operations, properties, prospects, assets, or condition of the Acquired Company, and no event

3.12    Նյութական Բացասական Փոփոխության Բացակայություն: Հաշվեկշռի ամսաթվից սկսած, չի եղել Չեռքերըվաձ Ընկերությyան գործունեության, աշխատանքների, գույքերի, հեռանկարների, միջոցների, կամ

31

of the Acquired Company, and no event has occurred or circumstance exists that may result in such a material adverse change.

վիճակի բացասական փոփոխություն, եւ չի պատասահել որեւէ դեպք կամ գոյություն չունի որեւէ հանգամանք որի արդյունքում կարող է սեղել ունենալ նման նյութական բացասական փոփոխությունը:

3.13    **Employee benefits.**

3.13    Աշխատողների Արտոնություններ:

(a)    Part 3.13(i) of the Disclosure Letter contains a complete and accurate list of all Company employee benefit plans and obligations.

(ա)    Բացահայտման Նամակի Բաժին 3.13(i)-ը ներառում է Ընկերության աշխատողների արտոնությունների եւ դրա վերաբերյալ պարտավորությունների ամբողջական եւ ճիշտ ցուցակը:

(b)    The consummation of the Contemplated Transactions will not result in the payment, vesting, or acceleration of any benefit.

(բ)    Նախատեսված Գործարքների իրականացումն արդյունք չի հանդիսանա որեւ արտոնության վճարման, տրման կամ ծավալման համար:

3.14    **Compliance with Legal Requirements; Governmental Authorizations.**

3.14    Օրենքի Պահանջի Ենթարկվելը; Կառավարական Լիազորություններ:

(a)    Except as set forth in Part 3.14 of the Disclosure Letter:

(ա)    Բացի Բացահայտման Նամակի Բաժին 3.14-ում ներկայացվածի:

(i)    The Acquired Company is, and at all times has been, in full compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets;

(i)    Ձեռքբերված Ընկերությունը ամբողջովին ենթարկվում է, եւ բոլոր ժամանակներում ամբողջովին ենթարկվել է իրեն, իր գործունեության կամ դրա վարմանը, իր ցանկացած միջոցների տնօրինմանը կամ օգագործմանը վերաբերող յուրաքանչյուր Օրենքի Պահանջին;

(ii)    no event has occurred or circumstance exists that (with or without

(ii)    տեղի չի ունեցել որեւէ դեպք կամ գոյություն չունի որեւէ

32

exists that (with or without notice or lapse of time) (A) may constitute or result in a violation by the Acquired Company of, or a failure on the part of the Acquired Company to comply with, any Legal Requirement, or (B) may give rise to any obligation on the part of the Acquired Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature; and

(iii)    The Acquired Company has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement, or (B) any actual, alleged, possible, or potential obligation on the part of the Acquired Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(b)    Part 3.14 of the Disclosure Letter contains a complete and accurate list of each Governmental Authorization that is held by the Acquired Company or that otherwise relates to the business of, or to any of the assets owned or used by, the Acquired Company. Each Governmental Authorization listed or required to

հանգամանք որը (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում) (Ա) կարող է համայել կամ արդյունք հանդիսանալ Ձեռքբերված Ընկերության կողմից որեևէ Օրենքի Պահանջի խախտման կամ չենթարկվելուն, եւ (Բ) կարող է առաջացնել Ձեռքբերված Ընկերության կողմից որեևէ. բնույթի փոխհատուցման գործողության կամ դրա որեևէ մասի կատարման, եւ

(iii)    Ձեռքբերված Ընկերությունը չի ստացել, երբեւէ, որեևէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որեևէ Կառավարական Մարմնից կամ այլ Անձից որը վերաբերվում է (Ա) որեևէ Օրենքի Պահանջի որեևէ փաստացի, պախատանդրվող, հնարավոր կամ պոտենցիալ խախտմանը, կամ դրան չենթարկվելուն, կամ (Բ) Ձեռքբերված Ընկերության կողմից որեևէ փաստացի, պախատադրվող, հնարավոր, կամ պոտենցիալ պարտավորությանը հատուցելու, կամ ամբողջովին կամ մասամբ վճարելու որեևէ բնույթի որեևէ փոխհատուցում:

(բ)    Բացահայտման Նամակի Բաժին 3.14-ը ներառում է Ձեռքբերված Ընկերությանը պատկանող կամ նրա գործունեության, միջոցների տնօրինմանը կամ օգտագործմանը վերաբերող բոլոր Կառավարական Լիազորությունների ամբողջական եւ ճիշտ ցուցակը: Բացահայտման Նամակի Բաժին 3.14-ում

Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter is valid and in full force and effect. Except as set forth in Part 3.14 of the Disclosure Letter:

(i)     The Acquired Company is, and at all times has been, in full compliance with all of the terms and requirements of each Governmental Authorization identified or required to be identified in Part 3.14 of the Disclosure Letter;

(ii)     no event has occurred or circumstance exists that may (with or without notice or lapse of time) (A) constitute or result directly or indirectly in a violation of or a failure to comply with any term or requirement of any Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter, or (B) result directly or indirectly in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter;

ներկայացված կամ ներկայացման ենթակա յուրաքանչյուր Կառավարական Լիազորություն իսկական է եւ ունի լրիվ իրավական ուժ եւ ունակություն։ Բացի Բացահայտման Նամակի Բաժին 3.14-ում ներկայացվածի՝

(i)     Ձեռքբերված Ընկերությունը ամբողջությամբ ենթարկվում եւ բոլոր ժամանակներում ամբողջությամբ ենթարկվել է Բացահայտման Նամակի Բաժին 3.14-ում ներկայացված կամ ներկայացման ենթակա յուրաքանչյուր Կառավարական Լիազորության բոլոր պայմաններին եւ պահանջներին,

(ii)     տեղի չի ունեցել որեւէ դեպք եւ գոյություն չունի որեւէ հանգամանք որը կարող է (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում) (Ա)ուղղակիորեն կամ անուղղակիորեն հանղիսանա կամ պատառա դառնա Բացահայտման Նամակի Բաժին 3.14-ում ներկայացված կամ ներկայացման ենթակա որեւէ Կառավարական Լիազորության որեւէ պայմանի կամ պահանջի խախտման կամ չենթարկվելուն, կամ (Բ) ուղղակիորեն կամ անուղղակիորեն պատառա հանղիսանա Բացահայտման Նամակի Բաժին 3.14-ում ներկայացված կամ ներկայացման ենթակա որեւէ Կառավարական Լիազորության չեղյալ

34

հայտարարելուն, հետ վերցնելուն, առկախմանը, չեզոքացմանը, կամ վերացմանը, կամ փոփոխմանը:

(iii)    The Acquired Company has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with any term or requirement of any Governmental Authorization, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Governmental Authorization; and

(iv)    all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Part 3.14 of the Disclosure Letter have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been

(iii)    Ձեռքբերված Ընկերությունը չի ստացել, երբևէ, որևէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որևէ Կառավարական Մարմնից կամ այլ Անձից որը վերաբերվում է (Ա) որևէ Կառավարական Լիազորության որևէ պաշոնճի կամ պահանջի որևէ փաստացի, պարտադրվող, հնարավոր կամ պոտենցիալ խախտմանը, կամ դրան չենթարկվելուն, կամ (Բ) որևէ Կառավարական Լիազորության որևէ փաստացի, պարտադրվող, հնարավոր, կամ պոտենցիալ չեղյալ հայտարարելուն, հետ վերցնելուն, առկախմանը, չեզոքացմանը, կամ վերացմանը, կամ փոփոխմանը, և

(iv)    Բացահայտման Նամակի Բաժին 3.14-ում ցերկայացված կամ ներկայացման ենթակա Կառավարական Լիազորությունների նորացման համար պահանջվող բոլոր դիմումները պատշաճ կերպով և ժամանակին ներկայացվել են համապատասխան Կառավարական Մարմիններին, և այդ Կառավարական Լիազորությունների

Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies.

կապակցությամբ պահանջվող բոլոր այլ գրանցումները պատշաճ կերպով եւ ժամանակին կատարվել են համապատասխան Կառավարական Մարմինների մոտ:

The Governmental Authorizations listed in Part 3.14 of the Disclosure Letter collectively constitute all of the Governmental Authorizations necessary to permit the Acquired Company to lawfully conduct and operate their businesses in the manner they currently conduct and operate such businesses and to permit the Acquired Company to own and use their assets in the manner in which they currently own and use such assets.

Բացահայտման Նամակի Բաժին 3.14-ում ներկայացված Կառավարական Լիազորությունները միասնաբար հանդիսանում են այն բոլոր Կառավարական Լիազորությունները, որոնք անհրաժեշտ են Ձեռքբերված Ընկերության գործունեությունը օրինականորեն վարելու համար այնպես ինչպես վարվում է տվյալ պահին, ինչպես նաեւ Ձեռքբերված Ընկերությանը թույլ տալու համար որպեսզի այն տնօրինի եւ օգտագործի իր միջոցները այնպես ինչպես այն տնօրինվում եւ օգտագործվում է ներկա պահին:

3.15    **Legal Proceedings; Orders.**

3.15    Իրավական Վարույթներ; Հրամաններ

(a)    Except as set forth in Part 3.15 of the Disclosure Letter, there is no pending Proceeding:

(ա)    Բացահայտման Նամակի Բաժին 3.15-ում նշվածից բացի գոյություն չունեն ընթացքում գտնվող Վարույթներ՝

(i)    that has been commenced by or against the Acquired Company or that otherwise relates to or may affect the business of, or any of the assets owned or used by, the Acquired Company; or

(i)    որոնք սկսվել են Ձեռքբերված Ընկերության կողմից կամ դեմ կամ այլ կերպ առնչվում են կամ կարող են ազդել Ձեռքբերված Ընկերության գործունեության կամ նրա կողմից տնօրինվող կամ օգտագործվող որեւէ միջոցներին, կամ

36

(ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

To the Knowledge of Sellers and the Acquired Company, (1) no such Proceeding has been Threatened, and (2) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Proceeding. Sellers have delivered to Buyer copies of all pleadings, correspondence, and other documents relating to each Proceeding listed in Part 3.15 of the Disclosure Letter. The Proceedings listed in Part 3.15 of the Disclosure Letter will not have a material adverse effect on the business, operations, assets, condition, or prospects of the Acquired Company.

(b) Except as set forth in Part 3.15 of the Disclosure Letter:

(i) there is no Order to which the Acquired Company, or any of the assets owned or used by the Acquired Company, is subject;

(ii) no Seller is subject to any Order that relates to the business of, or any of the assets owned or used by, the Acquired Company; and

(ii) որը սպառնում է, կամ կարող է. արգելել, հետաձգել, անօրինական դարձնել, կամ այլ կերպ խանգարել Նախատեսվող Գործարքներից որևէ մեկին:

Վաճառողների եւ Ձեռքբերված Ընկերության Իմացությամբ, (1) ոչ մի նման Վարույթ չի Սպառնում, եւ (2) ոչ մի դեպք տեղի չի ունեցել կամ գործություն չունի որևէ հանգամանք որը կարող է առաջացնել կամ հիմք հանդիսանալ որևէ նման Վարույթի հարուցմանը: Վաճառողները Գնորդին տրամադրել են Բացահայտման Նամակի Բաժին 3.15-ում ներկայացված յուրաքանչյուր Վարույթին առնչվող բոլոր միջնորդությունները, նամակագրությունը, եւ այլ փաստաթղթերը: Բացահայտման Նամակի Բաժին 3.15-ում ներկայացված Վարույթները չեն ունենա նյութական բացասական ազդեցություն Ձեռքբերված Ընկերության գործունեության, աշխատանքների, միջոցների, վիճակի, կամ հեռանկարների վրա:

(բ) Բացահայտման Նամակի Բաժին 3.15-ում նշվածից բացի.

(i) գոյություն չունի Հրաման որին ենթակա է Ձեռքբերված Ընկերությունը, կամ նրա տնօրինման կամ օգտագործման տակ գտնվող որևէ միջոցները,

(ii) ոչ մի Վաճառող ենթակա չի որևէ Հրամանի որն առնչվում է Ձեռքբերված Ընկերության գործունեությանը, կամ նրա տնօրինման կամ

37

Company; and

(iii)    no officer, director, agent, or employee of the Acquired Company is subject to any Order that prohibits such officer, director, agent, or employee from engaging in or continuing any conduct, activity, or practice relating to the business of the Acquired Company.

(c)    Except as set forth in Part 3.15 of the Disclosure Letter:

(i)    The Acquired Company is, and at all times has been, in full compliance with all of the terms and requirements of each Order to which it, or any of the assets owned or used by it, is or has been subject;

(ii)    no event has occurred or circumstance exists that may constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement of any Order to which the Acquired Company, or any of the assets owned or used by the Acquired Company, is

օգտագործման տակ գտնվող որևէ միջոցներին, և

(iii)    Ձեռքբերված Ընկերության ոչ մի պաշտոնյա, տնօրեն, գործակալ, կամ աշխատող ենթակա չի որևէ Հրամանի որն արգելում է այդ պաշտոնյային, տնօրենին, գործակալին, կամ աշխատողին զբաղվելու կամ շարունակելու Ձեռքբերված Ընկերության գործունեության հետ առնչվող որևէ գործողություն, գործունեություն, կամ աշխատանք:

(q)    Բացառությամբ Նամակի Բաժնի 3.15-ում նշվածից բացի`

(i)    Ձեռքբերված Ընկերությունը ամբողջովին ենթարկվում է, և բոլոր ժամանակներում ամբողջովին ենթարկվել է իրեն, իր գործունեության կամ դրա վարման, իր ջանկացած միջոցների տնօրինմանը կամ օգտագործմանը ներկայումս կամ անցյալում վերաբերող յուրաքանչյուր Հրամանի;

(ii)    տեղի չի ունեցել որևէ դեպք կամ գոյություն չունի որևէ հանգամանք որը (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում) կարող է համավել կամ արդյունք հանգեցնել Ձեռքբերված Ընկերության կողմից Ձեռքբերված Ընկերությանը, կամ նրա կողմից տնօրինվող

38

Acquired Company, is subject; and

կամ օգտագործվող ցանկացած միջոցներին վերաբերող որեւէ Հրամանի որեւէ պայմանի կամ պահանջի խախտման կամ չենթարկվելուն, եւ

(iii)    the Acquired Company has not received, at any time, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any term or requirement of any Order to which the Acquired Company, or any of the assets owned or used by the Acquired Company, is or has been subject.

(iii)    Ձեռքբերված Ընկերությունը չի ստացել, երբեւէ, որեւէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որեւէ Կառավարական Մարմնից կամ այլ Անձից որը վերաբերվում է Ձեռքբերված Ընկերությանը, կամ նրա կողմից տնօրինվող կամ օգտագործվող որեւէ միջոցներին վերաբերող որեւէ Հրամանի որեւէ պայմանի կամ պահանջի որեւէ փաստացի, պատտադրվող, հնարավոր կամ պոտենցիալ խախտմանը, կամ դրան չենթարկվելուն:

### 3.16  Absence of Certain Changes and Events.

Except as set forth in Part 3.16 of the Disclosure Letter, since the date of the Balance Sheet, the Acquired Company has conducted its businesses only in the Ordinary Course of Business and there has not been any:

3.16    Որոշակի Փոփոխությունների եւ Դեպքերի Բացակայություն: Բացառությամբ Նամակի Բաժին 3.16-ում ներկայացվածից բացի, Հաշվեկշռի ամսաթվից սկսած, Ձեռքբերված Ընկերությունն իր գործունեությունը վարել է բացառապես Գործունեության Բնականոն Ընթացքով եւ չի եղել որեւէ.

(a)    change in the Acquired Company's authorized or issued capital; grant of any share option or right to purchase shares of capital of the Acquired Company; issuance of any security convertible into such capital stock; grant of any registration rights; purchase, redemption, retirement, or other acquisition by the Acquired Company of any shares; or declaration or payment of any

(ա)    Ձեռքբերված Ընկերության կանոնադրական կամ թողարկված կապիտալի փոփոխություն, Ձեռքբերված Ընկերության որեւէ բաժնեմասի կամ բաժնեմասի գնման իրավունքի շնորհում, բաժնեմասի փոխակերպվող արժեթղթերի որեւէ թողարկում, որեւէ գրանցման իրավունքների շնորհում, գնում, մարում, վերացում, կամ Ձեռքբերված Ընկերության կողմից ցանկացած բաժնեմասի ձեռք

39

declaration or payment of any dividend or other distribution or payment;

(b)     amendment to the Organizational Documents of the Acquired Company;

(c)     payment or increase by the Acquired Company of any bonuses, salaries, or other compensation to any stockholder, director, officer, or (except in the Ordinary Course of Business) employee or entry into any employment, severance, or similar Contract with any director, officer, or employee;

(d)     adoption of, or increase in the payments to or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance, pension, retirement, or other employee benefit plan for or with any employees of the Acquired Company;

(e)     damage to or destruction or loss of any asset or property of the Acquired Company, whether or not covered by insurance, materially and adversely affecting the properties, assets, business, financial condition, or prospects of the Acquired Company, taken as a whole;

(f)     entry into, termination of, or receipt of notice of termination of (i) any license,

բերում, կամ դիվիդենտների հայտարարում կամ վճարում կամ վճարումների այլ տեսակի բաշխում,

(բ)     Ձեռքբերված Ընկերության Կազմակերպչական Փաստաթղթերի փոփոխություն,

(գ)     Ձեռքբերված Ընկերության կողմից որևէ բաժնետերերին, տնօրեններին, պաշտոնյաներին, կամ (բացի Գործունեության Բնականոն Ընթացքից) աշխատողներին որևէ հավելումների, աշխատավարձերի, կամ այլ փոխհատուցումների վճարում կամ ավելացում կամ աշխատանքային, արձակման նպաստի, կամ համանման Պայմանագրի ստորագրում որևէ տնօրենի, պաշտոնյայի, կամ աշխատողի հետ,

(դ)     Ձեռքբերված Ընկերության աշխատանողների հետ որևէ շահույթի կիսման, հավելյան, փոլային փոխխատուցման, խնայման, ապահովագրման, կենսաթոշակի, թոշակի անցնելու, կամ այլ աշխատանքային արտոնությունների ընդունում, կամ վճարման մեջ հավելյան կամ այլ արտոնություն,

(ե)     Ձեռքբարված Ընկերության որևէ միջոցի կամ գույքի վնասում, վատնում կամ կորուստ, լինի ապահովագրված կամ ոչ, Ձեռքբերված Ընկերության ամբողջությամբ վերցրած Գույթականներեն կամ բացասականորեն գույքի, միջոցների, գործունեության, ֆինանսական իրավիճակի, կամ հեռանկարների վրա ազդող,

(զ)     (i) ցանկացած լիցենզիայի, առետուրային ներկայացուցչության, դիլերային,

40

of termination of (i) any license, distributorship, dealer, sales representative, joint venture, credit, or similar agreement, or (ii) any Contract or transaction involving a total remaining commitment by or to the Acquired Company of at least $1,000.00 USD;

    (g)    sale (other than sales of inventory in the Ordinary Course of Business), lease, or other disposition of any asset or property of the Acquired Company or mortgage, pledge, or imposition of any lien or other encumbrance on any material asset or property of the Acquired Company, including the sale, lease, or other disposition of any of the Intellectual Property Assets;

    (h)    cancellation or waiver of any claims or rights with a value to the Acquired Company;

    (i)    material change in the accounting methods used by the Acquired Company; or

    (j)    agreement, whether oral or written, by the Acquired Company to do any of the foregoing.

**3.17**    <u>Contracts; No Defaults.</u>

    (a)    Part 3.17(a) of the Disclosure Letter contains a

վաճառքի ներկայացուցչության, համատեղ ձեռնարկության, վարկի, կամ համանման պայմանագրերի, կամ (ii) Ձեռքբերված Ընկերության կողմից առնվազն $1,000.00 ԱՄՆ Դոլարի ընդհանուր մնացորդային պարտավորվածություն պահանջող ցանկացած Պայմանագրի կամ գործարքի կնքում, լուծում, կամ լուծման ծանուցման ստացում,

    (է)    Ձեռքբերված Ընկերության որևէ միջոցի կամ գույքի վաճառք (բացի Գործունեության Բնականոն Ընթացքում ապրանքների վաճառքից), վարձակալություն, կամ այլ տեղաբաշխում, կամ Ձեռքբերված Ընկերության որևէ նյութական միջոցի կամ գույքի գրավադրում, գրավ, կամ այլ պարտավորության տեղաբաշխում կամ ծանրաբեռնում, ներառյալ որևէ Ստավոր Սեփականության Միջոցների վաճառքը, վարձակալությունը, կամ այլ կերպ տեղաբաշխումը,

    (ը)    արժեք ունեցող որևէ պահանջի կամ իրավունքի վերացումը կամ դրանցից հրաժարվելը Ձեռքբերված Ընկերության նկատմամբ,

    (դ)    Ձեռքբերված Ընկերության կողմից օգտագործվող հաշվապահական մեթոդների նյութական փոփոխությունը, կամ

    (ե)    Ձեռքբերված Ընկերության համաձայնությունը, բանավոր կամ գրավոր, վերոհիշյալից որևէ մեկն իրականացնելու վերաբերյալ:

**3.17**    <u>Պայմանագրեր, Խախտման Բացակայություն:</u>

    (ա)    Բացահայտման Նամակի Բաժին 3.17(ա)-ն

41

Disclosure Letter contains a complete and accurate list, and Sellers have delivered to Buyer true and complete copies, of:

(i)    each Applicable Contract that involves performance of services or delivery of goods or materials by the Acquired Company;

(ii)    each Applicable Contract that involves performance of services or delivery of goods or materials to the Acquired Company;

(iii)    each Applicable Contract that was not entered into in the Ordinary Course of Business;

(iv)    each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Applicable Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property;

Ներառում է ամբողջական եւ ճիշտ ցուցակը, եւ Վաճառողները Գնորդին տրամադրել են հետեւյալը.

(i)
յուրաքանչյուր Կիրառելի Պայմանագիրը որը ներառում է Ձեռքբերված Ընկերության կողմից ծառայություների մատուցում կամ ապրանքների կամ նյութերի առաքում,

(ii)
յուրաքանչյուր Կիրառելի Պայմանագիրը որը ներառում է Ձեռքբերված Ընկերությանը ծառայությունների մատուցում կամ ապրանքների եւ նյութերի առաքում,

(iii)
յուրաքանչյուր Կիրառելի Պայմանագիրը որը չի ստորագրվել Գործունեության Բնականոն Ընթացքում,

(iv)
յուրաքանչյուր վարձակալությունը, վարձույթի կամ օգտագործման պայմանագիրը, լիցենզիան, պայմանական եւ տեղադրման վաճառքի պայմանագիր, այլ Կիրառելի Պայմանագիրը որն ազդում է որեւէ անշարժ կամ շարժական գույքի տնօրինմանը, վարձակալմանը, սեփականատիրման իրավունքին, օգտագործմանը, վարձակալությամբ տրմանը կամ այլ գործարքին,

42

(v)     each licensing agreement or other Applicable Contract with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of the Intellectual Property Assets;

(vi)     each collective bargaining agreement and other Applicable Contract to or with any labor union or other employee representative of a group of employees;

(vii)     each joint venture, partnership, and other Applicable Contract (however named) involving a sharing of profits, losses, costs, or liabilities by the Acquired Company with any other Person;

(viii)     each Applicable Contract containing covenants that in any way purport to restrict the business activity of the Acquired Company or any Affiliate of the Acquired Company or limit the

(v)     յուրաքանչյուր լիցենզիայի պայմանագիրը կամ այլ Կիրառելի Պայմանագիրը առնչվող պատենտներին, առեւտրային նշաններին, հեղինակային իրավունքներին, կամ այլ մտավոր սեփականությանը, ներառյալ պայմանագրերը ներկա եւ նախկին աշխատողների, խորհրդատուների, կամ կապալառուների հետ կամ Մտավոր Սեփականության Միջոցների չբացահայտման վերաբերյալ,

(vi)     յուրաքանչյուր կոլեկտիվ պայմանագիր կամ այլ Կիրառելի Պայմանագիր արհեստակցական միության հետ կամ մի՞շ կամ այլ աշխատողների խմբի ներկայացուցչի,

(vii)     յուրաքանչյուր համատեղ ձեռնարկության, համագործակցության, եւ այլ Կիրառելի Պայմանագիր (ինչպես էլ որ անվանված լինի) որը ներառում է Ձեռքբերված Ընկերության կողմից որեւէ այլ Անձի հետ շահույթի, կորուստի, ինքնարժեքի կամ պարտավորությունների բաշխում,

(viii)     յուրաքանչյուր Կիրառելի Պայմանագիր որը ներառում է պարտավորություններ որոնք ինչ որ ձեւով հնարավոր է որ արգելակեն Ձեռքբերված Ընկերության

43

Company or limit the freedom of the Acquired Company or any Affiliate of the Acquired Company to engage in any line of business or to compete with any Person;

(ix)    each Applicable Contract providing for payments to or by any Person based on sales, purchases, or profits, other than direct payments for goods;

(x)    each power of attorney that is currently effective and outstanding;

(xi)    each Applicable Contract entered into other than in the Ordinary Course of Business that contains or provides for an express undertaking by the Acquired Company to be responsible for consequential damages;

(xii)    each Applicable Contract for capital expenditures in excess of Two Thousand United States Dollars ($2,000.00);

կամ Ձեռքբերված Ընկերության որեւէ Աֆիլացված Անձի գործունեությունը կամ սահմանափակեն Ձեռքբերված Ընկերության կամ Աֆիլացված Անձի ազատությունը զբաղվելու գործունեության ցանկացած տեսակով կամ մրցակցել այլ Անձի հետ,

(ix)    յուրաքանչյուր Կիրառելի Պայմանագիր որը սահմանում է որեւէ Անձին կամ նրանից վճարում կատարվող վաճառքի, գնումների, կամ շահույթի հետ՝ բացի ապրանքների համար ուղղակի վճարումները,

(x)    յուրաքանչյուր լիազորագիր որը ներկայումս գտնվում է ուժի մեջ կամ ժամկետանոց է,

(xi)    յուրաքանչյուր Կիրառելի Պայմանագիր որը ստորագրվել է Գործունեության Բնականոն Ընթացքից դուրս որը ներառում կամ սահմանում է Ձեռքբերված Ընկերության կողմից արդյունքում ստեղծված վնասների համար հստակ պատասխանատվություն,

(xii)    յուրաքանչյուր Կիրառելի Պայմանագիր Երկու Հազար ($2,000.00) ԱՄՆ Դոլարից ավելի արժողությամբ կապիտալ ծախսեր պահունակող,

44

(xiii)    each written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by the Acquired Company other than in the Ordinary Course of Business; and

(xiii) յուրաքանչյուր գրավոր երաշխիք, երաշխավորություն, եւ կամ այլ համանման պարտավորություն առնչվող Ձեռքբերված Ընկերության կողմից Գործունեության Ընականոն Ընթացքից դուրս պայմանագրային պարտավորությունների կատարմանը, եւ

(xiv)    each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(xiv) յուրաքանչյուր փոփոխություն, հավելում, եւ նորացում (լինի բանավոր կամ գրավոր) վերոհիշյալին առնչվող:

Part 3.17(a) of the Disclosure Letter sets forth reasonably complete details concerning such Contracts, including the parties to the Contracts, the amount of the remaining commitment of the Acquired Company under the Contracts, and the Acquired Company's office where details relating to the Contracts are located.

Բացահայտում ան Նամակի Բաժին 3.17(ա)-ն ներկայացնում է նման Պայմանագրերի ողջամտորեն ավարտուն մանրամասները, ներառյալ Պայմանագրի կողմերին, Պայմանագրերի համաձայն Ձեռքբերված Ընկերության պարտավորությունների մնացորդները, եւ Ձեռքբերված Ընկերության գրասենյակը որտեղ տեղադրված են Պայմանագրերին առնչվող մանրամասները:

(b)    Except as set forth in Part 3.17(b) of the Disclosure Letter:

(բ)    Բացահայտում ան Նամակի Բաժին 3.17(բ)-ում ներկայացվածից բացի`

(i)    No Seller (and no Related Person of a Seller) has or may acquire any rights under, and no Seller has or may become subject to any obligation or liability under, any Contract that relates to the business

(i)    ոչ մի Վաճառող (եւ որեւէ Վաճառողի ոչ մի Փոխկապակցված ԱնՁ) չունի կամ չի կարող ձեռք բերել որեւէ իրավունք, եւ ոչ մի Վաճառող չունի եւ չի կարող մաս կազմել որեւէ

45

that relates to the business of, or any of the assets owned or used by, the Acquired Company; and

(ii)     no officer, director, agent, employee, consultant, or contractor of the Acquired Company is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant, or contractor to (A) engage in or continue any conduct, activity, or practice relating to the business of the Acquired Company, or (B) assign to the Acquired Company or to any other Person any rights to any invention, improvement, or discovery.

(c)     Except as set forth in Part 3.17(c) of the Disclosure Letter, each Contract identified or required to be identified in Part 3.17(a) of the Disclosure Letter is in full force and effect and is valid and enforceable in accordance with its terms.

(d)     Except as set forth in Part 3.17(d) of the Disclosure Letter:

Պայմանագրի պարտավորությունն կամ պատասխանատվությունն որն առնչվում է Ձեռքբերված Ընկերության գործունեությանը, նրա կողմից տնօրինվող կամ օգտագործվող միջոցներին, եւ

(ii)     Ձեռքբերված Ընկերության ոչ մի պաշտոնյա, տնօրեն, գործակալ, աշխատող, խորհրդատու, կամ կապալառու պարտավորված չէ որեւէ Պայմանագրով որը հնարավոր է որ սահմանափակի նման պաշտոնյայի, տնօրենի, գործակալի, աշխատողի, խորհրդատուի, կամ կապալառուի ունակությունը (Ա) զբաղվելու կամ շարունակելու զբաղվել գործով, գործունեությամբ, կամ աշխատանքով առնչվող Ձեռքբերված Ընկերության գործունեությանը, կամ (Բ) Ձեռքբերված Ընկերությանը կամ ցանկացած այլ Անձին շնորհելու ցանկացած գյուտի, բարելավման, կամ հայտնագործության իրավունքներ:

(գ)     Բացահայտման Նամակի Բաժին 3.17(գ)-ում ներկայացվածից բացի, Բացահայտման Նամակի Բաժին 3.17(ա)-ում ներկայացված կամ ներկայացման ենթակա յուրաքանչյուր Պայմանագիր ունի լրիվ իրավական ուժ եւ իսկական է եւ կիրառելի է իր պայմաններին համաձայն:

(դ)     Բացահայտման Նամակի Բաժին 3.17(դ)-ում ներկայացվածից բացի`

46

Letter:

(i)    The Acquired Company is, and at all times has been, in full compliance with all applicable terms and requirements of each Contract under which the Acquired Company has or had any obligation or liability or by which the Acquired Company or any of the assets owned or used by the Acquired Company is or was bound;

(ii)    each other Person that has or had any obligation or liability under any Contract under which the Acquired Company has or had any rights is, and at all times has been, in full compliance with all applicable terms and requirements of such Contract;

(iii)    no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with, or result in a violation or breach of, or give the Acquired Company or other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; and

(i)    Ձեռքբերված Ընկերությունը ամբողջովին ենթարկվում է, եւ բոլոր ժամանակներում ամբողջովին ենթարկվել է իրեն, իր գործունեության կամ դրա վարմանը, իր ջանկացած միջոցների տնօրինման կամ օգագործման նկատամմբ ներկայումս կամ անցյալում կիրառելի յուրաքանչյուր Պայմանագրի պայմանններին եւ պահանջներին;

(ii)    յուրաքանչյուր այլ ԱնՁ որն ունի կամ ունեցել է որեւէ պարտավորություն համաձայն որեւէ Պայմանագրի համաձայն որի Ձեռքբերված Ընկեպությունն ունի կամ ունեցել է որեւէ իրավունք ամբողջովին ենթարկվում է, եւ բոլոր ժամանակներում ամբողջովին ենթարկվել է նման Պայմանագրի գործող պայմանններին եւ պահանջներին,

(iii)    տեղի չի ունեցել որեւէ դեպք կամ գոյություն չունի որեւէ հանգամանք որը (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում) կարող է որեւէ Կիրառելի Պայմանագրին հակասել, բախման պատճառ հանդիսանալ, կամ այդուունքում խախտում կամ չենթարկվել, կամ Ձեռքբերված Ընկերությունը կամ այլ ԱնՁին իրավունք տալ խախտում հայտարարելու կամ

47

Applicable Contract; and

փոխհատուցում պահանջելու, կամ կատարումը կամ լյուծումն արագացնելու, կամ չեղյալ համարելու, լուծելու, կամ փոփոխելու այն, եւ

(iv)    the Acquired Company has not given to or received from any other Person, at any time, any notice or other communication (whether oral or written) regarding any actual, alleged, possible, or potential violation or breach of, or default under, any Contract.

(iv)    Ձեռքբերված Ընկերությունը չի ստացել, երբեւէ, որեւէ ծանուցում կամ այլ հաղորդագրություն (լինի բանավոր կամ գրավոր) որեւէ Կառավարական Մարմնից կամ այլ Անձից որը վերաբերվում է Ձեռքբերված Ընկերությանը, կամ նրա կողմից տնօրինվող կամ օգտագործվող որեւէ միջոցներին վերաբերող որեւէ Պայմանագիր որեւէ պայմանի կամ պահանջի որեւէ փաստացի, պարտադրվող, հնարավոր կամ պոտենցիալ խախտմանը, կամ դրանց չենթարկվելուն:

(e)    There are no renegotiations of, attempts to renegotiate, or outstanding rights to renegotiate any material amounts paid or payable to the Acquired Company under current or completed Contracts with any Person and no such Person has made written demand for such renegotiation.

(ե)    Գոյություն չունեն որեւէ վերաբանակցություններ, վերաբանակցելու փորձեր, կամ իրավունքներ վերաբանակցելու որեւէ նյութական գումար վճարված կամ վճարվելիք Ձեռքբերված Ընկերությանը ներկա կամ կատարված Պայմանագրերով որեւէ Անձի հետ եւ ոչ մի նման Անձ չի պահանջել գրավոր նման վերաբանակցություն վերաբերյալ:

(f)    The Contracts relating to the sale, design, manufacture, or provision of products or services by the Acquired Company has been entered into in the Ordinary Course of Business and have been entered into without the commission of any act alone or in concert with any other Person, or any consideration having been paid or promised, that

(զ)    Ձեռքբերված Ընկերության վաճառքներին, նախագծմանը, արտադրությանը, կամ ապրանքների կամ ծառայությունների մատակարարմանը վերաբերող Պայմանագրերը կնքվել են Գործունեությւն Բնականոն Ընթացքում եւ կնքվել են առանց այլ Անձի կողմսից վճարների եւ առանց նրանց ներգրավման, կամ առանց որեւէ խոստման կամ վճարի որը

48

having been paid or promised, that is or would be in violation of any Legal Requirement.

3.18 **Insurance.**

(a)     Sellers have delivered to Buyer:

(i)     true and complete copies of all policies of insurance to which the Acquired Company is a party or under which the Acquired Company, or any official of the Acquired Company, is or has been covered at any time;

(ii)     true and complete copies of all pending applications for policies of insurance; and

(iii)     any statement by the auditor of the Acquired Company's financial statements with regard to the adequacy of such entity's coverage or of the reserves for claims.

(b)     Part 3.18(b) of the Disclosure Letter describes:

(i)     any self-insurance arrangement by or affecting the Acquired

համարվում է կամ կարող է համարվել որևէ Օրենքի Պահանջի խախտում:

3.18     Ապահովագրություն:

(ա)     Վաճառողները Գնորդին տրամադրել են.

(i)     բոլոր ապահովագրական պոլիսների ամբողջական պատճեները որոնցում Ձեռքբերված Ընկերությունը հանդիսանում է որպես կողմ, կամ որոնցով Ձեռքբերված Ընկերության որևէ պաշտոնյա որևէ ժամանակ ապահովագրվել է,

(ii)     ապահովագրական պոլիսների համար ներկայացված ընթացքում գտնվող բոլոր դիմումների ճիշտ ու ամբողջական պատճեները, ևւ

(iii)     Ձեռքբերված Ընկերության ֆինանսական հաշվետվությունների աուդիտորի կողմից կատարած որևէ հայտարարություն առնչվող նշված մարմնի ապահովագրությանը կամ կատարած հայցապահանջների վերաբերյալ վերապահումները:

(բ)     Բացահայտման Նամակի Բաժին 3.18(բ) ներկայացնում է`

(i)     Ձեռքբերված Ընկերությանը վերաբերվող կամ նրա կողմից

49

affecting the Acquired Company, including any reserves established thereunder;

(ii)    any contract or arrangement, other than a policy of insurance, for the transfer or sharing of any risk by the Acquired Company; and

(iii)    all obligations of the Acquired Company to third parties with respect to insurance (including such obligations under leases and service agreements) and identifies the policy under which such coverage is provided.

(c)    Part 3.18(c) of the Disclosure Letter sets forth, by year, for the current policy year and each of the preceding policy years:

(i)    a summary of the loss experience under each policy;

(ii)    a statement describing each claim under an insurance policy which sets forth:

կատարված ինքնապահովագրության վերաբերյալ բոլոր գործարքները, ներառյալ դրանցով նախատեսված ցանկացած պահուստային ֆոնդերը,

(ii)    բոլոր գործարքները եւ պայմանագրերը՝ ապահովագրական պոլիսներից բացի, որոնցով փոխանցվում կամ բաշխվում են Ձեռքբերված Ընկերության ցանկացած ռիսկեր, եւ

(iii)    Ձեռքբերված Ընկերության երրորդ կողմերի նկատմամբ՝ ապահովագրության վերաբերող բոլոր պարտավորությունները (ներառյալ վարձակալության եւ ծառայությունների պայմանագրերով սահմանվածները) եւ պոլիսները որոնցով տրվում են այդ ապահովագրությունները:

(գ)    Բացահայտման Նամակի Բաժին 3.18(գ)-ն ներկայացնում է, տարիներ կտրվածքով, ընթացիկ պոլիսային տարվա եւ անցած պոլիսային տարիների համար՝

(i)    յուրաքանչյուր պոլիսի ներքո վնասի առաջացման պրակտիկայի կրճատ ընկարագրությունը,

(ii)    ապահովագրական պոլիսի ներքո ներկայացված

50

sets forth:

    (A)    the name of the claimant;

    (B)    a description of the policy by insurer, type of insurance, and period of coverage; and

    (C)    the amount and a brief description of the claim; and

    (iii)    a statement describing the loss experience for all claims that were self-insured, including the number and aggregate cost of such claims.

    (d)    Except as set forth on Part 3.18(d) of the Disclosure Letter:

    (i)    All policies to which the Acquired Company is a party or that provide coverage to any Seller, the Acquired Company, or any officer of the Acquired Company:

    (A)    are valid, outstanding,

---

յուրաքանչյուր հայցը ներկայացնող հաշվեվարույթյան որը ներկայացնում է՝

    (Ա)    հայցվորի անունը,

    (Բ)    ապահովագրողի կողմից պոլիսի նկարագրությունը եւ ապահովագրության ժամանակարգ ացքը, եւ

    (Գ)    հայցի գումարը եւ կրճատ նկարագրությունը, եւ

    (iii)    ինքնապահովագրով ած բոլոր դեպքերի հայցերի համար վնասի առաջացման պրակտիկան, ներառյալ հայցերի թվաքանակի եւ ընդհանուր գումարի վերաբերյալ հաշվեվարույթյուն:

    (դ)    Բացահայտման Նամակի Բաժին 3.18(դ)-ում ներկայացվածից բացի՝

    (i)    բոլոր պոլիսները որոնցում Ձեռքբերված Ընկերությունը համարվում է կողմ կամ որոնք ապահովագրություն են տրամադրում որեւէ Վաճառողի, Ձեռքբերված Ընկերության, կամ Ձեռքբերված Ընկերության որեւէ պաշտոնյայի վրա՝

    (Ա)    իսկական են,

valid, outstanding, and enforceable;

   (B)    are issued by an insurer that is financially sound and reputable;

   (C) · taken together, provide adequate insurance coverage for the assets and the operations·of the Acquired Company and for all risks to which businesses such as the Acquired Company are normally exposed;

   (D)    are sufficient for compliance with all Legal Requirements and Contracts to which the Acquired Company is a party or by which it is bound;

   (E)    will continue in full force and effect following the consummation of the Contemplated Transactions; and

իրական, եւ կիրառելի,

   (Բ)
տրամադրվա
ծ են
ապահովագրողի
կողմից որը
ֆինանսապես
ապահով է, եւ ունի
բարի համբավ,

   (Գ)
միասին
վերցրած,
Ձեռքբերված
Ընկերության
միջոցների եւ
գործունեության
ընկատմանը, եւ
Ձեռքբերված
Ընկերության
գործունեության
տեսակի համար
սովորական
համարվող ռիսկերի
համար
տրամադրում են
համապատասխան
ապահովագրություն,

   (Դ)
բավարալ են
ենթարկվելու համար
բոլոր Օրենքի
Պահանջներին եւ
Պայմանագրերին
որոնցում
Ձեռքբերված
Ընկերությունը
համարվում է կողմ
կամ որոնք կիրառելի
են իր ընկատմանը,

   (Ե)
կշարունակվե
ն ամբողջ իրավական
ուժով եւ
ունակությամբ
Նախատեսվող
Գործարքների

կատարումից հետո,
եւ

(F)    do not provide for any retrospective premium adjustment or other experienced-based liability on the part of the Acquired Company.

(Ձ) Ձեռքբերված Ընկերության նկատմամբ չեն սահմանում որեւէ հետին ուժ ունեցող պարտավորություններ վճարման առումով կամ այլ՝ նախկին փորձի հիման վրա սահմանված պարտավորություններ:

(ii)    No Seller or the Acquired Company has received (A) any refusal of coverage or any notice that a defense will be afforded with reservation of rights, or (B) any notice of cancellation or any other indication that any insurance policy is no longer in full force or effect or will not be renewed or that the issuer of any policy is not willing or able to perform its obligations thereunder.

(ii)    ոչ մի վաճառող կամ Ձեռքբերված Ընկերություն չի ստացել (Ա) ապահովվածության որեւէ մերժում կամ իրավունքների վերապահումով պաշտպանության ծանուցում, կամ (Բ) չեղյալ համարելու որեւէ ծանուցում կամ ցանկացած այլ վկայություն առ այն որ որեւէ ապահովագրական պոլիս այլեւս լրիվ իրավական ուժ կամ ունակություն չունի կամ որ այն չի նորացվի կամ որ ապահովագրողը չի կարող կամ չի ուզում կատարել իր պարտավորությունները:

(iii)    The Acquired Company has paid all premiums due, and have otherwise performed all of their respective obligations, under each policy to which the Acquired Company is a party or that provides coverage to the Acquired Company or director thereof.

(iii)    Ձեռքբերությունը վճարել է պահանջվող բոլոր ապահովագրական վճարները, եւ այլ կերպ կատարել է իր բոլոր պարտականությունները, յուրաքանչյուր պոլիսի ներքո որում կողմ է հանդիսանում Ձեռքբերված Ընկերությունը կամ որն ապահովագրություն է տրամադրում Ձեռքբերված Ընկերության կամ նրա

53

տնօրենի նկատմամբ:

(iv)    The Acquired Company has given notice to the insurer of all claims that may be insured thereby.

(iv)    Ձեռքբերված Ընկերությունը ծանուցել է ապահովագրողին իրա կողմից ապահովագրության ենթակա բոլոր հայցերի վերաբերյալ:

### 3.19  Environmental Matters.
Except as set forth in part 3.19 of the disclosure letter:

3.19  Միջավայրային Խնդիրներ: Բացահայտման Նամակի Բաժնի 3.19-ում սահմանվածից բացի`

(a)    The Acquired Company is, and at all times has been, in full compliance with, and has not been and is not in violation of or liable under, any Environmental Law.  No Seller or the Acquired Company has any basis to expect, nor has any of them or any other Person for whose conduct they are or may be held to be responsible received, any actual or Threatened order, notice, or other communication from (i) any Governmental Body or private citizen acting in the public interest, or (ii) the current or prior owner or operator of any Facilities, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or Threatened obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has had an interest, or with respect to any property or Facility at or to which Hazardous Materials were generated, manufactured, refined, transferred, imported, used, or processed by Sellers, the Acquired

(ա)    Ձեռքբերված Ընկերությունը ամբողջությամբ ենթարկվում է, եւ բոլոր ժամանակներում ամբողջությամբ ենթարկվել է ցանկացած Միջավայրային Օրենքին, չի խախտում եւ չի խախտել այն: Ոչ մեկ Վաճառող կամ Ձեռքբերված Ընկերություն հիմք չունեն սպասելու, ոչ էլ նրանցից որեւէ մեկը կամ ցանկացած այլ Անձ որի գործելակերպի համար նրանք պատասխանատու են կամ կարող են ճանաչվել այդպիսին, ստանա լ փաստացի կամ Սպառնացող իրական, ծանուցում, կամ այլ հաղորդագրություն (i) հանրային շահերը ներկայացնող որեւէ Կառավարական Մարմնից կամ մասնավոր քաղաքացուց, կամ (ii) որեւէ Միջոցների նախկին տիրոջից կամ աշխատանցնողից, որեւէ Միջավայրային Օրենքի որեւէ փաստացի կամ պոտենցիալ խախտման կամ չենթարկվելու վերաբերյալ, կամ որեւէ Միջավայրային, Առողջական, կամ Անվտանգության Պարտավորությունների ծախսերլր կրելու կամ կատարելու որեւէ փաստացի կամ Սպառնացող պարտավորություն որեւէ Միջոցների կամ այլ գույքի (լինի այն անշարժ, շարժական կամ խառը) վերաբերյալ, որոնց հետ կապված Վաճառողները կամ Ձեռքբերված Ընկերությունն ունեցել են

54

processed by Sellers, the Acquired Company, or any other Person for whose conduct they are or may be held responsible, or from which Hazardous Materials have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(b)    There are no pending or, to the Knowledge of Sellers and the Acquired Company, Threatened claims, Encumbrances, or other restrictions of any nature, resulting from any Environmental, Health, and Safety Liabilities or arising under or pursuant to any Environmental Law, with respect to or affecting any of the Facilities or any other properties and assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has or had an interest.

(c)    No Seller or Acquired Company has any basis to expect, nor has any of them or any other Person for whose conduct they are or may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning, or other communication that relates to Hazardous Activity.

բաժնեմասեր, կամ որեւէ գույքի կամ Միջոցների վերաբերյալ որոնց վրա կամ որոնց նկատմամբ կուտակակվել, արտադրվել, գոյվել, փոխանցվել, ներկրվել, օգտագործվել, կամ վերամշակվել են Վտանգավոր Նյութեր Վաճառողների, Ձեռքբերված Ընկերության, կամ որեւէ այլ Անձի կողմից որի գործելակերպի համար պատասխանատու են կամ կարող են այդպիսին համարվել նրանք, կամ որոնցից Վտանգավոր նյութերը փոխադրվել, վերամշակվել, պահեստավորվել, օգտագործվել, տեղափոխվել, տնօրինվել, շրջադարձվել, կամ ստացվել են:

(p)    Գործություն չունեն ընթացքում գտնվող կամ, Վաճառողների եւ Ձեռքբերված Ընկերության Իմացությամբ, Սպառնացող հայցեր, Ծանրաբեռնումներ, կամ որեւէ բնույթի այլ սահմանափակումներ, որոնք արդյունք են Միջավայրային, Առողջապահական, կամ Անվտանգության Պարտավորությունների կամ սկիզբ են առնում որեւէ Միջավայրային օրենքից համաձայն կամ համապատասխան, որոնք վերաբերվում են կամ ազդում են որեւէ Միջոցների կամ ցանկացած այլ գույքերի եւ միջոցների վրա (լինեն դրանք անշարժ, շարժական կամ խառը) որոնցում Վաճառողները կամ Ձեռքբերված Ընկերությունը ունեն կամ ունեցել են բաժնեմաս:

(q)    ոչ մի Վաճառող կամ Ձեռքբերված Ընկերություն չունի որեւէ հիմք սպասելու, ոչ էլ նրանցից որեւէ մեկը կամ որեւէ այլ Անձ որի գործելակերպի համար իրենք պատասխանատու են կամ կարող են այդպիսին համարվել, ստանալ որեւէ հղում, ուղղություն, հարցում, Հրաման, կանչ, զգուշացում, կամ այլ հաղորդագրություն որը

55

that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which Sellers or the Acquired Company had an interest, or with respect to any property or facility to whioh Hazardous Materials generated, manufactured, refined, transferred, imported, used, or processed by Sellers, the Acquired Company, or any other Person for whose conduct they are or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

    (d)    No Seller ór the Acquired Company, or any other Person for whose conduct they are or may be held responsible, has any Environmental, Health, and Safety Liabilities with respect to the Facilities or with respect to any other properties and assets (whether real, personal, or mixed) in which Sellers or the Acquired Company (or any predecessor), has or had an interest, or at any property

վերաբերվում է Գործունեության Գործունեությանը, Վտանգավոր Նյութերին, կամ ցանկացած ենթադրվող, փաստացի, կամ պոտենցյալ խախտմանը կամ չենթարկվելուն որևէ Միջավայրային Օրենքին, կամ որևէ ենթադրվող, փաստացի կամ պոտենցիալ պարտավորության կրելու կամ կատարելու որևէ Միջավայրային Օրենքի, Առողջապահական, կամ Անվտանգության Պարտավորությունների ծախսերը որևէ Միջոցների կամ այլ գույքի կամ միջոցների (լինի այն անշարժ, շարժական կամ խառը) վերաբերյալ, որոնցում Վամճառողները կամ Ձեռքբերված Ընկերությունն ունեցել են բաժնեմասեր, կամ որևէ գույքի կամ Միջոցների վերաբերյալ որոնց վրա կամ որոնց ենկատմամբ կուտանակվել, արտադրվել, զտվել, փոխանցվել, ներկրվել, օգտագործվել, կամ վերամշակվել են Վտանգավոր Նյութեր Վամճառողների, Ձեռքբերված Ընկերության, կամ որևէ այլ Անձի կողմից որի գործեյակերպի համար պատասխանատու են կամ կարող են այդպիսին համարվել նրանք, կամ որոնցից Վտանգավոր Նյութերը փոխադրվել, վերամշակվել, պահեստավորվել, օգտագործվել, տեղավոռնվել, տնօրինվել, շրջադարձվել, կամ ստացվել են:

    (դ)    Ոչ մի Վաճառող կամ Ձեռքբերված Ընկերություն, կամ այլ Անձ որի գործեյակերպի համար նրանք պատասխանատու են կամ կարող են այդպիսին ճանաչվել, ունեն որևէ Միջավայրային, Առողջապահական, կամ Անվտանգության Պարտավորություններ առնչվող Միջոցների կամ առնչվող ցանկացած այլ գույքին կամ միջոցներին (լինեն դրանք անշարժ, շարժական, կամ խառը) որոնցում

56

interest, or at any property geologically or hydrologically adjoining the Facilities or any such other property or assets.

(e)    There are no Hazardous Materials present on or in the Environment at the Facilities or at any geologically or hydrologically adjoining property, including any Hazardous Materials contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Facilities or such adjoining property, or incorporated into any structure therein or thereon. No Seller, the Acquired Company, any other Person for whose conduct they are or may be held responsible, or any other Person, has permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to the Facilities or other properties or assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has or had an interest.

(f)    There has been no Release or, to the Knowledge of Sellers and the Acquired Company, Threat of Release, of any Hazardous Materials at or from the

Վաճառողները կամ Ձեռքբերված Ընկերությունը (կամ ցանկացած այլ նախկին սեփականատեր), ունի կամ ունել բաժնեմաս, կամ այլ գույքին որը երկրաբանորեն կամ ջրաբանորեն միանում է Միջոցներին կամ ցանկացած այլ գույքին եւ միջոցներին:

(ե)    Գոյություն չունեն Վտանգավոր Նյութեր Միջոցներին Միջավայրում կամ այլ երկրաբանորեն կամ ջրաբանորեն միացված գույքերում, ներառյալ տակառներում, վերգետնյա եւ ստորգետնյա պահեստային տարաներում, հորերում, ստորգետնյա փոսերում, աղբահորերում, սարքավորումներում (լինեն դրանք անշարժ կամ շարժական) կամ այլ տարաներում, հիմնական եւ ժամանակավոր, տեղաբաշխված կամ տեղակ�որված հողի, ջրի, առուների մեջ, կամ Միջոցների այլ մասերում կամ համակցված այլ գույքում, կամ միակցված ցանկացած կառուցվածքում ամենուր: Ոչ մեկ Վաճառող, Ձեռքբերված Ընկերությունը, կամ այլ Անձը որի գործելակերպի համար պատասխանատվություն են կամ կարող են այդպիսին ճանաչվել Որանք, կամ ցանկացած այլ Անձ, չի թույլատրել կամ կատարել, Միջոցների կամ ցանկացած այլ գույքի եւ միջոցների (լինեն դրանք անշարժ, շարժական, կամ խառը) որոնցում Վաճառողները կամ Ձեռքբերված Ընկերությունը ունի կամ ունեցել է բաժնեմաս, նկատմամբ կատարված ցանկացած Վտանգավոր Գործունեություն, կամ տեղյակ չէ այդ մասին:

(զ)    Չի կատարվել որեւէ Արտանետում կամ, Վաճառողների եւ Ձեռքբերված Ընկերության Իմացությամբ, Արտանետման Վտանգ, որեւէ Վտանգավոր Նյութի

Hazardous Materials at or from the Facilities or at any other locations where any Hazardous Materials were generated, manufactured, refined, transferred, produced, imported, used, or processed from or by the Facilities, or from or by any other properties and assets (whether real, personal, or mixed) in which Sellers or the Acquired Company has or had an interest, or any geologically or hydrologically adjoining property, whether by Sellers, the Acquired Company, or any other Person.

Միջոցներից կամ Միջոցների նկատմամբ կամ ցանկացած այլ տեղում որտեղ կուտակվել, արտադրվել, զտվել, տեղափոխվել, պատրաստվել, ներկրվել, օգտագործվել, կամ վերամշակվել են Վտանգավոր Նյութերը Միջոցների կողմից կամ Միջոցներով, կամ ցանկացած այլ գույքի կամ միջոցների կողմից կամ դրանցով (լինեն դրանք անշարժ, շարժական, կամ խառը) որտեղում Վաճառողները կամ Ձեռքբերված Ընկերությունն ունի կամ ունեցել է բաժնեմաս, կամ որևէ երկրաբանորեն կամ ջրաբանորեն փոխկապակցված միջոցներից, լինի դա Վաճառողների, Ձեռքբերված Ընկերության, կամ ցանկացած այլ Անձի կողմից:

(g)    Sellers have delivered to Buyer true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Sellers or the Acquired Company pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance by Sellers, the Acquired Company, or any other Person for whose conduct they are or may be held responsible, with Environmental Laws.

(է)    Վաճառողները տրամադրել են Գնորդին Վաճառողների կամ Ձեռքբերված Ընկերության տրամադրության տակ գտնվող կամ նրանց կողմից սկզբնավորված՝ Միջոցների մեջ, վրա կամ տակ եղած Վտանգավոր Նյութերին կամ Վտանգավոր Գործողություններին վերաբերող կամ Վաճառողների, Ձեռքբերված Ընկերության, կամ ցանկացած այլ Անձի որի գործելակերպի համար նրանք պատասխանատու են կամ կարող են այդպիսին համարվել, Միջավայրային Օրենքներին ենթարկվելու վերաբերյալ ցանկացած զեկույցների, ուսումնասիրությունների, վերլուծությունների, փորձարկումների, կամ դիտարկումների ճիշտ ու ամբողջական պատճեները եւ արդյունքները:

3.20    **Employees.**

(a)    Part 3.20 of the Disclosure Letter contains a complete and accurate list of the

3.20    Աշխատողներ:

(ա)    Բացահայտման Նամակի Բաժին 3.20-ը ներկայացնում է ամբողջական եւ

58

complete and accurate list of the following information for each employee, official, or participant of the Acquired Company, including each employee on leave of absence or layoff status: employer; name; job title; current compensation paid or payable and any change in compensation since January 1, 2003; vacation accrued; and service credited for purposes of vesting and eligibility to participate under the Acquired Company's pension, retirement, profit-sharing, thrift-savings, deferred compensation, stock bonus, stock option, cash bonus, employee stock ownership (including investment credit or payroll stock ownership), severance pay, insurance, medical, welfare, or vacation plan, other Employee Pension Benefit Plan or Employee Welfare Benefit Plan, or any other employee benefit plan or any other plan.

(b)     No employee or official of the Acquired Company is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, noncompetition, or proprietary rights agreement, between such employee or director and any other Person ("Proprietary Rights Agreement") that in any way adversely affects or will affect (i) the performance of his duties as an employee or director of the Acquired Companies, or (ii) the ability of the Acquired Company to

Ճիշտ ցուցակը Ձեռքբերված Ընկերության յուրաքանչյուր աշխատողի, պաշտոնյայի, կամ մասնակցի վերաբերյալ հետևյալ տեղեկության մասին, ներառյալ արձակուրդում գտնվող կամ հետաձգված կարգավիճակի աշխատողների. գործատուին, անունը, պաշտոնը, վճարվելիք կամ վճարվող ընթացիկ փոխհատուցումը կամ փոխհատուցման ցանկացած փոփոխություն սկսած 2003թ-ի հունվարի 1-ից, անցկացված արձակուրդը, Ձեռքբերված Ընկերության կանսաթոշակը, թոշակը, շահույթի բաշխումը, խնայումը, փուլային փոխխատուցումը, բաժնեմասի նկատմամբ արտոնությունը, աշխատողի կողմից բաժնեմասի տնօրինումը (ներառյալ ներդրումային վարկավորումը կամ բաժնեմասի վարձատրումային տնօրինումը), արձակման նպաստը, ապահովագրությունը, բժշկական, կենսաթոշակային, կամ արձակուրդային պլանը, այլ Աշխատողի Թոշակի Արտոնության Պլանը կամ Աշխատողի Կենսաթոշակի Արտոնության Պլանը, կամ ցանկացած այլ աշխատողի արտոնության կամ այլ պլանը աշխատողի վրա տարածելու գործառույթները։

(բ)     Ձեռքբերված Ընկերության ոչ մի աշխատող կամ պաշտոնյա կողմ չի հանդիսանում, կամ այլ կերպ պարտավորված չէ, որևէ պայմանագրի կամ գործարքի, ներառյալ ցանկացած գաղտնապահության, չմրցակցելու, կամ սեփականության իրավունքի պայմանագրերը, նման աշխատողի կամ տնօրենի եւ ցանկացած այլ Անձի միջեւ («Սեփականության Իրավունքի Պայմանագիր») որը որեւէ ձեւով բացասականորեն ազդում է կամ կազդի (i) որպես Ձեռքբերված Ընկերության աշխատող կամ տնօրեն իր

59

ability of the Acquired Company to conduct its business, including any Proprietary Rights Agreement with Sellers or the Acquired Company by any such employee or director.

(c)    Part 3.20 of the Disclosure Letter also contains a complete and accurate list of the following information for each retired employee or director of the Acquired Company, or their dependents, receiving benefits or scheduled to receive benefits in the future: name, pension benefit, pension option election, retiree medical insurance coverage, retiree life insurance coverage, and other benefits.

3.21  **Labor Relations; Compliance.** The Acquired Company has not been and is not a party to any collective bargaining or other labor Contract. The Acquired Company has complied in all respects with all Legal Requirements relating to employment, the payment of social security and similar taxes, occupational safety and health, and other employee relations. Acquired Company is not liable for the payment of any compensation, damages, taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the applicable Legal Requirements.

պարտականությունները կատարելու վրա, կամ (ii) Ձեռքբերված Ընկերության կողմից իր գործունեությունը, ներառյալ որևէ Վաճառողների կամ Ձեռքբերված Ընկերության ցանկացած Սեփականության Իրավունքի Պայմանագիրը նման աշխատակցի կամ տնօրենի կողմից իրականացնելու վրա:

(q)    Բացահայտման Նամակի Բաժին 3.20-ը նաև ներառում է ամբողջական և ճիշտ ցուցակը Ձեռքբերված Ընկերության յուրաքանչյուր թոշակի անցած աշխատողի կամ տնօրենի, կամ դրանց ընտանիքի անդամների, որոնք ստանում են կամ սպասվում է որ ապագայում կստանան արտոնություններ, վերաբերյալ. անունը, թոշակի արտոնությունը, թոշակի այլընտրանքի ընտրությունը, թոշակի անցածի բժշկական ապահովագրության տարածումը, և այլ արտոնություններ:

3.21  **Աշխատանքային Հարաբերություններ, Ենթարկում:** Ձեռքբերված Ընկերությունը մաս չի կազմում, և չի կազմել որևէ կոլեկտիվ համաձայնության կամ այլ աշխատանքային Պայմանագրի: Ձեռքբերված Ընկերությունը ենթարկվել է բոլոր առումներով բոլոր Օրենքի Պահանջներին աշխատանքի ընդունմանը, սոցալ և համանման հարկերի վճարման, աշխատանքային անվտանգության և առողջապահության, և այլ աշխատանքային հարաբերությունների հետ առնչվող: Ձեռքբերված Ընկերությունը պարտավոր չէ վճարել որևէ փոխհատուցում, վնասներ, հարկեր, տուգանքներ, տույժեր, կամ այլ գումարներ, որոնք ինչ որ կերպ առնչություն ունեն որևէ գործող Օրենքի Պահանջին չենթարկվելու հետ:

3.22    **Intellectual Property.**

(a)    Intellectual Property Assets.  The term "Intellectual Property Assets" includes:

(i)    the names SHA, LLC and Hankavan Mine, all fictional business names, trading names, registered and unregistered trademarks, service marks, and applications (collectively, "Marks");

(ii)    all patents, patent applications, and inventions and discoveries that may be patentable (collectively, "Patents");

(iii)    all copyrights in both published works and unpublished works (collectively, "Copyrights"); and

(iv)    all know-how, trade secrets, confidential information, software, technical information, data, process technology, plans, drawings, and blue prints , including but not limited to all relevant GKZ records.

3.22    Մտավոր Սեփականություն:

(ա)    Մտավոր Սեփականության Միջոցներ: «Մտավոր Սեփականության Միջոցներ» սահմանումը ներառում է.

(i)    ՍՀԱ, Ս՟Լ՟Կ՟ եւ Հանքավանի Հանքավայր անվանումները, բոլոր մտածածին ձեռնարկատիրական անվանումները, առեւտրային անունները, գրանցված եւ չգրանցված ֆիրմային անվանումները, ծառայական նշանները, եւ դրանց կիրառումները (միասնաբար` «Նշաններ»),

(ii)    բոլոր պատենտները, պատենտների կիրառումները, եւ գյուտերը եւ հայտնագործությունները որոնք կարող են պատենտավորվել (միասնաբար` «Պատենտներ»),

(iii)    բոլոր հեղինակային իրավունքները հրապարակված կամ չհրապարակված աշխատանքների վերաբերյալ (միասնաբար` «Հեղինակային Իրավունք»), եւ

(iv)    Ձեռքբերված Ընկերության կողմից որպես լիցենզատու կամ լիցենզատու անօրինավոր, օգտագործվող, կամ լիցենզավորվող բոլոր նոու-հաուները, առեւտրային գաղտնիքները, գաղտնի ինֆորմացիան, կոմպյուտերային ծրագրերը,

61

relevant GKZ records, (collectively, "Trade Secrets"); owned, used, or licensed by the Acquired Company as licensee or licensor.

(b)    Agreements.  Part 3.22(b) of the Disclosure Letter contains a complete and accurate list and summary description, including any royalties paid or received by the Acquired Company, of all Contracts relating to the Intellectual Property Assets to which the Acquired Company is a party or by which the Acquired Company is bound There are no outstanding and, to Sellers' Knowledge, no Threatened disputes or disagreements with respect to any such agreement.

(c)    Know-How Necessary for the Business.

(i)    The Intellectual Property Assets are all those necessary for the operation of the Acquired Company's businesses as they are currently conducted and contemplated to be conducted.  The Acquired Company is the owner of all right, title, and interest in and to each of the Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances, equities, and

տեխնիկական ինֆորմացիան, տեղեկույթը, վերահշվանման տեխնոլոգիան, ծրագրերը, գծագրերը, ևս գրաֆիկները, ներառյալ սակայն չսահմանափակված ՊԲՀ գրանցումները (միասնաբար «Առետորային Գաղտնիք»):

(p)    Պայմանագրեր: Բացահայտման Նամակի Բաժին 3.22(p)-ն ներկայացնում է Մտավոր Սեփականության Միջոցներին առնչվող Պայմանագրերի ամբողջական ևս ճիշտ ցուցակը ևս կրճատ նկարագրությունը, ներառյալ Ձեռքբերված Ընկերության կողմից վճարված կամ ստացված բոլոր ռոյալթիները, որոնց Ձեռքբերված Ընկերությունը կողմ է կամ որոնք տարածվում են Ձեռքբերված Ընկերության վրա: Գոյություն չունեն ընթացքի մեջ գտնվող ևս, Վաճառողների Իմացությամբ, Սպառնացող վեճեր կամ անհամաձայնություններ այդ պայմանագրերի հետ կապված:

(q)    Գործունեության համար անհրաժեշտ Նուու-Հաու:

(i)    Մտավոր Սեփականության Միջոցները Ձեռքբերված Ընկերության գործունեության համար անհրաժեշտ միջոցներն են որոնցով ներկայումս այդ գործունեությունն իրականացվում կամ նախատեսվում է իրականացվել: Ձեռքբերված Ընկերությունը անորինում է յուրաքանչյուր ևս ցանկացած Մտավոր Սեփականության Միջոցների ամբողջ իրավունքը, տիտղոսը, ևս բաժնեմասը ազատ ևս զերծ

62

encumbrances, equities, and other adverse claims, and has the right to use without payment to a third party all of the Intellectual Property Assets.

(ii)   Except as set forth in Part 3.22(c) of the Disclosure Letter, no employee of the Acquired Company has entered into any Contract that restricts or limits in any way the scope or type of work in which the employee may be engaged or requires the employee to transfer, assign, or disclose information concerning his work to anyone other than the Acquired Company.

(d)   Patents.

(i)   Part 3.22(d) of the Disclosure Letter contains a complete and accurate list and summary description of all Patents. The Acquired Company is the owner of all right, title, and interest in and to each of the Patents, free and clear of all liens, security interests, charges, encumbrances, entities, and other adverse claims.

բոլոր գրավներից, կալանադրումներից, ցանձումներից, ծանրաբեռնումներից, այլ անձանց բաժնեմասերից, եւ այլ բացասական բնույթի հայցերից, եւ ունի բոլոր Մտավոր Սեփականության Միջոցները առանց երրորդ անձանց վճարման օգտագործելու իրավունք:

(ii)   Բացահայտման Նամակի Բաժին 3.22(գ)-ում ներկայացվածից բացի, Ձեռքբերված Ընկերության ոչ մի աշխատող Պայմանագրի մեջ չի մտել որն իրեն արգելում կամ սահմանափակում է որեւէ ձեւով աշխատանքի կողմից հնարավոր ներգրավված աշխատանքի բնույթը կամ բնագավառը կամ պահանջում է որպեսզի աշխատողը փոխանցի, նշանակի, կամ բացահայտի իր աշխատանքի վերաբերյալ տեղեկություններ որեւէ մեկին Ձեռքբերված Ընկերությունից բացի:

(դ) Պատենտներ:

(i)   Բացահայտման Նամակի Բաժին 3.22(դ)-ն ներկայացնում է բոլոր Պատենտների ամբողջական եւ ճիշտ ցուցակը եւ կրճատ նկարագրությունը: Ձեռքբերված Ընկերությունն տնօրինում է յուրաքանչյուր Պատենտի բոլոր իրավունքները, տիտղոսը, եւ բաժնեմասը, ազատ եւ զերծ բոլոր գրավներից, կալանադրումներից,

63

other adverse claims.

(ii)     All' of the issued Patents are currently in compliance with formal legal requirements (including payment of filing, examination, and maintenance fees and proofs of working or use), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

(iii)     No Patent has been or is now involved in any interference, reissue, reexamination, or opposition proceeding.  To Sellers' Knowledge, there is no potentially interfering patent or patent application of any third party.

(iv)     No Patent is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way.  None of the products manufactured and sold, nor any process or know-how used, by the Acquired Company infringes or is alleged to infringe any patent or other

---

 զանձումներից, ծանրաբեռնումներից, այլ անձանց բաժնեմասերից, եւ այլ բացասական բնույթի հայցերից:

(ii)     բոլոր տրղարկված Պատենտները ներկայումս համապատասխանում են պաշտոնական օրենքի պահանջներին (ներառյալ գրանցման, ստուգման, եւ պահպանման, եւ գործելու եւ օգտագործելու ապացույցների համար վճարումները), իրական եւ կիրառելի են, եւ ենթակա չեն որեւէ պահպանման վճարումների կամ հարկերի կամ այլ գործողությունների որոնք պետք է կատարվել Կատարման Ամսաթվից իննսուն օրվա ընթացքում:

(iii)     Ոչ մի Պատենտ չի ենթարկվել սահմանափակման, վերաթողարկման, վերստուգման, կամ բողոքարկման գործընթացի: Վեճառողների Իմացությամբ, գոյություն չունի երրորդ անձանց կողմից ստացված մրցակցող պատենտ կամ նման պատենտի համար ներկայացված դիմում:

(iv)     Ոչ մի Պատենտ սահմանափակված չէ կամ, Վածառողների Իմացությամբ, բողոքարկված կամ որեւէ կերպ կասկածի տակ դրված չէ: Չերքթերված Ընկերության կողմից արտադրված կամ վամառված ոչ մի ապրանք, օգտագործված ոչ մի

64

infringe any patent or other proprietary right of any other Person.

(e)    Trademarks.

(i)    Part 3.22(e) of Disclosure Letter contains a complete and accurate list and summary description of all Marks. The Acquired Company is the owner of all right, title, and interest in and to each of the Marks, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

(ii)    All Marks that have been registered are currently in compliance with all formal legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

ընթացք կամ նորս-հաու, չի սահմանափակում կամ ենթարկվում որ կարող է սահմանափակել որևէ երրորդ Անձին պատկանող որևէ պատենտ կամ որևէ առաջնային իրավունք:

(ե)    Առևտրային Նշաններ:

(i)    Բացահայտման Նամակի Բաժին 3.22(ե)-ն ներկայացնում է բոլոր Նշանների ամբողջական եւ ճիշտ ցուցակը եւ կրճատ նկարագրությունը: Ձեռքբերված Ընկերությունը տանօրինում է յուրաքանչյուր Նշանի բոլոր իրավունքների, տիտղոսը, եւ բաժնեմասը, ազատ եւ զերծ բոլոր գրավներից, կալանադրումներից, գանձումներից, ծանրաբեռնումներից, այլ անձանց բաժնեմասերից, եւ այլ բացասական բնույթի հայցերից:

(ii)    բոլոր գրանցված Նշանները ներկայումս համապատասխանում են վաշտոնական օրենքի պահանջներին (ներառյալ օգտագործման ապացույցների ժամանակին գրանցումը եւ մրցակցությունը եւ նորացման համար դիմումները), իրական եւ կիրառելի են, եւ ենթակա չեն որևէ պահպանման վճարումների կամ հարկերի կամ այլ գործողությունների որոնք պետք է կատարվել Կատարման Ամսաթվից իննսուն օրվա ընթացքում:

65

(iii)     No Mark has been or is now involved in any opposition, invalidation, or cancellation and, to Sellers' Knowledge, no such action is Threatened with the respect to any of the Marks.

(iv)     To Sellers' Knowledge, there is no potentially interfering trademark or trademark application of any third party.

(v)     No Mark is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way. None of the Marks used by the Acquired Company infringes or is alleged to infringe any trade name, trademark, or service mark of any third party.

(vi)     All products and materials containing a Mark bear the proper federal registration notice where permitted by law.

(f)     Copyrights.

(i)     Part 3.22(f) of the Disclosure Letter contains a complete and accurate list and summary

(iii)     Ոչ մի Նշան չի ենթարկվում եւ չի ենթարկվել բողոքարկման, չեղյալ չի համարվել, չի դադարեցվել կամ ոչնչացվել եւ, Վաճառողների Իմացությամբ, ոչ մի նման գործողություն չի Սպառնում Նշաններից որեւէ մեկին:

(iv)     Վաճառողների Իմացությամբ, գոյություն չունի որեւէ երրորդ անձի պոտենցիալ խանգարող առեւտրային նշան կամ առեւտրային նշանի դիմում:

(v)     Ոչ մի Նշան սահմանափակված չէ կամ, Վաճառողների Իմացությամբ, բողոքարկված կամ որեւէ կերպ կասկածի տակ դրված չէ: Ձեռքբերված Ընկերության կողմից օգտագործվող որեւէ Նշան չի սահմանափակում կամ ենթադրվում որ կարող է սահմանափակել որեւէ երրորդ կողմին պատկանող որեւէ առեւտրային անուն, առեւտրային նշան, կամ ծառայության նշան:

(vi)     Նշանը կրող բոլոր ապրանքները եւ նյութերը կրում են պետական գրանցման նիշը՝ օրենքով թույլատրվող դեպքերում:

(q)     Հեղինակային Իրավունքներ:

(i)     Բացահայտման Նամակի Բաժին 3.22(q)-ն

66

accurate list and summary description of all Copyrights. The Acquired Company is the owner of all right, title, and interest in and to each of the Copyrights, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

ներկայացնում է բոլոր Հեղինակային Իրավունքների ամբողջական եւ ճիշտ ցուցակը եւ կրճատ նկարագրությունը: Ձեռքբերված Ընկերությունը տնօրինում է յուրաքանչյուր Հեղինակային Իրավունքի բոլոր իրավունքները, տիտղոսը, եւ բաժնեմասը, ազատ եւ զերծ բոլոր գրավմերից, կալանադրումներից, գանձումներից, ծանրաբեռնումներից, այլ անձանց բաժնեմասերից, եւ այլ բացասական բնույթի հայցերից:

(ii) All the Copyrights have been registered and are currently in compliance with formal legal requirements, are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the date of Closing.

(ii) բոլոր Հեղինակային Իրավունքները գրանցված են եւ ներկայումս համապատասխանում են պաշտոնական օրենքի պահանջներին, իրական եւ կիրառելի են, եւ ենթական չեն որեւէ պահպանման վճարումների կամ հարկերի կամ այլ գործողությունների որոնք պետք է կատարվել Կատարման Ամսաթվից իննսուն օրվա ընթացքում:

(iii) No Copyright is infringed or, to Sellers' Knowledge, has been challenged or threatened in any way. None of the subject matter of any of the Copyrights infringes or is alleged to infringe any copyright of any third party or is a derivative work based on the work of a third party.

(iii) Ոչ մի Հեղինակային Իրավունք սահմանափակված չէ կամ, Վաճառողների Իմացությամբ, բողոքարկված կամ որեւէ կերպ կասկածի տակ դրված չէ: Ձեռքբերված Ընկերության կողմից օգտագործվող որեւէ Հեղինակային Իրավունք չի սահմանափակում կամ ենթադրվում որ կարող է սահմանափակել որեւէ երրորդ կողմին պատկանող որեւէ հեղինակային

67

իրավունք կամ չի
հանդիսանում երրորդ անձի
որևէ աշխատանքի
աձանձյայր:

(iv)    All works
encompassed by the
Copyrights have been
marked with the proper
copyright notice.

(vi)
Հեղինակային
Իրավունքի մեջ ներառված
բոլոր աշխատանքները
կրում են համապատասխան
հեղինակային իրավունքի
նշանը:

(g)    Trade Secrets.

(է)    Առևտրային
Գաղտնիք:

(i)    With respect
to each Trade Secret, the
documentation relating to
such Trade Secret is current,
accurate, and sufficient in
detail and content to identify
and explain it and to allow
its full and proper use
without reliance on the
knowledge or memory of
any individual.

(i)
Յուրաքանչյուր
Առևտրային Գաղտնիքի
մասով, այդ Առևտրային
Գաղտնիքին վերաբերող
փաստաթղթերն արդիական,
ճիշտ, եւ բավարան են
մանրամասների եւ իմաստի
առումով այն սահմանելու եւ
բացատրելու համար եւ բույլ
են տալիս դրա ամբողջական
եւ պատշաճ օգտագործումն
առանց որևէ
անձնավորության
իմացության կամ
հիշողության վրա հենվելու:

(ii)    Sellers and
the Acquired Company have
taken all reasonable
precautions to protect the
secrecy, confidentiality, and
value of their Trade Secrets.

(ii)
Վաճառողները եւ
Ձեռքբերված Ընկերությունը
ձեռք են առել բոլոր
զգուշության միջոցները
պաշտպանելու համար
Առևտրային Գաղտնիքների
գաղտնիությունը,
խորհրդապահությունը, եւ
արժեքը:

(iii)    The Acquired
Company has good title and
an absolute right to use the
Trade Secrets.  The Trade
Secrets are not part of the

(iii)    Ձեռքբերված
Ընկերությունը տնօրինում է
Առևտրային Գաղտնիքներն
ամբողջությամբ եւ դրանց
օգտագործման նկատմամբ

68

Secrets are not part of the public knowledge or literature, and, to Sellers' Knowledge, have not been used, divulged, or appropriated either for the benefit of any Person (other than the Acquired Company) or to the detriment of the Acquired Company. No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way.

ունի անսահմանափակ իրավունք: Առևտրային Գաղտնիքները հանրային իմացության կամ գրականության առարկա չեն, և, Վաճառողների Իմացությամբ, չեն օգտագործվել, բացահայտվել, կամ փոխանցվել ի շահ որևէ Անձի (բացի Ձեռքբերված Ընկերությունից) կամ ի վնաս Ձեռքբերված Ընկերության: Ոչ մի Առևտրային Գաղտնիք ենթակա չէ որևէ բացասական հայցի, չի բողոքարկվել կամ սպառնալիքի ենթարկվել որևէ այլ կերպ:

**3.23   Certain Payments.** Neither the Acquired Company nor any participant, officer, agent, or employee of the Acquired Company, or any other Person associated with or acting for or on behalf of the Acquired Company, has directly or indirectly (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (i) to obtain favorable treatment in securing business, (ii) to pay for favorable treatment for business secured, (iii) to obtain special concessions or for special concessions already obtained, for or in respect of the Acquired Company or any Affiliate of the Acquired Company, or (iv) in violation of any Legal Requirement, (b) established or maintained any fund or asset that has not been recorded in the books and records of the Acquired Companies.

**3.23   Որոշակի Վճարումներ:** Ոչ Ձեռքբերված Ընկերությունը ևս ոչ էլՁեռքբերված Ընկերության որևէ մասնակից, պաշտոնյա, կամ աշխատող, կամ Ձեռքբերված Ընկերության հետ կապ ունեցող կամ նրա անունից գործող որևէ այլ Անձ, ուղղակիորեն կամ անուղղակիորեն չի տվել (ա) որևէ ներդրում, նվեր, կաշառք, զեղչ, վճար, ազդեցության վճար, շնորհավճար, կամ այլ վճար որևէ Անձի, հանրորեն կամ առանձին, անկախ ձևից, գումարով, գույքով, կամ ծառայություններերի ձևով (i) ձեռք բերելու գործունեության ապահովության համար բարենպաստ վերաբերմունք, (ii) վարճահատույց լինելու համար գործունեության ապահովության բարենպաստ վերաբերմունքի համար, (iii) Ձեռքբերված Ընկերության կամ Ձեռքբերված Ընկերության որևէ Փոխկապակցված Անձի համար կամ առնչությամբ ձեռք բերելու համար հատուկ զիջումներ կամ վարձահատույց լինելու ձեռք բերված հատուկ զիջումների համար, կամ (iv) որևէ Օրենքի Պահանջի խախտումով, (բ) ստեղծել կամ պահել է որևէ դրամագլուխ կամ գույք որը չի գրանցվել Ձեռքբերված Ընկերության գրքերում ևս գրանցումներում:

**3.24  Disclosure.**

(a)  No representation or warranty of Sellers in this Agreement and no statement in the Disclosure Letter omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

(b)  No notice given pursuant to Section 5.5 will contain any untrue statement or omit to state a material fact necessary to make the statements therein or in this Agreement, in light of the circumstances in which they were made, not misleading.

(c)  There is no fact known to either Seller that has specific application to any Seller or the Acquired Company (other than general economic or industry conditions) and that materially adversely affects the assets, business, prospects, financial condition, or results of operations of the Acquired Companies (on a consolidated basis) that has not been set forth in this Agreement or the Disclosure Letter.

**3.25  Relationships with Related Persons.**  No Seller or any Related Person of Sellers or of the Acquired Company has.

3.24  Բացահայտում:

(ա)  Վաճառողների՝ Սույն Պայմանագրում արված ոչ մի հայտարարություն կամ տրված երաշխիքը եւ Բացահայտման Նամակում կատարված ոչ մի հայտարարություն չի պարունակում ոչ մի էական փաստի բացթողում որն անհրաժեշտ է յուրաքանչյուր փաստաթղթում կատարված հայտարարությունը ոչ ապակողմնորոշող դարձնելու համար՝ հանգամանքներում որոնցում դրանք կատարված են:

(բ)  Բաժին 5.5-ի համաձայն տրված ծանուցումներից ոչ մեկը չի պարունակի որեւէ ոչ ճիշշտ հայտարարություն կամ որեւէ էական փաստի բացթողում որն անհրաժեշտ է կատարած հայտարարությունները դրանցում կամ սույն Պայմանագրում՝ հանգամանքներում որոնցում դրանք արվել են, ոչ ապակողմնորոշող դարձնելու համար:

(գ)  Գ-ոյություն չունի որեւէ Վաճառողին հայտնի փաստա որը հատուկ կիրառում ունի որեւէ Վաճառողի կամ Ձեռքբերված Ընկերության նկատմամբ (բացի ընդհանուր տնտեսական կամ արտադրական վիճակը) եւ որը նյութականորեն բացասական ազդեցություն ունի Ձեռքբերված Ընկերության գույքի, գործունեության, հեռանկարների, ֆինանսական վիճակի կամ գործունեության արդյունքների վրա (միասնական հիմունքներով) որը չի ներկայացվել սույն Պայմանագրում կամ Բացահայտման Նամակում:

3.14  Փոխկապակցված Անձանց հետ Հարաբերություններ: Ոչ մի Վաճառող կամ Վաճառողի կամ Ձեռքբերված

70

of Sellers or of the Acquired Company has, or since has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to the Acquired Company's businesses. No Seller or any Related Person of Sellers or of the Acquired Company is, or since has owned (of record or as a beneficial owner) an equity interest or any other financial or profit interest in, a Person that has (i) had business dealings or a material financial interest in any transaction with the Acquired Company, or (ii) engaged in competition with the Acquired Company with respect to any line of activities of the Acquired Company (a "Competing Business") in any market presently served by the Acquired Company. Except as set forth in Part 3.25 of the Disclosure Letter, no Seller or any Related Person of Sellers or of the Acquired Company is a party to any Contract with, or has any claim or right against, the Acquired Company.

Ընկերության հետ Փոխկապակցված Անձ յանցի, եւ չի ունեցել, որեւէ բաժնեմաս ունել, գույքի մեջ (լինի դա անշարժ, շարժական, կամ խառը եւ նյութական կամ ոչ նյութական), որն օգտագործվում է կամ առնչվում է Ջեռքբերված Ընկերության գործունեությանը: Ոչ մի Վաճառող կամ Վաճառողի կամ Ջեռքբերված Ընկերության հետ Փոխկապակցված Անձ չի տնօրինում, եւ չի տնօրինել (որպես ուղղակի կամ անուղղակի սեփականատեր) որեւէ բաժնեմաս կամ որեւէ ֆինանսական կամ շահութային բաժնեմաս մի Անձի մոտ որը (i) գործնական շփումներ կամ նյութական ֆինանսական շահեր է ունեցել որեւէ գործարքում Ջեռքբերված Ընկերության հետ, կամ (ii) ներգրավված է եղել Ջեռքբերված Ընկերության հետ Ջեռքբերված Ընկերության որեւէ գործունեության բնագավառում («Մրցակցող Ջենմարկություն») Ջեռքբերված Ընկերության կողմից ներկայումս ծառայող որեւէ շուկայում: Բացառությամբ Նասնակի Բաժին 3.25-ում ներկայացվածից բացի, ոչ մի Վաճառող կամ Վաճառողների կամ Ջեռքբերված Ընկերությանը Փոխկապակցված Անձ կողմ չի հանդիսանում որեւէ Պայմանագրի, կամ չունի որեւէ հայց կամ իրավունք, Ջեռքբերված Ընկերության հետ:

### 3.26    <u>Brokers or Finders</u>.
Sellers and their agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

### 3.26    <u>Բրոկերներ եւ Գտնողներ</u>:

Վաճառողները եւ նրանց գործակալները չունեն որեւէ պարտավորություններ կամ պարտականություն, պայմանական կամ այլ կերպ, բրոկերների կամ գտնողների վճարների կամ գործակալների շահավճարների կամ այլ համանման վճարների մասով սույն Պայմանագրի հետ կապված:

## 4.    <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>.  Buyer represents and warrants to Sellers as follows:

## 4.    <u>ԳՆՈՐԴԻ ՀԱՅՏԱՐԱՐՈՒԹՅՈՒՆՆԵՐ ԵՒ ԵՐԱՇԽԻՔՆԵՐ</u>:  Գնորդը հայտարարում եւ երաշխավորում է Վաճառողներին հետեւյալով.

71

4.1 **Organization and Good Standing**. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, USA.

4.2 **Authority; No Conflict.**

(a)    This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.  Upon the execution and delivery by Buyer of the Escrow Agreement and the Promissory Notes (collectively, the "Buyer's Closing Documents"), the Buyer's Closing Documents will constitute the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.  Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and the Buyer's Closing Documents and to perform its obligations under this Agreement and the Buyer's Closing Documents.

(b)    Except as set forth in Schedule 4.2, neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the Contemplated Transactions by Buyer will give any Person the right to prevent, delay, or otherwise interfere with any of the

4.1 **Կազմակերպում եւ Պատշաճ Վիճակ**: Գնորդը ԱՄՆ Դելավեր նահանգի օրենսդրությամբ պատշաճ կազմավորված, իրավականորեն գոյություն ունեցող, եւ պատշաճ վիճակում գտնվող սահմանափակ պատասխանատվությամբ ընկերություն է:

4.2 **Լիազորություն; Շահերի Բախման Բացակայություն:**

(ա)    Սույն Պայմանագիրը սահմանում է Գնորդի իրավական, պատշաճ եւ Գնորդին պարտավորեցնող պարտավորություն՝ կիրառելի իր դրույթների համաձայն: Գնորդի կողմից Էսքրո Պայմանագրի եւ Մուրհակի ստորագրումից եւ տրամադրումից հետո (միասնաբար՝ «Գնորդի Կատարման Փաստաթղթեր»), Գնորդի Կատարման Փաստաթղթերը կսահմանեն Գնորդի իրավական, պատշաճ եւ պարտավորեցնող պարտավորություններ՝ Գնորդների հանդեպ կիրառելի իրենց համապատասխան դրույթների համաձայն: Գնորդն ունի բացարձակ եւ անսահմանափակ իրավունք, իշխանություն, իրավասություն, եւ ունակություն ստորագրելու եւ կատարելու սույն Պայմանագիրը եւ Գնորդի Կատարման Փաստաթղթերը եւ կատարելու սույն Պայմանագրով եւ Գնորդի Կատարման Փաստաթղթերով սահմանված պարտավորությունները:

(բ)    Բացի Բացահայտման Նախակի Բաժին 4.2-ում նշված, սույն Պայմանագրի ստորագրումը եւ կատարումը, կամ Գնորդի կողմից որեւէ Նախատեսված Գործառքների իրականացումը կամ կատարումը չի շնորհի որեւէ Անձի իրավունքով արգելելու, ուշացնելու, կամ այլ կերպ խանգարելու որեւէ Նախատեսված Գործառքներ համաձայն.

72

interfere with any of the Contemplated Transactions pursuant to:

    (i)    any provision of Buyer's Organizational Documents;

    (ii)    any resolution adopted by the board of directors or the stockholders of Buyer;

    (iii)    any Legal Requirement or Order to which Buyer may be subject; or

    (iv)    any Contract to which Buyer is a party or by which Buyer may be bound.

Except as set forth in Schedule 4.2, Buyer is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

**4.3**    <u>Investment Intent</u>.  Buyer is acquiring the Shares for its own account.

**4.4**    <u>Certain Proceedings</u>. There is no pending Proceeding that has been commenced against Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.  To Buyer's Knowledge, no such Proceeding has been Threatened.

    (i)    Գնորդի Կազմավորման Փաստաթղթերի,

    (ii)    Գնորդի տնօրենների կամ բաժնետերերի ժողովի կողմից կայացված որոշման,

    (iii)    որևէ Օրենքի Պահանջի կամ Հրամանի որին Գնորդը կարող է ենթակա լինել, կամ

    (iv)    որևէ Պայմանագրի որին կողմ է Գնորդը կամ որով Գնորդը կարող է պարտավորվել:

Բացառությամբ Նամակի Բաժին 4.2-ում ներկայացվածից բացի, Գնորդից չի պահանջվում ձեռք բերել որևէ Համաձայնություն որևէ Անձից սույն Պայմանագրի ստորագրման ևւ կատարման կամ Նախատեսված Գործարքներից որևէ մեկի կատարման կամ իրականացման վերաբերյալ:

**4.3**    <u>Ներդնելու Նպատակը</u>: Գնորդը Բաժնետմասը ձեռք է բերում իր հաշվին:

**4.4**    <u>Որոշ Գործընթացներ</u>: Գոյություն չունեն ընթացքի մեջ գտնվող Գործարքներ որոնք մեկնարկվել են Գնորդի դեմ ևւ որոնք սպառնում են, կամ կարող են արգելել, ուշացնել, անօրինական դարձնել, կամ այլ կերպ խանգարել Նախատեսված Գործարքներից որևէ մեկը: Գնորդի իմացությամբ, նման ոչ մի Գործընթաց չի սպառնացել:

4.5 **Brokers or Finders**. Buyer and its officers and agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and will indemnify and hold Sellers harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or its officers or agents.

5. **COVENANTS OF SELLERS PRIOR TO CLOSING DATE.**

5.1 **Access and investigation**. Between the date of this Agreement and the Closing Date, Sellers will, and will cause the Acquired Company and its Representatives to, (a) afford Buyer and its Representatives and prospective lenders and their Representatives (collectively, "Buyer's Advisors") full and free access to the Acquired Company's personnel, properties (including subsurface testing), contracts, books and records, and other documents and data, (b) furnish Buyer and Buyer's Advisors with copies of all such contracts, books and records, and other existing documents and data as Buyer may reasonably request, and (c) furnish Buyer and Buyer's Advisors with such additional financial, operating, and other data and information as Buyer may reasonably request.

4.5 Բրոկերներ եւ Գտնողներ: Գնորդը եւ իր պաշտոնյաները եւ գործակալները յունեն որեւէ պարտավորություններ կամ պարտականություն, պայմանական կամ այլ կերպ, բրոկերների կամ գտնողների վճարների կամ գործակալների շահավճարների կամ այլ համանման վճարների մասով սույն Պայմանագրի հետ կապված, եւ կփոխխատուցեն եւ Վաճառողներին զերծ կպահեն Գնորդի միջոցով վճարման առկա որպես Գնորդի եւ իր պաշտոնյաների գործողությունների առդյունք ենթադրվող բոլոր նման վճարներից:

5. ՎԱՃԱՌՈՂԻ ՊԱՐՏԱՎՈՐՈՒԹՅՈՒՆՆԵՐԸ ՄԻՆՉԵՒ ԿԱՏԱՐՄԱՆ ԱՄՍԱԹԻՎԸ:

5.1 Մուտք եւ Ստուգում: Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Վաճառողներն անձամբ, եւ Ձեռքբերված Ընկերության եւ նրա Ներկայացուցիչների միջոցով, (ա) Գնորդին եւ նրա ներկայացուցիչներին եւ հետամնկարային վարկատուներին եւ նրանց Ներկայացուցիչներին (միասնաբար՝ «Գնորդի Խորհրդատուներ») կշնորհեն լազատ եւ անկաշկանդ մուտքով Ձեռքբերված Ընկերության աշխատակազմի, գույքի (ներառյալ ստորգետնյա ստուգումների), պայմանագրերի, գրքերի եւ գրանցումների, եւ այլ փաստաթղթերի եւ տեղեկության ճկամանբ, (բ) Գնորդին եւ Գնորդի Խորհրդատուներին կտրամադրեն նման բոլոր պայմանագրերի, գրքերի եւ գրանցումների, եւ այլ գոյություն ունեցող փաստաթղթերի եւ տեղեկության պատճեներով համաձայն Գնորդի ողջամիտ խնդրանքի, եւ (գ) Գնորդին եւ Գնորդի Խորհրդատուներին կտրամադրեն նման հավելյալ ֆինանսական, աշխատանքրային, եւ այլ տեղեկատվություամբ համաձայն Գնորդի ողջամիտ խնդրանքի:

74

5.2  **Operation of the Businesses of the Acquired Company.** Between the date of this Agreement and the Closing Date, Sellers will, and will cause the Acquired Company to:

(a)  conduct the business of such Acquired Company only in the Ordinary Course of Business;

(b)  use their Best Efforts to preserve intact the current business organization of such Acquired Company, keep available the services of the current officers, employees, and agents of the Acquired Company, and maintain the relations and good will with suppliers, customers, landlords, creditors, employees, agents, and others having business relationships with the Acquired Company;

(c)  confer with Buyer concerning operational matters of a material nature; and

(d)  otherwise report periodically to Buyer concerning the status of the business, operations, and finances of the Acquired Company.

5.3  **Negative Covenant.** Except as otherwise expressly permitted by this Agreement, between the date of this Agreement and the Closing Date, Sellers

5.2  Ձեռքբերված Ընկերության Գործունեության Կառավարում: Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակարճնթացում Վաճառողներն անձամբ, եւ Ձեռքբերված Ընկերության միջոցով`

(ա)  Ձեռքբերված Ընկերության գործունեությունը կկառավարեն բացառապես Գործունեության Բնականոն Ընթացքով,

(բ)  կջանագործեն իրենց Լավագույն Ջանքերը ամբողջական պահպանելու համար Ձեռքբերված Ընկերության գործավարական կազմավորվածությունը, կպահպանեն Ձեռքբերված Ընկերության ընթացիկ պաշտոնյաների եւ գործակալների ծառայությունները, եւ կպահպանեն մատակարարների, հաճախորդների, գույքատերերի, վարկատուների, աշխատողների, գործակալների, եւ այլոց հետ ունեցող գործնական հարաբերությունները ունեն Ձեռքբերված Ընկերության հետ բարի հարաբերություններ եւ բարի կամք:

(գ)  կխորհրդակցեն Գնորդի հետ գործառական բնույթ ունեցող աշխատանքային հարցերով, եւ

(դ)  այլ կերպ պարբերաբար կզեկուցեն Գնորդին Ձեռքբերված Ընկերության գործունեության, աշխատանքի, եւ ֆինանսների վերաբերյալ:

5.3  Բացասական Պարտավորություն: Սույն Պայմանագրում հատակորեն այլ կերպ սահմանվածից բացի, սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած

75

Agreement and the Closing Date, Sellers will not, and will cause the Acquired Company not to, without the prior consent of Buyer, take any affirmative action, or fail to take any reasonable action within their or its control, as a result of which any of the changes or events listed in Section 3.16 is likely to occur.

5.4    **Required Approvals**.  As promptly as practicable after the date of this Agreement, Sellers will, and will cause each Acquired Company to, make all filings required by Legal Requirements to be made by them in order to consummate the Contemplated Transactions. Between the date of this Agreement and the Closing Date, Sellers will, and will cause each Acquired Company to, (a) cooperate with Buyer with respect to all filings that Buyer elects to make or is required by Legal Requirements to make in connection with the Contemplated Transactions, and (b) cooperate with Buyer in obtaining all consents identified in Schedule 4.2.

5.5    **Notification**.  Between the date of this Agreement and the Closing Date, each Seller will promptly notify Buyer in writing if such Seller or the Acquired Company becomes aware of any fact or condition that causes or constitutes a Breach of any of Sellers' representations and warranties as of the date of this Agreement, or if such Seller or the Acquired Company becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a Breach of any such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of

ժամանակարընթացքում, Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության միջոցով, առանց Գնորդի նախորոք համաձայնության, չեն կատարի որեւէ պատասխանել գործողություն, կամ որեւէ անգործություն իրենց իրավասությունների սահմաններում, որի արդյունքում կարող են առաջանալ Բաժին 3.16-ում նախատեսված փոփոխություններից կամ դեպքերից որեւէ մեկը:

5.4    **Պահանջվող Հաստատումներ:** Սույն Պայմանագրի ամսաթվից ինչքան հնարավոր է շուտ, Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության միջոցով, կկատարեն Օրենքի Պահանջով պահանջվող բոլոր գրանցումները իրականացնելու համար Նախատեսված Գործարքները: Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածի ընթացքում, Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության միջոցով, (ա) կհամագործակցեն Գնորդի հետ Գնորդի կողմից ընտրված կամ Օրենքի Պահանջով պահանջվող բոլոր գրանցումներում Նախատեսված Գործարքների հետ կապված, եւ (բ) կհամագործակցեն Գնորդի հետ Բաժին 4.2-ում նախանշված բոլոր թույլտվությունների ստացման գործում:

5.5    **Ծանուցումներ:** Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածի ընթացքում, յուրաքանչյուր Վաճառող անմիջապես գրավոր կծանուցի Գնորդին եթե այդ Վաճառողը կամ Ձեռքբերված Ընկերությունը տեղեկանան որեւէ փաստի կամ իրավիճակի մասին որը հարուցում կամ սահմանում է Վաճառողների որեւէ հայտարարությունների եւ երաշխիքների Խախտում սույն Պայմանագրի ամսաթվի դրությամբ, կամ եթե Վաճառողը կամ Ձեռքբերված Ընկերությունը սույն Պայմանագրի ամսաթվից հետո տեղեկանան մեկ փաստի կամ իրավիճակի մասին որը կհարուցեր կամ կհամարեր արված հայտարարության կամ

76

as of the time of occurrence or discovery of such fact or condition. Should any such fact or condition require any change in the Disclosure Letter if the Disclosure Letter were dated the date of the occurrence or discovery of any such fact or condition, Sellers will promptly deliver to Buyer a supplement to the Disclosure Letter specifying such change. During the same period, each Seller will promptly notify Buyer of the occurrence of any Breach of any covenant of Sellers in this Section 5 or of the occurrence of any event that may make the satisfaction of the conditions in Section 7 impossible or unlikely.

**5.6 Payment of Indebtedness by Related Persons.** Except as expressly provided in this Agreement, Sellers will cause all indebtedness owed the Acquired Company by any Seller or any Related Person of a Seller to be paid in full prior to Closing.

**5.7 No Negotiation.** Until such time, if any, as this Agreement is terminated pursuant to Section 9, Sellers will not, and will cause the Acquired Company and each of its Representatives not to, directly or indirectly solicit, initiate, or encourage any inquiries or proposals from, discuss or negotiate with, provide any non-public information to, or consider the merits of any unsolicited inquiries or proposals from, any Person (other than Buyer) relating to any transaction involving the sale of the business or assets (other than in the Ordinary Course of Business) of the Acquired Company, or any of the capital of

երաշխիքի Խախտում եթե այդ փաստը կամ իրավիճակը հայտնաբերվելիս կամ գոյություն ունենային այդ հայտատարությունների կամ երաշխիքների կատարման ժամանակ: Եթե նման փաստը կամ իրավիճակը պահանջի Բացահայտման Նամակի որևէ փոփոխություն այդ դեպքում երբ Բացահայտման Նամակը ամսագրված լիներ նման փաստի կամ իրավիճակի հայտնաբերման կամ գոյության ունենալու ժամանակ, ապա Վաճառողները Գ-նույին անհապաղ կտրամադրեն այդ փոփոխությունն արտացոլող Բացահայտման Նամակի հավելվում: Նույն ժամանակահատվածի ընթացում, յուրաքանչյուր Վաճառող Գ-նորդին անհապաղ կտեղեկացնի Բաժին 5-ում սահմանված Վաճառողի որևէ պարտավորության որևէ Խախտման առաջացման վերաբերյալ կամ որևէ դեպքի կամ երևույթի վրա հասնելու վերաբերյալ որը կարող է Բաժին 7-ի պայմաններիի բավարարումը դարձնել անհնար կամ ոչ հավանական:

**5.6 Փոխկապակցված Անձանց կողմից Պարտքերի Վճարում:** Սույն Պայմանագրում հատուկ սահմանվածից բացի, Վաճառողները ամբողջությամբ վճարել կստան Ձեռքբերված Ընկերությանը որևէ Վաճառող կամ Վաճառողի Փոխկապակցված Անձի պարտքը մինացած գումարները մինչև Կատարումը:

**5.7 Բանակցությունների Բացակայություն:** Բացի մինչև այն ժամանակը, եթե տեղի ունենա, երբ սույն Պայմանագիրը կդադարի Բաժին 9-ի համաձայն, Վաճառողները անձամբ, եւ Ձեռքբերված Ընկերության եւ նրա յուրաքանչյուր Ներկայացուցչի միջոցով թույլ չեն տա, ուղղակիորեն կամ անուղղակիորեն կամենա, մեկնարկի, կամ խթանի երեւէ Անձի կողմից որևէ հարցումի կամ առաջարկություն, կամ նրա կողմից որևէ քարտուղման հարցման կամ առաջարկության որևէ խնդիրի քննարկում (բացի Գ-նորդից) առնվլով որևէ գործարքի որը կներառի Ձեռքբերված Ընկերության գործունեություն կամ գույքի վաճառք

77

Acquired Company, or any of the capital of the Acquired Company, or any merger, consolidation, business combination, or similar transaction involving the Acquired Company.

(բացի Գ-ործունեության Ընականոնն Ընկարգբից), կամ Չեղբրեկվա Ընկերության որեւէ կապիտալի վաճառք, կամ որեւէ միացում, միավորում, գործունեության համատեղում, կամ համանման գործավար որը կներառի Չեղբրբերված Ընկերությունը:

**5.8    Best Efforts.** Between the date of this Agreement and the Closing Date, Sellers will use their Best Efforts to cause the conditions in Sections 7 and 8 to be satisfied.

**5.8    Լավագույն Ջանքեր:** Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Վաճառողները կօգտագործեն իրենց Լավագույն Ջանքերը բավարարելու համար Բաժին 7-ի եւ Բաժին 8-ի պայմանները:

**6.    COVENANTS OF BUYER PRIOR TO CLOSING DATE.**

**6.    ԳՆՈՐԴԻ ՊԱՐՏԱՎՈՐՈՒԹՅՈՒՆՆԵՐԸ ՄԻՆՉԵՒ ԿԱՏԱՐՄԱՆ ԱՄՍԱԹԻՎԸ:**

**6.1    Approvals of Governmental Bodies.** As promptly as practicable after the date of this Agreement, Buyer will, and will cause each of its Related Persons to, make all filings required by Legal Requirements to be made by them to consummate the Contemplated Transactions. Between the date of this Agreement and the Closing Date, Buyer will, and will cause each Related Person to, (i) cooperate with Sellers with respect to all filings that Sellers are required by Legal Requirements to make in connection with the Contemplated Transactions, and (ii) cooperate with Sellers in obtaining all consents identified in Part 3.2 of the Disclosure Letter; provided that this Agreement will not require Buyer to dispose of or make any change in any portion of its business or to incur any other burden to obtain a Governmental Authorization.

**6.1    Կառավարական Մարմինների Հաստատումները:** Սույն Պայմանագրի ամսաթվից ինչքան որ հնարավոր է շուտ, Գնորդն անձամբ եւ իր Փոխկապակցված Անձանց միջոցով, կստարեl Օրենքի Պահանջով նախատեսված բոլոր գրանցումները որոնք անհրաժեշտ են իրականացներու համար Նախատեսված Գործարքները: Սույն Պայմանագրի ամսաթվի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Գնորդն անձամբ, եւ իր Փոխկապակցված Անձանց միջոցով, (i) կհամագործակցի Վաճառողների հետ Օրենքի Պահանջով պահանծվող բոլոր գրանցումների կատարման մեջ կապված Նախատեսված Գործարքների հետ, եւ (ii) կհամագործակցի Վաճառողների հետ Բացահայտումման Նամակի Բաժին 3.2-ում ներկայացված բոլոր թույլտվությունների ստացման գործում. պայմանով որ սույն Պայմանագիրը չի պահանջի Գնորդին փոխել կամ փոփոխել իր գործունեության առարկա կամ կրել Կառավարական Լիազորության ստանալու ծանրաբեռնում:

**6.2    Best Efforts.** Except as set forth in the provison to Section 6.1.

**6.2    Լավագույն Ջանքեր:** Բաժին 6.1-ում ներկայացվածից բացի,

78

forth in the provison to Section 6.1, between the date of this Agreement and the Closing Date, Buyer will use its Best Efforts to cause the conditions in Sections 7 and 8 to be satisfied.

## 7. CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE.
Buyer's obligation to purchase the Shares and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

### 7.1 Accuracy of Representations.

(a)    All of Sellers' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Disclosure Letter.

(b)    Each of Sellers' representations and warranties in Sections must be accurate in all respects as of the date of this Agreement, and must be accurate in all respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Disclosure Letter.

## 7. ԳՆՈՐԴԻ ԿԱՏԱՐՄԱՆ ՊԱՐՏԱՎՈՐՈՒԹՅԱՆ ԻՐԱԿԱՆԱՑՄԱՆ ՆԱԽԱՊԱՅՄԱՆՆԵՐԸ:
Բաժնեմասը գնելու եւ Կատարման ժամանակ Գնորդից պահանջվող այլ գործողությունները կատարելու պարտավորությունը պայմանավորված է յիետեւյալ պայմաններից յուրաքանչյուրի բավարարմամբ (որոնցից ցանկացածը կարող է չեղյալ համարվել Գնորդի կողմից, ամբողջությամբ կամ մասամբ) Կատարման ժամանակ կամ դրանից առաջ`

### 7.1 Հայտարարությունների Ճշտությունը:

(ա)    Վաճառողների սույն Պայմանագրում արված բոլոր հայտարարությունները եւ երաշխավորությունները (միասնին վերցված), եւ յուրաքանչյուր այս հայտարարությունները եւ երաշխավորությունները (առանձնին վերցված), պետք է լինեն ճիշտ բոլոր էական առումներով սույն Պայմանագրի ամսաթվի դրությամբ, եւ պետք է լինեն ճիշտ բոլոր էական առումներով Կատարման Ամսաթվի դրությամբ իբր թե կատարվել են Կատարման Ամսաթվի դրությամբ, առանց հաշվելու պատռաստելու Բացահայտման Նամակին:

(բ)    Բաժիններում Վաճառողների հայտարարությունները եւ երաշխավորությունները պետք է ճիշտ լինեն բոլոր առումներով սույն Պայմանագրի ամսաթվի դրությամբ, եւ պետք է ճիշտ լինեն բոլոր առումներով Կատարման Ամսաթվի դրությամբ իբր կատարվել են Կատարման Ամսաթվից, առանց

79

Բացահայտման Նամակին
հավելում պատառաելու:

**7.2    Sellers' Performance.**

(a)    All of the covenants and obligations that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

(b)    Each document required to be delivered pursuant to Section 2.4 must have been delivered, and each of the other covenants and obligations in Sections must have been performed and complied with in all respects.

**7.3    Consents.** Each of the Consents identified in the Disclosure Letter, and each Consent identified in Schedule 4.2, must have been obtained and must be in full force and effect.

**7.4    Additional Documents.** Sellers must have delivered additional documents reasonably by Buyers:

**7.5    No Proceedings.** Since the date of this Agreement, there must not have been commenced or Threatened against Buyer, or against any Person affiliated with Buyer, any Proceeding (a) involving any challenge to, or seeking damages or other

**7.2    Վաճառողի Գործելակերպը:**

(ա)    Կատարման ժամանակ կամ դրանից առաջ սույն Պայմանագրի համաձայն Վաճառողների կողմից կատարման ենթակա բոլոր պարտավորությունները եւ պարտականությունները (միասին վերցված), եւ յուրաքանչյուր այս պարտավորությունները եւ պարտականությունները (առանձին վերցված), պետք է պատշաճ ձեւով կատարվեն եւ իրականացվեն բոլոր էական առումներով:

(բ)    Բաժնի 2.4-ի համաձայն տրամադրման ենթակա բոլոր փաստաթղթերը պետք է տրամադրված լինեն, եւ Բաժիններում ներկայացված յուրաքանչյուր այլ պարտավորությունները եւ պարտականությունները պետք է կատարված եւ իրականացված լինեն բոլոր առումներով:

**7.3    Համաձայնություններ:** Բացահայտման Նամակում ներկայացված բոլոր Համաձայնությունները, եւ Բաժին 4.2-ում ներկայացված յուրաքանչյուր Համաձայնություն պետք է ձեռք բերված լինի, եւ լինի լրիվ ուժի մեջ եւ ունենա ունակություն:

**7.4    Հավելյալ Փաստաթղթեր:** Վաճառողները պետք է տրամադրած լինեն Գնորդի կողմից ողջամտորեն պահանջված փաստաթղթերը:

**7.5    Վարույթների Բացակայություն:** Սույն Պայմանագրի ամսաթվից Գնորդի, կամ Գնորդի հետ աֆիլացված այլ Անձի դեմ չպետք է սկսված կամ Սպառնացած լինեն, որեւէ Վարույթներ (ա) որոնք ներառում են որեւէ սպառնալիք որեւէ Նախատեսված Գործարքի

*82*

challenge to, or seeking damages·or other relief in connection with, any of the Contemplated Transactions, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the Contemplated Transactions.

**7.6 No Claim Regarding Stock Ownership or Sale Proceeds.** There must not have been made or Threatened by any Person any claim asserting that such Person (a) is the holder or the beneficial owner of, or has the right to acquire or to obtain beneficial ownership of, any stock of, or any other voting, equity, or ownership interest in, the Acquired Company, or (b) is entitled to all or any portion of the Purchase Price payable for the Shares.

**7.7 No Prohibition.** Neither the consummation nor the performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any applicable Legal Requirement or Order, or (b) any Legal Requirement or Order that has been published, introduced, or otherwise proposed by or before any Governmental Body.

**8. CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE.** Sellers' obligation to sell the Shares and to take the other actions required to be taken by Sellers at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Sellers, in whole or in part):

նկատմամբ, կամ վնասների կամ այլ փոխհատուցման խնդիրներ դնելով հետ կապված, կամ (բ) որը կարող է արգելել, ուշացնել, անօրինական դարձնել, կամ այլ կերպ խանգարել ագլեցություն ունենալ որևէ Նախատեսված Գործառթի նկատմամբ:

**7.6 Բաժնետման Սեփinման կամ Վաճառթի Գ-ումարների Վերաբերյալ Հայցի Բացակայություն:** Չպետք է ներկայացվի կամ Սպառնա ներկայացվելու որևէ հայց որևէ Անձի կողմից պնդումով որ այդ Անձն (ա) Չերբթերված Ընկերության սեփականատերն է, կամ ունի դրա, դրա որևէ բաժնետման, կամ դրա որևէ ձայնի, գույքի, կամ բաժնետման ձեռբթրման կամ անմդղակի սեփականաթիրման իրավունքը, կամ (բ) իրավասո է Բաժնետման Գ-նմավ Գ-նի կամ դրա որևէ մասի նկատմամբ:

**7.7 Արգելման Բացակայություն:** Նախատեսված Գործարքների իրականացումը կամ կատարումը ուղղակիորեն կամ անմդղակիորեն (ծանուցմամբ կամ առանց դրա կամ ժամանակի ընթացքում), ijուrթականoրեն չի հակասի, կամ բախումn առաջացնի, կամ Sjուrթական խախտման արդյունբ հանդիսանա, կամ Գ-նnrդին Գ-ine Գ-nrդի հետ Փnխկապակցված Անձի հարուցի տուժել որևէ Sjուrթականorեն բացասական հետեւանգներից որոնք առաջանան են (ա) որևէ գործող Oրեների Պահանջի կամ Հրամանի արդյունբում, կամ (բ) որևէ Oրեների Պահանջից կամ Հրամանից որը հրատարակվել է, ներկայացվել է, կամ այլ կերպ առաջարկվել է որևէ Կատավարական Մարմնի կողմից կամ ծրաս:

**8. ՎԱՃԱՌՈՂԻ ԿՍՏԱՐՄԱՆ ՊԱՐՏSՎՈՐՈՒԹՅԱՆ ԻՐԱԿԱՆՍՏՄԱՆ ՆԱԽԱՊԱՅՄԱՆՆԵՐԸ:** Բաժնետմանը վաճառելու եւ Կատավարման ժամանակ Վաճառողներից պահանջվող այլ գործողությունները կատարելու պարտավորությունը պայմանավnrված է հետեւյալ պայմաններից յուրաքանչյուrի բավարարմամբ (որոնցից գանկագածը կարող է չեղյալ համարվել Վաճառողների

waived by Sellers, in whole or in part):

8.1    **Accuracy of Representations.**  All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

8.2    **Buyer's Performance.**

(a)    All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b)    Buyer must have delivered each of the documents required to be delivered by Buyer pursuant to Section 2.4 and must have made the cash payments required to be made by Buyer pursuant to Sections 2.4(b)(i) and 2.4(b)(ii).

8.3    **Consents.**  Each of the Consents identified in the Disclosure Letter must have been obtained and must be in full force and effect.

կողմից, ամբողջությամբ կամ մասամբ)
Կատարման ժամանակ կամ դրանից առաջ

8.1    Հայտարարությունների Ճշտություն: Գնորդի սույն Պայմանագրում արված բոլոր հայտարարությունները եւ երաշխավորությունները (միասին վերցված), եւ յուրաքանչյուր այս հայտարարությունները եւ երաշխավորությունները (առանձին վերցված), պետք է լինեն ճիշտ բոլոր էական առումներով սույն Պայմանագրի ամսաթվի դրությամբ, եւ պետք է լինեն ճիշտ բոլոր էական առումներով Կատարման Ամսաթվի դրությամբ իբր թե կատարվել են Կատարման Ամսաթվի դրությամբ, առանց հավելյալ պատճառելու Բացահայտման Նամակին:

8.2    Գնորդի Գործելակերպ:

(ա)    Կատարման ժամանակ կամ դրանից առաջ սույն Պայմանագրի համաձայն Գնորդի կողմից կատարման ենթակա բոլոր պարտավորությունները (միասին վերցված), եւ յուրաքանչյուր այս պարտավորությունները եւ պարտավանականությունները (առանձին վերցված), պետք է պատշաճ ծեւով կատարվեն եւ իրականացվեն բոլոր էական առումներով:

(բ)    Գնորդը պետք է տրամադրած լինի Բաժնի 2.4-ի համաձայն Գնորդի կողմից տրամադրման ենթակա բոլոր փաստաթղթերը, եւ կատարած լինի Գնորդի կողմից վճարման ենթակա կանխիկ վճարումները համաձայն Բաժինների 2.4(բ)(i) եւ 2.4(բ)(ii)-ի:

8.3    Համաձայնություններ: Բացահայտման Նամակում ներկայացված բոլոր Համաձայնությունները պետք է ձեռք բերված լինեն, եւ լինեն լրիվ ուժի մեջ եւ ունենան ուժակություն:

82

84

**8.4    Additional Documents**. Buyer must have delivered to Sellers additional documents reasonably requested by Sellers.

**8.5    No Injunction**. There must not be in effect any Legal Requirement or any injunction or other Order that (a) prohibits the sale of the Shares by Sellers to Buyer, and (b) has been adopted or issued, or has otherwise become effective, since the date of this Agreement.

## 9.    TERMINATION.

**9.1    Termination Events**. This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)    by either Buyer or Sellers if a material Breach of any provision of this Agreement has been committed by the other party and such Breach has not been waived;

(b)    (i) by Buyer if any of the conditions in Section 7 has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date; or (ii) by Sellers, if any of the conditions in Section 8 has not been satisfied of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Sellers to comply with their obligations under this Agreement) and Sellers have

8.4    Հավելյալ Փաստաթղթեր: Գնորդը Վաճառողներին պետք է տրամադրած լինեն Վաճառողների կողմից ողջամտորեն պահանջված փաստաթղթերը:

8.5    Դատական Արգելանքի Բացակայություն: Ոչ մի Օրենքի Պահանջ կամ որևէ դատական արգելանք չպետք է ուժի մեջ գտնվի որը (ա) կարգելի Բաժնեմասի վաճառքը Վաճառողների կողմից Գնորդին, եւ (բ) որն ընդունվված կլինի, կամ այլ կերպ ուժ մեջ մտած կլինի, սույն Պայմանագրի ամսաթվից հետո:

## 9.    ԴԱԴԱՐՈՒՄ

9.1    Դադարման Դեպքեր: Սույն Պայմանագիրը կասող է, միՆչեւ Կատարումը կամ դրա ժամանակ ծանուցում տալու միջոցով, դադարել՝

(ա)    կամ Գնորդի կամ Վաճառաղների կողմից եթե սույն Պայմանագրի որեւէ դրույթի նկատմամբ Խախտում կատարավ լի մյուս կողմ կողմից եւ այդ Խախտումը չեղյալ չհամարվի,

(բ)    (i) Գնորդի կողմից եթե Բաժ֊ն 7-ի որեւէ պայման ի չբավարարվի Կատարման Ամսաթվի դրությամբ կամ եթե նման պայմանի բավարարումը համարվի կամ դառն անhնար (բացի Գնորդի կողմից սույն Պայմանագրով իր պարտավորությունների չկատարման դեպքերի միջոցով) եւ Գնորդը չեղյալ չհամարի նման պայմանը Կատարման Ամսաթվից առաջ կամ դրա Ժամանակ, կամ (ii) Վաճառողների կողմից եթե Բաժն 8-ի որեւէ պայման ի չբավարարվի Կատարման Ամսաթվի դրությամբ կամ եթե նման պայմանի բավարարումը համարվի կամ դառն անhնարին (բացի Վաճառողների կողմից սույն Պայմանագրով իրենց

83

this Agreement) and Sellers have not waived such condition on or before the Closing Date;

     (c)    by mutual consent of Buyer and Sellers; or

     (d)    by either Buyer or Sellers if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before December 31, 2003, or such later date as the parties may agree upon.

**9.2**    <u>**Effect of Termination**</u>. Each party's right of termination under Section 9.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties under this Agreement will terminate, except that the obligations in Sections 11.1 and 11.3 will survive; provided, however, that if this Agreement is terminated by a party because of the Breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

պարտավորությունների չկատարման դեպքերի միջոցով) և Վաճառողները չեղյալ չհամարեն նման պայմանը Կատարման Ամսաթվից առաջ կամ դրա ժամանակ,

     (գ)    Գնորդի և Վաճառողների երկուսստեր համաձայնությամբ, կամ

     (դ)    կամ Գնորդի կամ Վաճառողների կողմից եթե Կատարումը տեղի չունենա (բացի սույն Պայմանագրի դադարման մեջ շահագրգռված կողմի կողմից սույն Պայմանագրով սահմանված իր պարտավորությունների կատարումից խուսափելու դեպքերը) 2003թ-ի դեկտեմբերի 31-ը, կամ կողմերի կողմից համաձայնած ավելի ուշ ժամկետում:

**9.2**    <u>Դադարման Հետևանքը:</u> Բաժին 9.1-ի համաձայն յուրաքանչյուր կողմի դադարեցնելու իրավունքը հավելում է սույն Պայմանագրով կամ այլ կերպ նրանց ունեցած ցանկացած իրավունքներին, և դադարեցնելու իրավունքի օգտագործումը չի նշանակում վնասների փոխհատուցման ընտրություն: Եթե սույն Պայմանագիրը դադարի Բաժին 9.1-ի համաձայն, սույն Պայմանագրով սահմանված կողմերի բոլոր հետագա պարտավորությունները դադարում են, բացի Բաժիններ 11.1-ում և 11.3-ում սահմանված պարտավորությունները որոնք ընում են ուժի մեջ, պայմանով, սակայն, որ եթե սույն Պայմանագիրը դադարի որևէ կողմի կողմից մյուս կողմի կողմից Պայմանագրի Խախտման պատճառով կամ դադարեցնող կողմի՝ սույն Պայմանագրով սահմանված մեկ կամ մի քանի պայմանների մյուս կողմի՝ սույն Պայմանագրով սահմանված իր պարտավորությունները չկատարելու հետևանքով չբավարարելու պատճառով, դադարեցնող կողմի՝ իրավական փոխխատուցում հետապնդելու իրավունքը պետք է մնա ուժի մեջ:

84

## 10.  INDEMNIFICATION; REMEDIES.

### 10.1  Survival; Right to Indemnification not Affected by Knowledge.

All representations, warranties, covenants, and obligations in this Agreement, the Disclosure Letter, the supplements to the Disclosure Letter, the certificate delivered pursuant to Section 2.4(a)(v), and any other certificate or document delivered pursuant to this Agreement will survive the Closing. The right to indemnification, payment of Damages or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of Damages, or other remedy based on such representations, warranties, covenants, and obligations.

### 10.2  Indemnification and Payment of Damages by Sellers.

Sellers, jointly and severally, will indemnify and hold harmless Buyer, the Acquired Company, and their respective Representatives, stockholders, controlling persons, and affiliates (collectively, the

## 10.  ՓՈԽՀԱՏՈՒՑՈՒՄ

### 10.1  Ուժի Մեջ Մնալը, Իմացության Հետեւանքը Չունենալը Փոխհատուցման Վրա:

Սույն Պայմանագրի, Բացահայտման Նամակի, Բացահայտման Նամակի հավելումների, Բաժին 2.4(ա)(v)-ի համաձայն տրամադրած վկայականների, եւ սույն Պայմանագրի համաձայն ցանկացած այլ տրամադրած վկայականի կամ փաստաթղթի բոլոր հայտարարությունները, երաշխավորությունները, խոստումները, եւ պարտավորությունները մնում են ուժի մեջ Կատարումից հետո: Փոխհատուցման, Վնասների վճարման, կամ այլ փոխհատուցման իրավունքը հիմնված այդ հայտարարությունների, երաշխավորությունների, խոստումների, եւ պարտավորությունների վրա չպետք է խախտվի որեւէ ճանապարհով կատարված որեւէ ինչպիսի ուսումնասիրության, կամ ձեռք բերված (կամ ձեռք բերման հնարավորության) Իմացության, լինի դա սույն Պայմանագրի ստորագրումից եւ տրամադրումից կամ Կատարման Ամսաթվից առաջ կամ հետո, հանգամանքներում: Որեւէ հայտարարության կամ երաշխավորության, կամ որեւէ խոստման կամ պարտավորության կատարման որեւէ պայմանից չեղյալ համարելը չի ազդում այդ հայտարարության, երաշխավորության, խոստման կամ պարտավորության հիման վրա փոխհատուցման, Վնասների վճարման, կամ այլ փոխհատուցման իրավունքի վրա:

### 10.2  Վաճառողների Կողմից Փոխհատուցումը եւ Վնասների Վճարումը:

Վաճառողները, միասնաբար եւ առանձին, Գնորդին, Ձեռքբերված Ընկերությանը, եւ իրանց համապատասխան Ներկայացուցիչներին, բաժնետերերին, վերահսկող անձանց, եւ փոխկապակցված

persons, and affiliates (collectively, the "Indemnified Persons") for, and will pay to the Indemnified Persons the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, "Damages"), arising, directly or indirectly, from or in connection with:

անձանց (միասնաբար՝ «Փոխհատուցված Անձանց») կփոխհատուցեն եւ զերծ կպահեն, ցանկացած կորստից, պարտավորությունից, հայցից, վնասից (ներառյալ պատահական եւ իրրեւ հետեւանք առաջացած վնասները), ծախսից (ներառյալ ստուգման եւ պաշտպանության եւ փաստաբանների ողջամիտ ծախսերը) կամ արժեքի անկումից, անկախ երրոր կողմից հայցի ներառման հանգամանքից (միասնաբար՝ «Վնասներ»), եւ Փոխհատուցված Անձանց կվճարեն այն համապատասխան գումարները, որոնք կծագեն, ուղղակիորեն կամ անուղղակիորեն, հետեւյալից կամ դրա հետ կապված.

    (a)    any Breach of any representation or warranty made by Sellers in this Agreement (without giving effect to any supplement to the Disclosure Letter), the supplements to the Disclosure Letter, or any other certificate or document delivered by Sellers pursuant to this Agreement;

    (ա)    սույն Պայմանագրում (առանց Բացահայտման Նամակի վրա ազգելու կամ հավելյալ առաջացնելու), Բացահայտման Նամակում, Բացահայտման Նամակի հավելումներում, կամ սույն Պայմանագրի համաձայն Վաճառողների կողմից տրամադրած որեւէ վկայագրում կամ փաստաթղթում Վաճառողների կողմից կատարված ցանկացած հայտարարության կամ երաշխավորության Խախտումից,

    (b)    any Breach of any representation or warranty made by Sellers in this Agreement as if such representation or warranty were made on and as of the Closing Date without giving effect to any supplement to the Disclosure Letter, other than any such Breach that is disclosed in a supplement to the Disclosure Letter and is expressly identified in the certificate delivered pursuant to Section 2.4(a)(v) as having caused the condition specified in Section 7.1 not to be satisfied;

    (բ)    սույն Պայմանագրում Վաճառողների կողմից կատարված որեւէ հայտարարության կամ երաշխավորության Խախտումից՝ իբր ճման հայտարարությունը կամ երաշխիքը կատարված լինի Կատարման Ամսաթվի դրությամբ առանց Բացահայտման Նամակին հավելում հարուցելու, բացի Բացահայտման Նամակում բացահայտված եւ Բաժին 2.4(ա)(v)-ի համաձայն տրամադրված վկայագրում հստակեորեն նկարագրված ցանկացած Խախտում որի հետեւանքով Բաժին 7.1-ում սահմանված պայմանը չի

86

(c)    any Breach by either Seller of any covenant or obligation of such Seller in this Agreement;

(d)    any product shipped or manufactured by, or any services provided by, the Acquired Company prior to the Closing Date;

(e)    any matter disclosed in the Disclosure Letter; or

(f)    any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any such Person with either Seller or the Acquired Company (or any Person acting on their behalf) in connection with any of the Contemplated Transactions.

The remedies provided in this Section 10.2 will not be exclusive of or limit any other remedies that may be available to Buyer or the other Indemnified Persons. The Buyer also has athe right of set off against any royalty payments.

**10.3    Indemnification and Payment of Damages by Sellers; Environmental Matters**.  In addition to the provisions of Section 10.2, Sellers,

բավարարել,

(գ)    սույն Պայմանագրի՝ Վաճառողների կողմից ցանկացած Խախտումը, կամ, Վաճառողների կողմից կատարված որևէ խոստման կամ պարտավորության խախտումը,

(դ)    մինչև Կատարման Ամսաթիվը Ձեռքբերված Ընկերության կողմից ուղարկված կամ արտադրված որևէ ապրանքը, կամ մատուցած որևէ ծառայությունը,

(ե)    Բացահայտման Նամակում բացահայտված որևէ խնդիրը, կամ

(զ)    բրոկերների կամ գործուղերի վճարների կամ շահավճարների վերաբերյալ ցանկացած Անձի հայցը որը հիմնված է նման ցանկացած Անձի և որևէ Վաճառողի կամ Ձեռքբերված Ընկերության (կամ նրանց կողմից գործող ցանկացած Անձի) հետ ենթադրվող պայմանագրի վրա կապված որևէ Նախատեսված Գործարքի հետ:

Սույն Բաժնի 10.2-ում ներկայացված փոխհատուցումները բացառիկ չեն կամ չեն սահմանափակում որևէ այլ փոխհատուցում Գնորդին կամ այլ Փոխհատուցված Անձին հասանելի ցանկացած այլ փոխհատուցումներ: Գնորդը նաև իրավունք ունեի հաշվանցումներ կատարելու ցանկացած ռոյալթիի վճարման ընկատմամբ:

**10.3    Վաճառողների Կողմից Փոխհատուցումը և Վնասների Վճարումը, Միջավայրային Խնդիրներ:** Ի լրումն Բաժնի 10.2-ի դրույթների, Վաճառողները, միասին

87

the provisions of Section 10.2, Sellers, jointly and severally, will indemnify and hold harmless Buyer, the Acquired Company, and the other Indemnified Persons for, and will pay to Buyer, the Acquired Company, and the other Indemnified Persons the amount of, any Damages (including costs of cleanup, containment, or other remediation) arising, directly or indirectly, from or in connection with:

(a) any Environmental, Health, and Safety Liabilities arising out of or relating to: (i) (A) the ownership, operation, or condition at any time on or prior to the Closing Date of the Facilities or any other properties and assets (whether real, personal, or mixed and whether tangible or intangible) in which Sellers or the Acquired Company has or had an interest, or (B) any Hazardous Materials or other contaminants that were present on the Facilities or such other properties and assets at any time on or prior to the Closing Date; or (ii) (A) any Hazardous Materials or other contaminants, wherever located, that were, or were allegedly, generated, transported, stored, treated, Released, or otherwise handled by Sellers or the Acquired Company or by any other Person for whose conduct they are or may be held responsible at any time on or prior to the Closing Date, or (B) any Hazardous Activities that were, or were allegedly, conducted by Sellers or the Acquired Company or by any other Person for whose conduct they are or may be held responsible; or

եւ առանձին, Գ-նորդից, Ձեռքբերված Ընկերությանը, եւ այլ Փոխհատուցված Անձանց կփոխհատուցեն եւ զերծ կպահեն ցանկացած Վնասներից (ներառյալ մաքրման, մեկուսացման, կամ այլ վերականգնման ծախսերը), եւ Գ-նորդին, Ձեռքբերված Ընկերությանը, եւ այլ Փոխհատուցված Անձանց կվճարեն գումարները, որոնք կծագեն, ուղղակիորեն կամ անուղղակիորեն, հետեւյալից կամ դրա հետ կապված.

(ա) ցանկացած Միջավայրային, Առողջապահական, կամ Անվտանգության Պարտավորությունից որը ծագում է կամ կապված է. (i) (Ա) Միջոցների կամ ցանկացած այլ գույքի կամ միջոցների (լինի անշարժ, շարժական, կամ խառը եւ նյութական կամ ոչ նյութական) սեփականության, գործառնության, կամ վիճակից, որի վերաբերյալ Վաճառողները կամ Ձեռքբերված Ընկերությունն ունեցել է բաժնեմաս, կամ (Բ) որեւէ Վտանգավոր Նյութից կամ այլ աղտոտիչից որոնք առկա են եղել Միջոցներին, կամ նման այլ գույքի կամ միջոցներին վրա Կատարման Ամսաթվից առաջ որեւէ ժամանակ, կամ (ii) (Ա) որեւէ Վտանգավոր Նյութից կամ այլ աղտոտիչից, անկախ տեղանքից, որոնք եղել կամ ենթադրվում է որ եղել են կուտակված, տեղափոխված, պահեստավորված, մշակված, Արտանետված, կամ այլ կերպ օգտագործված Վաճառողների կամ Ձեռքբերված Ընկերության կամ ցանկացած այլ Անձի կողմից որի գործելակերպի համար պատասխանատու են կամ կարող են պատասխանատու համարվել նրանք ցանկացած ժամանակ մինչեւ Կատարման Ամսաթիվը, կամ (Բ) ցանկացած Վտանգավոր Գործողություններից որոնք եղել են, կամ ենթադրվում է որ եղել են, կատարված Վաճառողների կամ

88

Ձեռքբերված Ընկերության կամ ցանկացած այլ Անձի կողմից որի գործելակերպի համար պատասխանատու են կամ կարող են պատասխանատու գտնվել նրանք, կամ

(b)    any bodily injury (including illness, disability, and death, and regardless of when any such bodily injury occurred, was incurred, or manifested itself), personal injury, property damage (including trespass, nuisance, wrongful eviction, and deprivation of the use of real property), or other damage of or to any Person, including any employee or former employee of Sellers or the Acquired Company or any other Person for whose conduct they are or may be held responsible, in any way arising from or allegedly arising from any Hazardous Activity conducted or allegedly conducted with respect to the Facilities or the operation of the Acquired Company prior to the Closing Date, or from Hazardous Material that was (i) present or suspected to be present on or before the Closing Date on or at the Facilities (or present or suspected to be present on any other property, if such Hazardous Material emanated or allegedly emanated from any of the Facilities and was present or suspected to be present on any of the Facilities on or prior to the Closing Date) or (ii) Released or allegedly Released by Sellers or the Acquired Company or any other Person for whose conduct they are or may be held responsible, at any time on or prior to the Closing Date.

(բ)    ցանկացած մարմնական վնասվածքից (ներառյալ հիվանդությունը, անդամալուծությունը, եւ մահը, եւ անկախ հանգամանքից թե երբ է եղած մարմնական վնասվածքը առաջացել, ենթարդրվել որ առաջացել է, թե իր մասին հայցանի դարձրել), անձնական վնասվածքից, գույքի վնասվածքից (ներառյալ անշարժ գույքի չարաշահումը, վիշացումը, ապօրինի տիրապետումը, օգտագործման որեւէ բաժառումը), կամ ցանկացած Անձի կողմից կամ Անձին հասցրած վնասից, ներառյալ Վաճառողների կամ Ձեռքբերված Ընկերության կամ ցանկացած Անձի որի գործելակերպի համար նրանք պատասխանատու են կամ կարող են համարվել պատասխանատու, ցանկացած աշխատողի կամ նախկին աշխատողին, որեւէ կերպ որեւէ Վտանգավոր Գործունեությունից՝ Միջոցների ընկատմամբ կատարված կամ ենթադրյալ կատարված, կամ Ձեռքբերված Ընկերության աշխատանքից միևնչև Կատարման Ամսաթիվը, բխող կամ ենթադրաբար բխող կամ Վտանգավոր Նյութերից որոնք (i) միևնչև Կատարման Ամսաթիվը կամ դրա ժամանակ առկա են եղել կամ կասկածվում է որ առկա են եղել Միջոցներում կամ դրանց վրա (կամ առկա են եղել կամ կասկածվում են որ առկա են եղել որեւէ այլ գույքերի վրա, եթե այդ Վտանգավոր Նյութերը ծագել են կամ ենթադրվում է որ ծագել են Միջոցներից եւ առկա են եղել կամ ենթադրվում է որ առկա են եղել որեւէ Միջոցների վրա միևնչև Կատարման Ամսաթիվը) բխող կամ

89

ենթադրյալ բիտող, կամ (ii)
Վաճառողների, Ձեռքբերված
Ընկերության կամ որևէ Ամձի
կողմից՝ որի գործելակերպի համար՝
պատասխանատու են կամ կարող
են պատասխանատու լինել նրանք,
Արտանեւսված կամ ենթադրյալ
Արտանեւսված որևէ ժամանակ
մինչեւ Կատարման Ամսաթիվը:

Գնորդն իրավասու կլինի
վերահսկելու որևէ Մաքրում, որեւէ
կապակցված Վարույթ, եւ, բացի
հաջորդ նախադասությունում
սահմանվածից, ցանկացած այլ
Վարույթ որի առնչությամբ կարող է
հետապնդվել փոխhատուցում Բաժնի
10.3-ի համաձայն։ Բաժնի 10.9-ում
նկարագրված գործընթացը
կկիրառվի բաժին 10.3-ից առկա որևէ
խնդրի հետ կապված դրամարժին
վնասների վերաբերյալ ցանկացած
hայցի նկատմամբ:

Buyer will be entitled to control any
Cleanup, any related Proceeding, and,
except as provided in the following
sentence, any other Proceeding with respect
to which indemnity may be sought under
this Section 10.3. The procedure described
in Section 10.9 will apply to any claim
solely for monetary damages relating to a
matter covered by this Section 10.3.

10.4    **Indemnification and
Payment of Damages by Buyer**. Buyer
will indemnify and hold harmless Sellers,
and will pay to Sellers the amount of any
Damages arising, directly or indirectly,
from or in connection with (a) any Breach
of any representation or warranty made by
Buyer in this Agreement or in any
certificate delivered by Buyer pursuant to
this Agreement, (b) any Breach by Buyer
of any covenant or obligation of Buyer in
this Agreement, or (c) any claim by any
Person for brokerage or finder's fees or
commissions or similar payments based
upon any agreement or understanding
alleged to have been made by such Person
with Buyer (or any Person acting on its
behalf) in connection with any of the
Contemplated Transactions.

10.4    Գնորդի Կողմից Կատարվող
Փոխhատուցումը եւ Վնասների Վճարումը:
Գնորդը կփոխhատուցի եւ Վաճառողներին
զերծ կպահի, եւ Վաճառողներին կվճարի
ցանկացած Վնասների գումարներ որոնք
կառաջանան, ուղղակիորեն կամ
անուղղակիորեն, (ա) սույն Պայմանագրում
կամ Գնորդի կողմից սույն Պայմանագրի
համաձայն տրամադրված որևէ այլ
վկայագրում Գնորդի կողմից արված որևէ
հայտարարության կամ երաշխիքի որևէ
Խախտման, (բ) սույն Պայմանագրով
Գնորդի կողմից տրված որևէ խոստման
կամ պարտավորության որևէ Խախտման,
կամ (գ) որեւէ Ամձի կողմից բրոկերների
կամ գտնողների վճարների կամ
շահավճարների կամ համանման
վճարումների հետ կապված որևէ հայցից
այդ Ամձի եւ Գնորդի (կամ նրա անունից
գործող այլ Ամձի) միջեւ պայմանագրի կամ
ենթադրյալ պայմանագրի կամ
պայմանավորվածության հիման վրա՝
կարված Նախատեսված Գործարքներից
որեւէ մեկի հետ:

90

10.5    **Time Limitations**. If the Closing occurs, Sellers will have no liability (for indemnification or otherwise) with respect to any representation or warranty, or covenant or obligation to be performed and complied with prior to the Closing Date, other than those in Sections 3.3, 3.11, 3.13, and 3.19, unless on or before January 1, 2007 Buyer notifies Sellers of a claim specifying the factual basis of that claim in reasonable detail to the extent then known by Buyer; a claim with respect to Section 3.3, 3.11, 3.13, or 3.19, or a claim for indemnification or reimbursement not based upon any representation or warranty or any covenant or obligation to be performed and complied with prior to the Closing Date, may be made at any time. If the Closing occurs, Buyer will have no liability (for indemnification or otherwise) with respect to any representation or warranty, or covenant or obligation to be performed and complied with prior to the Closing Date

10.6    **Procedure for Indemnification**--Third Party Claims.

(a)    Promptly after receipt by an indemnified party under Section 10.2, 10.4, or (to the extent provided in the last sentence of Section 10.3) Section 10.3 of notice of the commencement of any Proceeding against it, such indemnified party will, if a claim is to be made against an indemnifying party under such Section, give notice to the indemnifying party of the commencement of such claim, but the failure to notify the indemnifying party will not relieve

---

10.5    Ժամանակի

Սահմանափակումն: Եթե Կատարումը տեղի ունենա, Վաճառողները չեն ունենա որևէ պարտավորություն (փոխհատուցման կամ այլ) առնչվող որևէ հայտարարության կամ երաշխավորության, կամ խոստումնա կամ պարտավորության կատարման եւ իրականացման հետ մինչեւ Կատարուման Ամսաթիվը` բացի Բաժիններ 3.3, 3.11, 3.13 եւ 3.19-ում նշվածները, եթե Գնորդը` 2007թ-ի հունվարի 1-ին կամ դրանից առաջ Վաճառողներին չծանուցի որևէ հայցի մասին մասնավորելով այդ հայցի փաստացի հիմը ողջամիտ մանրամասներով եւ Գնորդին հայտնի չափով. Բաժիներ 3.3, 3.11, կամ 3.19-ի, կամ որևէ հայտարարության կամ երաշխավորության կամ որևէ խոստումնա կամ պարտավորության միջեւ Կատարուման Ամսաթիվը իրականացման վրա չհիմնված փոխհատուցման կամ վճատների հատուցման հայցերը կարող են ներկայացվել ցանկացած ժամանակ: Եթե Կատարումը տեղի ունենա, Գնորդը չի ունենա որևէ պարտավորություն (փոխհատուցման համար կամ այլ) առնչվող որևէ հայտարարության կամ երաշխավորության, կամ խոստումնա կամ պարտավորության` միջեւ Կատարուման Ամսաթիվը կատարված կամ իրականացված լինելու հետ:

10.6    Փոխհատուցման

Գործընթացը -- Երրորդ Կողմի Հայցեր:

(ա)    Փոխհատուցված կողմի կողմից Բաժիններ 10.2, 10.4, կամ (Բաժին 10.3-ի վերջին նախադասության մեջ ներկայացված չափով) Բաժին 10.3-ի համաձայն իր դեմ որևէ Վարույթի սկսելու վերաբերյալ ծանուցում ստանալուց անմիջապես հետո այդ փոխհատուցված կողմը կծանուցի փոխհատուցող կողմից նման հայցի ներկայացված առնչությամբ եթե հայցը պետք է ներկայացվի փոխհատուցող կողմին համաձայն նշված Բաժնի, սակայն փոխհատուցող կողմին չծանուցելը

91

indemnifying party will not relieve the indemnifying party of any liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the indemnifying party's failure to give such notice.

(b) If any Proceeding is brought against an indemnified party and it gives notice to the indemnifying party of the commencement of such Proceeding, the indemnifying party will, unless the claim involves Taxes, be entitled to participate in such Proceeding and, to the extent that it wishes (unless (i) the indemnifying party is also a party to such Proceeding and the indemnified party determines in good faith that joint representation would be inappropriate, or (ii) the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capacity to defend such Proceeding and provide indemnification with respect to such Proceeding), to assume the defense of such Proceeding with counsel satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will not, as long as it diligently conducts such defense, be liable to the indemnified party under this Section 10 for any fees of other counsel or any other expenses with respect to the defense of such

չի ազգատ փոխխատուցող կողմին որեւէ փոխխատուցված կողմի ն կատմամբ ունեցած որեւէ պարտավություննից, բացի այն դեպքերից երբ փոխխատուցող կողմն ակնառու կերպով ցույց տա որ այդ հայցի պաշտպանությունը էականորեն թույատում է փոխխատուցված կողմից ն շված ծանուցումը չներկայացնելու փաստով։

(բ) Նթե որեւէ Վարույթ հարուցվի փոխխատուցված կողմի ն դեմ եւ նա ծանուցի փոխխատուցող կողմին ն շված Վարույթի հարուցման մասին, փոխխատուցող կողմը ՝ բացի այն դեպքից երբ հայցր ներառում է Հարկերին վերաբերող խնդիրներ, իրավասու կլինի մասնակցել այդ Վարույթին իմ ցանկությամբ որոշված չափով (բացառությամբ այն դեպքերի երբ (i) փոխխատուցող կողմը նույնպես հանդիսանում է այդ Վարույթի կողմ եւ երբ փոխխատուցվող կողմը որոշում է բարի կամքի համաձայն որ միասնական ներկայացուցչությունները նպատատակարմար չէ, կամ (ii) փոխխատուցող կողմը փոխխատուցվող կողմին չի ներկայացնում իմ ֆինանսական ունակության վերաբերյալ հավաստիացումներ նման Վարույթը պաշտպանելու եւ նման Վարույթի վերաբերյալ փոխխատուցում տրամադրելու վերաբերյալ), փոխխատուցվող կողմին բավարարող խորհրդատուի մասնակցությամբ ընդունի Վարույթում պաշտպանությունները եւ, փոխխատուցող կողմից նման Վարույթի պաշտպանությունը ընդունելու մասին ծանուցումը փոխխատուցված կողմին տրամադրելուց հետո, փոխխատուցող կողմն այլեւս պարտավորություն չի ունենա փոխխատուցված կողմի նտտակլմմբ

respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding, other than reasonable costs of investigation. If the indemnifying party assumes the defense of a Proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; (ii) no compromise or settlement of such claims may be effected by the indemnifying party without the indemnified party's consent unless (A) there is no finding or admission of any violation of Legal Requirements or any violation of the rights of any Person and no effect on any other claims that may be made against the indemnified party, and (B) the sole relief provided is monetary damages that are paid in full by the indemnifying party; and (iii) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its consent. If notice is given to an indemnifying party of the commencement of any Proceeding and the indemnifying party does not, within ten days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will be bound by any determination made in such Proceeding or any compromise or settlement effected by the indemnified party.

սույն Բաժինը 10-ի համաձայն այլ խորհիրդատուին վճարների կամ նշված Վարույում պաշտպանության յուրաքանչյուր դեպքում նշված Վարույում փոխհատուցված կողմի համար պաշտպանության վերաբերյալ այլ ծախսերի մասով բացի դեն այն պատճառ կերպով իրականացնում է, այդ պաշտպանությունը՝ րնթնրյան ողջամիտ ծախսերից բացի: Եթե փոխխատուցող կողմն րնդունի Վարույթի պաշտպանությունը, (i) սույն Պայմանագրի նպատակներով անեղկա կիատատումli որ այդ Վարույթում ներկայացված հայցերը գտնվում են փոխխատուցման շրջանակներում եւ համապատասխանում են դրա առայկային, (ii) առանց փոխխատուցված կողմի համաձայնության նշված հայցի վերաբերյալ փոխխատուցող կողմի կողմից չի կատարվի որեւէ զիջում կամ ձեռք չի բերվի որեւէ համաձայնություն բացառությամբ այն դեպքերին երբ (Ա) չի պարզվել կամ հայտնաբերվել Օրենքի Պահանջի որեւէ խախտում կամ որեւէ Անձի իրավունքների որեւէ խախտում եւ գոյություն չունի որեւէ ազդեցություն փոխխատուցված անձի դեմ հնարավոր ցանկացած այլ հայցի վրա, եւ (Բ) միակ փոխխատուցումը դրամական փոխհացումler են որոնք վճարվում են ամբողջականորեն փոխխատուցող անձի կողմից, եւ (iii) փոխխատուցվող անձը չի ունենա որեւէ պարտավորություն առնչվող որեւէ զիջման կամ համաձայնության հետ որոնք տրվել են առանց իր համաձայնության: Եթե որեւէ Վարույթի մասին ծանուցումները տրվել են փոխխատուցող կողմին եւ փոխխատուցող անձը փոխխատուցված անձից ծանուցումը ստանալուց հետո փոխխատուցված անձից չի ծանուցում Վարույթի պաշտպանությունն րնդունելու

93

(c)    Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise, or settle such Proceeding, but the indemnifying party will not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld).

(d)    Sellers hereby consent to the non-exclusive jurisdiction of any court in which a Proceeding is brought against any Indemnified Person for purposes of any claim that an Indemnified Person may have under this Agreement with respect to such Proceeding or the matters alleged therein, and agree that process may be served on Sellers with respect to such a claim anywhere in the world.

վերաբերյալ, փոխհատուցող անձի պարտավորված կլինի տվյալ Վաճառքի որևէ որոշմամբ կամ որևէ զիջմամբ կամ համաձայնությամբ որը կնդրուվմի փոխհատուցված անձի կողմից:

(գ)    Չնայած վերը նշվածին, եթե փոխհատուցված անձը որոշի բարի կամքի համաձայն որ գոյություն ունի ողջամիտ հնարավորություն որ Վարույթը կարող է բացասաբար ազդել իր կամ իր փոխկապակցված անձանց վերաբերյալ բացի գումարային վնասները որոնց համար նա իրավասու է փոխհատուցման սույն Պայմանագրի համաձայն, փոխհատուցված անձը կարող է, փոխհատուցող անձին ծանուցելով, ընդունել բացառիկ իրավունք պաշտպանելու, զիջելու, կամ համաձայնության գալու նման Վարույթում, սակայն փոխհատուցող անձը պարտավորված չի լինի Վարույթի որևէ որոշմամբ եթե այն պաշտպանվմի կամ զիջվի կամ դրա նկատմամբ համաձայնություն ձեռքբերվի առանց իր համաձայնության (որը չի կարող անողջամտորեն մերժվել):

(դ)    Վաճառողները սույնով համաձայում են որևէ դատարանի ոչ բացառիկ ընդդատությանը որտեղ որևէ Վարույթ կիրառուցվի որևէ Փոխհատուցվում Անձի դեմ որևէ հայցի նպատակներով որը Փոխհատուցված Անձը կարող է ու'նենալ սույն Պայմանագրի համաձայն նման Վարույթի առնչությամբ կամ դրանով ենթադրվող խնդիրների վերաբերյալ, եւ համաձայն է որ գործընթացը կարող է կիրառվել Վաճառողներին նկատմամբ նման հայցի առնչությամբ աշխարհի որևէ մասում:

94



**10.7** **Procedure for Indemnification--Other Claims.** A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

## 11. GENERAL PROVISIONS.

**11.1** **Expenses.** Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of agents, representatives, counsel, and accountants in connection with this Agreement and the Contemplated Transactions. Sellers will cause the Acquired Companies not to incur any out-of-pocket expenses in connection with this Agreement. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

**11.2** **Public Announcements.** Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued, if at all, at such time and in such manner as Buyer determines. Unless consented to by Buyer in advance or required by Legal Requirements, prior to the Closing Sellers shall, and shall cause the Acquired Company to, keep this Agreement strictly confidential and may not make any disclosure of this Agreement to any Person. Sellers and Buyer will consult with each other concerning the means by which the Acquired Company's

10.7 Փոխհատուցման Գործընթացը -- Այլ Հայցեր: Նրրորդ անձի հայց չպարունակող որևէ խնդրի վերաբերյալ փոխհատուցման հայցը կարող է հարուցվել ծածուցման միջոցով անձին ումից պահանջվում է փոխհատուցում:

## 11. ԸՆԴՀԱՆՈՒՐ ԴՐՈՒՅԹՆԵՐ:

11.1 Ծախսեր: Սույն Պայմանագրում այլ կերպ ներկայացված չլինելու դեպքում, սույն Պայմանագրի յուրաքանչյուր կողմ կկրի իր համապատասխան ծախսերը որոնք կգոյանան սույն Պայմանագրի և Նախատեսված Գործարքների պատրաստման, ստորագրման, և իրականացման հետ կապված, ներառյալ բոլոր գործծակալների, ներկայացուցիչների, խորհրդատուի, և հաշվապահների վճարները և ծախսերը կապված սույն Պայմանագրի և Նախատեսված Գործարքների հետ: Վաճառողները Ձեռքբերված Ընկերությանը թույլ չեն տա կրել որևէ կողմնակի ծախսեր կապված սույն Պայմանագրի հետ: Սույն Պայմանագրի դադարման դեպքում, յուրաքանչյուր կողմի պարտավորությունը կապված իր սեփական ծախսերի կրման հետ կկազմի մյուս կողմի կողմից սույն Պայմանագրի խախտումից ծագած այդ կողմի ցանկացած իրավունքների մասը:

11.2 Հանրային Հայտարարություններ: Սույն Պայմանագրի կամ Նախատեսված Գործարքների հետ կապված որևէ հանրային հայտարարություն կկատարվի, եթե ընդհանրապես կատարվի, Գնորդի կողմից որոշված ժամանակ և ձևով: Բացի Գնորդի կողմից նախնոր համաձայնեց և Օրենքի Պահանջով սահմանված դեպքերից, մինչև Կատարումն Ամսաթիվը Վաճառողները անձամբ, և Ձեռքբերված Ընկերության միջոցով, պետք է պահեն սույն Պայմանագրը հույժ գաղտնի և չպետք է բացահայտեն սույն Պայմանագիրը որևէ Անձի: Վաճառողները և Գնորդը կխորհրդակցեն միմյանց հետ

95

means by which the Acquired Company's employees, customers, and suppliers and others having dealings with the Acquired Companies will be informed of the Contemplated Transactions, and Buyer will have the right to be present for any such communication.

**11.3  Confidentiality.** Between the date of this Agreement and the Closing Date, Sellers will maintain in confidence, and will cause the officers, employees, agents, and advisors of Buyer and the Acquired Company to maintain in confidence this Agreement or the Contemplated Transactions, unless (a) such information is already known to such party or to others not bound by a duty of confidentiality or such information becomes publicly available through no fault of such party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the Contemplated Transactions, or (c) the furnishing or use of such information is required by legal proceedings.

**11.4  Notices.** All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier

Նախատեսված Գ-ործարքների մասին Ջերքբերված Ընկերության աշխատողներին, հաճախորդներին, եւ առաքողներին եւ այլ գործ ունեցողներին կողմից տեղեկանալու միջոցների վերաբերյալ, եւ Գ-նորդը իրավունք կունենա ներկա գտնվելու նման յուրաքանչյուր տեղեկացման ժամանակ:

**11.3  Գ-աղտնապահություն:** Սույն Պայմանագրի եւ Կատարման Ամսաթվի միջեւ ընկած ժամանակահատվածում, Վաճառողները գաղտնի կպահեն, եւ Ջերքբերված Ընկերության եւ Գ-Նորդի պաշտոնյաներին, աշխատողներին, գործակալներին, եւ խորհրդատուներին գաղտնի պահել կստանա սույն Պայմանագիրը եւ Նախատեսված Գ-ործարքները, բացառությամբ, եթե (ա) նշված տեղեկությունն արդեն հայտնի է այդ կողմերին կամ գաղտնապահությամբ չպարտավորված այլ կողմերին կամ եթե նշված տեղեկությունը դառնում է հայտնի հանրությանը առանց նման կողմի մեղքի, (բ) նշված տեղեկության օգտագործումն անհրաժեշտ է համապատասխան է որեւէ գրանցում կատարելու կամ որեւէ համաձայնություն կամ հաստատում ստանալու համար որը կպահանջվի Նախատեսված Գ-ործարքների իրականացման համար, կամ (գ) նշված տեղեկության տրամադրումը կամ օգտագործումն պահանջվում է իրավական գործընթացներով:

**11.4  Ծանուցումներ:** Սույն Պայմանագրով սահմանված բոլոր ծանուցումները, համաձայնությունները, եւ այլ հաղորդագրությունները պետք է լինեն գրավոր եւ կհամարվեն պատշաճ կերպով տրված երբ (ա) ուղղարկվել անձամբ (ստացման գրավոր հաստատմամբ), (բ) ուղղարկվել հեռապատճենով (ստացման գրավոր հաստատմամբ), պայմանով որ պատճենը ուղղարկվել գրանցված փոստով, ստացման ստացական պահանջվելով, կամ (գ) երբ ստացվում է հասցեատիրոջ կողմից, եթե ուղղարկվել է ազգորեն հանրահայտ սուրհանդակային ծառայությամբ (ստացական պահանջվելով), յուրաքանչյուր դեպքում ուղղարկված լիներով

numbers set forth below (or to

such other addresses and telecopier numbers as a party may designate by notice to the other parties):

11.5    **Arbitration ;Jurisdiction; Service of Process**. The Parties acknowledge that they are entering into and shall perform under this Agreement in good faith, and any disputes will be resolved in good faith, with the letter and spirit of this Agreement as the standard. The Parties will use their best efforts to resolve any disputes between themselves within thirty (30) days. During this thirty (30) day period, any party with ten (10) days' notice may request and the other party must agree to meet in good faith to resolve the dispute. After thirty day's effort, if a dispute is not resolved, any party may refer the dispute for final settlement to and in accord with under the Rules of Conciliation and Arbitration of the International Chamber of Commerce, London, England (the "Rules") by a panel of three (3) arbitrators. In the case of any matter to be settled under the Rules, each party hereto shall appoint one arbitrator and such two arbitrators shall appoint a third arbitrator; provided, that if all three arbitrators have not been appointed within thirty (30) days after the party submitting the matter in dispute has notified the other party of such submission, either party hereto may apply to the International Chamber of Commerce for appointment of the remaining arbitrators. The place of arbitration of any matter to be settled under the Rules shall be in New York City, or at such other place as the parties shall unanimously choose. On a case-by-case basis, the parties may also agree to alternative dispute resolution methods. Such an Agreement must be in writing and signed by both parties.

համապատասխանն հասցեով կամ հեռապատճենիին ինչպես նշված է ներքեւում (կամ այլ հասցեներին կամ հեռապատճենի համարներին որոնք կողմերը կներկայացնեն միմյանց ծանուցման միջոցով):

11.5    Արբիտրաժ, Ընդդատություն, Գործընթաց: Կողմերն ընդունում են, որ կնքում են սույն Պայմանագիրը եւ պետք է գործեն ըստ սույնի բարի կամքի հիման վրա, եւ որ ցանկացած վեճ պետք է լուծվի ըստ բարի կամքի` սույն Պայմանագրի ոգուն եւ տառին համապատասխան: Կողմերը պետք է իրենց ուժերի սահմաններում գործադրեն բոլոր ջանքերը իրենց միջև ծագած վեճերը երեսուն (30) օրվա ընթացքում լուծելու համար: Այդ երեսուն (30) օրվա ընթացքում ցանկացած կողմ տաս (10) օր առաջ ներկայացված ծանուցմամբ կարող է դիմել մյուս կողմին հանղիպմ ամ համար, եւ մյուս կողմը պետք է համաձայնվի հանղիպել բարի կամքով վեճը լուծելու համար: Երեսուն օրվա ջանքերից հետու, եթե վեճը դեռ չի լուծված, ցանկացած կողմ կարող է վեճն ուղղել Առեւտրի Միջազգային Պալատի (Լոնդոն, Անգլիա) Հաշտեցման եւ Արբիտրաժի Կանոններով (Կանոններ) լուծման համար, երեք արբիտրորից բաղկացած դատարանի միջոցով: Ըստ Կանոնների վեճի լուծման դեպքում յուրաքանչյուր կողմ պետք է նշանակի մեկ արբիտոր, եւ այդ երկու արբիտորները պետք է նշանակեն երրորդ արբիտրորին. պայմանով, որ եթե բոլոր երեք արբիտորները չեն նշանակվում վեճը լուծման ներկայացնող կողմի մյուս կողմին այդ ներկայացման մասին տեղյակ պահելուց հետո երեսուն (30) օրվա ընթացքում, սույնի յուրաքանչյուր կողմ կարող է դիմել Միջազգային Առեւտրի Պալատ մնացած արբիտորների նշանակելու համար: Ըստ Կանոնների վեճի լուծման արբիտրաժի վայրը պետք է հանղիսանա Նյու- Յորք քաղաքը, կամ կողմերի ընտրությամբ մեկ այլ վայր: Որոշ դեպքերում կողմերը կարող են նաեւ համաձայնել վեճերի լուծման այլընտրանքային եղանակների շուրջ: Նման Համաձայնագիրը պետք է լինի գրավոր եւ ստորագրվի երկու կողմերի

97

signed by both parties.

կողմից:

**11.6 Applicable Law, Institution**.
This Agreement is an international
Agreement and shall be governed and
construed in accordance with the ·
substantive laws of New York, without
regard to conflict of laws provisions. Each
party hereto hereby irrevocably and
unconditionally agrees that any action to
enforce a decision rendered in an·
arbitration proceeding described in Article
8 may be instituted (i) in Armenian courts,
(ii) in the courts of the State of New York,
the courts of the United States of America
for the Southern District of New York, and
appellate courts thereof, or (iii) in the
courts of the United Kingdom and hereby
irrevocably and unconditionally waives, to
the fullest extent permitted by applicable
law, any objection of the convenience of
the forum of any such legal suit, action or
proceeding and irrevocably submits
generally and unconditionally to the
jurisdiction in any such court in any suit,
action or proceeding.

**11.6   Կիրառվող Օրենք,**
**Իրավասու:** Սույն Պայմանագիրը
համայվում է Միջազգային Պայմանագիր,
եւ պետք է ղեկավարվի եւ մեկնաբանվի Նյու
Յորքի հանապատասխան օրենքների
համաձայն, առանց կոլիզիոն նորմերի
կիրառման: Յուրաքանչյուր կողմ
հստակորեն եւ անվերապահորեն
համաձայնվում է, որ Հոդված 8-ում
նեքկայացված ախիտրաժի որոշման
կատարոմման ուղղված ցանկացած
գործողություն կարող է իրականացվել. (i)
Հայաստանի դատարաններում, (ii) Նյու
Յորքի նահանգի դատարաններում,
Ամերիկայի Միացյալ Նահանգների Նյու
Յորքի Հարավային Շրջանի
դատարաններում եւ նման վճռաբեկ
դատարաններում, կամ (iii) Միացյալ
Թագավորության դատարաններում, և
սույնով կիրառելի օրենքով սահմանվաճ
առավելագույն չափով հրաժարվում է
ցանկացած առարկությունից, որն ինչպէ
կարող է ունենալ այժմ կամ հետագայում
նման դատավարության, դատական
պրոցեսի տեղի, դատարանի ընտրության,
կամ նման դատավարության տեղի
հարմարության վերաբերյալ, ինչպես նաև
ամբողջապես եւ անվերապահորեն
ընդունում է նման դատարանի որոշումները
ցանկացած հայցի կամ այլ գործողության
վերաբերյալ:

**11.7   Further Assurances**. The
parties agree (a) to furnish upon request to
each other such further information, (b) to
execute and deliver to each other such
other documents, and (c) to do such other
acts and things, all as the other party may
reasonably request for the purpose of
carrying out the intent of this Agreement
and the documents referred to in this
Agreement.

**11.7   Հետագա**
**Հավաստիացումներ:** Կողմից համաձայն են
(ա) ըստ միմյանց խնդրանքի միմյանց
ներկայացնել տեղեկություններ, (բ)
ստորագրել եւ միմյանց տրամադրել այլ
փաստաթղթեր, եւ (գ) կատարել այլ նման
քայլեր եւ գործարքներ, որոնք միւս կողմը
կարող է ողջամտորեն պահանջել սույն
Պայմանագրի եւ սույն Պայմանագրում
սահմանված փաստաթղթերի մինումը
կատարելու համար:

**11.8   Waiver**. The rights and
remedies of the parties to this Agreement
are cumulative and not alternative. Neither

**11.8   Հրաժարում:** Սույն
Պայմանագրի կողմերի իրավունմբները եւ
իրավական միջոցները հավաքական են եւ

98

are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

11.9 **Entire Agreement and Modification**. This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

ոչ ընտրողական։ Սույն Պայմանագրով կամ սույն Պայմանագրում սահվանված որևէ վիաստաթղթի համաձայն որևէ իրավունքի, իրավասության կամ արտոնության չկիրառում չի սահմանում ևման իրավունքից, իրավասությունից կամ արտոնությունից հրաժարում, և ևման իրավունքի, իրավասության կամ արտոնության մեկ անգամյա կամ մասնակի կիրառում չի սահմանանխակում այդ իրավունքի հետագա կիրառումը։ Գործող օրենսդրությամբ սահմանված առավելագույն չափով, (ա) սույն Պայմանագրից կամ սույն Պայմանագրով սահմանված վիաստաթղթերից բխող ոչ մի հայց կամ իրավունք չի կարող սպառվել կողմերից մեկի կողմից, ամբողջությամբ կամ մասամբ, հայցից կամ իրավունքից հրաժարման կամ չեղյալ համարելու միջոցով, բացի մյուս կողմի կողմից գրավոր և ստորագրած վիաստաթղթի ներկայացման դեպից, (բ) կողմերից մեկի կողմից տրվածi հրաժարումը չի կարող կիրառելի դառնալ բացի որոշակի դեպքում որի համար տրվել է, և (գ) որևէ կողմին ներկայացված որևէ ծանուցում կամ պահանջ չի կարող համարվել այդ կողմի որևէ պարտավորությունից հրաժարում կամ ծանուցումը կամ պահանջը ներկայացնող կողմի՝ սույն Պայմանագրի կամ սույն Պայմանագրով սահմանված վիաստաթղթերի համաձայն հետագա քայլեր առանց ծանուցման կամ պահանջ ներկայացնելու կիրառման որևէ իրավունքից հրաժարում։

11.9 Ամբողջ Համաձայնությունը և Փոփոխությունը։ Սույն Պայմանագիրը գերակայում է կողմերի միջև սույն խնդրի վերաբերյալ բոլոր նախկին պայմանագրերի նկատմամբ և հանդիսանում է (սույն Պայմանագրում սահմանված վիաստաթղթերի հետ միասին) կողմերի միջև սույն խնդրո առարկայի վերաբերյալ պայմանագրի պայմանների մասին ամբողջական և բացառիկ համաձայնություն։ Սույն Պայմանագիրը չի կարող փոփոխվել բացի փոփոխությանը ենթարկվող կողմի գրավոր համաձայնության։

99

**11.10  Disclosure Letter.**

(a)     The disclosures in the Disclosure Letter, and those in any Supplement thereto, must relate only to the representations and warranties in the Section of the Agreement to which they expressly relate and not to any other representation or warranty in this Agreement.

(b)     In the event of any inconsistency between the statements in the body of this Agreement and those in the Disclosure Letter (other than an exception expressly set forth as such in the Disclosure Letter with respect to a specifically identified representation or warranty), the statements in the body of this Agreement will control.

**11.11  Assignments,** Successors and No Third Party Rights.  Neither party may assign any of its rights under this Agreement without the prior consent of the other parties, which will not be unreasonably withheld, except that Buyer may assign any of its rights under this Agreement to any Subsidiary of Buyer. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this

11.10    Բացահայտման Նամակ:

(ա)     Բացահայտման Նամակում կատարված բացահայտումները, եւ դրա Հավելման մեջ կատարված բացահայտումները, պետք է վերաբերվեն սույն Պայմանագրի այն Բաժնում կատարված հայտարարությունների եւ երաշխավորությունների որոնց դրանք վերաբերվում են, եւ ոչ սույն Պայմանագրի ցանկացած այլ հայտարարությունը կամ երաշխիքին:

(բ)     Սույն Պայմանագրի եւ Բացահայտման Նամակի որեւէ սահմանումների միջեւ անհամապատասխանության դեպքում (բացի Բացահայտման Նամակում հստակ կերպով սահմանված բացառությունից մասնավորապես հստակեցված հայտարարության կամ երաշխիքին առնչությամբ արված), գերակայում են սույն Պայմանագրի սահմանումները:

11.11    Փոխանցումներ: Իրավահաջորդներ եւ Երրորդ Կողմերի Իրավունքների Բացակայություն: Կողմերից ոչ մեկի չի կարող փոխանցել սույն Պայմանագրով սահմանված իր որեւէ իրավունքները առանց մյուս կողմերի նախօրոք համաձայնության, որը չպետք է մերժվի անողջամտորեն, բացառությամբ որ Գնորդը կարող է փոխանցել սույն Պայմանագրով իր ցանկացած իրավունքները իր որեւէ Դուստր Ընկերությանը: Նախորդ նախադասության պայմանով, սույն Պայմանագիրը կկիրառվի, կպարտավորեցնի բոլոր առումներով, եւ կիրականանցվի կողմերի իրավահաջորդների եւ ներկայացուցիչների ընկումամ: Սույն Պայմանագրում սահմանված ոչինչ չի կարող մեկնաբանվել որպես սույն Պայմանագրի կողմերից բացի

100

this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

որեւէ Անմիջին իրավական կամ օրինական իրավունtp, փոխհատուցում, կամ սույն Պայմանագրի կամ նրա որեւէ դրույթի համաձայն որեւէ հայց շնորհող: Սույն Պայմանագրի բոլոր դրույցները եւ պայմանները պետք է ծառայեն միայն եւ բացառապես սույն Պայմանագրի կողմերին եւ նրանց իրավահաջորդներին եւ ներկայացուցիչներին:

**11.12  Severability.** If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**11.12  Spnhելիություն:** Եթե սույն Պայմանագրի որեւ է դրույթ ճանաչվլի ոչ իրավական կամ ոչ կիրառելի որեւէ ընդդատություն ունեցող դատարանի կողմից, սույն Պայմանագրի մնացած դրույթները կմնան ուժի մեջ: Սույն Պայմանագրի որեւէ դրույթ որը ճանաչվում է ոչ իրական կամ ոչ կիրառելի որեւէ մասով կամ աստիճանով կմնա ուժի մեջ եւ կիրառելի մնացած մասով կամ աստիճանով:

**11.13  Section Headings, Construction.** The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

**11.13  Բաժինների վերնագրեր, Կառուցվածքը:** Սույն Պայմանագրի Բաժինների վերնագրերը ներկայացված են բացառապես հարմարության համար եւ չեն ազդում դրա կառուցվածքի կամ մեկնաբանման վրա: «Բաժին»-ին կամ «Բաժիններ»-ին կատարված բոլոր հղումները վերաբերվում են սույն Պայմանագրի Բաժնին կամ Բաժիններին կատարված: Սույն Պայմանագրում օգտագործված բոլոր բառերը պետք է մեկնաբանվեն սեռով կամ թվով ինչպես կպահանջեն հանգամանքները: Բացառությամբ այլ կերպ սահմանվածի, «ներառյալ» բառը չի սահմանափակում նախորդ բառերը կամ սահմանումները:

**11.14  Time of Essence.** With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**11.14  Ժամանակի Կարեւորությունը:** Սույն Պայմանագրում ներկայացված ամսաթվերի եւ ժամանակահատվածների առումով, ժամանակը կարեւոր է:

**11.15  Governing Law.** This Agreement will be governed by the laws of the State of New York without regard to

**11.15  Կիրառվող Օրենք:** Սույն Պայմանագիր պետք է ղեկավարվի Նյու Յորքի նահանգի օրենքներով` առանց

101

the State of New York without regard to conflicts of laws principles.

**11.16 Counterparts, Language.** This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. This Agreement has been prepared in English. All documents, notices, waivers and all other communication written or otherwise between the parties hereto in connection with this Agreement shall be in English. This Agreement shall also be translated into and executed in Armenian. If there is any inconsistency betweeen the versions, English version shall prevail.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the date first written above.

11.16 **Կրկնօրինակներ, Լեզուն:** Սույն Պայմանագիրը կարող է ստորագրվել մեկ կամ մի քանի կրկնօրինակներով, որոնցից յուրաքանչյուրը պետք է համարվի սույն Պայմանագրի բնօրինակն եւ որոնցից բոլորը, միասին վերցված, պետք է համարվեն մեկ եւ միեւնույն պայմանագիրը: Սույն Պայմանագիրը պատրաստվել է անգլերեն լեզվով: Սույն Պայմանգրի հետ կապված, կողմերի միջեւ գրավոր կամ այլ կերպ կատարվող բոլոր փաստաթղթերը, ծանուցումները, հրաժարումները եւ այլ հաղորդագրությունները պետք է լինեն անգլերեն: Սույն Պայմանագիրը պետք է նաեւ թարգմանվի եւ ստորագրվի հայերեն լեզվով: Տարբերակների միջեւ որեւէ անհամապատասխանության դեպքում գերակայում է անգլերեն տարբերակը:

Ի ՎԿԱՅՈՒԹՅՈՒՆ ՈՐԻ, կողմերը ստորագրում եւ տրամադրում են սույն Պայմանագիրը վերը նշված ամսաթվին:

| | | | |
|---|---|---|---|
| Signed for and on behalf of the Sellers | Signed for and on behalf of the Buyers | Ստորագրված է Վաճառողների անունից եւ կողմից | Ստորագրված է Գնորդի անունից եւ կողմից |

Yuri Balazaryan

Van Krikorian
Vice President
Global Gold
Mining, LLC

Մայրեն Բատոյան
Mayren Batoyan

Edward Janibekian

Յուրի Լալազարյան

Վան Կրիկորյան
Փոխնախագահ
Global Gold
Mining, LLC

Մայրեն
Բատոյան

Էդվարդ
Ջանիբեկյան

Երկու հազար չորս թվականի _____Թվայնֆբֆ_չաչ_թֆմֆ___

սույն պայմանագիրը վավերացված է իմ    Կենտրոն նոտարական տարածքի նոտար

Ելենա Ռ. Սարգսյանս կողմից:

Կողմերը պայմանագիրը ստորագրեցին իմ ներկայությամբ: Կողմերի, նրանց ներկայացուցիչների ինքնությունը, գործունակությունը և (կամ) իրավունականությունը ստուգված են:

Գրանցված է սեղանամատյանում ___2606___ -ով

Գանձված եմ պետական և ծառայության տուրքեր համաձայ
ՀՀ նոտարական տուրքի մասին և պետատուրքի մասին օրենքներ

Նոտար

Երբ տարագար վեց թվականի ———————— ————————
Ես, ՀՀ « ԿԵՆՏՐՈՆ » նոտարական տարածքի նոտար  Նունե Սարգսյանս
վավերացնում եմ սույն պատճենի իսկությունը իսկականի հետ: Վերջինում
ուղղումներ, քերված բառեր և այլ չճանաչպագրված  ուղղումներ կամ ուրիշ
առանձնահատկություններ չհայտնաբերվեցին:
« ՀՀ Նոտարիատի  մասին » օրենքի 65 հոդվածի  համաձայն հաստատում
եմ  փաստաթղթի  պատճենի  համապատասխանությունը  բնօրինակի  հետ, այլ
ոչ  թե  դրանում  շարադրված     փաստերը:

Գրանցված է սեղանամատյանում  հ.  *19.9 49*



Գանձված է տուրք և ծառայության
վճար համաձայն
ՀՀ« Պետական տուրքի մասին » և
« Նոտարիատի  մասին » օրենքների

Ն. ՍԱՐԳՍՅԱՆ



## DISCLOSURE LETTER

December 21, 2003
Global Gold Mining, LLC
104 Field Point Road
Greenwich, CT 06830

Gentlemen:

We refer to the Stock Purchase Agreement (the "Agreement") to be entered into today between the undersigned individuals ("Sellers") and Global Gold Mining, LLC ("Buyer") pursuant to which Sellers are to sell and Buyer is to purchase all of the issued and outstanding capital stock of SHA, LLC (the "Company") as provided in the Agreement.

This letter constitutes the Disclosure Letter referred to in Section 3 of the Agreement. The representations and warranties of Sellers in Section 3 of the Agreement are made and given subject to the disclosures in this Disclosure Letter. The disclosures in this Disclosure Letter are to be taken as relating to the representations and warranties in the section of the Agreement to which they expressly relate and to no other representation or warranty in the Agreement.

Terms defined in the Agreement are used with the same meaning in this Disclosure Letter. References to Appendices are to the Appendices to this Disclosure Letter.

## ԲԱՑԱՀԱՅՏՄԱՆ ՆԱՄԱԿ

21 դեկտեմբերի, 2003թ
Global Gold Mining, LLC
104 Field Point Road
Greenwich, CT 06830

Պարոնայք.

Սույնը վերաբերում է Բաժնենաաի Գնման Պայմանագրին («Պայմանագիր») որը ստորագրվում է այսօր՝ ներքոհիշյալ անձանց («Վաճառողներ») եւ Global Gold Mining, LLC-ի («Գնորդ») կողմից, որի համաձայն Վաճառողները վաճառում իսկ Գնորդը ձեռք է բերում ՍՀԱ ՍՊԸ-ի («Ընկերություն») ամբողջ թողարկված եւ սովորական կապիտալ բաժնենաաը Պայմանագրում սահմանվաած կարգով:

Սույն նամակը համարվում է Պայմանագրի Բաժին 3-ում հիշատակվաած Բացահայտման Նամակը: Պայմանագրի Բաժին 3-ում ներկայացված Վաճառողների հայտարարությունները եւ երաշխավորությունները կատարված եւ արված են սույն Բացահայտման Նամակի բացահայտումների համաձայն: Սույն Բացահայտման Նամակի բացահայտումները պետք է ընդունվեն Պայմանագրի կոնկրետ բաժնում կատարված հայտարարությունների եւ երաշխավորությունների կապակցությամբ որոնց նրանք հստակորեն վերաբերվում են, եւ ոչ Պայմանագրի այլ հայտարարությունների կամ երաշխավորությունների կապակցությամբ:

Պայմանագրում սահմանված սահմանումները սույն Բացահայտման Նամակում օգտագործվում են նույն իմաստներով: Հավելվածներին կատարված հղումները կատարված են սույն Բացահայտման Նամակի Հավելվածների նկատմամբ:

Պայմանագրի Բաժին 3-ի մասով

By reference to Section 3 of the Agreement (using the numbering in such Section), the following matters are disclosed:

3.1 **Acquired Company:**
SHA, LLC

**Jurisdiction:**
Republic of Armenia

**Other Jurisdiction:**
None

**Capitalization:**

| | | |
|---|---|---|
| Yurik Lalazarian | — | 33% |
| Mayren Batoyan | — | 33% |
| Edward Janibekian | — | 34% |

**Certificate of Foundation and Charter:**

Attached (Armenian & English)

3.2 **Exceptions:**
None

3.4 **Financial Statements:**
Attached

3.6 **Property:**
Valid Armenian General Exploration License – Attached with property description (Armenian & English), Valid and exclusive exploration rights to Hankavan and Marjan mines – Attached with property description (Armenian & English)

3.8 **Accounts Receivable:**
None

3.10 **Liabilities:**
None

(թվագրությունը նշված Բաժնի համաձայն բերված լինելով), բացահայտվում է հետևյալը.

3.1 Ձեռքբերված Ընկերությունը
ՍՀԱ, ՍՊԸ

Օրենսդրությունը
Հայաստանի Հանրապետություն

Այլ Օրենսդրություն
Չկա

Կապիտալիզացիա
Յուրիկ Լալազարյան    --    33%
Մայրեն Բատոյան        --    33%
Էդվարդ Ջանիբեկյան    --    34%

Գրանցման Վկայագիր և Կանոնադրություն
Կցվում են (հայերեն և անգլերեն)

3.2 Բացառություններ
Չկան

3.4 Ֆինանսական Հաշվետվություններ
Կցվում են

3.6 Գույք
Գործող Հայկական Ընդհանուր Հետախուզման Լիցենզիա --Կցվում է գույքի նկարագրության հետ (հայերեն և անգլերեն) Հանքավանի և Մարջանի հանքավայրերի Իրական և Բացառիկ Հետախուզման Իրավունքներ -- Կցվում են գույքի նկարագրության հետ (հայերեն և անգլերեն)

3.8 Ստացվող Հասույթ
Չկա

3.10 Պարտավորություններ
Չկան

3.11 Հարկեր/հասույթներ

3.11    **Taxes/Returns:**
No liabilities, no returns due, no audits

3.13    **Employee Benefits:**
None, no employees

3.14    **Legal Compliance with Law:**
**Government Authorizations:**
No exceptions, 25 year
Exploration License, Exclusive
Rights to Hankavan and Marjan
Mines – Attached (Armenian &
English), no exceptions to validity

3.15    **Legal Proceedings:**
None

3.16    **Absence of Changes:**

No disclosures applicable

3.17    **Contracts:**
Hankavan and Marjan Mines
Exploration Agreements Attached
(Armenian & English)

3.17(a)    **Contract Details:**
(see attached)

3.17(b), (c), and (d)    **Contract Matters:**
No exceptions

3.18    **Insurance:**
No insurance

3.19    **Environmental Matters:**
No exceptions

3.20    **Employees:**
No employees

3.22    **Intellectual Property:**
Not applicable

3.13    Պարտավորություններ չկան,
հասույթներ չեն սպասվում, աուդիտներ չկան

3.13    Աշխատողների Արտոնություններ`
Չկան, աշխատողներ չկան

3.14    Օրենքին Ենթարկվելը.
Կառավարական Լիազորություններ.
Առանց բացառությունների, 25
տարվա Հետախուզության
Լիցենզիա, Հանքավանի եւ Մարջանի
Հանքավայրերի նկատմամբ
բացառիկ իրավունքներ -- Կցվում են
(հայերեն եւ անգլերեն), իսկական
լինելու իմաստով բացառություններ
չկան

3.15    Իրավական Վարույթներ`
Չկան

3.16    Փոփոխությունների
Բացակայություն`
Կիրառելի բացահայտումներ չկան

3.17    Պայմանագրեր`
Հանքավանի և Մարջանի
հանքավայրերի
հետախուզությունների պայմանագրեր
Կցվում են (հայերեն եւ անգլերեն)

3.17(ա) Պայմանագրերի մանրամասները
(տես կից)

3.17(բ),(գ), եւ (դ)    Պայմանագրերի
Խնդիրները`
Բացառություններ չկան

3.18    Ապահովագրություն`
Ապահովագրություն չկա

3.19    Միջավայրային Խնդիրներ`
Բացառություններ չկան

3.20    Աշխատողներ`
Աշխատողներ չկան

3.22    Մտավոր Սեփականություն`
Չի կիրառվում

Not applicable

Very truly yours,

Հարգանքով՝

_Թամ․ Ջաաթեն Մաուրեն_
_ԱԹ Չ․ Ջաունրդան Սյան․_

_ՀՅամ․ Ջաաթ․ոճս Մաււրս_
_Յ ԵԸ Չ․ Ջաունրդ։ Սյո ։_

Sellers

Վաճառողներ

Buyer acknowledges receipt of the
Disclosure Letter of which this is a
duplicate (including the Appendices
referred to therein).

Գնորդը հաստատում է Բացահայտման
Նամակի ստացումը որի պատճեն է
հանդիսանում սույնը (ներառյալ սույնում
հիշատակվված Հավելվածները):

Dated: _____

Ամսաթիվ՝ _____

BUYER:

ԳՆՈՐԴ՝

By:

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

November 2, 2006

Scott Horton
(212) 336-2820
shorton@pbwt.com

Mr. Yurik Lalazaryan
66 Spandarian Street
Etchmiadzin, Armenia

Mr. Edward Janibekian
Apt. 44, b.18, A. Khachatryan Street
Yerevan, Armenia

Ms. Mayren Batoyan
Apt. 28, b.135, A. Babajanian Street
Yerevan, Armenia

Mr. Vardan Ayvazian
Building 22, Block 6
Apt. 16
Charentsavan, Kotaik Region
Armenia
10 Alex Manukian Street
Yerevan, Armenia

### NOTICE OF DISPUTE UNDER SECTION 11.5 OF DECEMBER 21, 2003 SHA, LLC SHARE PURCHASE AGREEMENT

Dear Ms. Batoyan and Messrs. Ayvazian, Janibekyan, and Lalazarian:

This firm represents Global Gold Mining, LLC ("Global Gold") which was the Buyer and your counterparty in the December 21, 2003 share purchase agreement (the "SPA") of all of your shares in the Armenian company SHA, LLC, the license holder to the Marjan and Hankavan mines. Mr. Ayvazian, you are named with the other sellers because based on information from law enforcement authorities, we have learned that in fact you were an undisclosed principal, reviewed and approved the SPA before it was signed, authorized its signature, controlled the transaction, and personally received payment of the purchase price. None of this was known to Global Gold at the time of the transaction. Nevertheless, under the governing law of the SPA stated in Section 11.15 of both the English and the Armenian language versions, you are personally jointly and severally liable for breaches as if you signed the contract in your own name.

Through this letter, and as contemplated in Section 11.5 of the SPA, Global Gold advises you that you have materially breached the SPA in a manner entitling Global Gold to monetary damages and equitable remedies. This letter begins the dispute resolution process provided in Section 11.5 of the SPA. There is now a thirty-day period to resolve our disputes on a good-faith, amicable basis prior to the right to commence international arbitration. For example, and without limiting the generality of the foregoing, the SPA represented and warranted that the licenses for Hankavan and Marjan were valid through 2017. In Mr. Ayvazian's official capacity, however, he has himself purported to terminate the licenses and in



November 2, 2006
Page 2

the case of Hankavan actually issued a competing illegal license to another company, which is a mere shell. In addition, there have been multiple interferences with Global Gold's and SHA's abilities to operate under the transferred licenses and a complete failure to act in good faith. All of this has been documented and unfortunately been made the subject of media attention and libelous statements by Mr. Ayvazian. This course of behavior and situation has resulted in actual and potential damage to Global Gold which if not corrected we expect to be in the millions of dollars.

In beginning this process, we hope that we can agree to a solution that will eliminate this damage and allow the actions agreed in the SPA to go forward as anticipated and agreed at the time. You or your attorney can contact me via the fax or email coordinates on this letter with a mandatory copy to Global Gold's Regional Director in Yerevan. You should understand that your diligent attention to this matter is necessary. As a convenience to you an Armenian translation of this letter is also provided. We look forward to an amicable resolution, but please be assured that if none is forthcoming promptly, enforcement of Global Gold's rights under domestic and international law will not be compromised.

Very truly yours,

*Scott Horton*

Scott Horton

Cc:  Global Gold Mining
      Greenwich, CT - Yerevan, Armenia

1321349v1

November 15, 2006-11-24                                        Yerevan


TO: Global Gold Mining
    Mr. Scott Horton
    (through lawyer Hrayr Ghoukassian)


Dear Sir,


I received your November 2, 2006, letter addressed to me, in which you are trying to put in claims towards me, as a shareholder/member of SHA LLC, that, allegedly, some provisions of the share purchase agreement (SPA) were violated that has become a reason for financial losses. In regard with this, I would like to state the following. The geological exploration license #076, which makes an indivisible part of the SPA and was provided to SHA LLC for the time period until April 5, 2017, refers to the implementation of geological exploration at deposits of metal and non-metal minerals and it has never had and could never have any relation to the exploration issues at certain deposits. In other words, the aforementioned license is a permit for implementation of such type of activities and nothing else. As for the issue of implementation of geological researches at certain deposits, then, according to the legislation, which was valid as of the day of the SPA signing, they were being regulated by a permit for implementation of geological and exploration works at relevant deposit, and it [*the permit*] is issued by the Ministry of Environment for a certain term. And attached to the SPA we transferred to you the permit #221 dated April 26, 2002, which was provided to SHA LLC for implementation of geological and exploration works at Marjan deposit. And the term of its validity was from II quarter of 2002–IV quarter of 2007. In addition to this, we transferred to you the permit #F-02-13/1 for Hankavan deposit, the term of validity of which was from III quarter of 2002– IV quarter of 2003. By the way, this factor is recorded also in paragraph 3.6 of the "disclosure letter."

Factually, these are the arrangements, which the LLC transferred to you under the agreement and which were assessed by you at the time of the agreement's signing as full-value from the legal point of view and enough for implementation of geological exploration at the afore-mentioned deposits under your own responsibility. As for the relationship, which was later established between you and the state authorized body, the shareholders/members have no any relation to it.

By the way, we appointed a shareholder/member of the LLC—Yuri Lalazarian, to the post of Executive Director of the LLC. And he continues holding this post and is competent for providing comments concerning the arrangements reached within the framework of the SPA.



And finally, as for the role, which was ascribed to Mr. Aivazyan in your letter, during the preparation and making of this transaction, I hear about it, as a shareholder/member, for the first time from you. And I would like to notify you that my actions in this issue were not directed by anybody.

Hopefully, these comments by me will clarify our relations.

Best regards,

/signature/

Janibekian

15.11.2006թ                                                         ք. Երևան


Գլոբալ Գոլդ Մայնինգ
պարոն Սբոտ Հորթոնին
(փաստաբան Հրայր
Դուլկասյանի միջոցով)


Հարգելի պարոն

        Ստացա իմ հասցեագրված Ձեր նամակը, որը թվագրված է 2 նոյեմբերի 2006թ.
և որում դուք փորձում եք իմ որպես ՍՀԱ ՍՊԸ-ի բաժնետեր ներկայացնել պահանջ
այն մասին, որ իբր բաժնետերերի գնման պայմանագրով նախատեսված
պայմանավորվածությունների մի մաս խախտվել է և պատռճառ դարձել նյութական
վնասներ: Այս կապակցությամբ ուզում եմ Ձեզ ներկայացնել հետևյալը: ԲԳՊ-ի
անիրավունելի մաս հանդիսացող ԵՈԻԴԼ N076 լիցենզիան, որը տրված է եղել ՍՀԱ
ՍՊԸ-ը միայն 2017թ. ապրիլի 5-ը ժամկետը, վերաբերվում է մետաղային և ոչ
մետաղային օգտակար հանածոների հանքավայրերում երկրաբանական
ուսումնասիրություն կատարելու գործունեությանը և որևէ առնչություն չունի և չեն էլ
կարող ունենալ կոնկրետ հանքավայրերի ուսումնասիրության խնդիրների հետ: Այլ
կերպ ասած վերը նշված լիցենզիան նման տիպի գործունեություն կատարելու
թույլտվություն է և որիշ ոչինչ: Ինչ վերաբերվում է կոնկրետ հանքավայրում
երկրաբանական ուսումնասիրություններ կատարելու խնդրին, ապա ԲԳՊ-ի կնքման
օրվա դրությամբ գործող օրենսդրության համաձայն դրանք կարգավորվում էին
համապատասխան հանքավայրում երկրաբանահետախուզական աշխատանքների
կատարման թույլտվությամբ, որը տրվում է ՀՀ Բնապահպանության նախարարության
կողմից կոնկրետ ժամկետով: Եվ ԲԳՊ-ին կից մենք Ձեզ ենք փոխանցել Մարջանի
հանքավայրում երկրաբանահետախուզական աշխատանքների կատարման
վերաբերյալ ՍՀԱ ՍՊԸ-ին տրամադրված 26.04.02թ. N221 թույլտվությունը, որի
գործողության ժամկետը նախատեսված էր II եռ. 2002թ-IV եռ. 2007թ.: Ինչպես նաև
Հանգավաճան հանքավայրի վերաբերյալ Ֆ-02-13/1 թույլտվությունը, որի գործողության
ժամկետն էր III եռ. 2002թ – IV եռ. 2003թ: Ի դեպ այս հանգամանքը արձանագրված է
նաև «բաժանագտնման նամակ»-ի 3.6 կետում:
        Ահա ըստ էության այն պայմանավորվածությունները որոնք ՍՊԸ-ը համաձայն
պայմանագրի փոխանցել է Ձեզ և որոնք Ձեր կողմից պայմանագիրը կնքելու պահին
գնահատվել են իրավական առումով լիարժեք և բավարար սեփական
պայմանավորվածությամբ ծգված հանքավայրերում երկրաբանական
ուսումնասիրություններ կատարելու համար: Թե հետագայում ինչպիսիի
հարաբերություններ են ձևավորվել Ձեզ և պետական կառավարման լիազոր մարմնի
միջև բաժնետերերը դրա հետ որևէ առնչություն չունեն:
        Ի դեպ ՍՊԸ –ի բաժնետերերից մեկը` պարոն Յու. Լալագարյանը մեր կողմից
նշանակված էր ՍՊԸ գործադիր տնօրեն և այսօր էլ աշխատում է այդ պաշտոնում,
միանգամայն իրավատաս է ԲԳՊ-ի շրջանակներում ծեռք բերված
պայմանավորվածությունների մեկնաբանությունների հարցում:
        Եվ վերջապես, ինչ վերաբերվում է Ձեր նամակում նշված պարոն Վ.
Այվազյանին վերագրված դերակատարմանը այս գործարքի նախապատրաստման և

կնքման ընթացքում ես որպես բաժնետեր առաջին անգամ եմ ձեզանից տեղեկանում այդ մասին և տեղեկացնում եմ, որ իմ գործողությունները այս խնդրում որևէ մեկի կողմից չեն ուղղորդվել:

Հուսով եմ, իմ այս մեկնաբանությունները պարզություն կմտցնեն մեր փոխհարաբերություններում:

Հարգանքներով Ձեր                          Էդ. Ջանիբեկյան

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

December 4, 2006

Scott Horton
(212) 336-2820
shorton@pbwt.com

Mr. Yurik Lalazaryan
66 Spandarian Street
Etchmiadzin, Armenia

Mr. Edward Janibekian
Apt. 44, b.18, A. Khachatryan Street
Yerevan, Armenia

Ms. Mayren Batoyan
Apt. 28, b.135, A. Babajanian Street
Yerevan, Armenia

Mr. Vardan Ayvazian
Building 22, Block 6
Apt. 16
Charentsavan, Kotaik Region
Armenia
10 Alex Manukian Street
Yerevan, Armenia

Re:    **CONFIDENTIAL DRAFT RESPONSE**

Dear Ms. Batoyan and Messrs. Ayvazian, Janibekyan and Lalazarian:

We have received a letter from Mr. Janibekian (the "Letter") dated November 15, 2006, received by Global Gold Mining, LLC Armenian Branch on November 24, 2006 in response to my letter of November 2, 2006. I am writing in response, as the Letter seemed to take the bizarre position that the sellers of SHA somehow did not actually transfer the valid "25 year Exploration License [with,] Exclusive Rights to Hankavan and Marjan Mines" despite the quoted language of Section 3.14 of the Disclosure Letter and the explicit terms of the Share Purchase Agreement. In the context of the quoted language, your response can be read to support a contention that the sellers perpetrated a fraud on Global Gold Mining, LLC (the "Buyer"). I would recommend that you take another look at the Share Purchase Agreement ("SPA") provisions.

The position taken in the Letter actually establishes a clear violation the SPA under the governing New York law, and thereby admits liability for all damages incurred by Buyer. We wrote to initiate good faith negotiations as called for in the SPA; this type of response (attempting to justify fraudulent behavior) is absolutely counterproductive. A Manager of Buyer is planning to be in Yerevan during the week of December 11. Please contact Ashot Boghossian if any of you would like to meet him to explore a good faith resolution; otherwise, we will have to plan to go ahead and pursue the International Chamber of Commerce arbitration in New York City option as agreed in the SPA.

With respect to the assertions made under Armenian law, we have consulted with local counsel, and based on that, bring the following to your attention:

December 4, 2006
Page 2

The Letter states that the exploration license No. 076 issued to SHA for the term until April 5, 2017 is not an exploration license, but just an "activity" license, and that it has "nothing to do with certain deposits." The Letter also states that "as for the exploration of certain deposits, according to Armenian law in force as of the day of signing the SPA, exploration works were regulated by permits issued for certain terms by the Ministry of Environment." The Letter further states that the participants of SHA and parties to the SPA, transferred mining rights for Marjan deposit only until the fourth quarter of 2007, and for Hankavan only until forth quarter of 2003. Despite the clear contractual provisions, the Letter claims that the Disclosure Letter section 3.6 reflects that circumstance.

However, Disclosure Letter section 3.6 refers to License No. 076 as the exploration license for Hankavan and Marjan mines, that license was made a part of the SPA and is attached to the SPA. It is sealed and notarized by Notary Office No. 1 in Yerevan. You signed the SPA at the Notary Office in person, before the Notary, in February 17, 2004. SPA Article 3.14 and the Disclosure Letter point 3.14 both state that SHA has an exploration rights for 25 years for both Hankavan and Marjan mines, with no exception. Armenian License Law, the only Armenian law regulating "activity" licenses, in force at the time of issuance of license No. 076 specifically states that Armenian License Law does not cover licenses for the use of minerals (Article 1, Armenian License Law). In addition, even if the law could possibly be read as the Letter, the Armenian License Law itself does not provide for the activity licensed in License No. 076. In fact, License 076 was issued under 1992 Armenian Mineral Code, and the Armenian Government specifically authorized the Ministry of Environment to issue such licenses as provided under 1992 Armenian Mineral Code. Thus, license No. 076 can not be a mere "activity" license under Armenian law, contrary to the claims set out in the Letter. The contractual as well as Armenian law are all quite clear that objectively the exclusive exploration rights to Hankavan and Marjan for 25 years were transferred to Buyer.

As of the day of signing the SPA at the Notary in Yerevan, Armenian Concession Law which was in force since in April 1, 2003 until today (note that this law entered into force almost eleven months before signing of the SPA), provides that mining rights shall be provided under licenses issued under Armenian Concession Law (including exploration licenses) (Armenian Concession Law Article 3). In fact, Armenian Concession Law specifies "licenses" as the only authorization to carry out exploration works at metal mines, such as Hankavan and Marjan mines, under Armenian law. The Armenian Concession Law does not authorize exploration at metal mines and deposits "under permits for explorations works issued by the Ministry of Environment" as you stated in your letter. In addition, Armenian Concession Law Article 76 acknowledges mining rights held by license holders before Armenian Concession Law entered into force (before April 1, 2003, such as the license No. 076 at issue), and specifically states that the terms of the new licenses under Armenian Concession Law issued by the Ministry of Environment to replace the licenses held by the license holders before Armenian Concession Law entered into force, shall be the same as the terms of the licenses issued before Armenian Concession law entering into force (Armenian Concession Law Article 76).

1328862v2

December 4, 2006
Page 3

It is now surprising to learn from the Letter that Hankavan mining rights, for example, were valid until only the end of 2003, while the SPA transferring the Hankavan mining rights was signed by you and other SHA former participants at the Notary only on February 17, 2004. Considering the clear representations you and other SHA participants made in the SPA, and the fact that the SPA was signed by you before the Notary in person, it is inexplicable to see the Letter make clearly contradicting representations.

Regarding Mr. Aivazyan's role in this transaction, it is enough to note that we already have information to support the claim against him; you may want to reconsider the position taken in the Letter.

The content of this letter is for settlement and compromise purposes only and cannot be used for any other purpose. Neither this letter nor its contents may be introduced as evidence against Buyer or any affiliate on any issue or be used to bind, prejudice or estop Buyer or any affiliate in any way.

I hope this response is helpful in your understanding the actual standing of this matter, and I again encourage you to be in touch to attempt an amicable, negotiated resolution. Thank you for your attention to this matter.

Very truly yours,

Scott Horton

cc:     Global Gold Mining
        Greenwich, CT - Yerevan, Armenia

1328862v2

**UNOFFICIAL TRANSLATION**

FROM:       ROA Deputy Minister of Environment
TO:         Ashot Boghossian,
            Director of Yerevan Representation of the Company
            (Please deliver to Scott Horton)
DATE:       December 8, 2006
NUMBER:     0000452

Sirs,

We were informed through your representatives of the November 2, 2006 letter on behalf of Patterson Belknap Webb & Tyler LLL, which was signed by Scott Horton and addressed to Yu. Lalazarian, Ed. Janibekian, M. Batoyan and ROA Minister of Environment Mister V. Aivazyan.

It is evident from the letter's implication that an attempt is made to personalize the problems of administrative-legal nature arisen as a result of illegal actions by Global Gold Mining Company, and to transfer them to another level. It is quite clear that some irresponsible companies may disapprove the administration implemented as a result of fulfillment of the Minister's official powers. However, it does not provide you with the right to address a slanderous letter of disrespectful and threatening nature to an official of another country, who holds a political post, trying to hamper the fulfillment of the latter's powers, through concealing it as a letter addressed to citizen Vardan Aivazyan. The behavior exhibited in the letter is not only a gross violation of principles fixed in the international law norms, but is also an evident manifestation of complete absence of lawyer's professional ethics. To avoid your, including the represented sides', possible responsibility provided under the law, I suggest that you submit comprehensive information and evidences confirming the facts mentioned in the aforementioned letter to the Ministry and relevant bodies during 10 days.


/signature/
Arsen Darbinian



# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

December 19, 2006

Scott Horton
Partner
(212) 336-2820
shorton@pbwt.com

Mr. Arsen Darbinian, Deputy Minister of Environment
Republic of Armenia
Yerevan, Armenia

Dear Deputy Minister Darbinian:

I am in receipt of your December 8, 2006 letter and refer you to my November 2, 2006 letter and more recent letter dated December 4, 2006, to the four addressees thereof, including Mr. Vardan Ayvazian.

In response to your letter, I specifically note that my November 2 and December 4 letters, Mr. Ayvazian is not addressed in an official capacity, but rather is addressed in his personal capacity. Your characterization of my letter, as an effort to sway or influence the functioning of a ministry, is baseless. I also do not understand the basis for your response on Mr. Ayvazian's behalf - no power of attorney or other authorization is shown.

I had earlier sent a letter, dated June 20, 2006, to Mr. Ayvazian in his official capacity, addressing substantive issues concerning specific licenses, but neither you nor he chose to respond to that letter.

I hope this response is helpful in your understanding the actual standing of this matter. We regret that Mr. Ayvazian did not avail himself of the opportunity we gave to meet last week with a manager of Global Gold Mining, LLC to attempt an amicable, negotiated resolution.

Thank you for your attention to this matter.

Very truly yours,

Scott Horton

cc:    Global Gold Mining
       Greenwich, CT - Yerevan, Arm

July 6-7, 2006

# "IF MINING GOLD IS NOT PROFITABLE, LET THEM GO AND SELL GREENS"

## Says the Minister of Environment Mr. Vardan Ayvazyan

- *Mr. Ayvazyan, the relations between the Ministry of Environment of RA and the companies "Ararat Gold Recovery Company" (AGRC) and "Global Gold Mining" seem to have become strained. What is the conflict about?*

- Our relations cannot go beyond or under the scopes stipulated by the law. That is, a company engaged in gold mining, naturally, has certain obligations and the state – as a regulatory body – should conduct the relevant controls. All companies engaged in mining shall respect the laws of this country, respect and follow them strictly. Now, a few words about AGRC. For some reasons, no inspections have been conducted at this company before the years 2002-2003. After the year 2003 we made some inspection works and revealed violations. Reserves of about 460 grams of gold had been concealed. Violations for about 1 ton are registered by the second assessment act.

- *But the second act was for 600 kg.*

- No, it was about 1 ton. Our studies and assessments showed that the total estimated cost of the difference in unpaid mining fees and the missing ore amounted to 1 ton. The assessment act has been submitted to the Tax Inspection and to other relevant bodies.

- *But the lawyer of the company Mr. Armen Ter-Tachatyan states that it is impossible to conceal the earth for one ton of gold.*

- If they extract the rich mineral bodies containing 8-10 grams of gold and don't extract the adjacent 1-2 grams, they impoverish the ore and the mine. And now when we see that they went through that territory and didn't extract 1 gram which you should have extracted, and now it should be written (as concealed), they treat it very negatively. Let their lawyer say whatever he wants. The state has provided you with national treasury, you should go with the plan. Not only you are obliged to mine the rich ore, but also the poor. No one allows you to mine the gold from wherever you want. The mine shall be mined equally. They may dispute and say many things, but I can give you one fact, which is our achievement, that in the years of 2001-2003 the content of gold in 1 ton of ore at Zod was presented as being 2,4 grams, while after our first inspections in the years 2003-2005 it has become 6,8 grams. There are also violations of other nature – starting from the investments and the quantity of cyanide used for extraction of gold. I don't know what investments they made. From the technical aspect, they haven't used the newest equipment (though I think it is a secondary issue). There have been numerous accidents, which have led to death of people and criminal suits. The average salary is low, etc.

- *You turned down their proposal to construct a new plant in the Lake Sevan basin. The Director of AGRC says that they have submitted the second proposal, which is 35 km far from Sevan. They say you turned down that proposal as well.*

- We turn down locations concerning the Lake Sevan basin. They proposed to construct a plant in the Lake Sevan basin twice, and we turned that down twice, since the issues we are having with Sevan are valued more than the gold. Whether they agree or not, they are in Armenia and they have to act in accordance with our laws. We have also registered that the mining they are conducting is done in a very rough manner, i.e. the works envisaged under the working plan are not being implemented. Besides, the other thing, they say that everything is bad, we suffer losses, the transportation expenses are very high and we don't make profit from mining gold. Well. Let them go and sell greens then. If companies don't make profit from gold mining, what

else they are making profit from? If it's bad, drop it, we will take it back. Who said you are the God's only chosen people to mine that mine.

- *The managers of AGRC have applied to you to propose a suitable location for the plant.*

- Pardon me, if I suggest him to construct the plant on the other side of Dilijan or Vardenis, where there is no communication, no rail line, no electricity line, will he agree? Then he will say I did it deliberately, because I don't want to assist them as the investors. The plant, when we were selling and they were buying, was in Ararat. Besides, they were supposed to build an enrichment plant in Meghradzor. Did they do it? Not until today. Well, what is the reason? Why it was not done? Is this a breach of agreements, or what? True, afterwards we compromised. And now when we are telling him just once, hey boy, work properly, they feel uncomfortable. If we did the same thing in their country they would kill us with slingshots.

- *OK, but if you are so displeased with AGRC and you discovered so many violations, why haven't you taken the relevant measures for such a long time?*

- I have already proposed to the government to deprive this company of the right to exploit the Zod property. Since they have purchased the gold plant, let them work it properly. I shut down that plant for 3 months, since the release of cyanide was higher than the norm.

- *AGRC was a joint venture before, with 50/50 shares, the share of each of the two companies in the charter capital was USD 11 million. In the year 2003, when the Indians purchased the remaining 50 percent from our state, they paid only USD 3,5 million. Don'' you think that USD 14,5 is too small of an amount for a mine promising 80 tones of gold?*

- It is none of my business. In my opinion, as a mining company they don't do their work property, and they feel very bad if they are reprimanded for it. I know one thing, if they don't work properly, they will answer for it to the full extent. No matter what kind of investors they are – big or small, famous or unknown. I'd like to repeat – I can't understand how it is possible to make no profit from gold mining. If I punish a fisherman in Sevan who wins his family's daily bread by that, how can I leave this company unpunished? Won't you ask how it happened?

- *You have mentioned that no assessments were conducted at that plant before the year 2003, wide opportunities had been given to them in the course of time. Don't you think that such violations were due to these extensive opportunities?*

- It might be so, but now, if they want to work, they should carry out all their obligations.

- *You seem to be in the same conflict with the company "Global Gold Mining" (GGM).*

- There is no "Global Gold Mining" company registered for geological explorations at the Ministry of Environment, I don't know them. In this case, so called mining rights were provided to SHA and Athelea companies. However, the local companies which took the mine for exploration or mining, having no investment means, transferred its actives to another company, which became the founder or the owner of that company. At present, the Ministry of Environment has deprived SHA company of the exploration right. In 2002 that company was provided with the special license for 5 years for Marjan property, and for 3 years for Hankavan property. Hankavan mine exploration license expired in December 2005. No works were done in Marjan during the years of 2002 – 2006, and we deprived him from the license.

- *They say it is a border zone, that is why they had difficulties, and they bring paper bureaucracy as another reason for the delay.*

- If it's a border zone, we say return it to the state, why should you go there, if you go you may get shot. And I know that they have purchased and resold a number of deposits in Armenia – "Terterasar", "Sipan-1". It makes profit as well.  And now they declare openly throughout the world that they explore for uranium in Armenia. RA law regulates clearly that exploration for

radioactive materials shall be done in accordance with a certain procedure determined by the government. It is not greens, it is radioactive material. And it is utterly incomprehensible, that Athelea LLC purchased by GGM doesn't mention in its plan what it is exploring for.

- *But they say that they send the ore to the laboratory to assay its content. It might be uranium there too.*

- No problem, but he should have a permission for that.

- *But he has an exploration license.*

- He has a license to explore for gold, on the way to explore gold he sees that there is also uranium there. He must say, Mr. State, I work in your country and I found radioactive material, what do you say. And I apply to the government, which is to decide what to do. Not that I get up and declare around the world that I found uranium. And I say to him, Athelea LLC, if you don't tell me during three months what you found, I will deprive you. It turns out as if the employees of GGM are to decide themselves whether they should be engaged in uranium in Armenia or not. And I am being asked from abroad: hey, are you about to engage in uranium mining? How am I to know where the roots of this company go to, I don't know? I didn't know what kind of a company this GGM is, because the licenses were given to SHA and Athelea.

- *In relation with Marjan deposit your specialist said that there were new proposals made.*

- Yes, we are also working out a new procedure of geological exploration and exploitation of deposits, to rule out such re-sale and to organize exploitation of mines through tenders that would make them pay to the state.

- *Was the proposal for Marjan submitted by a local or a foreign company?*

- Frankly speaking, I don't care about it, the important aspect is that it should do its work. We have 139 registered explorations, I don't' know which of them are local and which are foreign. But I know that foreign companies are very interested in metal deposits, particularly – in non-ferrous metals.

- *Mr. Ayvazyan, the managers of the both companies imply that your expectations of them have increased, that is why the relations have become strained.*

- What kind of expectations, I have taken money and now I want more, isn't it? Well, let them pay me and get rid of the problem. Paying the first time is always the most difficult, and after that they will go on by paying …How come they don't pay? I have said and I repeat: both companies should act within the scopes of their obligations and the laws of RA.

Armine Avetyan